IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VIRGINIA LOO FARRIS,  )  )  Plaintiff  )  )  v.  )  )  CONDOLEEZA RICE,  )  )  Defendant  ) | Case No. 05-1975 (RMU) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF VIRGINIA LOO FARRIS' MOTION
FOR PRELIMINARY INJUNCTION**

The Plaintiff Virginia Loo Farris ("Plaintiff" or "Loo Farris"), through counsel, hereby

files this Memorandum in support of Plaintiff Virginia Loo Farris' Motion for Preliminary

Injunction.

**SUMMARY OF THE FACTS**

Virginia Loo Farris is a thirty-four year veteran of the United States Foreign Service.

See Curriculum Vitae at Ex. 4.   She is a recipient of the Secretary of Defense Civilian

Meritorious Honor Award, the United States Information Agency Director's Award for Superior

Achievement, two Department of State Meritorious Honor Awards, the Department of State

Franklin Award, and three United States Information Agency Meritorious Honor Awards. Id.

Ms. Loo Farris brought this case under Title VII of the Civil Rights Act of 1964, 42

U.S.C. 2000 et.seq., against the Department of State, through Condoleezza Rice, as Secretary of

State for the Department of State ("the Defendant" or "Department"), for unlawful

discrimination and retaliation. During the 1999, 2000, 2003, and 2004 bidding cycles, Defendant

1

Department of State did not choose Ms. Farris for certain positions. Complaint, ¶1. The Department wrongfully retaliated against Ms. Farris by investigating her, Complaint, ¶1, removed her from two Deputy of Chief of Mission short lists, id., denied her training and assignment after her tentative selection as Public Affairs Counselor Beijing, and, despite the absence of other bidders, deferred consideration of her assignment as Public Affairs Counselor in Jakarta, and as Public Affairs Counselor in Riyadh. Id. The Department of State has denied Ms. Farris the opportunity to remain in the Foreign Service through an extension of her "Time in Class" ("TIC"), thereby forcing Ms. Farris to retire at the end of September 2006, Complaint, ¶1, unless this Motion for Preliminary Injunction is granted.

The concept of Time In Class requires foreign service officers to be promoted to the next rank within a certain time, typically seven years, or be compelled to retire. 22 U.S.C. §4052 (mandatory retirement). Ms. Loo Farris was promoted in 1998, and without a promotion to the next rank, that of Minister Counselor, she must retire at the end of September 2006. Declaration of Virginia Loo Farris ("Farris Dec."), ¶ 13. Ex. 23.

After Ms. Farris-made an EEO complaint, she was "low-ranked," meaning that she was placed in the bottom five percent of all Foreign Service officers. Being low-ranked is a status that essentially precludes any promotion. Farris Dec., ¶ 12. Ex. 23. After leaving Thailand Ms. Farris earned efficiency reports and awards, which precluded her continued inclusion on the "low-ranked" list. However, she remained the subject of retaliatory actions until ultimately the Department was able to force her involuntary retirement to be effective on September 29, 2006.

## ARGUMENT

In order to grant a preliminary injunction, this Court must apply a balancing test considering four factors: "(1) plaintiff's likelihood of prevailing on the merits, (2) the threat of

2

irreparable injury to the plaintiff in the absence of injunctive relief, (3) the possibility of substantial harm to other interested parties from the injunctive relief; and (4) the interests of the public." Zervas v. District of Columbia, 1992 U.S. Dist. Lexis 9774, 1 *quoting* Foundation on Economic Trends v. Heckler, 756 F.2d. 143, 151 (D.C. Cir. 1985).  These factors are balanced against each other and "are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunction relief is warranted." Lee v. Christian Coalition of America, 160 F. Supp. 2d 14, 34 (D.C. Cir. 2001)(citing CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)); Int'l Ass'n of Machinists & Aero. Workers v. Nat'l Mediation Bd., 2005 U.S. Dist. LEXIS 11881 (D.D.C. June 20, 2005) (citing CityFed Fin. Corp., 58 F.3d at 747 ("An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.")).

Courts generally base a preliminary injunction on less formal procedures and on less extensive evidence than in a trial on the merits. See Cobell v. Norton, 391 F.3d 251, 261 (D.C. Cir. 2004) (citing Natural Res. Def. Council v. Pena, 147 F.3d 1012 (D.C. Cir. 1998). Specifically, this Court "may rely on the sworn declarations in the record and other credible evidence in the record" that may not be admissible at a trial. See AFGE v. District of Columbia, 2005 U.S. Dist. LEXIS 8326,*10 (May 2, 2005) (citing Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981)).    Under the local rules, federal courts in the District of Columbia encourage the resolution of preliminary injunction motions on the papers.

**I.    PLAINTIFF WILL PREVAIL ON THE MERITS BECAUSE THE DEFENDANT HAS DISCRIMINATED AGAINST THE PLAINTIFF BECAUSE OF HER RACE AND GENDER.**

    **A.    Plaintiff Has Established a Prima Facie Case under McDonnell-Douglas.**

To obtain a preliminary injunction, Plaintiffs need not show that they would prevail, only that they have "a substantial case on the merits." Megapulse, Inc. v. Lewis, 672 F.2d 959, 970, n. 56 (D.C. Cir. 1982). Plaintiff has made out a substantial case on the merits. She made out a prima facie case of unlawful discrimination based on her disparate treatment and has shown pretext based on inconsistent and apparently false statements made to her throughout the bidding process.

There were at least two positions amongst those for which Ms. Farris initially bid in 1999 which warrant closer scrutiny and were the subject of administrative claims, a political counselor position at the USNATO post, and a subsequent Political Advisor (POLAD) position at The Hague, where white male foreign service officers were selected. Although the Department has never produced documents on The Hague POLAD position, and thus there is little information on the white male selected there, the successful candidate for the USNATO position was a white male substantially junior to Ms. Farris. Farris. Dec., Ex. 23, ¶8. Ms. Farris was passed over for two white male officers, for these two different slots, and thus has established a prima facie case.

**B.    There Is Evidence of Pretext, as the Department Either Lied to Ms. Farris or Changed Its Position on Cedes to Bypass Ms. Farris for the NATO Position.**

"Cedes" are personnel actions where the Personnel Bureau waives the rank requirement on an advertised, or open, assignment — either because no officer of the required rank and eligibility to fill a given position has bid on the assignment, or under extraordinary circumstances, because a senior foreign service officer declares their lack of interest in said position and allows the Department, in contravention of standard operating policy, to accept a bid by an officer junior in rank. James Whitlock, Ms. Farris' career development officer, states in a February 8, 2000 e-mail that cedes are not granted where a senior bidder at grade is bidding for a job. Ex. 1 hereto. Whitlock earlier confirmed that such cedes were appropriate only where

4

there were no senior bidders.  Jan. 31, 2000 e-mail, Ex. 2.  Robert Dance describes a cede as a

position "when, for example, a senior level assignment cannot be filled by a senior level officer."

Dance Statement, Ex. 3, at 5.  It is undisputed that Ms. Farris was a senior foreign service officer,

and that she was bidding for the position at USNATO, which should have been awarded to Ms.

Farris.  Since she did not withdraw her bid no "cede" should have been granted.

 Ms. Farris had many years of managerial experience and of directing her own

departments within embassies and at headquarters, including the supervision of dozens of

employees.  She had also worked on a joint unified command staff and had graduated from the

National War College.  See Curriculum Vitae of Ms. Farris at Ex. 4.  Andrew Goodman, who

obtained the US NATO position instead of Ms. Loo Farris, had NATO experience as a mid-level

officer but no substantial managerial experience.  See Robert Hall e-mail attached as Ex. 5.

 Evidence that the Department's rationale is false, or other inconsistencies and

inaccuracies that raise questions of credibility as to defendant's assertions, shows pretext that is

sufficient for Ms. Farris' claims to survive summary judgment.  Reeves v. Sanderson Plumbing

Products, Inc., 530 U.S. 133, 146, 147 (2000).  Here, multiple inconsistencies, and the contrast

between what Ms. Farris was told at different times, show that the Department's shifting

rationales for denying Ms. Farris assignments were false and raise questions about the credibility

of Department witnesses.

 Without a "cede" from Ms. Farris, Mr. Goodman was not even eligible to be considered

for the USNATO position.  See Robert Hall e-mail of 3/15/00 at Ex. 5.  Mr. Tiernan thus

pressured Ms. Farris to withdraw her bid for the USNATO position entirely.  Thomas Tiernan e-

mail of 5/14/00 at Ex. 6.  Mr. Tiernan strongly advised Ms. Farris to take the PAO Athens

5

position, id., (which confirms that under Department policy, they could not simply grant a

"cede") and clear the way for the junior white male officer to take the USNATO position.

In this case, Ms. Farris, a senior officer, was applying for the USNATO position.  For

that reason, another senior Foreign Service officer e-mailed to Ms. Farris his view that the

Department might be compelled to give her the USNATO position.  Hall e-mail at Ex. 5.  The

Department's own operating procedures state that such cedes are in any case rare.  Operating

Procedures at Ex. 7, p.2, 5th paragraph.  However, in this case, the Department took an

extraordinary step and "ceded" the USNATO position that Ms. Farris had bid for, even though

she was the only senior officer bidding.  Ex. 8.

Plus, the Department again can produce no final documents on applicable assignment

procedures in 1999, just draft documents.  See Chandler letter of April 27, 2004, Ex. 9.

Mr. Goodman, who received the USNATO position, "isn't that popular with the troops

here – and probably is a pretty poor manager, too."  Ex. 5, at bates 627.  That e-mail from a

senior Department officer, who routinely served as acting USNATO Deputy Chief of Mission,

suggests that Ms. Farris would be hard pressed not to get that USNATO position due to her

seniority.  Id.

That e-mail also notes inexplicably that Ms. Farris' name was apparently not on the bid

list, as "there were no SFS [senior foreign service] applicants," Ex. 5, at 626, yet Ms. Farris in

fact did bid for that position earlier, by November 19, 1999, and reiterated her interest on

December 22, 1999 and other occasions. Ex. 10.

Thus, as to the USNATO position, there was a comparator, Mr. Goodman, and the

Department's position that the white male was chosen in part due to his management skills,

appears to be false, given e-mail produced by the Department from a senior foreign service

6

officer, experienced at serving for extended periods as acting USNATO Deputy Chief of
Mission, that questioned Mr. Goodman's management skills.   Ex. 5.

### C.    Other Inconsistencies Raise Questions of Credibility

Plus, the only way for the below grade white male to obtain the job was through a "cede,"
which Mr. Dance's own affidavit (ex. 3) suggests, and Mr. Whitlock's e-mails (ex. 2) confirm,
should be granted only if there is not a senior officer bidding for the job.  Ms. Farris was a senior
officer bidding for the job, and a cede would be especially inappropriate in this circumstance.

There are other inconsistencies in the Department's explanations.  Ambassador
Alexander Vershbow denied that Mr. Goodman was preselected for the position, and stated that
he was chosen "at the very last minute." Ex. 11. Answer to question 14, at bates 233.  The
"shoot-out" between Ms. Loo Farris and Mr. Goodman occurred on June 6, 2000.  However, Mr.
Tiernan of the European Bureau, in contrast, was demanding Ms. Farris to withdraw because Mr.
Goodman was allegedly going to get this position in any case, as early as May 12.  Deposition of
Thomas Tiernan ("Tiernan Dep."), Ex. 12, 117-18; E-mail of Thomas Tiernan, Ex. 13 bates no.
598.  Tiernan had requested that Ms. Farris withdraw to clear the way for Mr. Goodman to obtain
the position without having to obtain a "cede." Ex. 3. Obviously, if Mr. Goodman was selected
at the last minute, Ms. Farris would not have been pressured to withdraw.

The facts are that there was enormous pressure on Ms. Farris to withdraw because
without her withdrawal the Department would have been compelled to select her for the
USNATO position under normal procedures.  When she would not withdraw, the Department
just bypassed her anyway.   Tiernan Dep. at 120.

**D.    Ms. Farris Was Passed Over for The Hague Position and Later Told a Blizzard of Inconsistencies As To What Happened**

After initially inquiring about The Hague POLAD position with Patrick Moon in October 1999, Patrick Moon Statement, Ex. 14, at bates 286, and being told that it was filled, Ms. Farris again inquired about The Hague POLAD position on November 17, 1999 when it remained on the bid list. Ex. 15, second paragraph. Her CDO Mr. Whitlock informed her that to his knowledge the position was still open on November 18, 1999. Ex. 16. Ms. Farris thus bid on the job no later than November 19, 1999, according to the records. Ex. 17. Then on November 21 Ms. Farris was informed that the short list had gone forward, to a commanding general, apparently without her name. Ex. 18.

By December 22 Ms. Farris noted that a list sent by Mr. Whitlock showed that The Hague POLAD job was on a hard-to-fill cable, which was inconsistent with the existence of any bids and short lists already having been submitted. Ex. 19. This suggested that Ms. Loo Farris had been misled earlier. The hard-to-fill designation is apparently used, and possibly misused, to allow an otherwise ineligible bidder to bid early or out-of-cycle. See excerpt from Department disclosure regarding Open Assignments 1999-2000, Ex. 20, pages 4 and 5, bates no. FAR-751-52.

Mr. Moon provided a first affidavit dated December 3, 2001 where he disclaimed even any knowledge of The Hague POLAD position. Ex. 14, second document, response to question 4. But in his later declaration of September 4, 2002, Mr. Moon recalled that The Hague POLAD position was actually based in the close by town of Brunsum, and went to a Mr. Jack Segal, a white male foreign service officer. Ex. 14, first document, response to question 18. Unlike Mr. Whitlock, who had told Ms. Farris that the list had gone to a commanding general, Mr. Moon stated that a short list went to NATO authorities. Ex. 14, response to question 17. So no one can

8

tell who made the final decision. Mr. Tiernan stated that the Department of Defense made such decision. Tiernan Dep. at. 54, 59-60. Regardless of who made such decision, it is clear that the State Department submitted a short list, which had to have gone through Mr. Tiernan, Tiernan Dep. at 58, and given its disappearance may well have contained only one name. That State Department shortlist may have been generated by the NATO desk at the State Department, as Mr. Tiernan testified, id., but the list went through Mr. Tiernan to Human Resources at State. Id. at 59. Such document must exist somewhere if Mr. Tiernan is correct. Then according to Mr. Tiernan, Human Resources at State made the final decision but that was little more than a "rubber stamp" of a DoD decision based on an unwritten agreement between State and DoD. Id. at 59-60.

Mr. Moon seemed to recall nothing about the position in his 2001 affidavit, but somehow recalled much more a year later, in 2002, including talking to Ms. Farris about it and indicating who was selected.

Thus, the Department's own witnesses have testified variously that short lists were passed to a commanding general, to NATO authorities, or to DoD, which person or persons then made the decision on the job – or maybe not, since the State Department's Human Resources people had a final say, which was possibly no more than a rubber stamp. In any case, it appears undisputed that the Department prepared a short list of candidates, which might well have been limited to one person, but did not include Ms. Farris. The Department's inconsistent statements, and completely contradictory statements to Ms. Farris, show substantial evidence of pretext.

Ms. Farris was misled by the Department in several instances about The Hague-POLAD position. She kept trying to apply, but another foreign service officer was selected, who was a white male. The State Department had the discretion to submit its list of candidates, and their

9

candidate was chosen. The Department apparently did not even put Ms. Farris on the list to be submitted to NATO, ensuring that there was no way she could be chosen for this position. The Department itself cannot even agree on who made this selection, but various witnesses reference various other decisionmakers. Mr. Tiernan testified that the list for this position went through him but fell back on the argument that the Department of Defense made the final selection. Tiernan Dep., Ex. 12, at 54, 59, 60. Mr. Moon of the Department in his affidavit stated that the final choice was made by NATO authorities. Ex. 14, second document, at 2. However, Ms. Farris' allegation is that the Department would not even consider her for inclusion on a short list, ensuring that she could not be chosen.

### E.    Retaliation

It is also undisputed that Ms. Huhtala was aware of Ms. Farris' prior protected activity, that is, her EEO complaint. Deposition of Marie Huhtala, Ex. 21, at 33, and Ms. Huhtala admitted that she was surprised by such complaints from Ms. Farris. Huhtala Dep., Ex. 21, at 35. Ms. Farris' formal EEO complaint was filed on September 6, 2000. Ex. 22. Indeed, Ms. Farris had directly complained to Ms. Huhtala, as well as to Ambassador Hecklinger at the Embassy in Bangkok, alleging wrongful discrimination. Huhtala Dep., Ex. 21, at 33, 34 (as to Huhtala).

## II.    PLAINTIFF WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF INJUNCTIVE RELIEF

Plaintiff must show irreparable harm to obtain a preliminary injunction. Lee, et al. v. Christian Coalition of America, Inc., 160 F. Supp. 2d 14, 28, 45-47 (D.D.C. 2001). In Lee, this Court found the irreparable harm requirement satisfied, because if defendant could terminate plaintiffs, plaintiffs would have had to use public assistance, which would count against the five-year limit for certain types of public assistance. Such assistance, if taken by plaintiffs there, would count against the time limits for plaintiffs.

A.    **Every Day Of Forced Retirement Will Cut Time Off the Time From Ms. Farris' Employment At the State Department If She Is Reinstated**

Similarly, as to Ms. Farris, under the regulations for the Foreign Service, she must retire at age 65, or in May 2013, just less than seven years from now.   22 U.S.C. §4052(a)(1).   If this case were to continue, and she would be then reinstated, for example in 2008, she would have only five years remaining until retirement.   That shorter time period would inevitably limit the time that Ms. Farris has available for career assignments, overseas posting, and possible promotion.   Each day that she is out of the Foreign Service will inevitably decrease the remaining time that she would otherwise spend in the Foreign Service.

Ms. Farris meets the requisite irreparable injury standard because there is no adequate remedy in the absence of a preliminary injunction. If this Court declines to issue an injunction, Ms. Farris will be forced to end her Foreign Service career prematurely.

B.    **Ms. Loo Farris' Life Is Intertwined With Her Thirty-Four Year Career**

The most important criterion for determining whether irreparable harm exists is whether a plaintiff may obtain "adequate compensatory or other corrective relief at a later date" without an injunction. O'Donnell Const. Co. v. D.C., 963 F.2d 420, 428 (D.C. Cir. 1992) (citing Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)).   This Court has previously cited prospective termination of a federal government worker after a long career as irreparable harm warranting a preliminary injunction. Bonds v. Heyman, 950 F.Supp. 1202, 1215 (D.D.C. 1997) (abrogated on other grounds).   In Bonds, the plaintiff, a federal employee of the Smithsonian Institution, claimed she was being denied a promotion and was scheduled for termination in retaliation for having brought a prior lawsuit.   The Court held that because plaintiff worked her way up at her employment and obtained a senior level position, if terminated, she would not be able to find work approaching her current position, or she might not

11

be able to find work at all. Id. The Court further noted that the fact plaintiff could retire and be entitled to 80 percent of her high three salaries, but chooses to fight to keep her job stating, "It is telling that Bonds has tenaciously fought not only to stay employed but to be promoted as well given her age and tenure." Id. The Court took that to be a testament to how much of her life is tied into her career, and how harmed she would be if it were to end prematurely. The Bonds case is just like the case at bar.

If Ms. Farris could be terminated under such circumstances, based on a lack of promotion, such termination would have a chilling effect on future employees who were thinking about bringing an EEO claim. Valid policy reasons exist for at least preserving the status quo and staying any compelled termination until this case is decided.

Ms. Farris has put in thirty four years in the Foreign Service. Farris Dec., ¶3. Ex. 23. Despite her age and tenure, she is still fighting for the opportunity to continue to work. At the age of 58, Ms. Farris, like Ms. Bonds of the Smithsonian Institution, would be unable to find a comparable position anywhere else if forced to retire. Further, reintegration of an officer who is retired from the Foreign Service is difficult, and Ms. Farris would miss normal bidding cycles, potentially losing positions for which she is most qualified to junior and less qualified candidates. Declaration of former Deputy Assistant Secretary of State for Personnel Barbara S. Harvey, ¶5. Ex. 24. Thus, once Ms. Farris is forcibly retired, and she is replaced on all the rolls and bidding procedures, she cannot simply come back into the Foreign Service, without a jarring transition that will adversely affect any future career. Farris Dec., ¶ 14. Ex. 23.

## III.    NO OTHER PARTY WILL BE SUBSTANTIALLY HARMED IF THE INJUNCTION IS GRANTED

Courts balance the respective hardships imposed upon the parties when evaluating whether other parties would suffer if a preliminary injunction is granted. See O'Donnell, 963

F.2d at 429. Ms. Farris has been recognized on many occasions for excellence in her position. She has won numerous meritorious awards and cross-departmental recognition from the United States Government to include, the Secretary of Defense Civilian Meritorious Honor Award, the United States Information Agency Director's Award for Superior Achievement, two Department of State Meritorious Honor Awards, the Department of State Franklin Award, and three United States Information Agency Meritorious Honor Awards. Ex. 4.    She has consistently received praise from her supervisors in her reviews. Farris Dec. ¶ 4. Ex. 23.  She was working productively on tsunami relief work, and the need for officers who perform relief in third-world countries has never been greater.

Not only would the Department of State not be harmed by the granting of this injunction, but it would undoubtedly benefit from Ms. Farris' continued service given her experience and qualifications.

Ms. Farris was willing to be posted to the Middle East, where there is a great need for officers in the area of public diplomacy, Ms. Loo Farris' specialty.  The foreign service needs seasoned officers in the area of public diplomacy like Ms. Farris.  In fact, it seems insane as a common sense matter to force an officer like Ms. Farris into retirement at a time when the United States should be redoubling its efforts in public diplomacy in the third world.

In her most recent position in Washington, for example, there is no apparent successor to Ms. Farris.

## IV.    THE PUBLIC INTEREST LIES IN FAVOR OF PRESERVING THE STATUS QUO AND ISSUING THE INJUNCTION

This Court has held that issuing an injunction serves the public interest by ensuring that employers do not take retaliatory actions when employees file discrimination complaints. Lee v.

13

<u>Christian Coalition of America</u>, 160 F. Supp. 2d 14, 34 (D.C. Cir. 2001).   Certainly allowing

the State Department to retire Mrs. Farris forcibly would have a chilling effect on other

employees.  State Department employees would know that making EEO complaints would

potentially taint their career.

## V.    FACTS SUPPORT THE NEED FOR PROMPT TREATMENT OF THIS MOTION

Under the current schedule, Ms. Farris will be involuntarily retired on September 29,

2006.  She requests prompt treatment of her Motion, which would be better addressed by

September 29, 2006.  As time that passes after that date, it will be more difficult to reintegrate

Ms. Farris into the U.S. Foreign Service.

## CONCLUSION

For the foregoing reasons the Plaintiff's Motion for Preliminary Injunction should be

granted.

Respectfully submitted,

VIRGINIA FARRIS
By Counsel


/s/    George Doumar
George R.A. Doumar (D.C. Bar #415446)
George R. A. Doumar, PLLC
2000 N. 14th Street
Suite 210
Arlington, VA  22209
Phone: (703) 243-3737
Fax: (703) 524-7610

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of September 2006, a copy of the foregoing was served via first class mail, postage prepaid, on the following:

**Diane M. Sullivan**
UNITED STATES ATTORNEY'S OFFICE
555 4th Street, NW
Civil Division
Washington, DC 20530

/s/ George Doumar