## EXHIBIT INDEX

<u>DESCRIPTION</u>                                                          <u>EXHIBIT NO.</u>

| Description | Exhibit No. |
|---|---|
| 2/8/00 James Whitlock e-mail | 1 |
| 1/31/00 James Whitlock e-mail | 2 |
| Statement of Robert Dance | 3 |
| Virginia Loo Farris Curriculum Vitae | 4 |
| 5/15/00 Robert Hall e-mail | 5 |
| 5/12/00 Thomas Tiernan e-mail | 6 |
| Operating Procedures, James Whitlock e-mails | 7 |
| James Whitlock e-mail discussing decision to cede | 8 |
| 4/27/04 Melinda Chandler letter | 9 |
| 11/19/99 and 12/22/99 Farris e-mails expressing interest in positions | 10 |
| Declaration of Alexander Vershbow | 11 |
| Thomas Tiernan Deposition Excerpts | 12 |
| Thomas Tiernan e-mail | 13 |
| Statement of Patrick Moon | 14 |
| 11/19/99 Farris inquiry into Hague POLAD position | 15 |
| 11/18/99 James Whitlock e-mail on availability of POLAD position | 16 |
| 11/19/99 Farris bid on POLAD position | 17 |
| 11/21/99 Farris informed she was not included on short list | 18 |
| 12/22/99 Farris email discussing Hague POLAD job on hard to fill cable | 19 |
| Excerpt from Agency discovery- Open Assignments List | 20 |
| Marie Huhtala Deposition Excerpts | 21 |
| EEO Complaint of Virginia Loo Farris | 22 |
| Declaration of Virgina Loo Farris | 23 |
| Declaration and Curriculum Vitae of Barbara S. Harvey | 24 |

# EXHIBIT 1

In a message dated 2/9/00 9:27:17 AM, WhitlockJC@state.gov writes:

Colleagues,

Cede requests:
--------------------
Various bureaus are requesting cedes of senior positions to 0-1 officers. PER/CDA/SL is granting these only reluctantly and on a case-by-case basis <u>where it appears that no senior officer will be prepared to take the job</u>. Six generalist position cedes have been granted thus far this year. <u>With about 110 senior officers (not including those picked by the DCM committee, etc.) still up for assignment in mid-2000, cedes will continue to be difficult to obtain.</u>

For those interested, cedes have been requested for the following positions.
Please let me know if you are interested in any of these and I will enter your bid. They correspond to the latest senior open assignments cables (State 17122, unless otherwise indicated, and State 17124).

FE-MC

EAP/K
EAP/RSP,
Tokyo (Pol.C)

FE-OC

EAP/RSP/TC
IIP/SC v. Keegan (ETD 3/00, on State 17124)
NEA/PD (deputy director)
Ankara
Beijing (Pol.C) (ETD 7/01, on State 17124)
Cairo (Pol/Econ)
Lima (Admin)
Mexico (S&T)
New Delhi (Econ)
Panama (Pol/Econ)
Rabat (PAO)
Tokyo (Econ C)

Recent Assignments
--------------------
The following positions shown on State 17122 have been filled:

FE-MC

FE-MC/EE/
Rome (PAO, Deputy PAO)

EXHIBIT 01

FE-OC

IO/ESA
PER/OE
PER/REE/EX
La Paz (Admin)
Lagos (Consular)

Once again, I will be happy to remove from distribution those addressees who request it. Please let me know.

Warm regards,
Jim
</XMP>

-------------------- Headers ----------------------------
Return-Path: <WhitlockJC@state.gov>
Received: from rly-yb03.mx.aol.com (rly-yb03.mail.aol.com [172.18.146.3]) by air-yb02.mail.aol.com
(v67_b1.24) with ESMTP; Tue, 08 Feb 2000 14:27:17 -0500
Received: from franklin.state.gov (castle.us-state.gov [198.76.102.19]) by rly-yb03.mx.aol.com (v67_b1.24) with
ESMTP; Tue, 08 Feb 2000 14:26:57 1900
Received: from jefferson.state.gov by franklin.state.gov
      via smtpd (for rly-yb03.mx.aol.com [205.188.156.99]) with SMTP; 8 Feb 2000 19:26:56 UT
Received: from iscan.state.gov (mailscan.us-state.gov [99.1.12.2])
   by us-state.gov (8.8.8+Sun/8.8.8) with SMTP id OAA22378;
   Tue, 8 Feb 2000 14:17:50 -0500 (EST)
Received: by americas02.irm.state.gov with Internet Mail Service (5.5.2448.0)
   id <1MB050K7>; Tue, 8 Feb 2000 14:34:28 -0500
Message-ID: <E5D5E5255?F2D211896A0008C75DE53F016E9321@persnise.per.state.gov>
From: "Whitlock, James C Jr." <WhitlockJC@state.gov>
To: Ben Fairfax <FairfaxBF@state.gov>, Carl Chan <ChanCK@state.gov>,
    Christopher Fitzgerald <FitzgeraldC@state.gov>,
    "Daley, Roger J     001" <DALEYRJ@wo.state.gov>,
    "Dell, Christopher W" <DELLCW@wo.state.gov>,
    Edward Dong
    <DongEK@state.gov>, Frank Coulter <CoulterF@state.gov>,
    Frederick Cook
    <CookFR2@state.gov>,
    Gail Gulliksen <GulliksenGX@state.gov>,
    Gene Christy <ChristyGB@state.gov>,
    Geoffrey Chapman
    <ChapmanGW@state.gov>,
    Gerard Gallucci <GallucciGM@state.gov>, Janey Cole <ColeJD@state.gov>,
    John Collins <CollinsJA@state.gov>, John Sligh <SlighJ@state.gov>,
    Lawrence Greenwood <GreenwoodLO@state.gov>,
    Louise Crane <CraneLK@state.gov>, Martin Cheshes <CheshesML@state.gov>,
    Milton Drucker <DruckerM@state.gov>,
    Morton Dworken <DworkenMR@state.gov>,
    Roberts Fitts <FittsRW@state.gov>, Susan Clyde <ClydeSA@state.gov>,
    Thomas Furey <FureyTP@state.gov>, Timothy Dunn <DUNNTJ@state.gov>,
    W. Frank <FrankWD@state.gov>,
    A. Dalghesh
    albert.dalghesh@osd.pentagon.mil,
    B. Griffith
    bill.griffith@mail.house.gov,
    Bob Oakuta <rockuta@usip.org>, Brian Donlon <bec@exchange.usia.gov>,
    Christian Filostrat,
    Michael Philo <philo.a...,
    Herbert Loan <H...@...,
    Douglas Dickson <d...,...,
    James ...,
    ...

Pete Chaveas
&lt;CHAVEAS@unt11.eucom.mil&gt;,
Rosemary Dicarlo &lt;rdicarlo@exchange.usia.gov&gt;,
Virginia Faris &lt;VLooFarris@aol.com&gt;
Subject: Update on Assignments
Date: Tue, 8 Feb 2000 14:23:40 -0500
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2448.0)
Content-Type: text/plain

# EXHIBIT 2

CODE

In a message dated 1/31/00 11:23:44 AM, WhitlockJC@state.gov writes:

Ginny,

I have checked and am told that you are not on the POLAD short lists as prepared by the D committee.

There is a job you might want to consider, in view of your background in SE Asia, that of EAP/RSP Office Director. It covers regional affairs, ASEAN etc. It is a FE-MC job and the bureau has asked for a senior code to permit an O-1 to take it since there are no at-grade bidders.

Jim

EXHIBIT 02

# EXHIBIT 3

EXHIBIT F7

STATE OF VIRGINIA

COUNTY OF ARLINGTON

## STATEMENT

I, Robert Lawrence Dance, make the following statement freely and voluntarily to John J. Lokos, who has identified himself to me as a Contract Investigator for the US Department of State, investigating a complaint of discrimination filed by Virginia Loo Farris, knowing this statement may be used in evidence. I understand this statement is not confidential and may be shown to any interested party with a legal right to know.

I hereby state I am an African American male commissioned Foreign Service Officer (FS-01) with the US Department of State. I hold both U.S. Government Consular and Foreign Service Commissions. I am currently a student at the Department of State's National Foreign Affairs Training Center in Arlington, Virginia, studying in preparation to my being posted as the Deputy Chief of Mission at the United States Embassy, Mbabane, Swaziland.

At the time the alleged case of discrimination was supposed to have taken place, I was the Deputy Director of the Office of Career Development and Assignment in the Department of State's Bureau of Human Resources. As such, I handled administrative and budgeting issues within the office as a whole. I also monitored general and mid-level assignments meetings and occasionally was a substitute voting member. In addition, as a former member of the now defunct United States Information Agency, I informally

*Page 1 of 11*

261

monitored issues dealing with other former members of USIA, now State Department

Public Diplomacy Officers, that came to the attention of the Office Director.

Mr. John Lokos has asked me to answer the following questions:

1.  How is the bidding assignment process at State different from that at USIA?

2.  What is the effect of designating a position as a "stretch" position?

3.  What is a "shoot out" and what, in your own words, is/was your involvement, or knowledge of the facts, in NATO and Hague?

4.  What are the differences between a FE-OC and a FS-01, and does an FS-01 qualify for an FE-MC position? Explain how the "stretch" process out applies.

5.  What is a cone, and how does it enter into the process?

6.  What is a "cede"; how did it affect results?

Following are my answers to his queries, along with additional information that might pertain to the complaint.

1. I am commissioned officer in the Foreign and Consular Services of the United States of America serving in the Department of State. I hold the grade of FS-01 (O-6 equivalent). My heritage is a mixture including African American and Native American. I am in my 41st year of Federal service. I am a member of the Public Diplomacy (PD) cone currently in training to be the Deputy Chief of Mission in Swaziland.

2. I first met Virginia Farris in May or June of 1994 when I was sent TDY to Kingston, Jamaica, to assist her during the USG operation for screening potential Haitian refugees on the USNS *Comfort*, a U.S. Navy hospital ship reactivated just for the operation. Ms. Farris is an excellent officer.

During the course of normal business, I was aware that Ms. Farris had bid on a position at USNATO in Brussels and that she was one of several bidders.

3. At the time of the shootouts, I was the Deputy Director of HR/CDA. In that capacity, I usually was an observer of the paneling process. Though I don't remember her nomination specifically, I vaguely remember being in the actual sessions concerned.

4. The assignment processes at USIA and at State were similar in nature. The differences were in the size and coverage of the voting bodies. At USIA, all assignments for officers in the grade of FS-01 and below were handled by the regular assignment panel, which consisted of the head of the assignments branch, the three career counselors, and the five area personnel officers. Factors considered in making an assignment were a bidder's request for the assignment, that bidder's record of past assignments, and the desire of the concerned area office. When two or more candidates applied for the same position, the panel would discuss the merits of each candidate and then take a vote. Most of the time, the panel decision prevailed. Occasionally, for various reasons, a vote was overturned by higher authority. This latter situation was very, very rare.

Senior Foreign Service assignments were handled by the Senior Assignments Committee. The committee consisted of the heads of the Assignments Branch (SFS), the Office of Human Resources (SES), and the Bureau of Management (SES) along with the Counselor of the Agency (SES—The person was equivalent to the Director General, the head of the Bureau of Human Resources in the State Department. The committee made assignments in the same manner as above.

*Page 3 of 11*

263

At State Department, there are also two assignment committees. The general committee handles assignments of entry level (non-tenured) personnel and all personnel FS-01 and above (i.e., Senior Foreign Service). The Mid-Level Committee handles assignments of all tenured officers from the grades of FS-04 through FS-02. Each committee has, I believe, 14 voting members with the chair of the committee as the tiebreaker. In the general committee, the voting members are two officers each from the Entry-Level, Mid-Level, and Senior-Level Assignment Branches (6), six Area Personnel Officers, the head of the CDT Branch (an African-American female), and the CDA Continuity Representative (also an African-American female). The Director of HR/CDA chairs the committee and casts tie-breaking votes. I believe that one of the roles of the Continuity Representative is to ensure that the precepts of EEO are exercised in the assignment process. From my experience, she conscientiously and assiduously carries out her duties.

An informal aspect of the State assignment system that was absent at USIA is the influence of lobbying. Candidates for positions will contact area bureaus and prospective supervisors to express interest in and be interview about filling positions on which they have bid. This means that a person who is a known quantity stands a better chance for being recommended for a position than one who has bid and done very little more.

Also, in most cases, preference for filling a position goes to a person who is in the cone under which the position falls or who has experience working in that type of position.

5. Definition of Terms:

**Cone:** This is the branch to which a Foreign Service officer belongs. There are five branches or cones: Administrative, Consular, Economic, Political, and Public Diplomacy. The cone with the greatest number of officers is the Political cone. The cones that are understaffed are Public Diplomacy and Administrative.

**Stretch Assignment:** A stretch assignment occurs when an officer is assigned to a position that calls for a different grade. For example, a FS-02 officer assigned to an FS-01 position would be in a stretch assignment. Likewise, the same officer in an FS-03 position would be in a stretch assignment. The former, an up-stretch is considered better than the latter, a down-stretch.

**Cede:** A cede occurs when, for example, a senior-level assignment cannot be filled by a senior level officer. Then the assignment may be "ceded" to the Mid-level Branch.

**Mid-Level Officer:** A mid-level officer is an officer in grades FS-03 (Major equivalent) to FS-01 (Colonel equivalent). Tenured FS-04 officers (Army Captain equivalent) are also considered as mid-level officers.

**Senior-Level Officer:** Any officer who is a member of the Senior Foreign Service. The grades in the Senior Foreign Service equivalent of a general or flag officer ranks in the military. Grade FE-OC or Counselor is the equivalent to a Brigadier General; Grade FE-MC or Minister-Counselor is the equivalent to a Major General. Ms. Farris holds the grade of Counselor (FE-OC).

*Page 5 of 11*

265

Senior Seminar: The primary State Department professional development program for senior-level officers. This course is highly selective.

Shootout: A shootout occurs when two or more persons bid on the same position. When there are multiple bidders on a position, anyone who is not the choice of the affected bureau or office is apprized of the situation. If that person still wishes to maintain the bid, the Career Development Officers (CDO) of the bidders prepare presentations supporting each person's reasons for bidding. When scheduled during one of the weekly assignment meetings, each involved CDO makes a presentation about why his or her client would be the best choice for the position. The concerned Area Assignments Officer puts forth the affected bureau's choice for the position with rationale. The voting members of the committee then decide, based on the information presented, who would be assigned to the position. This is what should have happened in Ms. Farris's case.

6. Assignment Particulars:

a. For all practical purposes, there is little difference between an FE-OC and an FE-MC position. The idea of stretch does not usually come into play for assignments at this level.

b. Though FS-01 officers are considered mid-level officers on paper, their assignments are handled by the Senior-Level Assignments Division. I do not know for sure, but I think that this was done, in part, to even out the workload between the branches. I cannot remember the particulars of assigning an FS-01 to a Senior-Level position, though I do know that a FS-01 officer who has received a Meritorious Step Increase, for bidding

purposes, is considered as a senior-level officer. An actual example of how this has worked is the case of the PD Director for the AF Bureau. She was the choice of the then AF Bureau Director for the position. At the time of selection, she was an FS-01. The position is an FE-MC position. Because she had been selected to attend the Senior Seminar, she was considered a senior-level officer for bidding purposes. Since FE-OC and FE-MC positions are considered interchangeable, she was allowed to bid upon and was appointed to the FE-MC position of Director of the Office of Public Diplomacy in the Bureau of African Affairs. The officer, an African American woman from the political cone with AF and NSC experience, beat out several senior PD officers for the position.

7. BACKGROUND: I vaguely remember elements of Ms. Farris's case. I do remember being told that Ms. Farris had expressed interest in attending the Senior Seminar. She was deemed as not being eligible. as she had recently completed the National War College at Fort McNair. Washington. District of Colombia. I never heard any mention of her race in any form or manner. I would say that some factors that may have weighed against her in bidding on the positions involved in the case were that she was from bidding out of cone and had little, if any, regional experience in Europe. The individuals chosen had more, and more current regional experience. By the way, this points up another difference between USIA and State assignment practices. In USIA, that an officer was assigned to a specific geographic area. particular in Europe, for successive tours was a rare exception rather than the rule. USIA officers were encouraged to seek a

diversity in area experience. In the State Department, officers seem to "homestead" in certain areas, seemingly giving credence to the belief that one must be a member of a particular "area club" to get an assignment in that area.

8. MY INVESTIGATION: I have checked into the shootouts that took place. On the dates mentioned, I can find nothing about Ms. Farris being involved in a shootout over a position in The Hague. Following is the information I could find about the shootouts involving Ms. Farris:

a.    On June 6, 2000, there was a shootout involving the nominations of Ms. Farris and Andrew Goodman for the USNATO Brussels position. The position called for expertise in the area. Mr. Goodman, an FS-01 officer who was occupying the number two political position at USNATO, was selected to fill the position by the vote of the assignments panel. I would say the Ms. Farris's lack of area and subject matter experience weighed against her. The position is a position that needed someone who could "hit the ground running immediately." Mr. Goodman filled the bill. That said, Ms. Farris was given full consideration by the panel. Race was never an issue.

b.    One June 20, 2000, the nominations of Ms. Farris, FE-OC Dune, and FS-01 Leslie Lebl were involved in a three-way shootout for the Political Counselor position at USEU Brussels. Ms. Lebl won the shootout. An economics officer, Ms. Lebl has extensive political experience in the EUR area, particularly Sarajevo, and has worked in the Legislative Affairs Office of the State Department. She speaks Russian, German, French, Czech, and Polish fluently, and has some Spanish. Ms. Farris speaks

Thai, French, and some Spanish. The Assignments Committee selected Ms. Lebl.

Again, race was never an issue.

9. ANALYSIS: I understand that Mr. James Whitlock (FE-OC Retired), both Ms.

Farris's and my former Career Development Officer, told Ms. Farris that she could bid on

the positions. I would point out that her bidding on a position did not mean that she

automatically would get any job upon which she had bid. I would surmise that she was

still assigned as PAO Bangkok at the time with a TED of sometime in 2001. I would say

that the Assignment Committee did not look very favorably upon her bid. First, she was

bidding out of cone and probably had little prior experience, at least as far as State was

concerned, in either the political field or the EUR area. This was still in the first year of

integration, and State officers had (and still have, in many cases) little concept of the

range of skills of former USIA (now Public Diplomacy) officers. Ms. Farris was an

unknown quantity to the EUR Executive Office. The other persons were well known and

had more current experience in the area. The bottom line is that though Ms. Farris did

bid on the positions, there was no guarantee that she would get either of them. As to the

matter of race, it was not an issue. I would daresay that reasoning supporting her not

being selected could be broken down into three areas: Though she was at grade, she was

bidding out of cone. In fact, her cone was new and something of an unknown in the State

Department. This might have been overcome, if not for the next item. She had little, if

any, relevant EUR experience. I would think that at the grade level required for the

position, particularly with the issues that were confronting both missions, experience was

269

a major factor. She was a new and unknown quantity in both State as an organization and EUR as a bureau. The persons selected were not. She probably did not do the necessary networking involved in successfully bidding on a position in the State Department. Unlike USIA, in which assignments were more dependent on grade and general qualification and less on with whom you have made contact beforehand, a major factor in the State assignment process is networking in the prospective bureau and "selling" one's self for the position. Though I don't know for sure, I think Ms. Farris failed to do this. Actually, most USIA officers failed to do this during the first year of integration. Being newly acquired into a larger organization, we did not understand the system of the subsuming agency--State. We were unaware of this aspect of the State system. I believe that Ms. Farris had another year left on her assignment in Bangkok. Probably no compelling case was made for breaking her out of the last year of her assignment. I don't remember any such case being made. Actually, I vaguely remember only one shootout.

10. CONCLUSION: The individuals chosen to fill the positions were the choices of the EUR Bureau, the major organizational stakeholder in this affair. They possessed area and conal experience, which Ms. Farris did not possess. That said, the best case possible was presented for each person, including Ms. Farris, by his or her CDO during the shootouts. The voting members of the general assignments committee voted on their individual consciences based on the facts given. They chose those whom they thought were the best persons for the jobs. From my perspective, race did not come into play.

*Page 10 of 11*

I have read the above statement consisting of 11 pages. I declare under the penalty of perjury that my statement is true, correct, and complete to the best of my knowledge, information, and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Robert L. Dance

SIGNATURE OF AFFIANT                Date: September 10, 2001


SIGNED BEFORE (Witnessed)

Claris X. Dance

# EXHIBIT 4

Curriculum Vitae
VIRGINIA LOO FARRIS
AMERICAN EMBASSY - BOX 48
APO AP 96546-0001
E-mail: VLooFarris@aol.com
or: farris@exchange.usia.gov

Residence Tel: 011-(66-2) 205-4186          Office Tel:   011-(66-2) 205-4485
                011-(66-2) 254-1179          Office Fax:   011-(66-2) 650-8921

## ASSIGNMENT HISTORY:

1998-        Public Affairs Counselor, American Embassy, Bangkok
Manages an active public diplomacy program in Thailand with a budget of $2.5 million and provides assistance to smaller regional posts in Vietnam, Myanmar, Laos and Kampuchea. Supervises 7 Americans, 32 FSNs, 18 PSC employees. Produced seminars on economic recovery and corporate restructuring. Enhanced research capability of the new Thai International Trade and Intellectual Property Rights Courts.

1997-1998    National War College-NDU, Fort Lesley J. McNair, DC

1997-1997    Acting Director, Geographic Liaison Office, Information Bureau, USIA
Supervised a staff of 106 working in a team based environment for five geographic regions (Europe, East Asia, Latin America, Africa, and Near East & South Asia) and two centralized teams (Information Resources and Central Processing). Oversaw a budget in excess of $5.12 million. Ensured essential programs and services were delivered to posts worldwide. Motivated staff to develop effective working relations with the Area Offices, USIS client posts, and other USG elements.

1995-1997    Team Leader, Near East and South Asia, Information Bureau, USIA
Led one of five regional geographic teams within the Information Bureau, managing all Wireless File (English and Arabic), book, and speaker programs for the Middle East, North Africa and South Asia, with a budget of $600,000. Supervised 16 team members.

1994-1995    East Asia & Pacific Program Officer, Information Bureau, USIA
Developed budget and coordinated speaker programs for East Asian posts. Cultivated professional contacts with experts and institutions involved in East Asia and recruited caliber candidates. Facilitated interaction and productivity across Bureau teams and developed operational procedures and guidelines within this new Bureau to foster responsiveness to post and successful completion of projects. As an additional duty served on the USIA Information Bureau Design Team.

1992-1994    Public Affairs Officer, American Embassy, Kingston
Directed the public diplomacy program in Jamaica, supervising an American deputy and 10 FSNs and managed $250,000 budget. Served as Embassy lead for inter-departmental efforts with Haitian refugees. Supervised two additional USIA officers and coordinated the efforts of 12 other public affairs officers from different USG departments during the Haitian migrant processing operation, including the DOD Joint Task Force Operation Sea Signal V. Implemented a highly effective upgrade in the Post computers.

1990-1992    USIA Advisor to the Commander-in-Chief, U.S. Pacific Command
Advised the CINC on public diplomacy issues and served as liaison for USIA with USCINCPAC. Twice planned, implemented and secured funding for the Symposium on East Asia Security (SEAS) which enhanced understanding of America's security role in the Pacific Rim by key defense participants from nine Asian nations. Assumed contacts with East West Center and some Pacific Island programs when the USIA offices in Hawaii dealing with those areas closed.

EXHIBIT 4

**1985-1990   Cultural Affairs Officer, American Embassy, Bangkok**
_oordinated educational and cultural exchange programs, including grantees, speakers, book translations, and student counseling. Frequently served as Acting PAO. Oversaw the operations of the binational center with an enrollment of more than 3,000 students. Organized major seminars on economics, narcotics, environment and American Studies as well as key cultural presentations such as Preservation Hall and the New York Philharmonic, coordinating participation with the Royal Family. Handled thorny public affairs issues and negotiations for the return of a lintel from the Art Institute of Chicago to the archeology park at Phnom Rung.

**1984-1985   Foreign Service Institute: Area Studies and Thai Language Program**

**1983-1984   Congressional Foreign Affairs Fellow**
Tracked legislation, prepared position papers, and negotiated with other Congressional staffers to gain support for legislative initiatives. Handled a variety of foreign affairs, defense and trade issues for Representative Robert Lagomarsino (R) CA and Senator Frank Lautenberg (D) NJ. Helped organize and participated in an exchange between Washington and Ottawa with Canadian Parliamentary staff.

**1980-1983   USIA Deputy Country Affairs Officer – China, Hong Kong, & Taipei**
Liaised with posts and served as principal resource on China affairs for other Agency elements and for general public. With the establishment of diplomatic relations with the PRC, coordinated with other USG agencies and the private sector on US-PRC scientific, educational, cultural and artistic exchanges. Organized first American Film Festival in PRC and escorted official film delegation on China road tour.

**1977-1980   Cultural Affairs Officer, American Consulate General, Hong Kong**
°oordinated speaker, educational, and grantee programs. Supervised operation of library and outreach program, particularly to pro-PRC audiences. Organized briefings and provided assistance to delegations going to or returning from PRC, including Vice Presidential visit and numerous CODELs. Executed first exhibit of American educational technology in the PRC. Served as Executive Editor of *Current Scene*, a scholarly journal covering developments in the People's Republic of China.

**1975-1977   Information Center Director, American Embassy, Tunis**
**1974-1975   Information Center Director, American Consulate General, Lahore**

### AWARDS & HONORS:
• 1997   United States Information Agency Meritorious Honor Award, 3d Award
• 1996   United States Information Agency Director's Award for Superior Achievement
• 1995   United States Information Agency Meritorious Honor Award, 2d Award
• 1992   Secretary of Defense Civilian Meritorious Honor Medal
• 1984   United States Information Agency Meritorious Honor Award
• 1969   Phi Beta Kappa, Epsilon Chapter (MSU)

### EDUCATION AND TRAINING:
| | | |
|---|---|---|
| 1997-1998 | National Defense University: | MA, National Security Strategy |
| 1970-1972 | University of Michigan: | MA, Chinese Studies |
| 1966-1970 | Michigan State University: | BA, Social Sciences, *Magna cum laude* |

### FOREIGN LANGUAGES:
Thai (3+/3)
_rench (3/3)
Basic Chinese (1 – )

# EXHIBIT 5

RBH to VLF-15Mar00 Harris Comments

Subj: RE: Bon Voyage
Date: 00-03-15 07:00:19 EST
From: hallr@natosabxl.brussels.army.mil (Hall, Robert B.)
To: VLooFarris@aol.com

File: winmail.dat (9363 bytes)
DL Time (TCP/IP): < 1 minute

ok - here is latest i know. I think Bob Simmons is being wired to get
McConnell's job. SImmons is old State Dept. NATO hand. he got ticked out
and forceably retired last year -- all the other NATO people were very
upset. There were interventions on his behalf and a civil service job was
essentially created for him -- special advisor or something. So he is doing
much of what he did before but now civil service. It sounds like much the
same is being done again -- they are wiring the deal to put him into
McConnell's job.

Bill Harris is definitely leaving this summer. Departure June 1. Sandy had
tried to get him to extend, but Bill got Army War College offer and took it.
He is pretty burned out. He is the political counselor (Political Advisor
in USNATO speak) here in the mission. They do not have suitable applicants
for the job. Don't know if you are still on that list or if you are being
referred to as unsuitable. Think you may not be on list since the word that
Bill seemed to have was that there were no SFS applicants. Sandy's current
solution is to try to put one of Bill's two deputies - Andrew Goodman --
into the job. He is only a FS-1. That is a problem since he would
supervise two other FS-1's as well as a bunch of 2's. (The state guys here
have all sorts of morale and supervisory problems so this seems to be a big
deal. Lot of prima donnas -- although most pretty smart and good.) State
may resist agreeing to ANdrew - since it would be a stretch assignment.
Bill thinks their first instinct will be to resist and offer up someone who
didn't get his/her other choices. "A passed over type" in Bill's parlance.
Apparently Sandy is worried about that and also about the fact that his new
DCM who arrives July 15 (the old one leaves June 10 and I will be acting
which I dread - big pain) has no real NATO experience. She is Russia type,
Talbott protege. Hence his instinct to try to put Andrew into the job -- he
s here and is current on the issues. He is also a pretty good negotiator
which is very important in that job. The person does a lot of the key
negotiations.

EXHIBIT 05

**RBH to VLF-15Mar00 Harris Comments**

YOur situation. I mentioned to Sandy as we were walking down the hall that you might be interested and applying. He doesn't know anything about you. I said you had good rep, were SFS, that i knew you long time ago and you were impressive then. I-couldn't remember if you had any NATO experience, but mentioned CINCPAC and the fact that you had served in Germany (was that right ?), and had French. ANyway I think his instinct is to go with the person he knows even if the guy isn't quite suitable - more on that in second. I think you could only get the job if you can get someone like Marc Grossman or Pat Moon or someone in State EUR who knows Sandy well to call Sandy and tell him that they recommend you. I don't mean to imply i have no influence with Sandy, but i probably have only marginal influence in this area. He thinks i have been lost to Stat/USIA for too long and only know DOD people and stuff. He is pretty right about that. He is going to need to be pressed a bit from the State side. There is also a small USIA problem in that Elizabeth Pryor at one time expressed interest. She has a slight medical condition now and I don't think she wants it anymore because of that, and also - everyone agrees she is not suitable. (She is a really bad manager of people, all her staff hates her and keeps quitting -- please keep that to yourself.)

Going for you would be the fact that Goodman getting the job would be a stretch. State doesn't want to do that on important jobs. They'd have trouble denying you the chance and then putting in a stretch. Also he isn't that popular with the troops here -- and probably is a pretty poor manager too. Interesting, but pretty arrogant guy. Also only cares about Russia stuff - and that is only one piece of the job -- as head of the section he would have to cover the full gamut. Even now as one of Bill's deputies, he superrvises a number of subjects but only seems to care about the Russia account.

I think this will be decided in the next couple of days and so you should act on this case fast.

# EXHIBIT 6

Athens. I'm deeply indebted to EUR/PD and Post for their patience and continued expression of confidence. For my part I feel confident I could do an excellent job. However, having supervised a staff of more than 30 in my present position as Public Affairs Counselor I am interested as to what additional skills or credentials you feel PAO Athens would provide which would enhance my qualifications when I next bid for the "many DCM and Principal Officer jobs" you imply lie just over the horizon, particularly so when conventional wisdom would dictate a return to Washington following my next overseas assignment.

Tom, you expressed a belief that you "have no doubt that integration will work well for me." For that to happen it will need to take place prior to my retirement. You further wrote that, "State's assignment system must be a bit of a mystery..." My thoughts on that may be radical within the halls of State, but I don't think that it should be so. The system should be transparent and if it's not then perhaps for the benefit of all concerned it needs a test case to move it in that direction. My basic understanding and earlier observations of the bidding process is that within certain parameters officers bid on positions for which they are interested and feel qualified, then the Bureaus and Posts in conjunction with Personnel select the best qualified candidates.

Until reading your letter I was unaware that simply based on an early conal affiliation less experienced officers could, as you phrased it, "lay claim to [counselor jobs] without regard to grade." While it's not my place to tell EUR or PER which eggs to pick, as an experienced SFS Officer and an educated woman of color I do feel I've been around long enough to determine if an egg smells rotten.

Your e-mail borders on being patronizing when you say, "We need to come to closure on all the jobs in question, as many people's lives are in the balance," as it seems to indicate that somehow my life, and my family's are less important than those of the other candidates under consideration. I take umbrage with that proposition.

Prior to receiving your letter, in an effort to make the Athens job both more professionally rewarding, and more attractive in the spirit of Secretary Albright wanting a more "family friendly" Foreign Service, I had raised with Dick Virden the possibility of studying Greek within an immersion environment in Athens. Dick's response has been that if there was a chance for approval it would need to be advanced on the basis of cost savings. While I had found supportive data, the rigid tone of your letter has discouraged my efforts.

Tom, I'd welcome the opportunity to work with you in a constructive manner to find an appropriate utilization of my talent which would benefit the Department and further U.S. foreign policy goals while enabling me to develop professionally. However, if your solution is for me to fall on my proverbial sword in order that the interests of a favorite son candidate can be advanced then we may have a bumpy road ahead of us.

Given the manner in which the bidding process is developing your intimate involvement in my EUR assignment possibilities may be an asset to us both in crafting a creative and effective answer to the current impasse. However, in the final analysis I gather where there is a lack of consensus in such decisions the call is made by Central PER.

Regards,
Ginny

-----Original Message-----
From:   Tieman, Thomas J
Sent:   Friday, May 12, 2000 4:15 AM
To:     Farris, Virginia Loo
Subject:    onward assignment

Ginny, I hope you remember me from our contacts earlier in the cycle when you expressed belated interest in some DCM and principal officer positions in EUR; I'm the head personnel guy in EUR/EX.  I've become intimately involved with your EUR assignment possibilities over the past several weeks and want to

<div align="center">Page 13 of 16 Pages        Initial_____</div>

give you the lay of the land from where I sit.

First, its clear that you'd like to be in Brussels (who wouldn't; it's a great place to live), but I do not think that will work out this cycle. We've been advised that NATO is going with another candidate for the McConnell job on the International Staff. Your competition for the SHAPE PolAd job is three ambassadors, all with extensive regional and political/military experience. And both the USEU and USNATO ambassadors are holding very firm (as is EUR) for our O-1 stretch candidates for those two jobs. Central PER is ready to grant us the senior codes needed to panel those two officers as soon as you are paneled to another job, extend in Bangkok, or withdraw your candidacy for those jobs. (There are no other senior bidders.)

Ginny, I know that State's assignment system must be a bit of a mystery to you, and that the code concept might be confusing. There is no dictum that a senior automatically has priority for a senior job. While there is a general presumption in favor of at-grade officers for jobs at all grades, the qualifications and background of the senior officer for the job in question are key factors. In other words, multifunctional or program direction jobs (DCM, office director, etc.) are the ones that are easiest for senior officers to lay claim to without regard to cone. But, conversely, counselor jobs like the USEU and USNATO jobs are the ones that are easiest for conal officers to lay claim to without regard to grade. Bureaus, officers, and central PER tend to operate according to these basic assumptions, and will not normally put a senior officer into a job for which they do not have the background at earlier stages of their careers.

So I recommend that you turn your attention to the Athens job. You're at grade, in cone, and the bureau and post are enthusiastic about your candidacy. We need to come to closure on all the jobs in question, as many people's lives are in the balance.

So my advice (admittedly I'm hardly a neutral voice, but I am speaking for all elements of EUR on this) is to: 1) accept that you aren't going to be selected for the NATO jobs; 2) tell EUR/PD and Athens that you accept the Athens job; 3) tell all of this to your CDO Jim Whitlock.

In the spirit of full disclosure: 1) Athens comes with a year here at FSI (not a bad fate), as neither PER nor EUR can support at-post language training; 2) if you have your heart set on a PolAd job, there are still possibilities at KFOR in Pristina and OHR in Tuzla, Bosnia, but I assume given your family that they aren't exactly a major draw.

Ginny, I know most of this information is not what you were hoping to hear. But you have an excellent reputation, and I have no doubt that integration will work well for you. Athens is a great job for this year, and when next you bid, you'll certainly be extremely qualified for many DCM and Principal Officer jobs.

I know I've given you a lot to digest here, but we need you to let us all know very soon of your decisions. As always, I'm happy to discuss/clarify anything in this message.

Take care, Tom >>

In a message [Re: Responding to your suggestion to follow-up ] dated 03/27/00 10:31:06, BayJF@state.gov writes:
Ginny, thanks for you message. I am asking Kevin McGuire and Jim Whitlock to look at your specific questions and to review any other opportunities that are still available for summer 2000. I enjoyed very lmuch having a chance to chat with you. Janice

-----Original Message-----
From: VLooFarris@aol.com [SMTP:VLooFarris@aol.com]
        Sent: Monday, March 27, 2000 2:43 PM
        To:    BayJF@state.gov

Page 14 of 16 Pages                     Initial: _____

# EXHIBIT 7

## STANDARD OPERATING PROCEDURE

B-2
Revised: 5/2000
Approved: 7/2000

### STRETCH ASSIGNMENT POLICY

The assignment of Foreign Service Employees to at-grade, in-cone positions is the most effective use of State Department human resources. Stretch assignments, both above and below the bidder's grade, should be made only after a full review of the stretch candidate's qualifications and in accordance with guidelines laid down in this SOP. Because of the nature of their career paths, the stretch policy for specialists must be distinct for each category of specialist and different from the stretch policy applied to generalists.

Stretch assignment categories are:

Service Need (includes Hard to Fill)
Directed
Career Enhancing
Extension in Stretch
Downstretch

When upward stretch assignments are made, the proposed candidate's qualifications must be thoroughly reviewed as well as the availability of eligible at-grade bidders. The stretch category must be included in the remarks section of the agenda item when brought to panel. For downstretches a downstretch letter (a sample letter is in the CDA Handbook) must be on file and so noted in the remarks section of the agenda item.

### Generalists

Any assignment of a generalist to a position classified higher or lower than the officer's personal grade is a stretch assignment, except as noted below. Because the generalist selection process screens for the same basic knowledges, skills and abilities for all cones, an out-of-cone assignment is not considered to be a stretch assignment for a generalist.

Stretch assignments are permitted at different points in the assignment cycle. Off-cycle stretches have similar restrictions within the off-cycle assignments timeframe. As a result, late-season off-cycle career enhancing stretches may be made during the summer assignments season before such stretches are allowed for summer cycle positions. In the period before regular assignments begin (early season) stretches can be made in assignments to key positions, Special Embassy Program posts, as directed assignments or as timely extensions in stretch assignments.

The annual Open Assignments package (negotiated with AFSA prior to the start of the assignments cycle) establishes start dates during regular season for considering stretch assignments to high (15% or higher) differential posts, Hard-to-Fill positions and Most-Difficult-to-Staff posts. Down stretches and non-timely extensions in stretch assignments may be considered during the regular season. Downstretches are not encouraged. However, there are circumstances where downstretching an employee is a reasonable option; such proposals will be reviewed on a case by case basis.

Career-enhancing stretches are part of the late season, generally starting in March or April for summer cycle assignments. The exact timetable is established in the annual Open Assignments package. Such stretch assignments must be well justified.

There are risks associated with "holding out for a stretch." For the officers: at-grade possibilities will go to other officers while they wait. For Bureaus: at-grade bidders might insist on being brought to panel before the stretch candidate is eligible for consideration. Furthermore, qualified, at-grade bidders may be assigned elsewhere leaving the Bureau no acceptable candidates if the stretch proposal is not successful.

Stretches across the senior threshold have special requirements. There must be a cede from the Senior Officer Division. Such cedes are rare when unassigned senior officers remain. Double stretches across the senior threshold require the approval of the DG in addition to a senior cede. When a cede is called for, it must appear in the remarks section of the agenda item; it is valid only for one agenda and must be renewed weekly if the assignment is held or deferred.

In accordance with the Steigman Rule, an officer already stretched into a senior-level position may extend in that position without a senior cede so long as the request is timely and consistent with other tour of duty provisions. If the extension is not timely, a senior cede must be obtained before the extension can be brought to panel.

A tenured O-4 generalist going to his/her third assignment is considered at-grade for an O-3 position.

Downstretches of mid-level (ML) bidders into entry-level (EL) positions are generally not in order. Any such downstretches require the explicit concurrence of the EL division. Such assignments will take the standard EL tour of duty (TOD) rather than the TOD of the post. Exceptions to this policy include certain domestic assignments, such as positions in S/S-O and staff assistant positions. Other exceptions may be considered on the basis of compassion, tandem concerns or other extraordinary circumstances.

The following cases are not considered to be stretch assignments:

1. Seniors of any grade assigned to any senior grade position.
2. Untenured Junior officers assigned to any senior grade positions; e.g. an FP-04 assigned to an O-5 position.
3. Details - - always considered to be at grade for the incumbent.
4. Y Tours - - always considered to be at grade for the incumbent.
5. If an assignee is at grade when paneled, s/he is not considered to be in a downstretch if s/he is subsequently promoted.

Specialists

Stretch considerations do not apply to Printers, Construction Engineers, English Language, Information Resource, Diplomatic Security (DS) and Medical (MED) Specialists, as long as the assignment is within the bidder's skill code. DS Specialists get a senior cede for assignments across the senior threshold. Tenured specialists [bid] for positions advertised under the Specialist Excursion Program will be [consider]ed at grade for that excursion tour position.

[...] Specialists (GSO, PER and FMO):

[...]5 and -04 GSO, PER and FMO Specialists who have attained their skill [cod]e Career Mobility Program are considered at-grade for FP-03 positions [...]codes.

[...]t Specialists (OMS):

[...]udes grades FP-03 and FP-04 for PER positions at the FP-03 positions [...]P-07 and FP-08 are considered at grade for bidding and assignments

[...]pecialists (IM):

[...]l Specialist (IMTS) FP-05 and FP-04 are considered at grade for jobs at the FP-07 [...]ld not be considered as stretch assignments

[...]S) FP-05 and FP-06 positions are entry-level [...]le within these two grades.

[...]rade of FP-04 and above to any position [...]onsidered a stretch assignment including [...]05 positions.

[...]will be brought to the Mo[...]is, including downstretch ass[...]ts, including downstre[...] [...]Assignments Panel.

EXHIBIT F18i

### RBH to VLF-15Mar00 Harris Comments

Subj: RE: Bon Voyage
Date: 00-03-15 07:00:19 EST
From: hallr@natosabxl.brussels.army.mil (Hall, Robert B.)
To:   VLooFarris@aol.com

File: winmail.dat (9363 bytes)
DL Time (TCP/IP): < 1 minute

ok - here is latest i know. I think Bob Simmons is being wired to get
McConnell's job. SImmons is old State Dept. NATO hand. he got ticked out
and forceably retired last year -- all the other NATO people were very
upset. There were interventions on his behalf and a civil service job was
essentially created for him -- special advisor or something. So he is doing
much of what he did before but now civil service. It sounds like much the
same is being done again -- they are wiring the deal to put him into
McConnell's job.

Bill Harris is definitely leaving this summer. Departure June 1. Sandy had
tried to get him to extend, but Bill got Army War College offer and took it.
He is pretty burned out. He is the political counselor (Political Advisor
in USNATO speak) here in the mission. They do not have suitable applicants
for the job. Don't know if you are still on that list or if you are being
referred to as unsuitable. Think you may not be on list since the word that
Bill seemed to have was that there were no SFS applicants. Sandy's current
solution is to try to put one of Bill's two deputies - Andrew Goodman --
into the job. He is only a FS-1. That is a problem since he would
supervise two other FS-1's as well as a bunch of 2's. (The state guys here
have all sorts of morale and supervisory problems so this seems to be a big
deal. Lot of prima donnas -- although most pretty smart and good.) State
may resist agreeing to ANdrew - since it would be a stretch assignment.
Bill thinks their first instinct will be to resist and offer up someone who
didn't get his/her other choices. "A passed over type" in Bill's parlance.
Apparently Sandy is worried about that and also about the fact that his new
DCM who arrives July 15 (the old one leaves June 10 and I will be acting
which I dread - big pain) has no real NATO experience. She is Russia type,
Talbott protege. Hence his instinct to try to put Andrew into the job -- he
is here and is current on the issues. He is also a pretty good negotiator
which is very important in that job. The person does a lot of the key
negotiations.

# EXHIBIT 8

**23) 18 May 00 E-mail from CDO Whitlock informing of cedes on the USNATO & USEU positions.**

In a message dated 05/18/00 06:27:19, WhitlockJC@state.gov writes:
<< Ginny,

As a follow-up to my earlier message, you should know that it has been decided to cede two senior jobs on which you are the only senior bidder- USNATO and OECD. EUR is expected to bring their O-1 candidates to Panel on Tuesday, May 23. You have the right to have your name brought forward in a shootout. If you want to compete for the jobs, please send me talking points ASAP but to arrive here no later than May 22.

Warm regards, Jim >>

EXHIBIT 05