# EXHIBIT 9



**United States Department of State**

*Washington, D.C. 20520*

April 27, 2004

BY MESSENGER

George R.A. Doumar
2200 Wilson Boulevard
Suite 800
Arlington, VA  22201

Re:  <u>Virginia Farris v. DOS</u>

Dear Mr. Doumar:

Consistent with the Agency's continuing obligation to produce additional documents in discovery as they become available, enclosed please find two drafts of the 1999-2000 assignments precepts. The Department continues to be unable to locate the final version.

Sincerely,

Melinda Chandler
Agency Representative

# EXHIBIT 10

Subj: **More Bids**
Date: Friday, November 19, 1999 23:39:54
From: VLooFarris
To:    whitlockjc@state.gov

Jim - Thanks for your fax giving me copies of the emails you sent. You are correct that I had not received them as the State unclassified email system often freezes.

I appreciate your candid assessments on the bids I have already submitted. You mentioned that I am not on the short list for several of my high priority bids and that the prospects for success in bidding on EUR DCM positions are not very good as having the European experience is considered a major factor. Likewise bids on functional jobs at the senior level tend to go to officers in those cones. I had hoped that the USCINCPAC and National War College experience would make me competitive for USNATO jobs but you seem to indicate that this is not necessarily the case.

Since a slam dunk assignment hardly seems likely we may be in for a continuing exchange as various situations develop. It may seem to you that I'm only bidding on "holiday destinations." I'd like to dispell that impression as I am not "cherry picking," at least not in the manner you might think. While it is important for each of us to find a position where we can both contribute and advance, before I submit a bid it is paramount I also consider the likelihood of getting the necessary medical clearances for my entire family. In reality the number of PAO jobs (my functional speciality) are limited and located in countries where it's unlikely my family members could receive medical clearance.

So, while I am not ignoring the wisdom of your advice, the situation compels me to continue to look at locations where it is more likely clearances would be forthcoming. In turn the situation leads me to look at what might be considered a disproportionate number of DCM/PO positions or positions in other functional cones. I am attempting to follow your advice on having someone senior intercede with a recommendation to the relevant DAS' before I remove more of my bids from consideration.

Jim, you were most kind in offering to check on the Belgian and The Hague POLAD positions. Could I ask you to likewise to flesh out the Stuttgart POLAD position (Stuttgart/324045/POLAD/91433001/Chaveas), as to duties? I gather that it's based at USEUCOM. Assuming that it's within reach and given the state of play mentioned in your emails of Nov. 17 and 19, and the past changes I've made, I'll

015

EXHIBIT 10

enter the following bids:

| Belgium-M | POLAD | Vacant | 321245/10001000 | 0400 | High |
| NATO-IS | Pol Ofcr | McConnell | 505230/41027000 | 0600 | High |
| Paris | Pol Ofcr | Parmly | 323601/10017002 | 0800 | High |
| Stuttgart | POLAD | Chaveas | 324045/91433001 | 0800 | High |
| The Hague | AF POLAD | Vacant | 325601/10789111 | 0900 | High |
| USEC, Brussels | Pol Ofcr | Becker | 321023/10166000 | 0600 | High |

That means my updated bid list is would look like this:
&START/BB/575500283/FARRIS/VIRGINIA/L;
&1/AIT TAIPEI/330230/DPO/77001000/YOUNG/0801/H;
&2/ROME/325067/DEP US REP/00554000/TRACY/0800/H;
&3/BRUSSELS N/321213/DPTY CHF M/00029001/MCELHANEY/0800/H;
&4/GENEVA/327667/DEP US REP/00014003/ARIETTI/0700/H;
&5/BRUSSELS/321201/DPTY CHF M/00005002/CHESHES/0700/H;
&6/BERN/327601/DPTY CHF M/00001075/BELL/0900/H;
&7/BELGIUM-M/321245/POLAD/10001000/VACANT/0400/H;
&8/BRUSSELS N/321213/POL OFCR/16030000/HARRIS/H;
&9/ATHENS/321801/PUBLIC AFF/60888059/JACQUETTE/0801/H;
&10/LONDON/323201/POL OFCR/10282000/JOHNSON/0800/H;
&11/NATO-IS/505230/POL OFCR/41027000/MCCONNELL/0600/H;
&12/PARIS/323601/POL OFCR/10017002/PARMLY/0800/H;
&13/STUTTGART/324045/POLAD/91433001/CHAVEAS/0800/H;
&14/THE HAGUE/325601/AF POLAD/10789111/VACANT/0900/H;
&15/BRUSSELS-U/321023/POL OFCR/10166000/BECKER/0600/H;
&STOP/BB/999999999/23/NOV

What is not clear to me is once the short lists are compiled and were I not to be on a list would my name be formally removed from the appropriate bid book? Or having been so notified that I'm not on the short list, am I simply allowed to enter additional bids? The other position in EUR which is interesting, but on which I have little information is Paris-OECD/323614/IECON/ 20226000/Dolan. Can you obtain any information on that position? Can you also confirm that the language requirement for PAO Rabat position listed below is either French or Arabic and not both? Subject to availability of the positions on which I've made inquiries as soon as it's permissible I'll also enter bids on the following:

| Paris-OECD IECON | Dolan | 323614/20226000 | 0800 | High |
| Manila Econ Ofcr | Breese | 331401/20028000 | 0500 | High |

Brasilia PAO          Gullicksen     310601/60149001  0700  Med
Berlin PAO            Arnett         324001/60888085  0700  Med
Rabat PAO             McCreery       345601/60295000  0702  Med

Is it be too late to enter bids on CG Shanghai or Capetown? I'll use the informa
tion you provide, along with your earlier advice, to try and craft a more effective
strategy. Also since the unclassified State e-mail system is down so often if you
have the capability to respond to <<VLooFarris@aol.com>> your mail will reach me
much faster.

Many thanks,
  Virginia

## 21Nov99 JCW to VLF e-mail in re Short Lists Gone Forward

In a message dated 11/21/99 13:11:44, WhitlockJC@state.gov writes:
<< Dear Virginia,

I am told that short lists have already gone forward to the commanding
generals on the Hague and Belgium (Mons) POLAD jobs. With the support of
the general, Chaveas is asking to extend for one year in Stuttgart. With
regard to the senior functional jobs (POL and ECON), these will presumably
go to officers out of those cones. I will enter your bids, however. You
are correct that the Rabat job is French or Arabic, not both. The DCM
Committee has already selected an officer for Capetown but postponed until
early December a decision on Shanghai. That job will require a 3/3 in Chinese.

In answer to your question about the short list, only the short list is sent
to the relevant ambassador/general, etc. The only way that someone not on
the short list can be considered is for the ambassador/general to give
reasons for rejecting all of the candidates and then the process begins
anew. So you can remove your bids if you are not on the short list and then
bid anew if, as rarely happens, the drawing board is rolled out again.

Let me know what bids you want to delete (e.g., the three POLAD jobs appear
to be no longer viable) and what you want to add.

As before, I am using the "reply" function this should go to you at aol.com.
But since that doesn't seem to work, I will also fax this message.

Warm regards, Jim >>

EXHIBIT F18h

## 22Dec99 VLF to JCW email in re Hard to fill cable.

Subj: **Re: Hard to fill cable**
Date: Wednesday, December 22, 1999 12:04:27 PM
From: VLooFarris
To:    WhitlockJC@state.gov

Jim - Thanks for the call yesterday and the updated listings of Summer 2000 openings. However your Hard to Fill cable was surprising and confusing to me as several of the positions on which I had entered High Priority bids or was told the short lists with other candidates had already gone forward are now listed as hard to fill vacancies. I'm referring in particular to the following 3 positions:

Brussels Political (Harris) 321213/16030000 - FE-MC
Belgium (M) Polad (vacant) 321245/10001000 - FE-MC ...
The Hague AF Polad (vacant) 325601/1078911 - FE-OC

I had entered bids for the Brussels Political and The Hague AF Polad but withdrew the bid on the latter when Patrick Moon in EUR/RPM said they had had a very short deadline and that the list had already gone forward in late September. Likewise I believe I spoke with him concerning the Belgium (M) Polad position and he said the list had already been drawn up and I wasn't on it. So are these positions still available despite what Moon said? I am interested in these positions as I think my background at USCINCPAC and at the National War College would be very germane. I know you think that my not being in the Political cone is a major handicap, nonetheless I would like to register my bids for the 2 Polad jobs listed above.

My bid for the Brussels Political Officer is already in (sent in November 10 email to you). In looking at that position in the bid count cable of Nov 23 (State 222212), which lists total bids as 2, with none at grade and 2 in skill code, am I to assume that my bid is one of the two listed (even if I'm not in skill code) or did the system not register my bid in the overall tally?

As we discussed last night I would be very interested in any word on the status of the DPO-AIT Taipei job. As always I look forward to hearing from you but I did also want to wish you Happy Holidays.

Ginny

# EXHIBIT 11

## DECLARATION OF WITNESS

In accordance with the provisions of Title 28, United States
Code, Section 1746, I, make the following declaration:

1.   What is your full name?

A:   **Alexander Russell Vershbow**

2.   What is your race?

A:   **Caucasian**

3.   What is your sex?

A:   **Male**

4.   Have you yourself ever participated in protected EEO
     activity?

A:   No

5.   What is your current title?

A:   **U.S. Ambassador to the Russian Federation**

6:   In what Office or Bureau, and in what location, of the
     U.S. Department of State do you work?

A:   American Embassy, Moscow

7.   Since what date have you been employed in your current
     position and location?

A:   **July 19, 2001**

8.   Who are currently your immediate and second level
     supervisors?

A:   *Immediate:* A. Elizabeth Jones, Assistant Secretary of
     State for European and Eurasian Affairs, Department of
     State, Washington D.C.

     *Second Level:* Marc Grossman, Under Secretary of State
     for Political Affairs, Department of State, Washington
     D.C.

230

EXHIBIT 11

9.  If your position has changed since August 1998, please detail all positions held from August 1998 through November 2001 (to include title, location, and immediate and second level supervisors).

A:  **U.S. Ambassador to NATO, Brussels, Belgium, from January 1998 to July 2001.**

    **Immediate supervisors were then-Assistant Secretaries of State for European and Canadian Affairs Marc Grossman (1998-1999) and James F. Dobbins (2000-2001);**

    **Second Level supervisor was Under Secretary of State for Political Affairs Thomas Pickering.**

10. Do you now have, or have you ever had a direct work relationship to Ms. Farris while you were posted in Bangkok?  If so, what was the nature and duration of that relationship?

A:  **I was not posted in Bangkok and have never had a direct work relationship to Ms. Farris.**

11. Complainant Virginia Farris put in a bid for the USNATO Political Counselor/Advisor (FE-MC) - (Harris-321213/ 1603000) on November 10, 1999.  She states that she contacted you on March 27, 2000, at which time you told her that you had not yet made a decision, but that she was one of the stronger senior bidders.  She adds that she later learned that she was the only senior bidder so, according to Department Personnel policy, should have been selected.  Was Ms. Farris the only senior bidder?

A:  **Ms. Farris may have been the only senior bidder still interested in the job at the time a decision was made in June 2000, but I recall that at least two other senior officers also bid on the job.**

12. Ms. Farris was informed by various sources that she would not be selected for the position.  On May 18, however, she was informed that it had been decided to cede the USNATO job, and that she had the right to have her name brought forward in a shootout.

    12.1. Prior to the shootout, did you ever inform Thomas Tiernan or James Whitlock that Ms. Farris was unlikely to be selected?  If so, why?

A:      I do not recall ever informing Mr. Tiernan or Mr.
        Whitlock that Ms. Farris was unlikely to be
        selected.

12.2.   Did you ever have conversations with Mr. Tiernan,
        Mr. Whitlock, Marie Huhtala or Richard Hecklinger
        regarding Ms. Farris?  If so, what was discussed?

A:      I do not recall having any conversations with Mr.
        Tiernan, Mr. Whitlock, Ms. Huhtala or Mr.
        Hecklinger regarding Ms. Farris.

12.3.   If you did have conversations with any of the
        aforementioned parties, did their input regarding
        Ms. Farris in any way effect your decision not to
        select her for the position?

A:      N/A

13.  On what basis was Andrew Goodman selected for the USNATO
     position?

A:   It was my view as Ambassador that the USNATO Political
     Counselor/Advisor needed to have: (a) direct prior
     experience and expertise in NATO political and military
     issues (including NATO enlargement, Alliance relations
     with Russia and Ukraine, missile defense, non-
     proliferation of weapons of mass destruction, NATO-
     European Union defense relations, peacekeeping
     operations in the former Yugoslavia, the dynamics of
     Balkan and Central European politics, and many other
     U.S.-European security questions); (b) strong
     negotiating skills; and (c) familiarity with the
     interagency policy-making process.   These
     qualifications are necessary from the very outset
     because the USNATO Political Counselor/Advisor is the
     principal U.S. representative below the level of the
     Ambassador for the conduct of complex negotiations with
     Allied and Partner counterparts in a variety of NATO
     fora, virtually every day of the week.   The Political
     Counselor/Advisor must also have a demonstrated capacity
     to manage a large section, formulate policy advice, and
     interact effectively with senior and working-level
     policymakers in Washington.   Based on his strong
     performance as Deputy Political Advisor and his previous
     work in the Department and overseas on European and
     Russian affairs, I decided that Andrew Goodman was the

best candidate available for the job, even though he was
not then a member of the Senior Foreign Service.

14.   Ms. Farris asserts that she was more qualified for the
      USNATO position than the Selectee, Andrew Goodman.  She
      states that she possessed the required 3/3 in French,
      and had extensive managerial and leadership experience
      in a wide range of fields related to the USNATO
      position.  She asserts that her previous assignments as
      PD Advisor to the U.S. Commander in Chief Pacific,
      National War College Fellow and Congressional Foreign
      Affairs Fellow would have brought unique skills to the
      position.  She contends that she had more experience
      than Mr. Goodman, and that he was undergrade and
      ineligible to place a bid for the position. She adds
      that Mr. Goodman later bragged that he had been
      preselected for the position.  How do you respond to Ms.
      Farris' statements regarding her superior
      qualifications?

A:    While I considered Ms. Farris to have impressive
      credentials in terms of her record as a manager,
      Congressional fellow, and public diplomacy advisor at
      CINCPAC, I did not believe she had sufficient prior
      knowledge and experience in dealing with the wide array
      of European security issues that the USNATO Political
      Advisor must handle on a daily basis.  Nor did she have
      the experience that Mr. Goodman had gained in conducting
      high-level negotiations in the intense, multilateral
      NATO environment, as well as his operational experience
      in dealing with the interagency process.  Mr. Goodman
      was not pre-selected for the position – indeed, we
      sought to persuade the at-grade incumbent, William
      Harris, to extend for one more year, up until the month
      prior to the end of his tour of duty, and only made the
      decision in favor of Mr. Goodman at the very last
      minute, based on the relative qualifications of all
      available candidates.

15.   Were Ms. Farris' race or sex factors in her nonselection
      for the USNATO position?

A:    No.  Neither her race nor her sex was a factor in her
      non-selection.

16.   Ms. Farris asserts that she first made contact with
      Deirdre Davis of the Equal Employment Opportunity and
      Civil Rights Office regarding her situation in October
      1999.

233

16.1. Were you aware of Ms. Farris' EEO involvement?

A:    No.

16.2. If so, when and how did you become aware of Ms. Farris' EEO involvement?

A:    **I only became aware of Ms. Farris' EEO involvement upon receipt of this questionnaire in late August, 2002 .**

16.3. How do you respond to Ms. Farris' allegation that she was retaliated against for this EEO involvement when she was not selected for the USNATO position?

**I have no information on the basis of which to respond to this question.**

17. Is there anything that you would like to add at this time?

A:    No.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this day:

_September 6, 2002_
Date

_Alexander R. Vershbow_
Signature of Witness Vershbow


Subscribed and sworn to before
me at _____
on this _____ day of _September 2002_
_____
Signature of Affiant's Witness

234

Page 5 of 5                                                    Initials _____

### *PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES*
### *(OTHER THAN COMPLAINANT)*
### *FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW*

#### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

#### AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

#### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to EEO Commission activities, or to others for uses as published in the Federal Register.

#### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Signature of Interviewer

Date

Signature of Affiant

Place

235

# EXHIBIT 12

# In The Matter Of:

## *VIRGINIA FARRIS   v.*
## *U.S. DEPARTMENT OF STATE*

---

## *THOMAS TIERNAN*
## *April 13, 2004*

---

*BETA REPORTING & VIDEOGRAPHY SERVICES*
*910 SEVENTEENTH STREET, NW*
*SUITE 200*
*WASHINGTON, DC  USA  20006*
*(202) 638-2400    FAX: (202) 833-3030*

Original File AATIERNA.TXT, 191 Pages
Min-U-Script® File ID: 1579566178

**Word Index included with this Min-U-Script**

EXHIBIT 12

[2] A: Yes. John Heffern.

[3] Q: How long has Mr. Heffern been in
[4] that position? If you know.

[5] A: He's been there since I got here [6]
in '01. I think he got there in the summer
[7] of 2000, but maybe 2001.

[8] Q: Do you know what happened to [9]
Andrew Goodman?

[10] A: Yeah.

[11] Q: What happened?

[12] A: I don't know. I mean, I — John [13]
couldn't have been in that position [14]
until 2002, because Goodman was here
when I [15] got here. I think John — also
like [16] Goodman, I think he began as a
deputy and [17] moved up.

[18] Q: Okay.

[19] A: Goodman left in 2002 and went
[20] where? I don't remember, to tell you
the [21] truth. I think back to Washington.

[22] Q: Go ahead.

### Page 47

[1] A: That's — obviously I can get that [2]
information. I'm not a hundred percent
sure [3] of that.

[4] Q: Do you recall anything about [5]
Mrs. Ferris' background or quali-
ications, [6] sitting there in that room
today?

[7] A: Yes, a little bit.

[8] Q: What do you recall?

[9] A: Well, I mean, it's what I recall [10]
from reading this stuff last week, or what
I [11] recall from four years ago?

[12] Q: Well, that's a good question. [13]
What do you recall from three or four
years [14] ago?

[15] A: That she appeared to be a very [16]
good public diplomacy officer. She was,
you [17] know, articulate in her own
cause and so [18] forth, and really wanted
the job at NATO. [19] But I remember
thinking at the time, as we [20] got into it
more and more and as she pushed [21]
more and more for it that, it just really [22]
wasn't a good fit. Her background in
public

### Page 48

[1] diplomacy would make her an ex-
cellent public [2] affairs officer at a post
and maybe even a [3] good DCM at
certain posts, but not the [4] political
counselor or not the head of a [5] political
section at any [6] moderate-to-large-sized
embassy, and [7] certainly not at a place
like NATO.

[8] Q: Did you know if she had an prior [9]
experience dealing with military issues?

[10] A: I didn't remember then. At least
[11] I don't think did. I might have known
it [12] then, but I didn't remember until I
read it [13] last week that she had been a
political [14] advisor for one of the

military — I think [15] it was CinCPAC, or
whatever.

[16] Q: Right.

[17] A: Yeah. I probably knew that [18]
because we would have her PAR, her r
sum , [19] if you will.

[20] Q: What's that?

[21] A: I just didn't happen to recall it.

[22] Q: You say the power?

### Page 49

[1] A: PAR, I'm sorry. Using another [2]
acronym, and I don't even think we use it
[3] anymore. The Personnel Allotted
Report. [4] It's basically your r sum .

[5] Q: I see.

[6] A: That would be used by offices
when [7] they're reviewing candidates
for jobs.

[8] Q: Did you recall at the time that [9]
there was a shoot-out with Ms. Ferris and
[10] Mr. Goodman?

[11] A: Yes.

[12] Q: You say here that you don't know
[13] who spoke on behalf on each can-
didate.

[14] A: That's right.

[15] Q: At the time, 2001, did you know if
[16] there had been a shoot-out, or did you
[17] really have some idea that there was
in fact [18] a shoot-out?

[19] A: If there was a shoot-out, I would
[20] have known it from my position. I
mean, [21] there would be no way I
wouldn't know that.

[22] Q: Right.

### Page 50

[1] A: Because I was charged with, [2] you
know, giving to a charg , a bureau's [3]
candidate for a job. Then after the panel,
[4] making sure — you know, finding out
what [5] happened. Did the panel
approve all of the [6] candidates or not?
So there's no way that a [7] shoot-out
would occur without me knowing it.

[8] Q: Right. So in 2001, you should [9]
have known there was a shoot-out?

[10] MS. CHANDLER: A point of [11] clar-
ification. Mr. Doumar, you keep [12]
saying 2001. Do you mean 2000?

[13] THE WITNESS: 2000.

[14] BY MR. DOUMAR:

[15] Q: In 2000, you have know there was
[16] shoot-out? That's true.

[17] A: That's right.

[18] Q: When you —

[19] A: The reason I say, no that I didn't [20]
even recall if there was shoot-out, there
[21] was so much discussion back and
forth about [22] whether she would or
she wouldn't, that I

### Page 51

[1] had really forgotten how it played it
out. [2] But had there been a shoot-out, if
there was [3] one, I knew it at the time,
yeah.

[4] Q: You say HRCDASL is in the best [5]
position to provide that information. I [6]
suppose as to the shoot-out?

[7] A: That's the senior officer division [8]
in HR, yeah.

[9] Q: So they're called SL, I suppose?

[10] A: I guess. That's what they were [11]
called. I mean, I think they still are. [12]
Yeah, SL. Senior level I guess is what it [13]
stands for.

[14] Q: You said the ambassador's choice
[15] carries an enormous amount of
weight?

[16] A: Yes.

[17] Q: That's the ambassador to NATO
for [18] that position?

[19] A: That's correct.

[20] Q: Does the ambassador always have
[21] his sort of recommended candidate
for that [22] kind of position?

### Page 52

[1] A: That's a good question. I would [2]
say, for that kind of position at that kind
[3] of post, it would be highly unusual for
the [4] ambassador not to weigh in with at
least his [5] number two and say this is
who I'd like to [6] see in that job.

[7] It's certainly possible now and [8] then
that the ambassador cedes that position
[9] to his number two, his deputy chief [10]
admission. The position in question is
the [11] number-three-person in the
mission, so it [12] would be a rare
ambassador who wouldn't want [13] to
have a say in that, you know.

[14] Q: Who's the ambassador to NATO
now?

[15] A: Nick Burns.

[16] Q: I think you told me that. How [17]
long has he been in that position?

[18] A: He got there in September of '01.

[19] Q: Did he replace Ambassador [20]
Vershbow?

[21] A: That's correct.

[22] Q: Do you know what happened to

### Page 53

[1] Ambassador Vershbow?

[2] A: Yeah. He's the ambassador in [3]
Moscow.

[4] Q: It sounds like the way this [5]
process works, according to your state-
ment, [6] is that the ambassador would
typically weigh [7] in with his choice,
then the bureau, EUR, do [8] they select
the candidate? Then HR approves [9] that
selection?

THOMAS TIERNAN
April 13, 2004

VIRGINIA FARRIS  v.
U.S. DEPARTMENT OF STATE

[10] A: That's probably a fair [11] description. I mean, formally, it's HR. [12] Yeah, HR has to approve it. Their approval [13] is, you know, obviously essential. Without [14] that, you don't have the assignment. But, [15] yeah, that's an apt description of it.

[16] Q: The HR assignment's panel is this [17] group of 10 to 15 people who serve [18] for two-year terms, as we discussed?

[19] A: That's right.

[20] Q: Now, sitting here today, do you [21] recall from 2000 and 2001 — you have in [22] your statement "you have no recollection of

Page 54

[1] the decisionmaking process involved in the [2] selection of this political advisor [3] position." But you've described —

[4] A: In the Hague.

[5] Q: In the Hague. That was a separate [6] position?

[7] A: That's a separate position. [8] Right.

[9] Q: I see. That is at issue here. [10] Sitting here today, do you have any [11] recollection of the selection of the [12] political advisor position in the Hague?

[13] A: No, I don't.

[14] Q: Do you know what that position was [15] even?

[16] A: Yeah. That position — I mean, my [17] only recollection of it comes from the [18] material that Ms. Chandler sent me last [19] week, and that triggered some memories in my [20] mind. But at the time, I was very [21] peripherally involved, if at all, which is [22] why I don't have any memory of it. That's

Page 55

[1] different. The position was called [2] political advisor; same title as the one at [3] NATO, but it was a classic political advisor [4] that worked for military commanders.

[5] So the process for filing those [6] jobs was a little different, because instead [7] of the ambassador or anyone in the State [8] Department in HR making the final call, it [9] would be the military commander that the [10] advisor was going to be working for.

[11] So they didn't need to go through [12] our HR system except to formally rubber [13] stamp it at the end so that they could get [14] travel orders and everything and [15] bureaucratically get them in the system. [16] But the decisionmaking process wasn't done [17] by the bureau, it was done by the military [18] command. So my office really didn't [19] involved in that.

[20] It was — it gets confusing, but [21] the NATO — not the NATO, but the desk, the [22] military desk — turned out to be the NATO

[1] desk in this case, that office would be the [2] ones that would get the candidate lists and [3] forward them to the military command, and get [4] the druthers of that command and pass it [5] back. They'd pass it through me and I'd [6] pass it on to CDA, but it was such a small [7] role that I had that it wouldn't register on [8] my radar screen.

[9] Q: So the person who would have that [10] more conduit role is a NATO desk? Is that [11] within the State Department?

[12] A: Yeah. DREUR/RPM (?).

[13] Q: What does RPM stand for?

[14] A: Oh, God, what does it stand for?

[15] Q: That's the NATO desk?

[16] A: Political and military, I think.

[17] Q: Okay.

[18] A: It's been that acronym for, you [19] know, 20 years or more.

[20] Q: I've seen it around in this case, [21] so I thought maybe you could finally clarify [22] that for me.

Page 57

[1] A: I think it's regional political [2] military.

[3] Q: You were EUR, but they're sort of [4] a separate entity or somewhat off to the [5] side?

[6] A: No, they're one of the offices in [7] the EUR that, you know — I don't know, a [8] dozen or so. They're one of the offices [9] that would have day-to-day operational [10] responsibility for policy relations with the [11] embassy under their command, under their, [12] you know, portfolio.

[13] As part of that, they also dealt [14] with these political advisor jobs, because [15] they were closest office that the EUR had to [16] one that dealt with PALMEL (?) issues, [17] because they were the NATO desk. So they [18] would pick up these sort of stray cats and [19] dogs, like these military political [20] advisors, of which there are a handful in [21] Europe — I think maybe three, four, five — [22] you know, it's not a lot of them.

Page 58

[1] So someone had to sort of pay [2] attention to that and be the bureaucratic [3] liaison with the military and with that [4] office. But it wasn't one of their main [5] functions, but they had to do it.

[6] Q: Right. So they would pass the [7] choice on to the assignments committee in [8] HR.

[9] A: No, they would have gone through [10] me.

[11] Q: They would have gone through [12] you?

[13] A: Because we were — I was the only

[13] voice that dealt with HR — my office, for [14] clarity purposes, so that different people [15] weren't calling him and saying EUR-1, CUR-1. [16] I would be the voice of EUR in that sense. [17] So they would have worked it through me, but [18] I — you know, because it wasn't part of the [19] State system, I wasn't getting, you know, [20] e-mail communication from embassies. I [21] didn't know these military commanders were. [22] I had no role except to sort of pass through

Page 59

[1] what they said — the commander wants so and [2] so, and I'd pass that onto HR for [3] assignments. HR really had next to know [4] role. They would rarely do anything other [5] than rubber stamp that choice. It was sort [6] of an unspoken — I believe still sort of an [7] unspoken agreement between State and DoD [8] that if people put their name forward, State [9] will convey all the names and DoD will make [10] the selection.

[11] Q: State conveys the names to DoD? [12] Is that —

[13] A: Uh-huh.

[14] Q: Then there's some command?

[15] A: Yeah. I mean, that would have to [16] be the way it would have worked. Yeah.

[17] Q: Then the commander has a list of [18] names to review and to pick from?

[19] A: That's right.

[20] Q: How's the commander pick — if [21] it's a DoD person looking at State [22] Department personnel, how would he decide?

Page 60

[1] A: I don't have a clue. Good [2] question. Better put that to somebody in [3] RPM. He probably would talk — he and his [4] deputies would talk back to the people in [5] RPM if they didn't understand the r sum . [6] They might call the people directly at the [7] post and interview them, you know. I don't [8] know how they did it, frankly.

[9] They'd have to satisfy themselves [10] that they were getting the best in whatever [11] way they could do that.

[12] Q: In your last sentence in your [13] statement, you say, "in the judgment of [14] myself, the European bureau, and the HR [15] assignment's panel, the best qualified [16] candidates were selected in each case."

[17] A: Uh-huh.

[18] Q: When you say "in each case," do [19] you mean in every case? Or in these two —

[20] A: I think I mean each of these two [21] cases that I was asked about; the Hague and [22] NATO. I mean, I happen to

VIRGINIA FARRIS    v.
U.S. DEPARTMENT OF STATE

THOMAS TIERNAN
April 13, 2004

believe that in

---

Page 61

[1] every case, you know, because no one's — [2] what would be anybody's motivation to not [3] take the person they could get, you know, [4] for their job? I mean, that's what we all [5] want usually. But, yeah, here I was [6] speaking just about those two cases.

[7] Q: You would say that's based, on [8] your experience, true in every case?

[9] A: Well, in theory, yes. You know, [10] yeah.

[11] Q: In practice, is it true?

[12] A: Well, yes. It depends how you [13] define best qualified. I mean, I may not [14] always have agreed with the decision that [15] the decisionmaker made. I might have been [16] frustrated, say why didn't he take, you [17] know, candidate B instead of A? I think B [18] would be better, but that's always a [19] subjective judgment.

[20] I'm just saying I think the [21] decisionmaker, the ultimate decisionmaker [22] in each one of these cases, took the person

---

Page 62

[1] that they believed to be best qualified.

[2] Q: Do you know who got the political [3] advisor position in the Hague?

[4] A: No, I do not.

[5] Q: Do you know anything more than [6] what you've just told me about the [7] decisionmaking process for that position?

[8] A: No, I do not.

[9] Q: So the basis for your view that [10] they took the best qualified candidate in [11] that case is what?

[12] A: It is just the way I saw the [13] system always operating, which was like [14] I just said; that people — no one is [15] motivated to not take the best person they [16] can get from the ones that are showing an [17] interest in the job. So in my experience, [18] that's what they do. Now, maybe I shouldn't [19] have worded it like that, because I really [20] don't have that much, you know, specific [21] memory of the Hague. So I really — you [22] know, that's all I can say.

---

Page 63

[1] Q: All right.

[2] A: I was probably being more general [3] than I should have been in that answer, when [4] I look at it.

[5] Q: Do you know how you came to [6] prepare this statement that we've just [7] discussed, Mr. Tiernan?

[8] A: How I came to prepare it?

[9] Q: Yes. Was this something you typed

---

Page 64

[10] up?

[11] A: I did, yes. Here in my office. [12] Yeah.

[13] Q: It sounded like you'd gotten an [14] e-mail, potentially, from Mr. Lokos.

[15] A: I believe so. He's the one that [16] requested this statement?

[17] Q: I believe so.

[18] A: Yeah.

[19] Q: I'm just trying to find out if [20] that's the case or my knowledge could [21] be wrong.

[22] A: I believe that's correct. He's

---

Page 64

[1] the guy in Texas?

[2] Q: I believe so.

[3] A: Uh-huh.

[4] Q: Did you ever talk to him on the [5] phone?

[6] A: I do not believe so. Might have [7] once, but I don't believe so. I think it [8] was all just e-mail.

[9] Q: You say you might have once. Why [10] do you think that?

[11] A: I don't remember.

[12] Q: I see.

[13] A: If there was, it was to like get a [14] fax number or something. I have a vague [15] memory of that. I think we faxed this to [16] him, my secretary. But I don't — I [17] think it was all done by e-mail.

[18] Q: The witness here is Ruth [19] Underwood?

[20] A: My secretary at the time.

[21] Q: Is your secretary. You don't [22] recall hanging up on Mr. Lokos at any time,

---

Page 65

[1] do you?

[2] A: No.

[3] Q: It sounds like you're not sure you [4] talked to him at all.

[5] A: No. I don't have a memory of it, [6] but I — have some memory of needing a fax [7] number. And I can't remember — I really [8] don't remember if we got that by e-mail then [9] or if I or my secretary called him. I mean, [10] I don't — really don't remember.

[11] Q: Let's go through another document [12] here. I think we're making pretty good [13] progress. This is your declaration of [14] Thomas Tiernan, which I'll have the court [15] reporter mark as number 2.

[16] Do you have that in front of you? [17] This is the page 1 of 9 document that we [18] were discussing earlier.

[19] (Deposition Exhibit No. 2 was [20] marked for identification.)

---

Page 66

[21] THE WITNESS: Yes, I do.

[22] BY MR. DOUMAR:

[1] Q: Looked like in 2001, you had [2] drafted and written up this statement, and [3] yet in 2002, you do a declaration. Do you [4] recall how you came to draft up this [5] declaration after you had previously done a [6] statement?

[7] A: The one in 2002?

[8] Q: Yes.

[9] A: No. My memory was I just kept [10] being contacted by people in this case, [11] thinking, my God, is this still alive, you [12] know? I don't know why. No.

[13] Q: Do you recall if it was the same [14] investigator, Mr. Lokos, or a different [15] investigator?

[16] A: In all honesty, I just don't [17] recall. I'm sorry.

[18] Q: I'll go through this statement, at [19] least some of it. It asked you if you'd [20] participated in protected EEO activity, and [21] you have no idea. Let me ask that question [22] a different way.

---

Page 67

[1] A: Well, I was — yeah, okay.

[2] Q: Have you ever made a claim of [3] discrimination yourself?

[4] A: No, I have not.

[5] Q: Have you ever made a grievance [6] claim against the State Department?

[7] A: No.

[8] Q: Have you ever made a claim against [9] any private party that was a legal [10] claim?

[10] A: No.

[11] Q: Why did you get offended that [12] they asked you your race?

[13] A: Do I have to answer that? I don't [14] know. I mean, I just think that a [15] little offensive. Because either my [16] answer's following to me with — if [17] they're honest answers, then it doesn't [18] matter what [18] my race is. I always get offended at that [19] question.

[20] Q: Don't you have to answer that [21] question in lots of contexts nowadays?

[22] A: Probably, and I always get

---

Page 68

[1] offended. If given the choice to not fill [2] it in, you know, like on a census form [3] or [3] something, I don't fill it in. That's [4] me. [4] The reason I say I have no idea on [5] the [5] protected EEO activity is because I [6] didn't [6] know what that meant.

[7] Q: I figured that, which is why I [8] asked the question to you a little bit [9] differently. I think some of this we've [10] covered as I go through. I have an outline [11] with it, but based on your answers to

THOMAS TIERNAN
April 13, 2004

VIRGINIA FARRIS   v.
U.S. DEPARTMENT OF STATE

prior [12] questions, I'll try not to retread the same [13] ground, although I'm sure I'll do it a [14] little bit.

[15] A: Uh-huh.

[16] Q: On page 2, it covers your jobs [17] from 1998. Let me ask, did you ever know [18] Ms. Ferris or have contact with her [19] before [19] this job assignments process?

[20] A: No, I didn't.

[21] Q: Did you ever meet with her at any [22] time during, before, or after the job

Page 69

[1] assignments process?

[2] A: No, I did not.

[3] Q: As you sit there today, you've [4] never met Ms. Ferris?

[5] A: I don't believe I have.

[6] Q: Okay.

[7] A: No.

[8] Q: Let me ask what —

[9] A: Trick question?

[10] Q: No, it's not a trick question.

[11] A: I don't believe I have. No.

[12] Q: Let me go back and ask sort of a [13] preliminary question. You're sitting in [14] your office there today in Brussels? Is [15] that correct?

[16] A: Yes.

[17] Q: Is anyone else in the room with [18] you?

[19] A: No.

[20] Q: Has anybody else been in the room [21] with you since we started the [22] deposition?

[22] A: No.

Page 70

[1] Q: I think going to question 11, [2] we've covered some of that. I don't [3] always [3] understand these acronyms and statements, [4] and maybe this is something that you can [5] explain. Question 11, there's this [6] parentheses, Harris-321213/1603000. Do you [7] know what that refers to?

[8] A: Yeah. That's the way they [9] identify positions. Harris would have been [10] the incumbent that was leaving. The [11] numbers — the first set of numbers are — [12] what do they call this? Organization codes. [13] Each post in the world has a six-digit [14] number. The seven-digit number is the [15] position number. It's sort of a — you [16] know, codes for the computer and [17] everything. [17] So that identifies that specific job.

[18] Q: I see. You say here, "the [19] ambassador to NATO is the person who's [20] ultimately responsible, with the [21] assistant [21] secretary of the European bureau?"

[22] A: Yes, for filling the job. That's

Page 71

[1] correct. For responding to that question. [2] The ones that — you know, want it filled [3] and care about it.

[4] Q: So the ambassador sort of weighs [5] in and then the European bureau decides; it [6] is actually the assistant secretary.

[7] A: That's right. Well, it's the [8] assistant secretary, but he or she now had [9] delegated it at the time to the principal [10] desk, because if you can imagine, those [11] people are very business. So they don't get [12] into all the assignments in the bureau. But [13] they're the ones technically responsible, [14] but they delegate it to their assistant.

[15] Q: Okay.

[16] A: Who further delegates most of the [17] time. But he in every case approved the [18] list before we would send it every week to [19] HR, or of who ER wanted. So, yeah, it went [20] that high every single job.

[21] Q: Right. The U.S. NATO position. [22] You discuss that a little bit on 11.2. You

Page 72

[1] say that would have been the office director [2] of EUR/RPM.

[3] A: Uh-huh.

[4] Q: Is that correct? I thought you [5] said that would be the person for the Hague [6] job.

[7] A: For both jobs. That RPMNC office, [8] their main function is to be NATO desk. [9] They deal with NATO on a day-to-day basis, [10] and then they do those political jobs, [11] political advisor jobs, military command [12] jobs. Like in places like the Hague is sort [13] of a sideline, if you will. But their main [14] function is NATO relations.

[15] Q: Right. Help me understand, [15] because you said you didn't really have [17] anything to do with the filling of the [18] political advisor position on the Hague.

[19] A: Right.

[20] Q: But obviously you had quite a — [21] not quite a bit, but some contact with this [22] U.S. NATO political advisor position. How

Page 73

[1] did —

[2] A: More contact with it. Yes.

[3] Q: How did you come to have more [4] contact with it than with the Hague [5] position?

[6] A: Again, because the Hague position [7] is under military command, and there are a [8] handful of those; because no one in the [9] State system in any of our embassies is [10] really weighing in on

that. No one is [11] sending State e-mails on who they want or [12] don't want and all that. So I would have [13] naturally had less contact on that job than [14] I would routinely have on any other of [15] the 600 jobs that we were filling. It just [16] wasn't an in-house job, you know? If you [17] understand?

[18] Q: I understand what you're saying. [19] Now, they ask whether you'd had [20] discussions with the people responsible for [21] filling the position, such as Ambassador Vershbow.

[22] A: Uh-huh.

Page 74

[1] Q: You said you obviously had [2] discussions, because you knew that [3] Ms. Ferris was not the bureau's choice. Who [4] did you have discussions with?

[5] A: Well, not with Vershbow. He and I [6] never spoke about it. I would have with [7] the RPM — see, I don't remember the [8] specific names of the people at this point. [9] I know I [9] had them with Ferris' counselor in senior [10] officer division of HR. I remember talking [11] to him about it.

[12] But I would have talked to, most [13] likely, Pat Moon, the deputy in RPM at the [14] time in that office. I may have spoken with [15] somebody out at U.S. NATO. Probably [16] Mr. Harris would be my guess. That would be [17] typically how that would work. There would [18] be e-mails back and forth. You know, there [19] was a whole array of ways that you got [20] information on this, that certainly knew [21] of the case. But I can't remember [22] specifically, you know, who told me that the

Page 75

[1] other guy was our candidate.

[2] Q: You said you spoke to Ms. Ferris' [3] counselor. Who would that be?

[4] A: Whitlock.

[5] Q: James Whitlock. Do you recall [6] anything about your discussion with [7] Mr. Whitlock?

[8] A: No, they were mainly in the nature [9] of me trying to ascertain if and when we [10] would be able to get a senior cede from [11] that division so that we could bring our [12] candidate to panel. Then he — of course, [13] his job as a counselor is to help Ms. Ferris [14] and all of his other, you know, clients get [15] the jobs that they want.

[16] So of course, at the beginning, he [17] was interested in well, is there any chance [18] that she's going to be the candidate for [19] that job? So it would have been those kinds [20] of discussions. Working, discussing with [21] him about why, you know, the bureau was [22] going with the other guy, and then seeing if

Min-U-Script®

BETA REPORTING (202) 638-2400

[19] Q: You say you've become intimately [20] involved with your EUR assignment [21] possibilities over the last several —

[22] A: Yes. That's my way of — you

---

Page 114

[1] know, that's my way of saying, hey, you [2] know, we've been back and forth over your [3] assignment spec here and I've been paying a [4] lot of attention to it lately, and I want to [5] try to let you know where it sits from where [6] I stand.

[7] Q: Right.

[8] A: Or where it stands from where I [9] sit, is another way to put it.

[10] Q: First, you're pretty clear to her [11] that she'd like to be in Brussels, but it's [12] not going to work out from the first [13] sentence of the second paragraph.

[14] A: Right.

[15] Q: Actually, we're having Brussels' [16] weather today. I can see about 100 feet [17] outside my window. It's all cloudy and grey [18] and about 50 degrees.

[19] A: We're in the same boat.

[20] Q: You're in that same boat 10 months [21] a year, it seems like, over there.

[22] A: Right. Exactly.

---

Page 115

[1] Q: But obviously, it is a good place [2] to live.

[3] A: It is.

[4] Q: What's the McConnell job on the [5] international staff?

[6] A: I don't remember now what the [7] title of the job is, but he was a senior [8] officer, an ex-ambassador that had a [9] position on the international staff. [10] Again — well, not again, I don't think [11] I've covered this before. We, in the [12] bureau — they're kind of like the [13] political [13] advisor job at the Hague. These [14] international staff positions at NATO are [15] decided by non-State Department people, [16] either the secretary general of NATO or [17] designee. [18] But American officers would apply [19] for it and bid on those jobs whenever there [20] was an opening there. Really, it's the U.S. [21] mission to NATO personnel office that was [22] sort of the liaison with NATO international

---

Page 116

[1] staff on those positions. If an American [2] was selected, they would convey that [3] information to us in the EUR/EX and we'd [4] convey it to the assignment panel so that [5] the person could be formally assigned to [6] Brussels. But really, the State Department [7] and the Europe bureau had no real control or [8] say over those decisions.

[9] Q: I see. What's the Shape Polad [10]

job?

[11] A: That's another — and I don't [12] remember anything about this one either. [13] It's Shape headquarters in Mons, Belgium, [14] about 50 miles from Brussels. There is a [15] political advisor position like the one in [16] the Hague, and I think there's one in [17] Stuttgart and in Naples. I don't know where [18] else, and she must have bid that job. [19] I totally — I have no memory of that at the [20] time of her now. I might be one of the [21] those where the military — the Shape [22] commander would make the call.

---

Page 117

[1] Q: But you said "both U.S. European [2] Union and U.S. NATO ambassadors are holding [3] very firm for our '01 stretch candidates for [4] these two jobs." What does that mean?

[5] A: Well, and I don't remember the [6] U.S. EU job, frankly, either. What that [7] means is the same situation was applying at [8] NATO, was that there must have been another [9] position at U.S. EU that she was bidding on, [10] that same position that U.S. EU wanted [11] an '01 candidate into like Andrew Goodman [12] for the NATO job. I don't even know what [13] job that is now, or what the circumstances [14] of that job were, to tell you the truth.

[15] Q: It says "central PER." That's, I [16] guess, the human resources?

[17] A: Right. It's now known as HR. [18] Yes.

[19] Q: "Is ready to grant the senior [20] cedes needed to panel these two offices." [21] We talked about a senior cede for the U.S. [22] NATO position.

---

Page 118

[1] A: Right.

[2] Q: What are the two cedes you're [3] referring to here?

[4] A: Apparently for the U.S. EU job as [5] well. But I don't remember that job right [6] now, because I guess she hasn't made an [7] issue of that one particularly. I don't [8] know about that job. I mean, I just have no [9] memory of it.

[10] Q: It sounded like they wouldn't [11] make it the cede.

[12] A: Right.

[13] Q: It says make the cede as soon as [14] you are paneled to another job —

[15] A: Right. Or withdraw your [16] candidacy. That's fairly typical. Early [17] on — well, May 12th is very early on in the [18] cycle, but everybody gets more desperate to [19] wrap things up as it gets on toward the [20] summer. It's fairly typical, I think, that [21] the senior division didn't want to cede a [22] job as long as one of

their officers, a

---

Page 119

[1] senior officer, one of their clients, was [2] still interested in it. They were hoping [3] against hope always — if they don't cede [4] the job, we'll have to roll over and say, [5] okay, we'll take the senior candidate.

[6] So in this case, I was getting [7] indications from Mr. Whitlock that they [8] understood that she wasn't particularly [9] qualified for the job compared to Goodman, [10] yet she was still one of their clients. [11] They were not yet ready to cede the job. I [12] don't remember anything about the EUR job. [13] So they knew that we were necessarily EUR, [14] but they're not ceding, wasn't going to [15] suddenly say, okay, we'll take Ms. Ferris [16] for NATO.

[17] But there was sort of this [18] standoff between the bureau and HR on that, [19] and that they weren't ready to cede the [20] job. Some point down the road, they [21] probably would and that allowed the [22] shoot-out to occur, but they weren't yet at the time of

---

Page 120

[1] the e-mail.

[2] MR. DOUMAR: Hold on, Mr. Tiernan, [3] while I get some water for our court [4] reporter.

[5] (Pause.)

[6] MR. DOUMAR: I'm sorry, [7] Mr. Tiernan.

[8] BY MR. DOUMAR:

[9] Q: We're talking about the senior [10] cedes at that time. Did eventually [11] personnel cede the job even though [12] Ms. Ferris didn't extend, withdraw, or get [13] paneled to another job?

[14] A: Yes.

[15] Q: It sounded like at the time of [16] the e-mail at least, they weren't going to [17] cede the job unless she did get another [18] job, extend, or withdraw.

[19] A: Right. That sounds correct. Like [20] I said, that's fairly typical, you know, [21] before a cede is granted, that they aren't [22] willing to do them. They don't like to do them.

---

Page 121

[1] you know. More often than not, they don't [2] like to do them.

[3] Q: Do you recall how they decided to [4] do it in this case?

[5] A: I think they accepted the fact [6] that Mr. Goodman was objectively more [7] qualified at that point in time to assume [8] the duties at NATO than Ms. Ferris was. So [9] by giving us the cede eventually, that [10] allowed us to bring our candidate to the [11] panel. Without

---

# EXHIBIT 13

## 11) Tiernan to Farris E-mail 12May99

-----Original Message-----
From: Tiernan, Thomas J
Sent: Friday, May 12, 2000 4:15 AM
To:   Farris, Virginia Loo
Subject:    onward assignment

Ginny, I hope you remember me from our contacts earlier in the cycle when you ex-
pressed belated interest in some DCM and principal officer positions in EUR; I'm
the head personnel guy in EUR/EX.  I've become intimately involved with your EUR
assignment posibilities over the past several weeks and want to give you the lay of
the land from where I sit.

First, its clear that you'd like to be in Brussels (who wouldn't; it's a great place to
live), but I do not think that will work out this cycle. We've been advised that
NATO is going with another candidate for the McConnell job on the International
Staff. Your competition for the SHAPE PolAd job is three ambassadors, all with
extensive regional and political/military experience. And both the USEU and US-
NATO ambassadors are holding very firm (as is EUR) for our O-1 stretch candi-
dates for those two jobs. Central PER is ready to grant us the senior cedes needed
to panel those two officers as soon as you are paneled to another job, extend in
Bangkok, or withdraw your candidacy for those jobs. (There are no other senior
bidders.)

Ginny, I know that State's assignment system must be a bit of a mystery to you, and
that the cede concept might be confusing. There is no dictum that a senior automa-
tically has priority for a senior job. While there is a general presumption in favor
of at-grade oficers for jobs at all grades, the qualifications and background of the
senior officer for the job in question are key factors. In other words, multifunct-
ional or program direction jobs (DCM, office director, etc.) are the ones that are
easiest for senior officers to lay claim to without regard to cone. But, conversely,
counselor jobs like the USEU and USNATO jobs are the ones that are easiest for
conal officers to lay claim to without regard to grade. Bureaus, officers, and
central PER tend to operate according to these basic assumptions, and will not
normally put a senior officer into a job for which they do not have the background
at earlier stages of their careers.

So I recommend that you turn your attention to the Athens job. You're at grade, in
cone, and the bureau and post are enthusiastic about your candidacy. We need to
come to closure on all the jobs in question, as many people's lives are in the balance.

593

EXHIBIT 13

# EXHIBIT 14

EXHIBIT F8a

## DECLARATION OF PATRICK MOON

In accordance with the provisions of Title 28, United States Code, Section 1746, I, Patrick Moon, make the following declaration:

1.   What is your full name?

A:   Patrick Steven Moon

2.   What is your race?

A:   Caucasian

3.   What is your sex?

A:   male

4.   Have you yourself ever participated in protected EEO activity?

A:   no

5.   What is your current title?

A:   Deputy Chief of Mission

6:   In what Office or Bureau, and in what location, of the U.S. Department of State do you work?

A:   U.S. Embassy Zagreb, Croatia

7.   Since what date have you been employed in your current position and location?

A:   August 1, 2001

8.   Who are currently your immediate and second level supervisors?

A:   Immediate supervisor:  Ambassador Lawrence Rossin
I have no second level supervisor.

**284**

Initials ___

EXHIBIT 14

9.    If your position has changed since August 1998, please
       detail all positions held from August 1998 through
       November 2001 (to include title, location, and
       immediate and second level supervisors).

A:    August 1998-July 2000: Deputy Director, EUR/RPM
       (Regional Political and Military Affairs, Bureau of
       European Affairs, Department of State, Washington, DC)
       Immediate Supervisor: Barbro Owens-Kirkpatrick (Aug 98
       to Aug 99) and Walter Andrusysyn (Aug 99-Jul 00);
       Second level supervisor was Deputy Assistant Secretary
       Ron Asmus
       September 2000-July 2001: Language Student, Foreign
       Service Institute, Department of State

10.   Do you now have, or have you ever had direct work
       relationship to Ms. Farris while you were posted in
       Bangkok?  If so, what was the nature and duration of
       that relationship?

A:    I have never been posted in Bangkok.

11.   The position of Hague AF Political Advisor (FE-OC) -
       (325601-1078911) was advertised in September 1999.  Ms.
       Farris asserts that she bid on the position but, prior
       to the date that the official bid lists were due, you
       informed her that the short list for the position had
       already been submitted because DOD was pressing for
       candidates.

       11.1.    Do you recall making this statement?

       A:   No.  Although the position was advertised as being
in The Hague, it was actually the Political Advisor to the
NATO military commander located at Brunsum, Netherlands.
Furthermore, the position is a NATO International Staff
position and not a Department of State position.  As such,
the timetable for selection (and thus the submission of USG
candidates for the position) was set by NATO and was not
tied to the Department of State bidding and assignment
process.  As a matter of course, we put these NATO positions
on the Open Assignment cables in order to advertise them to
all FSOs.  I do not remember any pressure from DoD to submit
the names of candidates (there would be no reason for DoD to
do so).  It is possible, however, that the NATO authorities
were pressing for a list of names, but I do not remember the
facts of the process.  All other NATO member countries had
the opportunity to submit candidates.  Although we would
submit the names of USG candidates for NATO International
Staff positions, the final selection for such positions is

made by NATO authorities, not by USG officials.  I explained all of this in great detail to Ms. Farris.

> 11.2.    Why was a short list forwarded before official bid lists were due to be submitted?

A:    This is an assertion of fact and not a question. I do not remember when the list of names was submitted to the NATO authorities nor do I remember the names on the list.  As I indicated above, the position in question is a NATO International Staff position and not a Department of State nor even USG position.  Furthermore, the date for submission of the names was dictated by NATO and was not linked to the Department of State's assignment process.

> 11.3.    Had Ms. Farris' bid list been received at the time that the short list was forwarded?

A:    I do not remember.

> 11.4.    If so, was Ms. Farris' name forwarded on the short list?

A:    I do not remember.

> 11.5.    If not, how were you aware that Ms. Farris was interested in this position, and why did you inform her that the short list had already been forwarded?

A:    Ms. Farris communicated with me a number of times by phone and email regarding her interest in this job and others at the U.S. Mission to NATO.

12.  What was your role in filling this vacancy?

A:    I was responsible for identifying qualified Department of State candidates to propose to NATO for the position.  I consulted with my supervisors regarding which candidates we would recommend to NATO for International Staff positions.

13.  If you had a role in filling this vacancy, did you seek input regarding Ms. Farris from Marie Huhtala or Richard Hecklinger?  If yes, what information was shared with you regarding Ms. Farris?

A:    I do not know these people and do not remember seeking any information from them.



14.  If you were not directly responsible for filling the
     vacancy, who was responsible for filling the position?

A:   As I indicated above, the position is a NATO
International Staff position and not a USG position.  The
USG proposed candidates, and the NATO authorities made the
selection from our candidates and those of other NATO member
states.

15.  Did you ever speak to any of the individuals
     responsible for filling this position?  If so, what was
     discussed?  Was any information shared regarding Ms.
     Farris' family situation, her husband's Medical
     Clearance, or the reasons for allowing her to enter the
     bidding cycle early?  If so, please detail any
     information that was shared with those responsible for
     filling the Hague position.

A:   I did not speak to any NATO authorities regarding Ms.
Farris.  I had no knowledge of Ms. Farris' husband's medical
condition/clearance or that there was ever an issue in this
regard.  If I had any knowledge of why she was permitted to
bid early, I do not remember it now.  Frankly, I am not sure
what is meant by "bidding early."

16.  Ms. Farris states that, in mid-November 1999, the Hague
     position continued to appear on biweekly bid list
     updates.  She asserts that the position also appeared
     in a December 1999 State Department Hard-to-Fill cable
     as an immediate vacancy.  If a short list had been
     forwarded prior to the closing date for bids, why did
     the position remain unfilled for an extended period?

A:   I cannot verify whether Ms. Farris' statements are
accurate and cannot answer this question.  I would note
again that the position in question was not a Department of
State position.  The NATO authorities establish a deadline
for the submission of candidates.  These deadlines are not
tied to the Department's bidding cycle or procedures (thus
the Department's Open Assignments bid deadline was
irrelevant for this position).  The only way we could
advertise for candidates for the NATO positions was to put
the jobs in the Open Assignments cables.  The final decision
on filling the position was made by the NATO authorities.  I
explained all of this to Ms. Farris.

17.  Ms. Farris contends that, by listing the Hague opening
     on the bid list, then closing it before bids were due
     on October 4, 1999, it appeared that the Department had

no intention of allowing for open and fair competition for the position. She contends that the other candidates were junior in rank and experience to her, and that her bid was being discouraged due to the fact that the rank and qualifications of the preselected candidate at the time of the bidding process were inferior to hers. How do you respond?

A:  Once again, the "closing date" for bids for such NATO positions is often not tied to the Department's procedures because the positions are filled according to NATO's procedures. (I do not remember NATO's deadline for submitting our list of candidates for the position in question.) I explained this to Ms. Farris. I remember who was finally selected by the NATO authorities for the position, but I do not remember who the other candidates were. I know that the candidate who was selected by the NATO authorities for the job was an FE-OC who had significant experience with the development and implementation of U.S. foreign policy toward Russia and managing U.S. policies in Europe, including at the NSC.

18.  Who was ultimately selected for the Hague position at issue? What is the race and sex of that employee?

A:  As I recall, Mr. Jack Segal was selected by the NATO authorities for the NATO Political Advisor position at Brunsum, Netherlands. He is a male and Caucasian.

19.  Was Ms. Farris' race a factor in your informing her that the short list had been submitted prior to the receipt of her official bid list, or in her nonselection for the position?

A:  No. I was never aware of Ms. Farris' race. I never met her personally, and no one ever told me her race. Race was not a factor in the selection process for the short list. It was the NATO authorities who made the final decision.

20.  Was Ms. Farris' sex a factor in your informing her that the short list had been submitted prior to the receipt of her official bid list, or in her nonselection for the position?

A:  No.

288

21. Ms. Farris asserts that she first made contact with Deirdre Davis of the Equal Employment Opportunity and Civil Rights Office regarding her situation in October 1999.

21.1.   Were you aware of this meeting?

A:      No.

21.2.   If so, when and how did you become aware of Ms. Farris' EEO involvement?

A:      N/A

21.3.   How do you respond to Ms. Farris' allegation that she was retaliated against for this EEO involvement when the Department acted unfavorably in her bid for the Hague position?

A:      I had no knowledge of Ms. Farris' reported EEO involvement until reading about it in this statement.

22. Is there anything that you would like to add at this time?

A:  No.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this day:

_____
Date

_____
Signature of Witness Moon

Subscribed and sworn to before
me at _Zagreb Croatia_
on this __4__ day of _September_ _2002_

_____
Signature of Affiant's/Witness

289

Page 6 of 12                                          initials ___

## AFFIDAVIT
## PATRICK MOON

I, Patrick S. Moon, white, male, make the following statement freely and voluntarily to John J. Lokos, who has identified himself to me as an EEO Contract Investigator for the United States Department of State, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party. I hereby solemnly swear:

## RESPONDENT QUESTIONNAIRE
## EEO Case No. 0074

1. Your role/responsibility pertaining to the vacancy announcements in question.

I was the Deputy Director of EUR/RPM at the time and was responsible for managing the process to fill positions at the U.S. Mission to NATO and international positions, such as the Polad jobs, at NATO. I had no responsibility for filling the PAO position in Athens, and I am not familiar with Ms. Farris' candidacy for that job.

2. Please state whether you were aware of the Complainant's race, sex, and prior EEO activity.

Because of her name and several phone calls, I was aware that Ms. Farris is a woman. I had no knowledge of her race or any prior EEO activity.

3. Please state whether you have any knowledge of any prior EEO involvement by Complainant. If yes, indicate the nature of that involvement and when and how you became aware of her involvement.

I do not understand how this question is different from question 2 above, which I answered.

4. To the best of your knowledge, did any of these positions appear on bid lists as hard to fill, after Complainant was allegedly advised these positions had developed existing "short lists"?

I do not remember whether they appeared on the hard-to-fill list. I must also clarify that I'm not sure which Polad job is referred to above. There is no NATO Polad job in The Hague. If this is a Foreign Service position at Embassy The Hague, I had no responsibility for filling such jobs. I do not remember whether there was ever a "short list" for the USNATO Political Counselor position. As I recall, there were not many candidates for this position.

Page 1 of 5                                                                                    Initials: _____

5. To the best of your knowledge, were any of these positions filled through a "shoot out"? If so, who participated in the "shoot out"?

I have no knowledge of Ms. Farris' candidacy for the Athens PAO job. Candidates for NATO Polad jobs are interviewed by NATO, which makes the decision for the jobs and not the Department. I do not remember whether there was a "shoot out" for the USNATO political counselor position. However, the person who was paneled for the job was below grade which would have required special action by the assignment board.

6. Was the Complainant qualified to have applied for these positions? If no, why not?

While Ms. Farris met the grade qualification for these jobs, she did not have the type of career experience which would have made her a strong candidate for Polad positions and the USNATO Political Counselor job. In both cases, we were looking for people who had strong experience working on security issues in Europe, in particular, at NATO or USNATO or working on security issues at an Embassy in a NATO or other European capital. As I recall, Ms. Farris had worked in a public diplomacy job at a US military command in the Pacific. For NATO Polad jobs, the US candidates have to compete against candidates from Allied countries who normally have extensive political-miltiary job experience. In all my conversations and correspondence with Ms. Farris, I was candid that her qualifications were not strong for the jobs she sought.

7. State to the best of your knowledge who applied for the vacancies, and who was selected.

As I stated in responding to question 4, I'm not sure which Polad job is referred to above. I do not remember who else may have been a candidate for the USNATO political counselor job, but I know that the deputy political counselor at USNATO was eventually paneled for the political counselor job.

8. Were the positions filled?

As I stated in responding to question 7, the Political Counselor job at USNATO was filled. Again, I'm not sure which Polad job is referred to above.

9. Why do you believe the Complainant was not selected to fill the vacancies in question?

As I explained in responding to question 6, Ms. Farris did not have the type of political military career experience which was judged essential for the incumbents in these positions. As I recall, she did not have experience as a political officer, which was also hurt her candidacy for the political counselor job. I want to stress again that NATO and not the Department, makes the final selections for all international staff positions,

Initials: ____

including Polad jobs. However, she was treated as a serious candidate for all the jobs for which she applied.

10. By Comparing the Complainant's qualifications with those selected, why do you believe the selectees were considered better qualified than Complainant?

I have largely answered this question in responding to preceding questions. Although she was the right grade, Ms. Farris did not have the kind of career experience which was considered essential. Other candidates with much more relevant experience got the jobs. The person who was paneled for the USNATO Political Counselor job was a political officer with extensive political-military experience in Europe, including at USNATO.

I have read the above statement consisting of 3 pages, and I have made all the necessary changes, additions, or corrections, and I have signed or initialed every page. I hereby declare under penalty of perjury that the foregoing statement is true and complete to the best of my knowledge and belief.

(Affiant's signature)

SUBSCRIBED AND SWORN
BEFORE ME AT _ZAGREB, Croatia_
THIS THE _3_ DAY OF _December_ 200_1_

(Witness Signature)
Patricia Ann Wingerter

Initials:

293

# EXHIBIT 15

Subj:    Update?
Date:    Wednesday, November 17, 1999 05:23:56
From:    VLooFarris
To:      jwhitlock@state.gov

Jim:

I learned from my Public Diplomacy colleagues in EUR that the incumbent in the PAC USNATO job has asked to extend (or should I say withdrawn curtailment). As a result that prospect seems to have disappeared after being told that I was being favorably considered for that position. Could you provide me with some assessment of where I stand in my remaining bids? Am I on the short list for any of the bids? Should I continue to maintain bids even if I am not on the short list on the off chance that my direct contacts with the Ambassador or by others on my behalf with the Ambassador may cause him/her to consider my bid? I realize that the DCM/PO jobs are paneled first and others follow so that individuals are constantly revising bids. What is less clear is when I will definitely know that I am out of the running for a position.

For example, I noticed that a Tokyo Labor Officer position which had been advertised in the September listing as 330801/12544000 is not listed in the October 22 listing. It is a position that I considered but not in my top 15. However should other bids drop off, I may well want to add it. Is the fact that it doesn't appear in the October listing mean it has been filled or is this an oversight. Conversely, I notice that the The Hague AF Polad position (325601/10789111) is still in the October listing despite the fact that someone in RPM said the deadline for submitting bids to NATO passed the end of September and no further bids were being taken.

I'd welcome your further elucidations into how the bidding process works and how best to play my hand. Many thanks for your help.

Virginia Farris

EXHIBIT 15

4/30/2004

# EXHIBIT 16

In a message [JCW Nov 18 fax] dated 11/19/99 7:34:18 AM, Whitlock writes:

To my knowledge the Hague Polad position is still there. For whatever reason, no bids have registered on it. I will be happy to enter yours if you wnat.  The (Belgium PolAd) also shows no bids. I think it is under NATO. Both jobs will eventually be filled but the PolAd will be hand-picked by the resident general. I will see what I can find out about these 2 jobs.

As a general principle, best way is to go after something where you have a background that makes you competitive and then lobby with the powers that control it (usually executive officer in the Dept and relevant DAS), if you are not well known in the bureau, it is useful to have someone senior (Amb, DCM) make a call on your behalf. At senior level this direct approach is how it works.

4/30/2004

EXHIBIT 16

# EXHIBIT 17

Subj: **More Bids**
Date: Friday, November 19, 1999 23:39:54
From: VLooFarris
To: whitlockjc@state.gov

Jim - Thanks for your fax giving me copies of the emails you sent. You are correct that I had not received them as the State unclassified email system often freezes.

I appreciate your candid assessments on the bids I have already submitted. You mentioned that I am not on the short list for several of my high priority bids and that the prospects for success in bidding on EUR DCM positions are not very good as having the European experience is considered a major factor. Likewise bids on functional jobs at the senior level tend to go to officers in those cones. I had hoped that the USCINCPAC and National War College experience would make me competitive for USNATO jobs but you seem to indicate that this is not necessarily the case.

Since a slam dunk assignment hardly seems likely we may be in for a continuing exchange as various situations develop. It may seem to you that I'm only bidding on "holiday destinations." I'd like to dispell that impression as I am not "cherry picking," at least not in the manner you might think. While it is important for each of us to find a position where we can both contribute and advance, before I submit a bid it is paramount I also consider the likelihood of getting the necessary medical clearances for my entire family. In reality the number of PAO jobs (my functional speciality) are limited and located in countries where it's unlikely my family members could receive medical clearance.

So, while I am not ignoring the wisdom of your advice, the situation compels me to continue to look at locations where it is more likely clearances would be forthcoming. In turn the situation leads me to look at what might be considered a disproportionate number of DCM/PO positions or positions in other functional cones. I am attempting to follow your advice on having someone senior intercede with a recommendation to the relevant DAS before I remove more of my bids from consideration.

Jim, you were most kind in offering to check on the Belgian and The Hague POLAD positions. Could I ask you to likewise to flesh out the Stuttgart POLAD position (Stuttgart/324045/POLAD/91433001/Chaveas), as to duties? I gather that it is based at USEUCOM. Assuming that it's within reach and given the state of play mentioned in your emails of Nov 17 and 18, and the most changes I've made, I'll enter the following bids:

| Belgium-M | POLAD | Vacant | 321245/10001000 | 0400 | High |
| NATO-DS | Pol Ofcr | McConnell | 505230/41027000 | 0500 | High |
| Paris | Pol Ofcr | Parmly | 323601/ 10017002 | 0800 | High |
| Stuttgart | POLAD | Chaveas | 324045/91433001 | 0800 | High |

1130 2001

EXHIBIT 17

| The Hague | AF | POLAD | Vacant | 325601/10789111 | 0900 | High |
| USEC, Brussels | | Pol Ofcr | Becker | 321023/10166000 | 0600 | High |

That means my updated bid list is would look like this:
&START/BB/575500283/FARRIS/VIRGINIA/L;
&1/AIT TAIPEI/330230/DPO/77001000/YOUNG/0801/H;
&2/ROME/325067/DEP US REP/00554000/TRACY/0800/H;
&3/BRUSSELS N/321213/DPTY CHF M/00029001/MCELHANEY/0800/H;
&4/GENEVA/327667/DEP US REP/00014003/ARIETTI/0700/H;
&5/BRUSSELS/321201/DPTY CHF M/00005002/CHESHES/0700/H;
&6/BERN/327601/DPTY CHF M/00001075/BELL/0900/H;
&7/BELGIUM-M/321245/POLAD/10001000/VACANT/0400/H;
&8/BRUSSELS N/321213/POL OFCR/16030000/HARRIS/H;
&9/ATHENS/321801/PUBLIC AFF/60888059/JACQUETTE/0801/H;
&10/LONDON/323201/POL OFCR/10282000/JOHNSON/0800/H;
&11/NATO-IS/505230/POL OFCR/41027000/MCCONNELL/0600/H; .
&12/PARIS/323601/POL OFCR/10017002/PARMLY/0800/H;
&13/STUTTGART/324045/POLAD/91433001/CHAVEAS/0800/H;
&14/THE HAGUE/325601/AF POLAD/10789111/VACANT/0900/H;
&15/BRUSSELS-U/321023/POL OFCR/10166000/BECKER/0600/H;
&STOP/BB/999999999/23/NOV

What is not clear to me is once the short lists are compiled and were I not to be on a list would my name be formally removed from the appropriate bid book? Or having been so notified that I'm not on the short list, am I simply allowed to enter additional bids? The other position in EUR which is interesting, but on which I have little information is Paris-OECD/323614/IECON/ 20226000/Dolan. Can you obtain any information on that position? Can you also confirm that the language requirement for PAO Rabat position listed below is either French or Arabic and not both? Subject to availability of the positions on which I've made inquiries as soon as it's permissible I'll also enter bids on the following:

| Paris-OECD | IECON, | Dolan | 323614/20226000 | 0800 | High |
| Manila | Econ Ofcr | Breese | 331401/20028000 | 0800, | High |
| Brasilia | PAO | Gullicksen | 310601/60149001 | 0700 | Med |
| Berlin | PAO | Arnett | 324001/60888085 | 0700 | Med |
| Rabat | PAO | McCreery | 345601/60295000 | 0702 | Med |

Is it be too late to enter bids on CG Shanghai or Capetown? I'll use the information you provide, along with your earlier advice, to try and craft a more effective strategy. Also since the unclassified State e-mail system is down so often if you have the capability to respond to <<VLooFarris@aol.com>> your mail will reach me much faster.

Many thanks,
Virginia

4/30/2004