# EXHIBIT 18

In a message dated 11/21/99 1:11:44 PM, WhitlockJC@state.gov writes:

Dear Virginia,

I am told that short lists have already gone forward to the commanding generals on the Hague and Belgium (Mons) POLAD jobs. With the support of the general, Chaveas is asking to extend for one year in Stuttgart. With regard to the senior functional jobs (POL and ECON), these will presumably go to officers out of those cones. I will enter your bids, however. You are correct that the Rabat job is French or Arabic, not both. The DCM Committee has already selected an officer for Capetown but postponed until early December a decision on Shanghai. That job will require a 3/3 in Chinese.

In answer to your question about the short list, only the short list is sent to the relevant ambassador/general, etc. The only way that someone not on the short list can be considered is for the ambassador/general to give reasons for rejecting all of the candidates and then the process begins anew. So you can remove your bids if you are not on the short list and then bid anew if, as rarely happens, the drawing board is rolled out again.

Let me know what bids you want to delete (e.g., the three POLAD jobs appear to be no longer viable) and what you want to add.

As before, I am using the "reply" function this should go to you at aol.com. But since that doesn't seem to work, I will also fax this message.

Warm regards, Jim

4/30/2004

EXHIBIT 18

# EXHIBIT 19

In a message dated 12/23/99 6:39:19 AM, WhitlockJC@state.gov writes:

Ginny,

The hard-to-fill and bid count cables are inherently unreliable and should not be read in isolation from the open assignments cable. For these cables, the data are taken off the computer, without human intervention, and the cables are no better that the computer data (garbage in, garbage out).

The open assignments cable, on the other hand, is assembled with some care and generally reflects accurately what is yet unassigned. By looking at the open assignments cable, you will see there is no senior job at NATO occupied by Harris. There is one occupied by Becker where your bid shows, one of 14 bidders (eight seniors, the seven other than you are political officers).

Regarding the POLAD jobs, only The Hague shows on the open assignments list and Pat Moon tells me the selection has been made. It is not yet been paneled, however, and thus still shows on the open assignments list. Pat also confirmed that the list for applicants for the POLAD jobs closed in September.

To be realistic, the POLAD jobs in EUR will go to officers with an extensive EUR background and usually only then if they have RPM-type experience. People move into these areas early in the career and often specialize in them. Movement from one cone to another at the senior level is not easy.

Have a good Christmas and New Year, Jim

I sent you an e-mail, which evidently did not reach you (the internet is not reliable) but which said that the decision on the Taipei job has been put off until next year.

-----Original Message-----
From:    VLooFarris@aol.com [SMTP:VLooFarris@aol.com]
Sent:    Wednesday, December 22, 1999 5:04 PM
To:      WhitlockJC@state.gov
Subject:    Re: Hard to fill cable

Jim - Thanks for the call yesterday and the updated listings of Summer 2000 openings. However your Hard to Fill cable was surprising and confusing to me as several of the positions on which I had entered High Priority bids or was told the short lists with other candidates had already gone forward are now listed as hard to fill vacancies. I'm referring in particular to the following 3 positions:

Brussels Political (Harris) 321213/16030000 - FE-MC
Belgium (M) Polad (vacant) 321245/10001000 - FE-MC
The Hague AF Polad (vacant) 325601/1078911 - FE-OC

I had entered bids for the Brussels Political and The Hague AF Polad but withdrew the bid on the latter when

4/30/2004

EXHIBIT 19

Patrick Moon in EUR/RPM said they had had a very short deadline and that the list had already gone forward in late September. Likewise I believe I spoke with him concerning the Belgium (M) Polad position and he said the list had already been drawn up and I wasn't on it. So are these positions still available despite what Moon said? I am interested in these positions as I think my background at USCINCPAC
and at the National War College would be very germane. I know you think that my not being in the Political cone is a major handicap, nonetheless I would like to register my bids for the 2 Polad jobs listed above.

My bid for the Brussels Political Officer is already in (sent in November 10 email to you). In looking at that position in the bid count cable of Nov 23 (State 222212), which lists total bids as 2, with none at grade and 2 in skill code, am I to assume that my bid is one of the two listed (even if I'm not in skill code) or did the system not register my bid in the overall tally?

As we discussed last night I would be very interested in any word on the status of the DPO-AIT Taipei job. As always I look forward to hearing from you, but I did also want to wish you Happy Holidays.

Ginny
</XMP>

-------------------- Headers ----------------------------
Return-Path: <WhitlockJC@state.gov>
Received: from  rly-yb04.mx.aol.com (rly-yb04.mail.aol.com [172.18.146.4]) by air-yb05.mail.aol.com (v67.7) with ESMTP; Thu, 23 Dec 1999 11:39:18 -0500
Received: from  cambridge1-smrfy2.gtei.net (cambridge1-smrfy2.gtei.net [199.94.215.244]) by rly-yb04.mx.aol.com (v67.7) with ESMTP; Thu, 23 Dec 1999 11:38:58 -0500
Received: from marshall-a-hme0.state.gov (marshall.state.gov [198.76.102.24])
    by cambridge1-smrly2.gtei.net (Postfix) with SMTP id A624639F9
    for <VLooFarris@aol.com>; Thu, 23 Dec 1999 16:38:57 +0000 (GMT)
Received: from franklin.state.gov by marshall-a-hme0.state.gov
       via smtpd (for cambridge1-smrly2.gtei.net [199.94.215.244]) with SMTP; 23 Dec 1999 16:38:57 UT
Received: from mailscan.state.gov by franklin-a-qfe3.state.gov
       via smtpd (for [169.253.7.2]) with SMTP; 23 Dec 1999 16:38:57 UT
Received: by pubhost.state.gov; id LAA05614; Thu, 23 Dec 1999 11:32:13 -0500 (EST)
Received: by europe01.irm.state.gov with Internet Mail Service (5.5.2448.0)
    id <ZKZK4BFC>; Thu, 23 Dec 1999 11:44:33 -0500
Message-ID: <E5D8E52557F2D211896A0008C75DEB3FDAEBE0@persntse.net.state.gov>
From: "Whitlock, James C Jr." <WhitlockJC@state.gov>
To: "'VLooFarris@aol.com'" <VLooFarris@aol.com>
Subject: RE: Hard to fill cable
Date: Thu, 23 Dec 1999 11:35:25 -0500
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2448.0)
Content-Type: text/plain

# EXHIBIT 20

# Open Assignments
# The 1999-2000 Cycle

I.   **Alphabetical Index** ...................................................(p. 3)

II.  **Glossary**  ...................................................(p. 4)

III. **1999-2000 Open Assignment Cycle Timeline**...........................(p. 5)

IV.  **Open Assignments Policies and Procedures** ...........................(p. 6)

    A.  What's New for 2000...................................................(p. 6)
        1. Bid deadlines
        2. Core Bids
        3. Out-Year World Languages
        4. 6/8 Year Waivers
        5. Fair Share/Early Assignments
        6. Medical Clearances
        7. CDA reorganization
        8. Early Stretch Season Dates
        9. Early Designation

    B.  The 2000 Cycle ...................................................(p. 6)

    C.  Your Role in the Assignment Process ...........................(p. 7)
        1. Developing Your Bid List
        2. Failing to Bid/Refusing to Accept an Assignment
        4. Networking

    D.  Special Bidding Requirements and Guidance ......................(p. 10)
        1. Fair Share Assignments
        2. Tandem Couples
        3. Security Clearances
        4. Limited Non-Career Appointments (LNAs)
        5. Opportunities Outside the Department of State

**APPENDIX A.  Laws, Regulations, and Assignments Criteria** .........(p. 12)
        1. Assignments Authority
        2. Goal of the Assignments Process
        3. Assignments Criteria
        4. Assignments Panels

EXHIBIT 20

7

## C. Your Role in the Assignment Process

The Department is committed to making the open assignments system work as smoothly as possible, consistent with the requirements of fairness and discipline. To achieve that goal, bidders must also take an active role in the process.

All employees eligible for transfer in summer 2000 (May 1 through October 31, 2000) must submit bid lists by October 1, 1999. Employees with summer 2000 TEDs may bid on any advertised position. These bids (up to a maximum of 15) must be marked as "High," "Medium," or "Low" preference. You should also use the bidding narrative to communicate your priorities, particularly among the six core bids. **You may be paneled and assigned to any position on your bid list without further consultation.**

Please direct all correspondence to your CDO or personnel technician by name (rather than just CDA or CDA/EL, ML, SL or ASD). Include your name, social security number, personal grade and primary skill code, current post and onward post of assignment (if pertinent). If you are not on unclassified e-mail, please provide a telephone and fax number; if you are overseas, your home phone number is often useful. This information will enable CDA to provide a timely response.

### 1. Developing Your Bid List.

Developing and maintaining a bid list requires close attention to basic bidding rules, procedures, and the tools available to assist you. Your entire bid list may be invalidated by your CDO if it does not comply with the core bid and fair share requirements.

   **a. Core Bids.** If you are due for reassignment in summer 2000, six bids must be on positions that are at your grade and in-cone. For these bids to count as "core," you must already have the required language proficiency or, in the case of certain out-year world languages (see subsection d below) or any hard language vacancies, the time to get the language. Long-term training other than language and details may not be counted among the core bids. No more than three core bids may be in one bureau or its posts or in the same geographic area (e.g., an IO job in Geneva is counted as an EUR and an IO bid). If all bids are on domestic positions, no more than three may be in one bureau. There are further requirements if you have been identified as a fair share bidder (see p. 10).

**Generalist Core Bids:** IROG jobs may be included as in-cone bids. Not all jobs advertised in the Interfunctional Section of the open assignments cables are IROG. For example, a Pol/Econ job may be advertised in the interfunctional section of the cable but is in-cone and can be considered a core bid only for political and economic officers, not administrative or consular officers. Senior officers may include up to three bids on senior DCM or Principal Officer (PO) positions in their core bids. FE-OC officers must include four bids at the OC level. FS-1 generalists may include two FS-1 DCM, DCM/SEP or PO bids as core bids. FS-2 generalists may include one FS-2 DCM, DCM/SEP or PO bid as a core bid. All junior officer positions are considered at-grade for untenured junior officers. FO-O3 positions are considered at-grade for tenured FO-O4 generalists.

10

Should an employee refuse to accept an assignment after having been subjected to "identification" or "designation" under Sections I F 10 or I F 11, appropriate disciplinary action would be pursued. (See 3 FAM and Section 610 of the Foreign Service Act of 1980.)

**3. Networking.** Employees should be aware of the significant role that posts and regional and functional bureaus play in the selection of candidates for mid-level and senior vacancies. It has become increasingly useful (in some cases essential) to make yourself known to your prospective supervisors when pursuing an onward assignment. While there are no hard and fast rules about whom you or your intermediaries should approach, at a minimum you should contact the incumbent and direct supervisor.

For additional suggestions, contact your CDO who may refer you to the relevant CDA Assignments Officer (AO).

## D. Special Bidding Requirements and Guidance

To address a variety of special circumstances, CDA has developed a number of requirements.

**1. Fair Share Assignments.** All Foreign Service employees should expect to be available for their share of hardship assignments. You are a fair share bidder if you have not served at least 18 months in a differential post during the eight years prior to your upcoming transfer. For the 2000 cycle, fair share bidders must submit at least two bids on at-grade and in-cone or interfunctional 2000 summer cycle jobs at differential posts among their six core bids. Exceptions are made for a) officers overseas who bid only Washington jobs and b) officers assigned to Washington, who have sufficient time remaining before they reach the six-year limit on domestic service and who bid only domestic assignments. Fair share bids must meet your normal core requirements. They must be for positions at your grade, either in cone/specialty or IROG, for which you already have the language if the position is language-designated or sufficient time to obtain the language before arriving at post. (Certain bids on DCM, DCM/SEP, or PO jobs at differential posts may count as fair share bids. See Section C, 1.a. above.) To determine whether a post has a differential, consult the Bidding Tool, which may be found in post personnel/administrative offices and bureau Executive Offices. Fair share bidders (or accompanying EFMs) with limited medical clearances should consult their CDO well before the bid deadline to identify appropriate fair share bids. CDOs will consult with MED as needed. Bid messages which do not include fair share bids, if they are required, will be rejected.

Fair Share bidders are eligible to be paneled into differential positions in the "early season" (see the timeline).

**2. Tandem Couples.** If you are part of a tandem couple, include a special line in the automated portion of your bid message as noted in the bid instructions. (See sample format in Appendix E of this message.) In addition, tandem members should include a final narrative paragraph providing information to assist in the assignment process. Each member should indicate his/her spouse's employing agency, skill code, present post of assignment (or if on LWOP), transfer eligibility date, and **name of spouse's career counselor.** Tandem members who wish to be assigned together should submit coordinated bid lists while continuing to meet

15

-- For Watch Officer positions (S/S-O, NRRC, etc.), one position is viewed the same as another as long as the grade and skill code are the same. That means a bid on one is a bid on all.

-- All of your bids will be accepted and considered provided they meet the core and fair share criteria. Other positions in line with your skills, rank, qualifications, and expressed general preferences may be suggested to you by your CDO.

-- Employees being proposed for assignment to designated countries, a.k.a. critical threat posts (see your RSO or EX office for a list), are vetted by DS prior to assignment (see Section IV-D-3).

-- Summer cycle officers who are unassigned as of February 16, 2000, and who did not comply with bidding rules, may be placed by CDA in accordance with service need, whether or not they have bid on the position to which they will be assigned.

**4. Early Season.** Assignments to DCM, Principal Officer, and Office Director positions, SEP posts, all 24-hour Watch positions, and some seventh floor "key" positions will begin October 27, 1999. In addition, assignments to certain specialties, such as security and medical positions requiring training prior to assignment abroad, may be made during the early assignments season in advance of December. It is important that these specialists ensure that their bid lists are received in CDA by the October 14th deadline.

**5. Special Embassy Program (SEP) Assignments.** Department concern for the needs of SEP posts will be demonstrated in this assignment cycle through several mechanisms. First, SEP vacancies will be addressed in the early assignment season, along with other high-priority positions. Second, SEP vacancies receiving two or fewer bids at grade and cone by the October 1, 1999 bid deadline may be filled by qualified stretch candidates. Third, CDA will consider cross-conal assignments when warranted. Finally, identifications may be employed early in the cycle as needed to ensure that SEP posts are adequately staffed. (Posts designated as SEP are listed in Appendix F, pg. 30.)

**6. DCM/SEP.** Almost all SEP embassies have DCMs, and experience in these positions will count toward multifunctionality. DCMs at most SEP embassies will also be expected to perform other functional duties. Interested bidders should contact regional bureaus and their CDOs to learn more about specific positions.

Special assignment procedures apply for DCM/SEP positions. Although preference is given to qualified at-grade bidders, stretches into DCM/SEP positions will be permitted at any point in the assignment cycle. DCM/SEP assignments go through the DCM/SEP Committee. CDA and the regional bureau (in consultation with the Ambassador) recommend a candidate to the Director General from a short list of qualified candidates. The DG's decision is final.

**7. Hard-to-Fill Positions.** CDA will continue the Hard-to-Fill (HTF) exercise to assist bureaus in filling certain underbid overseas differential and domestic bureau positions. Bureaus may request to designate as HTF any position receiving only zero, one, or two bids at-grade and in-cone as of December 21, 1999. This date will allow for some follow-up bids to be submitted after DCM, Principal Officer, Office Director, SEP, and key positions have been filled in the

16

early season. The **key incentives** in the program are: (1) favorable consideration for a **one-year waiver of the six year rule** for employees wishing to spend a seventh year (or a two-year tour involving a sixth and seventh year) in one of these positions in the Department; and (2) a more liberal approach toward **early stretches** and cross-conal assignments to fill these vacancies. Officers are reminded that service in a functional bureau or a cross-conal assignment can be a factor in qualifying for the multifunctional skill code and eventual competition for multifunctional promotion in addition to in-cone promotion. You should contact your CDO for further information.

Under procedures separate from the open assignments process, **Civil Service** employees may compete for positions designated by the bureaus as HTF starting April 6, 2000. They may also compete for all unfilled overseas positions at the FO-01 level and below (excluding junior officer positions) after May 31, 2000.

    **8. Shoot-outs.** If at an assignments panel two or more bureaus are competing for one officer, or if there is more than one candidate proposed for a single position, a shoot-out occurs. In such a case, the requirements of the positions and bureau preferences, if any, are presented to the panel by the relevant Assignments Officer, while the desires, career development concerns, and qualifications (including discussion of strengths and weaknesses) of each candidate are presented by the employee's CDO. When it appears that a shoot-out will be on the agenda, CDOs contact their affected clients to discuss the proposed panel item. Employees who are being considered for shoot-out decisions may want to prepare talking points for their CDO. Such talking points are always helpful, and CDOs may use some or all of them as part of their presentation at panel.

    **9. Holds.** Any assignment proposal may be delayed ("held") for a maximum of two weeks by any panel member or combination of members. Holds may, for example, be used by bureaus intending to compete for an employee proposed to another bureau, and by CDOs intending to propose an alternative candidate to the one put forward by a bureau. Additionally, a CDO may sometimes hold a proposal in the interest of locating a more suitable assignment for the employee concerned, and a bureau may place a hold if it wants time to seek an alternative candidate to one that is being put forward by a CDO. Holding an assignment beyond two weeks is permitted only when the panel chairman determines that exceptional circumstances exist.

    **10. Identifications.** Identifications for service need may take place at any time during the assignments cycle. Your CDO will notify you if the Department's need for timely staffing is likely to result in your being considered for assignment by identification to a specific advertised vacancy on which you have not bid. The panel, in deciding whether to make such an assignment, will take into account such factors as service need, career development, viable alternative bids, and any relevant personal circumstances of the individual concerned. If the panel makes an identification assignment, you will be notified. You may, within ten working days of acknowledged receipt of notification, appeal the panel's decision to the Director General. The Director General may remand the issue to the assignment panel in light of new information.

    **11. Designations.** Service need is one of the principal criteria in the assignments process. Thus, after a suitable period in the cycle has elapsed, eligible qualified personnel who have not expressed interest in particular positions may be proposed for assignment by designation. **All bidders who did not comply with the bidding rules may be considered for**

# EXHIBIT 21

## In The Matter Of:

*VIRGINIA LOO FARRIS    v.*
*UNITED STATES DEPARTMENT OF STATE*

---

*MARIE T. HUHTALA*
*March 29, 2004*

---

*BETA REPORTING & VIDEOGRAPHY SERVICES*
*910 SEVENTEENTH STREET, NW*
*SUITE 200*
*WASHINGTON, DC  USA  20006*
*(202) 638-2400    FAX: (202) 833-3030*

*Original File AAHUHTAL.TXT, 110 Pages*
*Min-U-Script® File ID: 3242092161*

## Word Index included with this Min-U-Script©

EXHIBIT 21

VIRGINIA LOO FARRIS   v.
UNITED STATES DEPARTMENT OF STATE

MARIE T. HUHTALA
March 29, 2004

[9] A: I think I probably heard the name, [10] yes.

[11] Q: Do you know where Mr. Good-man is [12] now, stationed now?

[13] A: No, I don't.

[14] Q: Just for the record, did you hear [15] anything about Ms. Farris applying for a [16] position in The Hague?

[17] A: No, I did not know about it at the [18] time.

[19] Q: Is that something that may have [20] been discussed generally just in connection [21] with her bids, and you don't specifically [22] recall it, or you are sure that you didn't

---

Page 33

[1] know anything about it at all at the time?

[2] A: As I stated before, I knew that [3] she was bidding on a number of jobs in [4] Europe, but I did not know the specifics.

[5] Q: When were you aware that [6] Ms. Farris had some EEO issues that she was [7] raising?

[8] A: She told me herself that she was [9] unhappy with the way that her family [10] problems had been dealt with, and that she [11] believed it was due to discrim-ination.

[12] Q: That is covered in your [13] dec-laration, I think, as well?

[14] A: I think it is, yes.

[15] Q: Do you recall the time frame that [16] you did that?

[17] A: I believe it was in the middle [18] of 1999.

[19] Q: Do you recall the circumstances [20] under which she told you that?

[21] A: I remember that we were alone in [22] my office.

---

Page 34

[1] Q: Had she come to you to complain [2] about that specifically, or was this in the [3] context of a conversation where you were [4] discussing other matters as well?

[5] A: My recollection is that she had [6] come in to discuss the longstanding question [7] of whether or not her husband could return [8] to post.

[9] Q: That she made this discrimination [10] allegation in connection with that?

[11] A: That's correct.

[12] Q: Did you raise her discrimination [13] allegations or discuss the fact that she had [14] made a discrimination allegation with anyone [15] else at post or at the State Department?

[16] A: I believe I probably told the [17] Ambassador about that.

[18] Q: Did you discuss it with anyone [19] else?

[20] A: No, I did not.

[21] Q: Did you comment back to her about [22] the allegation that she was making?

---

Page 35

[1] A: I told her that I was very [2] surprised. I assured her that (a) I never [3] discriminate against a person on the basis [4] of their gender, or race, or origin, and (b) [5] the decisions that had been made with regard [6] to her husband had not been influenced in [7] any way by that sort of discrimination.

[8] Q: You told her at the time of that [9] first meeting?

[10] A: Yes, I did.

[11] Q: Were you aware that she filed a [12] formal EEO complaint?

[13] A: No.

[14] Q: Are you aware today of when she [15] filed a formal EEO complaint?

[16] A: No, I am not.

[17] Q: Were you aware that she met with [18] Diedre Davis at some point? Well, do you [19] know who Diedre Davis is?

[20] A: Yes, I do.

[21] Q: Who is she?

[22] A: Diedre is the Deputy Assistant

---

Page 36

[1] Secretary for Equal Employment Op-portunity.

[2] Q: Did she visit Bangkok at some [3] point?

[4] A: Yes, she did.

[5] Q: Do you recall when that was?

[6] A: I don't recall exactly when.

[7] Q: Were you aware that Ms. Farris met [8] with her during her visit regarding her EEO [9] complaint?

[10] A: I knew that Ms. Farris met with [11] her, but I do not know what it was about.

[12] Q: Is it reasonable to presume that [13] Ms. Farris had made a discrimination [14] complaint to you personally? Was it [15] something that you thought that she might [16] have done; that is, she would reiterate that [17] complaint to Ms. Davis, given that she was [18] with the Civil Rights Office?

[19] A: You know, Ms. Davis came to [20] consult with the Ambassador and myself on [21] several issues, completely un-related to [22] Virginia Farris. That was what was on my

---

Page 37

[1] mind at the time when Ms. Davis arrived, and [2] when we met with her.

[3] Q: What are these other issues that [4] would have been on your mind generally [5] speaking?

[6] A: Well, we had — one other thing [7] that she came — that Ms. Davis came to talk [8] about was the Department's policy against [9] sexual harassment, and we talked about that [10] at some length, and I was specifically [11] interested to find out that the protections [12] against sexual harassment would apply to [13] local Thai staff, as well as American staff.

[14] Q: Is there anything else that you [15] remember specifically?

[16] A: The other thing is that we had one [17] other employee at the Embassy who had a [18] physical handicap, and that Ms. Davis was [19] going to meet with that person, and was [20] concerned, to make sure that that person was [21] being treated fairly.

[22] Q: Anything else?

---

Page 38

[1] A: No, that's all.

[2] Q: Do you recall how long Ms. Davis [3] stayed at the Embassy?

[4] A: Not long, one or two days.

[5] Q: After that meeting in mid-1999 [6] with Ms. Farris, in which she indicated that [7] she had been discriminated against based on [8] her — I guess being a Chinese-American [9] woman; is that basically what you recall?

[10] A: Yes.

[11] Q: After that first meeting or after [12] that first complaint from Ms. Farris, did [13] she complain to you again about [14] discrimination?

[15] A: I don't recall her doing so, no.

[16] Q: When do you recall becoming aware [17] that she had filed an EEO complaint?

[18] A: After I left Bangkok, when I [19] received the request to submit this first [20] affidavit.

[21] Q: That would have been sometime in [22] late 2001?

---

Page 39

[1] A: Yes.

[2] Q: This first affidavit, it looks [3] like you executed it in December. Do you [4] recall how long after you received notice of [5] these questions that you answered it? That [6] is, I am trying to get an idea. Was it a [7] few days, or a few weeks, that it took you [8] to answer the questions?

[9] A: I was pretty prompt. I believe it [10] was in a few days.

[11] Q: Did you ever talk to anyone in [12] Washington about Ms. Farris in the 1998 [13] to 2001 period?

[14] A: You mean while I was in Bangkok, [15] right?

[16] Q: Right.

---

# EXHIBIT 22

# FORMAL COMPLAINT OF DISCRIMINATION
(Please Print or Type)

Note: Attach additional sheets, if needed. Form must be signed.

| Name of Complainant | Complainant's Telephone Numbers |
|---|---|
| Virginia Loo Farris | Home: |
| | Work    (66-2) 205-4486 |

Complainant's SSN

| Complainant's Address | Is Complainant Represented? (Yes or No)   NO |
|---|---|
| American Embassy - Bangkok | If yes, name of representative |
| Box 48, APO AP 96546 | |

Name of Agency You Believe Discriminated Against You    Department of State

Address of Agency (City, State, Zip code) 2201 C Street, NW, Washington, D.C. 20520

Date On Which Most Recent Alleged Discrimination Occurred (Month, Day & Year)   June 6, 2000

Are You Working for the Federal Government? (Yes or No)   Yes

Name of Agency Where Employed    Department of State

| Address of Current Employer | Title and Grade of Current Position |
|---|---|
| American Embassy - Bangkok | Counselor for Public Affairs, FE-OC |
| Box 48, APO AP 96546 | |

√ Check Below, Why You Believe You Were Discriminated Against

XX Race.. if so, state your race Asian, Ethnici⊠Sex. If so, state your sex  Gender: Female

□ Color. If so, state your color    Chinese □ Religion. If so, state your religion

□ Disability. Mental or Physical (circle one)    □ Age. If so, state your age

X⊠ Reprisal    □ Sexual Orientation

I Have Discussed My Complaint with an EEO Counselor (Yes or No)   Yes

Name of EEO Counselor    Brenda H. Ross

Date of Final Interview    August 9, 2000

Explain specifically how you were discriminated against, that is, treated differently from other employees or applicants, because of race, color, religion, sex, national origin, age, mental or physical disability, reprisal or sexual orientation. (attach additional sheets, if needed)

(see attached)

What corrective action(s) do you want taken on your complaint? (see attached)

Have you filed a grievance or appeal to MSPB on this matter(s)? (Yes or No)    No

Virginia Loo Farris
Signature of Complainant

Sept 6, 2000
Date

4/98.

001

Page

EXHIBIT 22

Explain specifically how you were discriminated against, that is, treated differently from other employees or applicants, because of race, color, religion, sex, national origin, age, mental or physical disability, reprisal or sexual orientation:

I believe the discrimination has been ongoing, at the least, since the start of the 2000 Bidding Cycle which began October 1999. I have been attempting to secure a reassignment since June 1999 as a result of personal reasons related to my family. Thus far the only accommodation to my case was to allow me bidding eligibility in the 2000 bidding cycle. If a mechanism exists to allow for consideration of reassignment for compassionate purposes it was not exercised in my case. The now ingrained inequities of an anachronistic assignment system undoubtedly sets the stage for routine abuse which perverts the intent of the system.

The nature and origin of the instant discrimination are both complex and subtle, and as such difficult to identify. However, specific examples more clearly emerged on or about May 13, 2000 when demands were levied upon me. When I refused to yield to those wishes, the subsequent retaliatory actions were taken by the European Bureau Personnel Officer, Thomas J. Tiernan in conjunction with persons as yet to be identified. Mr. Tiernan clearly represented that he was speaking for all elements of the European Bureau in demanding that I withdraw my bid as the only senior officer bidding for USNATO Political Counselor in order that the Bureau and Post's undergrade candidate could be granted a cede (a two-grade stretch at variance with Personnel's own policy) enabling him to be named to the position. When I indicated I was not inclined to withdraw, an orchestrated campaign to force my withdrawal was implemented in retaliation for my wish to see the process through.

As a woman of color my complaint relates to discrimination on the basis of both race and gender, but also on more subtle, but pervasive discrimination based on my status as a former USIA officer. These discriminatory actions were taken in the bidding and assignment process. I believe that facts support that I was treated differently. As a result I believe my career and chances for advancement have been seriously harmed.

002

Until the consolidation of USIA into the Department of
State my career development, training, promotions, and
performance have been such that  the objective observer
would conclude that every reasonable expectation existed
that I would be selected for positions of increasingly
greater responsibility in the foreign service, leading to
my selection for multifunctional position(s).

In the year preceding this complaint I placed bids on
numerous multifunctional positions and none reached
fruition. My files are replete with numerous phone calls,
letters of introduction with curricula vitae, and even
personal appointments which were conducted to express my
interest and qualifications. Each of these actions was
consistent with the advice I had received from my CDO, but
sequentially I was told that while my credentials were
impressive this was a position that required someone with
more area experience, or more policy experience. This
became a politically correct and expedient method of
excluding me from consideration.

At first I was willing to accept that the competition
consisted of qualified officers. Indeed, in some cases this
was undoubtedly true. However, in addition to my
observations I was advised that most multifunctional
positions go to officers who have served in either the
political or economic cones. The implicit and explicit
message being conveyed to me by my superiors and colleagues
was that to be seriously considered for a multifunctional
assignment one must first serve as a political, pol-mil, or
econ counselor, or in a program direction position (such as
an office director). While my last rated position before
leaving Washington was as an acting office director, my
personal situation makes it extremely difficult to
presently consider a Washington-based assignment.

As a Senior Foreign Service Officer (SFSO) I believed
myself to be well qualified to successfully fill any and
all of the multifunctional assignments for which I had
entered bids. Nonetheless, rather than adopt a sour grapes
attitude I felt I should try and conform with the new State
environment and first seek an assignment in one of the
cones (pol or econ) that so many feel are a virtual
prerequisite to being selected for a multifunctional
assignment.

While I have dealt with a variety of economic issues, focusing on pol counselor or advisor positions seemed the logical choice based on my previous service as the public diplomacy advisor for two Commanders-in-Chief of the U.S. Pacific Command  and the Masters degree in National Security Strategy earned from the National War College in 1998. My stint at USPACOM was recognized by the Secretary of Defense with an award of the DOD Civilian Meritorious Service Medal. These cross departmental assignments in the pol-mil arena were further buttressed by extensive experience as editor of "Current Scene" and of the Near East & South Asian edition of the Washington File.  So as you can see, my assignment strategy was based on actual experience as well as on the advice received from superiors.

I began to perceive, what I at first viewed as, some inconsistencies in the assignment process when I applied in October 1999 for The Hague AF Polad (Vacant) 325601/1078911 - FE-OC position within two weeks of the announcement only to be told that the short list had already been submitted because "they" were in a hurry. I was advised to withdraw my bid as it would only encumber one of the 15 maximum bids I could enter and thus lessen my chances for being selected for another position.

Yet in mid-November my CDO said to the best of his knowledge "the Hague Polad position is still there. For whatever reason, no bids have registered on it. I will be happy to enter yours if you wnat [sic]." When I entered a bid the following day my CDO conveyed to me that he was "told that the short lists had already been sent forward." However, in late December when I received the "Hard To Fill Cable" both The Hague position and the Brussels Political (Harris) 321213/16030000 - FE-MC were listed. I checked with my CDO and was told there was no position in The Hague, but after I again cited the cable, the apologetic response was that the individual responsible was looking in the wrong place and hence provided erroneous information.

Concurrently I was also bidding for the USNATO Political Counselor. A vague assertion was always floated that extensive NATO experience was needed to fill the job. Yet, when the incumbent for the Brussels position was queried on my behalf, I was informed that in his mind, the argument that I "don't have NATO experience is specious." It was also opined that half the job was to manage the subordinate talent, while the rest was to be learned while performing. However, it was also, rather prophetically, relayed to me through back channels that the Post and Bureau strategy was to stall until all the senior officers received other jobs so they could request a cede for their "favored son" candidate.

After seeing the Brussels Political (Harris) 321213/16030000 - FE-MC listed on the "Hard To Fill Cable" and being told that it should be filled soon as there were no other Senior Officers bidding I intensified my efforts to be considered for that position. In February my CDO informed me that "Various bureaus are requesting cedes of senior positions to 0-1 officers. PER/CDA/SL is granting these 'only reluctantly and on a case-by-case basis where it appears that no senior officer will be prepared to take the job.' Six generalist position cedes have been granted thus far this year (up to that time). With about 110 senior officers (not including those picked by the DCM committee, etc.) still up for assignment in mid-2000, cedes will continue to be difficult to obtain."

It was about this time that I learned that the FSO-1 whom the EUR Bureau was backing had been assigned to his current position for less than a year and could only be considered for a two-grade "stretch" to the MC position through a perversion of the personnel system. With more than 100 senior officers unassigned if Personnel adhered to their own policies the "favored son" candidate of the EUR Bureau would not even be eligible to bid. Even then I still felt that I would have an opportunity for a fair hearing. Unfortunately, that feeling proved wrong.

By March I began to feel increased pressure in that orders were published and sent to Post announcing the assignment of my successor a year early and before I received any assignment that would allow for my early departure. It was only some four months later that I learned from the officer in question that he had been told, by the CDO we mutually shared, in effect not to concern himself as "Ginny Farris

would be out of Bangkok one way or another before a conflict arose with his assignment orders."

By early April I was openly told that the European Bureau had an O-1 candidate they were strongly backing and for whom they would ultimately request a cede once any other Senior Officers were otherwise assigned--by then I had been for some time the only Senior Officer bidding. As the time progressed towards an inevitable selection, and I learned more about the qualifications of the NATO competition through various corridor comments, I felt confident then that my credentials, which included cross-departmental assignments, congressional liaison work, advanced education in national security strategy from the National Defense University, responsible management/leadership experience at post and in Washington, along with extensive editorial and reporting experience and my 3/3 qualification in French, would compare favorably against those of the less experienced and lower ranked officer whom the Bureau and Post were so resolutely supporting.

Of course, the above remarks are in no way meant to imply that the competing officer would not in time gain comparable qualifications--only that at this stage of his career he has not acquired qualifications comparable to those I possess. Even in the absence of any equitable selection process or the lack of any substantial demonstration of experience or skills to indicate that a midlevel officer is qualified for selection in a MC position my complaint is not directed toward the "competing" bidder, but rather Mr. Tiernan, and those as yet unidentified officers whom he assisted, or who worked with him, and aided his efforts to suppress my objective consideration in the selection process. After discriminating against me in this and other positions for which I applied, I believe these individuals took punitive measures to ensure I would not receive a job commensurate with my rank and qualifications in Europe, and quite possibly within the Department.

On May 12, 2000, Mr. Tiernan dispatched his first patronizing communication to me in which he in effect said that the Bureau (in which he claimed to speak for all elements) and both NATO and USEU remained resolute for their O-1 candidates. He wrote that I should 1) accept that I wasn't going to be selected for the NATO jobs; 2) tell EUR/PD and Athens that I accept the Athens PAO job; 3) tell

006

all of this to my CDO Jim Whitlock. He went on to relate
that "Athens is a great job for this year, and when next
you bid, you'll certainly be extremely qualified for many
DCM and Principal Officer jobs." Of course, this opinion
defies all conventional wisdom since by accepting the
Athens position I would be moving to a much smaller post
with commensurately less leadership and management
responsibilities than I had in the position I currently
occupy. What additional functional experience this position
would provide to qualify me for "many DCM and Principal
Officer jobs" he never made clear, in spite of my follow-up
attempts to learn from, or work with Mr. Tiernan.

As EUR/PD could no longer hold off filling PAO Athens, a
position which I had been considering, I concurred with
their assessment that as I desired to continue my candidacy
for NATO and USEU positions,  they would have to look
elsewhere.  I  withdrew from consideration for PAO Athens
in order to demonstrate serious interest in my bids for
NATO and USEU.

Mr. Tiernan apparently was displeased with my readiness to
see the process through against his "advice." On the
following business day May 15, 2000, my CDO sent a rather
curt letter informing me that "Because so many other
assignments are being held up by your own assignment, I am
told that we have to come to closure on whether you are to
stay in Bangkok or leave this summer. The choice is yours
but a decision has to be made soon...I am told that you
have to let me know by e-mail by May 18 Washington time
whether you want to stay in Bangkok until 2001 or want to
go to Athens (which you have bid) in 2000." The reader will
note that pointedly no mention is made of any of the
opportunities I was then pursuing within the political
cone.

As I was responding comprehensively to my CDO's May 15
letter, pointing out that both my eligibility to bid and my
position in Bangkok were the result of an integration
agreement arrived at by USIA Personnel and State in
consultation with the EA Director, myself, and Post, I
received a supplemental letter from my CDO composed less
than three days later. It informed me that I "should know
that it has been decided to cede two senior jobs on which
you are the only senior bidder--USNATO and OECD. EUR is
expected to bring [both] their O-1 candidates to Panel"
within three business days.

I was informed that I had the right to have my name brought
forward in a shootout. After actively competing for these
for more than six months I was patronizingly told that "if
you want to compete for the jobs, please send me talking
points ASAP but to arrive here no later than" within two
business days. Of course, given my operational
responsibilities at post and the short lead-time proposed
it appeared that the efforts were in themselves
discriminatory in nature and meant to both create
additional stress and impress upon me the futility of
trying to maintain my efforts to obtain a fair hearing.

Next I received a call from the USNATO DCM, Doug McElhaney,
casually explaining that it seemed unlikely that I would be
selected for the position at NATO-IS and if I had any other
job opportunities I might want to consider them.  Then our
Ambassador here in Bangkok "coincidentally" called me to
"explain" why it was unlikely I would receive either the
USNATO or USEU jobs.

Subsequently I received a call from Kevin McGuire, who's
head of the SFS assignments and who outlined what my
chances were (slim because the qualifications of the
competition were "more fulsome"). Kevin also explained to
me that my CDO would make a case for me based on my talking
points before a panel of 14 officers from Personnel, who
would undoubtedly be placing heavy weight on the Bureau's
choices. For a variety of reasons consideration of that
position on the appointed date of May 23, 2000 was
postponed and perhaps predictably two days later I received
e-mail from my CDO stating that I was "EUR's favored
candidate for PAO Athens" and that the Bureau has entered
me on the panel agenda for the following Tuesday. I was
again forced to withdraw my bid for PAO Athens in order to
continue being considered for the NATO and USEU positions.

Mr. Tiernan did write again on May 21, 2000 to say that,
"Perhaps USIA could afford to tailor each assignment more
closely to the optimal career development path for every
officer, but the larger State system simply cannot do that
in every case, especially this late in the cycle." Of
course, he failed to address why they were then able to
tailor the "optimal development" for their "favored son"
for whom he was requesting a cede and a two-grade stretch,
but his disdain for USIA plainly shows in his comments.

F

The meeting of the panels on June 6 and June 20, 2000 seemed to be pro-forma and in both instances the Bureau's candidate were selected. Any one, or several, of the incidents I have related may have been accepted as ordinary. However, given the chain of events leading up to the panels I was forced to reach the conclusion that, when viewed in their entirety, the events demonstrate a sustained pattern of discrimination to withhold multifunctional assignments from me and also to prevent my selection for assignments which might be expected to lead to multifunctional positions.

Mr. Tiernan's discriminatory actions (and those who remain to be identified) have been ultra vires, or beyond authority, and the campaign he has orchestrated has unjustly damaged my career and potential for advancement.

What corrective actions do you want taken on your complaint?

I would like to see the proverbial playing field leveled, as I have been disadvantaged and my career adversely affected by individuals both named and unidentified who are administering and influencing the assignments process. Corrective action could include:

1) Selection for the Senior Seminar; and/or Chinese Language & Area Studies School (CLASS) training in Taiwan; with

2) an appropriate ongoing multifunctional assignment.

3) An equal grant of the expanded time in class for my service while on a Congressional Fellowship and at the War College on par with that which is granted to other State Officers, but which has been denied to me as a former USIA officer.

*Virginia Loo Farris*
Sept 6, 2000

009

*Embassy of the United States of America*

η 41-00

American Embassy Box 48
APO AP 96546-0001

September 6, 2000

Ms. Deidre A. Davis
Deputy Assistant Secretary for
Equal Employment Opportunity
 And Civil Rights
Department of State
S/EEOCR Room 4216
2201 C Street, NW
Washington, DC 20520-4216

S/EEOCR    2000 SEP 11 A 11: 29    RECEIVED

Dear Ms. Davis:

Enclosed is my formal complaint of discrimination. I had requested that Brenda Ross
provide me with the materials to file such a complaint as she was wrapping up her inquiry
into the particulars of my case. Should you have any questions, please do not hesitate to
call me at 66-2-205-4485 (office) or 66-2-205-4186 (home).

Sincerely,

Virginia Loo Farris

Virginia Loo Farris
Counselor for Public Affairs

010

# EXHIBIT 23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **VIRGINIA LOO FARRIS ,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **Case No. 05-1975 (RMU)** |
| ) | |
| **CONDOLEEZA RICE,** ) | |
| ) | |
| **Defendant** ) | |
| ) | |

## PLAINTIFF VIRGINIA LOO FARRIS' DECLARATION

I, Virginia Loo Farris, declare as follows, pursuant to 28 U.S.C. §1746:

1.     I am a career foreign service officer.

2.     After election to the Epsilon Chapter of Phi Beta Kappa I graduated from Michigan State University in 1970, magna cum laude, with a degree in Social Sciences, and from the University of Michigan in 1972 with a degree in Chinese Studies.   In 1998 I  also earned another Masters from the National Defense University in National Security Strategy.

3.     I was commissioned a United States foreign service officer in 1972, at the age of twenty-four, and was posted first to Pakistan.   During my thirty-four year career, I have also been posted to Tunisia; Hong Kong; Washington for three tours; Thailand 1985-90; the U.S. Pacific Command at Camp Smith; Jamaica 1992-94; a subsequent tour in Thailand 1998-2001; South Africa 2001-2004; along with various temporary duty postings.    Until 1999, I was assigned to the United States Information Agency, which on October 1, 1999 was merged formally into the State Department.

1

EXHIBIT 23

4.     During my career I have received numerous awards for meritorious and superior performance from the United States Information Agency, the Department of Defense, as well as the Department of State.   Among the awards are the United States Information Agency's Director's Award for Superior Achievement, the Secretary of Defense Civilian Meritorious Honor Award, three awards of the United States Information Agency's Meritorious Honor Award, two awards of the Department of State Meritorious Honor Award, and the Department of State Franklin Award.

5.     The United States foreign service is the only life I have known as an adult.   I have been regularly promoted and have risen through the ranks. That pattern changed in 1998, when I was assigned as the Counselor for Public Affairs at the U.S. Embassy in Bangkok, Thailand.

6.     The Deputy Chief of Mission created a hostile working environment for me soon after I arrived at post. I was having family issues at post and she gave me advice about a personal matter, which I considered inappropriate.   I received indications from the Deputy Chief of Mission that she considered me, as an Asian-American woman, too passive and not aggressive enough in making decisions about my life, and therefore in the workplace.

7.     During 1999 I then applied for numerous career positions which would enhance my value to the Department.  Foreign service postings in Europe far exceed the relative percentage of Europeans in the world population.   As I had never been posted to Europe, but having both completed "fair share" hardship differential post requirements and having permission to bid early for compassionate reasons, I should have been favored for a European posting given the Department's policy of geographic diversity of assignments  -- a policy adopted in part to break-up the "old boy" network in the European bureau.  I applied in 1999 for

a position as Political Counselor at US NATO in Brussels. Then I was pressured to withdraw my name for the position, which would have allowed a junior officer, a white male, to fill the slot. After a panel review, largely by those individuals in Personnel who supported the pre-selection of the junior candidate, I was not selected for this position even though I was a senior foreign service officer. The junior white male selected for the position was not even eligible to bid for it, as he had only recently been assigned to the position he then occupied.

       8.      Concurrently in the same bidding cycle I applied for an at-grade position as Political-Military officer in the Netherlands.  I was initially told that it was too late to apply even though the position had just been advertised. While I considered this strange, as the bidding season progressed the updates continued to list the position. I inquired and was told the position was again open. When I applied I was the only senior officer. There followed a series of manipulations which appeared to suppress information regarding the location of the assignment and the timing. I later learned that a white male was awarded that position.

       9.      After these two postings went to white males I made a formal EEO complaint in 2000.  My EEO complaint ultimately included retaliatory and discriminatory actions of the Deputy Chief of Mission.  During the bidding process the Deputy Chief of Mission, who was hostile to me especially after the grievance I had filed, would have been consulted by decision makers regarding my bids.

      10.     Then in 2001 the Deputy Chief of Mission selectively initiated an investigation against me for waste, fraud and abuse, allegedly for time my husband was spending in Thailand, during which period I was collecting separate maintenance allowance for living in separate residences.   The separate maintenance allowance is a monetary payment made to foreign service officers to support two households when separated from their spouse.

11.    My husband and I did maintain separate residences from 1999 to 2001, and I thought I was entitled to collect separate maintenance.

12.    This investigation, which I considered retaliatory, basically killed my remaining career. In the foreign service, any blemish on one's record could well destroy one's chances of promotion. That investigation undoubtedly contributed to a negative "corridor reputation." I was "low-ranked" based on employee evaluation reports issued by the same Deputy Chief of Mission in 2000 and 2001, meaning that I was put on a list of the lowest five percent of officers in the foreign service. My rating officer from 1998 thorough that time was the same Deputy Chief of Mission in Bangkok. However, based on my performance in South Africa, I was removed from the low-rank list.

13.    The Department of State's personnel system is an up-or-out system, and if I was not promoted by the Fall 2005 promotion panel from my current rank of Officer–Counselor in the Senior Foreign Service, I would be forced to retire, based the fact that my last promotion was in 1998. In fact, I am being forced to retire due to a lack of promotion, and my retirement will become effective on September 29, 2006.

14.    My life in many ways is my career, and I have known no other job. Once forced to retire, I would be out of the State Department, and thus removed from the normal processes for bidding. Should the Department later be compelled to reinstate me, I could not be easily reintegrated into the personnel system. My ability to obtain any career-enhancing position given the competition in the senior foreign service would be hurt. My "corridor reputation" within the Department – and my standing among colleagues – would suffer. Thus, reentry into the Department at the same level, with comparable responsibilities, would be fraught with difficulties. Money alone could not compensate me for these problems.

4

15.     There is no way I could easily find comparable work if terminated.    I am currently proactively searching for other employment, but have not found a position.


I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON AUGUST 26, 2006 IN ARLINGTON, VA.

_____

VIRGINIA LOO FARRIS

# EXHIBIT 24

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| VIRGINIA LOO FARRIS , | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Case No. 05-1975 (RMU)** |
| | ) | |
| CONDOLEEZA RICE, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## DECLARATION OF MINISTER COUNSELOR BARBARA S. HARVEY

I, Barbara S. Harvey, declare as follows, pursuant to 28 U.S.C. §1746:

1.     During my more than 30-year career in the U. S. foreign service I attained the Class of Minister-Counselor in 1997. From 1991 to 1993, I served as Deputy Assistant Secretary of State for Personnel (Examination and Recruitment, Assignments, Evaluation, and Retirement). From 1993 to 1997 I was Deputy Chief of Mission of the U.S. Embassy in Indonesia. Earlier, 1984-1987, I had served as the Principal Officer of the U. S. Consulate in Surabaya, Indonesia, and from 1987 to 1989 I was Director of Political Training at the Department of State's Foreign Service Institute. Since retirement, I remain in contact with a number of Department of State colleagues with whom I served..

2.     Academic credentials: I graduated in 1956 from The George Washington University with an A.B. International Affairs, and in 1959 I received an A.M. in International Affairs from Radcliffe College. In 1974 I received a Ph.D. from Cornell

EXHIBIT 24

University. In addition to serving as Department of State Diplomat-in-Residence and
Visiting Scholar at the University of Arizona I have served on the staff of four
institutions of higher learning in the United States and abroad, both before and since my
retirement from the U. S. foreign service. I am the author of a number of professional
articles and book reviews. A selected bibliography of my published works is submitted as
an attachment along with my curriculum vitae.

3. During the course of my career I have had considerable experience with
the State Department's personnel system. My assignment as Deputy Assistant Secretary
of State for Personnel gave me a particular knowledge of assignment, grievance, and
Equal Employment Opportunity issues as well as the operating "culture" of the
Department.

4. I have met with Ms. Farris and reviewed her case and career file, for the
case of Farris v. Rice, Case No. 05-1975 (RMU). My conclusion is that the plaintiff
appears to be an exceptionally well-qualified senior foreign service officer with extensive
management and leadership experience. In my professional opinion should such an
officer be involuntarily separated prior to the resolution of her case now before this Court
she would suffer grievous harm which money damages alone would not address.

5. Reintegration of an officer who is retired, voluntarily or involuntarily,
from the Foreign Service, is difficult. An officer returning to active service would labor
under a significant disadvantage in having missed normal bidding cycles, in which
positions for which this officer might well have been selected could very well have gone
to others more junior and less qualified. This would place such an officer under further

disadvantage in obtaining meaningful opportunities for assignment, training, and service to which such an officer would be entitled.

      6.      In the circumstances of the instant case, the plaintiff has slightly less than seven years before she reaches the mandatory retirement age.    Mandatory requirement at age 65 cannot be extended.  Thus, involuntary separation before the case is resolved would, in my professional opinion, create unmitigable harm to the plaintiff.

      I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

      EXECUTED ON AUGUST **29**, 2006 IN WASHINGTON, D.C.

      *Barbara S. Harvey*

      BARBARA S. HARVEY

Curriculum Vitae
# BARBARA SILLARS HARVEY
**4577 Indian Rock Terrace, NW**
**Washington, DC 20007-2575**
**bsharveydc@comcast.net**
**Tel & Fax: (202) 338-2305**

## Employment:
| | |
|---|---|
| 2001 - 2002 | Adjunct Associate Professor of Asian Studies, Georgetown University. |
| 2000 - 2002 | Visiting Lecturer, Foreign Service Institute, Department of State. |
| 2000 - 2000 | Interim Indonesian Analyst, Bureau of Intelligence and Research, Department of State. |
| 1997 - 1999 | Diplomat-in-Residence/Visiting Scholar, University of Arizona. |
| 1993 - 1997 | Deputy Chief of Mission, U.S. Embassy - Jakarta. |
| 1991 - 1993 | Deputy Assistant Secretary of State for Personnel (Examination, Recruiting, Assignments and Reinstatments), Department of State. |
| 1989 - 1991 | Assistant Director, Office of Indonesia, Malaysia, Brunei, and Singapore Affairs. |
| 1987 - 1989 | Director, Political Training, Foreign Service Institute, Department of State. |
| 1984 - 1987 | Principal Officer, U. S. Consulate - Surabaya, Indonesia. |
| 1982 - 1984 | Desk Officer for North Korea - Bureau of East Asian and Pacific Affairs. |
| 1980 - 1982 | Desk Officer for Vietnam - Bureau of East Asian and Pacific Affairs. |
| 1978 - 1980 | Political Officer, U. S. Embassy - Singapore. |
| 1974 - 1977 | Lecturer in Politics, Monash University. Melbourne, Australia. |
| 1965 - 1968 | Assistant Cultural Affairs Officer - Exchanges (USIS), U. S. Embassy - Seoul. |
| 1961 - 1964 | Public Affairs Assistant, U. S. Consulate - Surabaya, Indonesia. |
| 1959 - 1960 | Public Affairs Trainee United States Information Service (USIS), U. S. Embassy - Seoul. |
| 1955 - 1959 | Clerical Staff, United States Information Service, Washington, DC. |
| 1953 - 1954 | Secretary to the Director of Women's Activities, The George Washington University. |

## Awards:
1995 Department of State Superior Honor Award
1994 Department of State, Performance Pay
1989 Department of State, Meritorious Step Increase
1989 Department of State, Meritorious Honor Award (Group)
1984 Department of State, Meritorious Honor Award
1955 Phi Beta Kappa, Pi Gamma Mu, Mortar Board (President),
1955 Who's Who Among Students in American Colleges and Universities
1952 Alpha Lambda Delta

## Education:
• Cornell University - Ph.D., Government, 1974
• Radcliffe College - A.M., International Affairs, 1959
• The George Washington University - A.B. International Affairs, 1956
• DePauw University, 1951-1952

## Modern Languages:
• Indonesian (fluent)
• French (reading)
• Dutch (minimal reading)
• Korean (minimal speaking)

- 2 -

**Publications:**

Harvey, Barbara S., *The Future of Indonesia as a Unitary State: Separatism and Decentralization*; Alexandria, VA: Center for Strategic Studies, CNA Corporation, 2002.

Harvey, Barbara S., "Nation Formation: The Indonesian and American Experience," in *Jurnal Studi Amerika,* Vol. III (Jan-Feb 1997); Jakarta: University of Indonesia, American Studies Center.

Harvey, Barbara S., "Diplomacy and Armed Struggle in the Indonesian National Revolution," in Daniel S. Lev and Ruth McVey, eds., *Making Indonesia;* Ithaca, NY: Southeast Asia Program, Cornell University, 1996, pp. 66-80.

Harvey, Barbara S., Indonesian translation of "Tradition, Islam and Rebellion: South Sulawesi 1950-1965" (PhD dissertation, Cornell University, 1974); Jakarta: Grafiti Pers. 1989.

Harvey, Barbara S., "South Sulawesi: Puppets and Patriots," in Audrey R. Kahin, ed., *Regional Dynamics of the Indonesian Revolution*, Honolulu: University of Hawaii Press, 1985, pp. 206-35.

Harvey, Barbara S., *Permesta: Half a Rebellion,* Ithaca, NY: Cornell Modern Indoensia Project, 1977; published in Indonesian translation by Grafiti Pers, Jakarta, 1984.

Harvey, Barbara S., "Indonesia: the Search for Stability, the Inevitability of Change," *Dyason House Papers,* Australian Institute of International Affairs, IV/2, October 1977.

Harvey, Barbara S., "Darul Islam in South Sulawesi: Hutan against Kota," *Majalah Universitas Hasanuddin*, Ujung Pandang, Indonesia, January-February 1977, pp. 10-26.

**Book Reviews:**

Harvey, Barbara S., "One Soul, One Struggle," by Anton Lucas; *The Journal of Asian Studies,* Vol. 81, No. 3 (August 1992), pp. 712-14.

Harvey, Barbara S., "Visions and Heat: the Making of the Indonesian Revolution," by William H. Frederick; *Indonesia*, No. 48 (October 1989), pp. 97-100.