**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                              )
VIRGINIA LOO FARRIS           )
                              )
            Plaintiff,        )
                              )
      v.                      )      Civil Action No. 05-1975(RMU)
                              )
CONDOLEEZZA RICE              )
Secretary of State            )
Department of State           )
                              )
            Defendant.        )
_____)
```

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

<u>INTRODUCTION</u>

Plaintiff is a public affairs foreign service officer; her complaint asserts that the failure to receive a range of job assignments through the State Department's "bidding" process was discrimination, and the investigation of a separate maintenance allowance ("SMA") she received while living in the same city as her husband constituted retaliation. Because she has not been promoted within the allotted "time in class," plaintiff will be mandatorily retired on September 29, 2006 pursuant to the standard operation of the foreign service personnel system. <u>See</u> 22 U.S.C. § 4007, 3 FAM 6213.3-3. Plaintiff seeks a preliminary injunction to prevent her involuntary retirement.

## FACTUAL BACKGROUND

Plaintiff began her government career as a Foreign Service Officer with the United States Information Agency ("USIA") in October 1972 (ROI, Ex. F2a, at 1).[1] While at USIA, she had approximately 13 assignments. Except for her years of training at the National War College (1997-1998) and her congressional fellowship (1983-1984), plaintiff's assignments were essentially as a Public and Cultural Affairs Officer. (Def. Ex. 1, Plaintiff's Curriculum Vitae).

USIA was integrated into the State Department in October 1999 pursuant to an Act of Congress. The State Department Foreign Service consists of five specialties (called "cones") to which Foreign Service Officers are assigned early in their careers. Prior to the integration of USIA with the State Department there were four "cones": political, economic, consular, and administrative. Upon integration, a fifth cone was added to incorporate the USIA Foreign Service Officers: public diplomacy (See generally, ROI, Ex. F2a, at 1). Upon integration, Ms. Farris continued to be assigned to the public diplomacy cone (Id.). The cone with the greatest number of officers is the political cone (ROI, Ex. F7, at 5). The cones that are understaffed are public diplomacy and administrative (Id.).

---

[1] "ROI" refers to the Report of Investigation of plaintiff's claims of discrimination and retaliation.

2

Plaintiff began a three-year assignment as Public Affairs Officer ("PAO") to Bangkok that commenced in August 1998 (ROI, Ex. F2a, at 2).   In late 1998,

The plaintiff's husband departed Bangkok in December 1998

For these and other reasons, he was not      to return to Bangkok for the duration of plaintiff's tour (Id., at 5-6).

In September 1999, for compassionate reasons and in order to enable plaintiff to reunite her family should she so choose, USIA and plaintiff entered into an agreement (in which the State Department acquiesced) whereby plaintiff could bid early on positions for transfer in the summer of 2000 (a year short of her three-year tour of duty in Bangkok)(ROI, Ex. F2a, at 2-3; see also ROI, Ex. F2b at 10).  The agreement provided that if plaintiff did not receive an assignment to her satisfaction, she could complete her tour of duty in Bangkok and re-bid in the following assignment cycle (ROI, Ex. F10, at 2).  Accordingly, plaintiff bid on potential assignments beginning in the fall of 1999 through spring of 2000.  She did not receive the assignments she desired and decided to remain in Bangkok until the summer of 2001.  During the next bidding cycle she bid on and was assigned to Pretoria, South Africa as Public Affairs Officer.

Plaintiff claims that she was the victim of discrimination, based on her race (Asian) and sex, when she was not selected for the USNATO Political Counselor position; when she was not selected for the Hague POLAD position; when she was not selected for the Public Affairs Officer (PAO) in Athens; and finally, a claim of a pattern of discrimination to deny her multifunctional assignments.[2]  Plaintiff also alleged that she was retaliated against because of her prior EEO activity when she was made the subject of an OIG investigation. (ROI, Ex. B1).

In her District Court complaint, plaintiff added several other allegations of non-selection which she failed to raise at the administrative level.  They are her non-selection for the PAO in Beijing (Complaint ¶ 34), withdrawal from the bidding process of a position in Jakarta (Complaint ¶ 34), and a posting in Riyadh (Complaint ¶¶ 1, 19).  She also alleges that she was pulled from two Deputy Chief of Mission "short lists" but fails to identify them further.  Similarly, she refers in passing to denial of training without further specificity (Complaint ¶¶ 1, 24).  Compare ROI, Ex. B1.

---

[2] A review of plaintiff's underlying District Court complaint reveals that she dropped her claim of discrimination with respect to the Public Affairs Officer (PAO) in Athens and several allegations of retaliation.

4

A.  **Positions at Issue**

1.  **USNATO Political Counselor.**

The USNATO Political Counselor (sometimes referred to as
"Political Advisor" or "POLAD") is one of the principal advisers
to the U.S. Permanent Representative to the U.S. Mission to NATO,
who was then Ambassador Alexander Vershbow.  (Ambassador Vershbow
is currently the U.S. Ambassador to Moscow.)  The USNATO
Political Counselor serves as principal U.S. Representative in
NATO's Senior Political Committee and in several other high-level
NATO bodies, where Alliance position on issues of vital
importance to U.S. interests are negotiated.  This includes the
negotiation of communiqués for NATO Summits and semi-annual
Foreign Ministers' meetings, and Alliance decision papers on NATO
enlargement, the European security and defense identity, Kosovo,
weapons of mass destruction, NATO-Russia relations, and National
Missile Defense to name but a few (Exhibit 1).  This is a
political cone position.

In early April, 2000, plaintiff learned that the European
Bureau had a candidate one level of seniority below the plaintiff
in the Foreign Service personnel system that it was strongly
backing for the position and for whom it would request a "cede"
(ROI, Ex. F2a, at 6).  "Cedes" are expressly provided for in
Department standard operating procedures (Exhibit 2).  A "cede"
in this context refers to the permission granted by the central

5

Bureau of Human Resources to permit an assignment of an officer who is not in the Senior Foreign Service into a Senior Foreign Service position (Exhibit 2, at Bates 440).

Although she had been offered the PAO Athens position (see discussion, _infra_), the plaintiff asked to go to what is called a "shoot-out" with the EUR Bureau's candidate for the USNATO position before the Department's assignments committee (_Id_.).  On or about June 6, 2000, the assignments panel selected Andrew Goodman for the USNATO Political Counselor position (_Id_., at 18; ROI, Ex. F2a, at 8).  Plaintiff's Career Development Officer advised her that the reason the panel did not select her for the position was that she had neither regional nor functional experience for the job (ROI, Ex. 18s).  Plaintiff had no NATO experience (Farris Dep., March 3, at 13 (Exhibit 3)).  Plaintiff's resume shows no experience in the European region (Def. Exhibit 1).

On May 30, 2000, Ambassador Vershbow sent a memorandum to the European Bureau setting forth his views for the purposes of the "shoot-out" as to why Mr. Goodman was a superior candidate to the plaintiff (Exhibit 4).  Mr. Goodman was at the time occupying the number two "political" position at USNATO, i.e., he was the deputy to the incumbent Political Counselor (ROI, Ex. F7, at 8).  As to Mr. Goodman Ambassador Vershbow states:

> I am confident that Andrew Goodman, while still an
> FS-1, can do the job effectively from day one.  He has

6

served with distinction for the past two years as
Deputy Political Advisor (a position with formidable
negotiating and managerial responsibilities in its own
right), and he has considerable background in East-West
and European issues.  As head of the policy unit within
the Political Section, Andrew has had under his wing
the main substantive issues that are addressed in the
SPC (e.g., ESDI, the Membership Action Plan).  He has
played a key role on these issues for the current
POLAD, the DCM and myself, including taking the US
chair on several occasions as Acting POLAD.  His deep
background on Russia is a particular bonus on issues
such as NATO enlargement and National Missile Defense;
his expertise on Germany has paid a similar dividend.
As a manager, Mr. Goodman drafted our first Mission
Program Plan in the new format and reconfigured the
Political Section's portfolios with outstanding
results.  On a day-to-day basis, my impression is that
the section runs like clockwork under his stewardship.
In sum, based on his record and first-hand experience,
I believe Andrew is equipped to take on the full range
of tasks in the POLAD's portfolio.  Moving Andrew
Goodman up to the POLAD position will also ensure
maximum continuity as a new DCM, Victoria Nuland, takes
over this summer.

As to Ms. Farris, he commented:

I have met personally with the other candidate,
Virginia Farris, and reviewed her record carefully.
While she is an excellent officer and has had some
exposure to Politico-Military issues, she has virtually
no EUR or NATO experience, little familiarity with the
national security bureaucracy in Washington and no
track record as a negotiator (the aspect of the job
that is, perhaps, the most critical and difficult to
pick up). While I trust that she has the potential to
master the many different skills that the POLAD
position requires, I do not think the Mission can
afford a lengthy period of on-the-job training,
especially at a time when the DCM position is turning
over.

Ambassador Vershbow reiterated his assessments of Mr. Goodman and

Ms. Farris in his Declaration (ROI, Ex. F5, at 3-4).  Moreover,

he emphatically denied that Mr. Goodman was "pre-selected" for

the job as he explains:

> Mr. Goodman was not pre-selected for the position -
> indeed, we sought to persuade the at-grade incumbent,
> William Harris, to extend for one more year, up until
> the month prior to the end of his tour of duty, and
> only made the decision in favor of Mr. Goodman at the
> very last minute, based on the relative qualifications
> of all available candidates.

(Id., at 4).

Plaintiff's lack of comparable regional and political

experience was confirmed by the Deputy Director of the Office of

Career Development and Assignment in the Bureau of Human

Resources at the time of the shoot-out (ROI, Ex. F7, at 9), by

the Director of Senior Assignment in the Career Development

Office at the time of the shoot-out (ROI, Ex. F10, at 3; see also

Ex. F10, at 5), and by the European Bureau (ROI, Ex. F6b (Bates

248)).

## 2.  **The Hague POLAD Position**

This position is the Political Adviser to the NATO military

commander located at Brunsum, Netherlands (ROI, Ex. F8a, at 2).[3]

Thus, it was a NATO position and not a Department of State

position (Id.).  As such, the timetable for the selection (and

_____

[3] At her deposition, the plaintiff claimed that her allegations
concerned the assignments system, not her non-selection for the
job, see Farris Dep., March 2, at 62.

thus the submission of U.S. Government (USG) candidates for the position) was set by NATO and was not tied to the Department of State bidding and assignment process (Id.).  Other NATO member countries would also have had the opportunity to submit candidates (Id.).  The final selection for this position was made by NATO authorities, not by U.S. government (USG) officials (Id., at 2-3).  The Department's "short list" of potential candidates for NATO consideration was made prior to the receipt of plaintiff's bid on the position (Id., at 5).  The European Bureau explained this to the plaintiff (Id.).  When plaintiff noticed in November 1999 that the job was still listed on the Open Assignments list, she contacted her Career Development Officer and entered a bid on the position (ROI, Ex. F2a, at 4).  Plaintiff was advised the very next day that the short lists had already been sent forward (Id.).  When plaintiff noticed in December of 1999 that the position continued to be on a list of jobs that were "hard to fill," she again contacted her Career Development Officer to ask about the apparent contradiction (Id.).  Plaintiff's Career Development Officer advised her that "the individual responsible for 'listing the Hague position in the 'Hard to Fill' cable had been misinformed" (Id., at 5).

The person selected for the position was a Department of State Senior Foreign Service Officer (male, Caucasian) at the same rank as Ms. Farris.  He had significant experience with the

development and implementation of U.S. foreign policy toward
Russia and managing U.S. policies in Europe, including at the
National Security Counsel (NSC) (ROI, Ex. F8a, at 5).  Plaintiff
had no similar regional experience or experience in developing
and implementing foreign policy towards Russia or Europe (Pl.
Exhibit 4).

### 3.  Athens Public Affairs Officer Position

Plaintiff appears to have abandoned her claim with respect
to this position.[4]  Plaintiff was offered the position of Public
Affairs Officer in Athens ("PAO") (ROI, Ex. F18m) and voluntarily
chose to turn it down (ROI, Ex. F2a, at 7; ROI Ex. F18n, at Bates
630).  Plaintiff listed the Athens PAO job as one of her six core
bids throughout the bidding cycle (Farris Dep., March 3, at 64).
She was both the Bureau's and Embassy's top candidate for the
position (ROI, Ex. F17, at Bates 598).

At plaintiff's request, the paneling of the position was
postponed several times. See (ROI, Ex. F18m; ROI, Ex. F18o; and
ROI, Ex. F18r, Bates 635).  Ultimately, the Department could wait
no longer as it needed to panel an officer into the job in order
to get that officer into the Greek language training course in

---

[4] Even though plaintiff appears to have dropped the claim of
discrimination with respect to this position in her District Court
complaint and fails to address it in her present motion, the
factual circumstances demonstrate her inability to succeed on the
merits of any of her claims and her lack of understanding of the
Department's unique personnel system.

the summer of 2000 <u>See</u> (ROI, Ex. 18r, at Bates 635; ROI, Ex. F2a, at 7; <u>see</u> <u>also</u> ROI, Ex. F17 at Bates 601-602 and F2, Bates 121. Plaintiff rejected the PAO Athens job choosing instead to participate in a "shoot-out" for the USNATO Political Counselor job in Brussels and because she could not arrange to take her language requirement in Greece rather than at the Foreign Service Institute (<u>see</u> <u>supra</u>).

### 4. "Multifunctional" Positions and Positions that Might Qualify Her for Multifunctional Positions.

The term "multifunctional" is a term of art within the Foreign Service personnel system that does not correspond to the repeated use of the word by the plaintiff. Specifically, internal Department regulations permit Foreign Service Officers to bid on and be assigned to certain positions designated "multifunctional" outside their cones. 3 FAH 2620 <u>et</u> <u>seq</u>. Officers who are approved for multifunctionality are given a "multifunctional secondary skill code" (<u>Id</u>.).

Plaintiff did not apply for, nor was she granted, a multifunctional secondary skill code. Plaintiff uses the term "multifunctional" to mean any job outside her public diplomacy cone (Farris Dep., March 3, at 20). Positions that she believes would enhance her multifunctionality would appear to include what she considers to be all other career enhancing positions, including political officer, economic officer, and administrative officer positions (<u>Id</u>., at 21, 28, 29).

11

### B.  **Retaliation Claims**

The gist of plaintiff's retaliation claim is that she was referred to the Office of the Inspector General regarding her claim for a Separate Maintenance Allowance ("SMA")[5] because she had not cooperated with the wishes of the Ambassador regarding the return of her family to Bangkok and because she had participated in Title VII protected activities (ROI, Ex. F2b, at 13). ......................Plaintiff applied for and was granted SMA in September 1999 because her husband and son were then living in the United States (ROI, Ex. F3a, at 13).  SMA regulations provide  that the SMS allowance cannot be granted if the family members for whom it is obtained spend more than 30 days at a time at the employee's post of assignment or within 300 miles thereof (Id.  See also Department Standardized Regulation 260).

In 2001 the Deputy Chief of Mission in Bangkok, Marie Huhtala, learned from the plaintiff that plaintiff's husband had visited Thailand on more than five occasions since he left on medical orders (ROI, Ex. F3a, at 13-14).  She asked the Regional Security Officer ("RSO") to investigate whether Mr. Farris had

---

[5] Separate Maintenance Allowance is granted to Foreign Service employees whose spouses are not living close to them at post.  It is intended to offset some of the additional expenses of maintaining two residences (ROI, Ex. F3a, at 13).

indeed returned to Bangkok in violation of the Ambassador's request (Id. at 14). The RSO's investigation revealed that George Farris and son Geoffrey Farris had returned to Bangkok in mid-2000 and were living in an apartment in the city. Plaintiff's son, Geoffrey, had been enrolled in a local school since the fall of 2000 (Id.). DCM Huhtala asked for the IG investigation because of her responsibility to ensure that allowances paid to employees at post were not being fraudulently obtained (Id., at 15). In fact, one of Ms. Huhtala's work requirements as DCM in Bangkok was to investigate any case of waste, fraud, or abuse (Huhtala Dep., at 55 (Exhibit 5)(Ms. Huhtala is currently the U.S. Ambassador to Malaysia.)).

Subsequently, the U.S. Attorney's Office filed suit against plaintiff under the False Claim Act, 31 U.S.C. § 3729 et seq. to recover damages and civil penalties due to plaintiff's fraudulently receiving SMA payments totaling $8,822.16 that she was not eligible to receive. See United States v. Farris, Civil Action No. 05-1718. On August 30, 2005, Ms. Farris and the U.S. Attorney's Office entered into a settlement agreement in which Ms. Farris agreed to pay $10,800 to the government without an admission of liability (Def. Ex. 8).

**Argument**

**I.   Standard for Preliminary Injunction**

In order for the Court to exercise its power to grant injunctive relief, an extraordinary measure, the plaintiff must show: (1) a strong likelihood of prevailing on the merits of its claim; (2) that without injunctive relief it will suffer irreparable harm; (3) that the issuance of an injunction will not substantially harm other interested parties; and (4) that the public interest favors the requested injunction. Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); accord Wisconsin Gas Co. v. FERC, 758 F.2d 669, 673-74 (D.C. Cir. 1985); Washington Metropolitan Area Transportation Commission v. Holiday Tours, Inc., 559 F.2d 841, 843-44 (D.C. Cir. 1977).

Additionally, relief in the form of a preliminary injunction is a drastic and extraordinary form of relief that should not be granted absent a clear and convincing showing by the moving party, see Yakus v. United States, 321 U.S. 414 (1944); Kahane v. Secretary of State, 700 F.Supp. 1162, 1165 (D.D.C. 1988), and "[t]he injury must be both certain and great; it must be actual and not theoretical." Id.; Wisconsin Gas, 758 F.2d at 674.  This is an exacting standard that the Plaintiff has not met.

"Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, is not

14

enough.... But injury held insufficient to justify a stay in one
case may well be sufficient to justify it in another, where the
applicant has demonstrated a higher probability of success on the
merits." Virginia Petroleum Jobbers Ass'n, 259 F.2d at 925. "An
injunction may be justified for example, where there is a
particularly strong likelihood of success on the merits even if
there is a relatively slight showing of irreparable injury."
CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738,
747 (1995). Wisconsin Gas Co. v. FERC, 758 F.2d at 674, sets
forth the guiding principles for determining whether irreparable
harm exists that (1) the injury must be both certain and great,
not something merely feared as likely to occur at some indefinite
time; (2) the injury must be of such imminence that there is a
"clear and present" need for relief to prevent it; and (3)
economic loss is insufficient to constitute irreparable harm
unless the plaintiff's very existence is threatened. See also
Sampson v. Murray, 415 U.S. 61, 88-90 (1974); see also Davenport
v. International Brotherhood of Teamsters, 166 F.3d 356, 360
(1999).

The deference owed to governments in personnel actions is,
in this Circuit, the rule and not the exception. Any grant of
injunctive relief comes only upon a showing of extraordinary
circumstances amounting to total employment preclusion resulting
from the termination and no harm to the agency so compelled to

15

retain the employee who, in turn, must show, even preliminarily, a high likelihood of success on the merits.  Compare Taylor v. R.T.C., 56 F.3d 1497, 1506, n.1 (D.C. Cir. 1995); Nichols v. A.I.D., 18 F. Supp. 2d 1, 5 (D.D.C. 1998); Moore v. Summers, 113 F. Supp. 2d 5, 28 (D.D.C. 2000) with Bonds v. Heyman, 950 F. Supp. 1202, 1214-1215 (D.D.C. 1997).   Where, as here, plaintiff seeks to enjoin a government agency from taking a personnel action against her, plaintiff "at the very least must make a showing of irreparable injury sufficient in kind and degree to override . . . factors cutting against the general availability of preliminary injunctions in Government personnel cases." Sampson v. Murray, 415 U.S. at 84.

## II.  **Applicable Title VII Law**

In any Title VII case, the plaintiff bears the burden of demonstrating by a preponderance of the evidence that intentional discrimination was a motivating factor in his or her discriminatory treatment.  This burden remains at all times with the plaintiff, Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Generally, the triparte framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) is the method "to bring the court expeditiously and fairly to this ultimate question."  Burdine, 450 U.S. at 253.

To prevail on the merits in a discrimination case brought under Title VII, a plaintiff must initially establish a prima

facie case of prohibited discrimination.  See McDonnell Douglas
Corp. v. Green, 411 U.S. 792 (1973); Aka v. Washington Hospital
Center, 156 F.3d 1284, 1288 (D.C. Cir. 1988) (en banc) ("under
the McDonnell Douglas framework, the complainant must first
establish a prima facie case . . .") (citation omitted).  The
burden of articulation, not proof, then shifts to the defendant
to "articulate some legitimate, nondiscriminatory reason for the
employee's rejection." McDonnell Douglas at 792.  If the
defendant meets this burden, then plaintiff must have the
opportunity to prove, by a preponderance of the evidence, that
"the legitimate reasons offered by the defendant were not its
true reasons, but were a pretext for discrimination.  Texas Dept.
of Community Affairs v. Burdine, 450 U.S. 248 (1981) (defendant's
burden articulated for Title VII cases).

 **A.** **Prima Facie Case**

  In order for a plaintiff to establish a prima facie case of
discrimination in a Title VII case, she must show that:  (1) she
is a member of a protected class; (2) she suffered an adverse
employment action; and (3) the unfavorable action gives rise to
an inference of discrimination.  Stella v. Mineta, 284 F.3d 135,
145 (D.C. Cir. 2002).

  The D.C. Circuit has refined this prima facie test for
discrimination in non-promotion and failure to hire cases, such
that plaintiff must establish: (1) that she belongs to a

protected group; (2) that she applied and was qualified for a job for which the employer was seeking applicants (i.e., the job sought was vacant); (3) that despite her qualifications, she was rejected (i.e., she suffered from no absolute or relative lack of qualifications for the position); and (4) that after her rejection the position was filled, or the position remained open and the employer continued to seek applicants from persons of plaintiff's qualification level.  Oliver-Simon v. Nicholson, 384 F. Supp.2d 298, 306 (D.D.C. 2005) (citing Morgan v. Federal Home Loan Mortgage Corporation, 328 F.3d 647, 650-51 (D.C. Cir. 2003); see also McDonnell Douglas, 93 S. Ct. 1817.

One critical element for evaluating Title VII claims of employment discrimination is the factor of adequate qualification for the job on the part of the complaining employee.  Williams v. Boorstin, 663 F.2d 109, 116 (D.C. Cir. 1980), cert. denied, 451 U.S. 985 (1981) (citing McDonnell Douglas, 93 S. Ct. at 1824 (Other elements of the prima facie case include: . . . qualifications of other applicants equivalent to those of complainant.))  Qualification on the part of the employee, then, would seem to be almost indispensable to a Title VII violation. Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980)

### B.  **Legitimate, Non-Discriminatory Reason for Selection**

Assuming that plaintiff can overcome the fact that plaintiff was not qualified for the positions, the burden of production

shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged action.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981) (defendant's burden articulated for Title VII cases).  The defendant's burden is one of production, not of proof.  See Aka, 156 F.3d at 1288 ("[I]n producing nondiscriminatory reasons for its challenged action, the employer is not obligated to support these reasons with objective evidence sufficient to satisfy the preponderance of the evidence standard").  Thus, the defendant's burden is satisfied if it simply explains what it has done or produces evidence of legitimate, nondiscriminatory reasons.  St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).  Notably, defendant is not required to prove that the agency made the wisest choice, but only that the reasons for the decision were non-discriminatory.  See Davis v. State University of New York, 802 F.2d 638, 641 (2d Cir. 1986) (citing Burdine, 450 U.S. at 258-59).

Even if the plaintiff establishes a prima facie case, summary judgment is still available to the defendant if it sufficiently articulates a nondiscriminatory reason for the challenged action, and the plaintiff fails to present objective evidence that undermines the defendant's proffered explanation for its actions and/or provides independent evidence of discriminatory statements or attitudes on the part of the

employer.  See Aka, 156 F.3d at 1288-1289.  And while "plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight," a plaintiff who creates a genuine issue of material fact with respect to the employer's proffered reason will not always be deemed to have presented enough evidence to survive summary judgment.  Id. at 1290.  As the D.C. Circuit has stated:

> There may be no legitimate jury question as to discrimination in a case in which a plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue, and there is abundant independent evidence in the record that no discrimination has occurred.

Id. at 1291.

## C. **Pretext**

Once defendant has carried the burden of production, the burden then shifts back to the plaintiff to establish that defendant's legitimate, non-discriminatory reasons were not its true reasons but rather, were pretextual.  See McDonnell Douglas v. Green, 411 U.S. 792, 802-04 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  St. Mary's Honor Center, 509 U.S. at 515 (emphasis in original).  "It is not enough, in other words, to disbelieve the employer, the fact finder must believe the plaintiff's explanation of intentional discrimination."  Id. at

20

519.  Plaintiff bears the ultimate burden of persuasion on the issue of whether she was intentionally discriminated against. <u>Burdine</u>, 450 U.S. at 253.

Even if the Court suspects that a job applicant "was victimized by [] poor selection procedures", it "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'"  <u>Fischbach v. District of Columbia Dept. of Corrections</u>, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting <u>Milton v. Weinberger</u>, 696 F.2d 94, 100 (D.C. Cir 1977)) ("It is axiomatic that under the statutory scheme of Title VII … an employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as racial or other discriminatory distinctions do not influence the decision."), <u>aff'd</u>, 595 F.2d 888 (D.C. Cir. 1979).  "Once the employer has articulated a nondiscriminatory reason for its actions … the issue is not the correctness or desirability of [the] reasons offered … [but] whether the employer honestly believes in the reason it offers." <u>Fischbach</u>, 86 F.3d at 1183 (internal quotation marks and citations omitted).  "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.  She must show that the explanation given is a phony reason." <u>Pignato v. American Trans Air</u>, 14 F.3d 342, 349 (7th Cir. 1994), quoted in <u>Fischbach</u>, 86 F.3d at 1183.

21

Because an employer's selection of one qualified candidate over another qualified candidate raises no inference of discrimination, plaintiff can <u>only</u> meet his burden of showing pretext by presenting evidence from which a jury could conclude that she was significantly better qualified than the selectees. (emphasis supplied) <u>Fischbach v. District of Columbia Dep't of Corrections</u>, 86 F.3d 1180, 83 (D.C. Cir. 1996); <u>Carter v. George Washington University</u>, 387 F.3d 872, 881-82 (D.C. Cir. 2004). A plaintiff must prove that his qualifications were "plainly superior" to the selectee's or summary judgment should be granted. <u>Lathram v. Snow</u>, 336 F.3d 1085, 1091-92 (D.C. Cir. 2003); <u>Stewart v. Ashcroft</u>, 352 F.3d 422, 430 (D.C. Cir. 2003) (comparing rejected plaintiff's credentials with those of successful applicant, and finding plaintiff "simply not discernibly better" than applicant); <u>Aka v. Washington Hosp. Ctr.</u>, 157 F.3d 1284, 1294 (D.C. Cir. 1988); <u>Poarch v. Caldera</u>, EEOC Doc. No. 01964230, 1998 WL 685237 (E.E.O.C. Sept. 18, 1998); <u>see</u> <u>also</u> <u>Holcomb v. Powell</u>, 433 F.3d 889 (D.C. Cir. 2006).

The "plaintiff's subjective belief of [her] qualifications is not evidence that can be used to establish that [she] was qualified for the job." <u>Rasekh v. Veneman</u>, 357 F. Supp. 2d 70, 74 (D.D.C. 2004) (citing <u>Harris v. Univ. of the Dist. Of Columbia</u>, No. CIV.A.87-2631-LFO, 1990 WL 99316, at *5 (D.D.C. July 6, 1990)

(citing <u>Morser v. AT&T Information Sys.,</u> 703 F. Supp. 1072, 1083
(S.D.N.Y. 1989)).

### III.   **Plaintiff Cannot Succeed on the Merits**

### A.   **Positions at Issue**

### 1.   **USNATO Political Counselor.**[6]

Apart from the fact that the selectee was a Caucasian male
and the plaintiff was a Chinese-American woman, there is not a
scintilla of evidence in the record that Ambassador Vershbow or
the State Department Assignments Panel intentionally
discriminated against plaintiff.  Indeed, the record is replete
with evidence that Andrew Goodman was chosen for the USNATO
position because the Assignments Panel (and Ambassador Vershbow)
considered him to be the most qualified of the two candidates,
without regard to gender or race.

Ambassador Vershbow set forth in considerable detail the
requirements of the position and his need for immediate
continuity (Exhibit 2).  Plaintiff's background and experience
simply did not meet the needs of the position.  Plaintiff has no
NATO or European experience or experience in political-military
positions (Farris Dep., March 3, at 13; Plaintiff's Exhibit 4).
Her tour of duty as Public Affairs Adviser to the U.S. Pacific

---

[6] While the plaintiff was eligible to bid on this position,
this is a far cry from establishing that she was qualified for the
position.  Moreover, the defendant has clearly articulated non-
discriminatory reasons for its action and the record is devoid of
any evidence of pretext.

Command was in the public diplomacy arena, not in political arena. Her one-year of training at the National War College does not substitute for hands-on experience in a political-military job. Finally, her 1983 Congressional Fellowship bears no discernible relationship to her qualifications for a USNATO political adviser position. The remainder of plaintiff's assignments were exclusively in the public diplomacy field. (Pl. Ex. 4).

The selectee, by contrast, had served with distinction for the past two years as Deputy Political Advisor (a position with formidable negotiating and managerial responsibilities in its own right), and had considerable background in East-West and European issues. (Exhibit 2)

Despite the stark disparity in her qualifications, plaintiff alleges that the reasons for selecting Mr. Goodman are pretextual because Mr. Goodman was "preselected."[7] The record is clear that Ambassador Vershbow's first choice was the incumbent. Ambassador Vershbow had been attempting to persuade the incumbent in the position to extend his tour of duty, but in the end was unsuccessful (ROI, Ex. F5, at 4). It was only in the spring of

_____

[7] Preselection does not violate Title VII when such pre-selection is based on the qualifications of the preselected party and not on some basis prohibited by Title VII. See, e.g., Mc Allister v. Runyon, 1994 WL 734528 (EEOC July 28, 1994); see also Goostree v. State of Tennessee, 796 F.2d 854, 862 (6th Cir. 1986) cert denied 107 S. Ct. 1374 (1987; Kennedy v. Laudon, 598 F.2d 337, 341 (4th Cir. 1979).

2000, therefore, that the Department was faced with making an immediate decision about a replacement after consideration of all candidates (Id.).(See also Exhibit 2).  There is no credible evidence of preselection.[8]

Plaintiff asserts that she had a right to the position because Mr. Goodman was one level below her.  There is no such right.  The Department's standard operating procedures specifically provide for the highest-ranking mid-level officers, such as Mr. Goodman to "stretch" into a Senior Foreign Service Assignment.  This requires what is known as a "cede" that is subject to approval by the central Bureau of Human Resources (Exhibit 3; ROI, Ex. F17, Bates 598) ("There is no dictum that a senior automatically has priority for a senior job").  Although there is a general presumption in favor of at-grade for all jobs at all grades, the qualification and background of the senior officer for the job in question are key factors (Id.).  There are circumstances every cycle where there is an unassigned senior officer who is not qualified for a position or is not a good fit for the position (Tiernan Dep. at 38, 169).  Contrary to plaintiff's contention, cedes are granted even when there are

---

[8] Plaintiff's claim of preselection also fails to take into account that the bidding cycle runs from the preceding fall through the following spring.  It was only at the end of the bidding cycle that the incumbent informed all concerned he would not extend (ROI, Ex. FS).

senior officers prepared to take the job.  This was such a case.[9]
Simply put, plaintiff's seniority does not trump the prerequisite
experience for the position.  Plaintiff cannot sustain her burden
to show that her qualifications for the position were
significantly superior to the selectee or that the articulated
reasons were pretext for discrimination.  The plaintiff cannot
show pretext based merely on personal speculation of
discriminatory motive or intent.  Green v. Dalton, 164 F.3d 671,
675 (D.C. Cir. 1999).

###    2.  **The Hague POLAD Position.**

The selection for the Hague POLAD position was made by NATO.
The defendant's short list was prepared and sent to NATO before
plaintiff even bid on the position (ROI, Ex. F8a).  Plaintiff
rests her claim of discrimination on her subjective belief that
there was something wrong with a system that kept generating the
position on open assignments and hard to fill lists.  She
persists in this claim of discrimination notwithstanding the fact
that this assignment was a NATO position and not connected with
the Foreign Service bidding cycle. (Farris Dep., p. 64).

---

[9] Plaintiff's evidence that another FSO (Robert Hall) emailed
her expressing an opinion that the selectee was not popular with
the "troops . . . and is a pretty poor manager" fails to
demonstrate pretext (ROI, Exhibit 181).  The Ambassador clearly did
not share Mr. Hall's opinion.  Moreover, in order to demonstrate
pretext, plaintiff must establish more than that the ambassador
misjudged the qualification.  See Holcomb, 433 F.3d 889 (D.C. Cir.
2006).

In November 1999, immediately after plaintiff inquired about the Hague POLAD position, her Career Development Officer told her that the "short list" had already been sent to NATO (ROI, Ex. F18f).  For reasons unknown, however, it continued to be listed as an available position on the December 1999 jobs "hard to fill" list (ROI, Ex. F18h).  A mistake on the computer generated list of assignments or a mistake by the person who stirred the job in a "Hard to Fill" document does not evidence intentional discrimination. (<u>Id.</u> at 5).  The plaintiff finds this suspicious and asks us to infer discrimination and/or pretext.  But plaintiff's subjective belief or unsupported speculation simply cannot sustain her burden of proof.

Even if plaintiff's relative qualifications had been an issue (which they were not), the Department had legitimate non-discriminatory reasons for putting the selectee on the short list (the Department did not make the ultimate selection, however).[10]  The selectee was a Department of State Senior Foreign Service Officer (male, Caucasian) at the same rank as Ms. Farris, who had significant experience with the development and implementation of U.S. foreign policy toward Russia and managing U.S. policies in Europe (ROI, Ex. F8, at 5).  Plaintiff had no such experience.  Thus, plaintiff fails to establish sufficient

---

[10] Plaintiff makes absolutely no attempt to argue let alone prove that she was better qualified than the selectee for this position.

evidence that would permit a reasonable fact-finder to find in her favor.

### 3. Sustained Pattern of Discrimination in Multifunctional Assignments and Assignments that Might Qualify for Complainant for Such Assignments.

Again, plaintiff cannot sustain her burden of proof with respect to any of these assignments. The complaint accepted for investigation is that the Department engaged in a "sustained pattern of discrimination" to deny her what she likes to term "multifunctional" assignments and assignments that "might" qualify her for "multifunctional" assignments (ROI, Ex. C, at Bates 058). Plaintiff's allegations are amorphous and subjective at best, and are wholly unsupported by any evidence.

The plaintiff does not allege discrimination in each and every position. ("I think it is counterproductive to go bid by bid." Farris Dep., March 3, at 40.) Nor does she even know who was selected for whatever positions are in question (See, e.g., Farris Dep., March 3, at 47). In her deposition, she conceded: "I don't honestly know whether there was a conspiracy" (Id. at 35).

The plaintiff has failed to produce a scintilla of evidence to sustain a pattern and practice claim of discrimination nor has she demonstrated that she was better qualified for any of these positions than the selectee. The Department had legitimate non-discriminatory reasons for not assigning her to the positions

on her bid lists.  Unlike her experience at USIA, plaintiff was competing with high level Foreign Service Officers who had devoted their careers to specific regions of the world and cones and professional expertise and niches other than public diplomacy.  Finally, plaintiff refused to consider career-enhancing jobs in Washington, D.C. and was by her own admission limited in terms of where she could bid based on her husband's medical clearance (<u>Id</u>., at 39-40).  Plaintiff ignored every effort of those counseling her to enhance her career by playing her strong card:  her excellent service as a public diplomacy officer in the public diplomacy cone.

To take but a few examples: Plaintiff cites the "SHAPE POLAD" position as evidence of a sustained pattern of discrimination (Farris Dep., March 3, at 43)("SHAPE" is the acronym for "Supreme Headquarters Allied Powers Europe.").  She alleges, without further specificity that her non-selection for this position and others "caused me to wonder" if it was on the basis of race or gender. <u>Id</u>.  This position is the "crown jewel" of POLAD jobs (ROI, Ex. F18k).  Her competition that year consisted of three ambassadors, all with extensive regional and political/military experience (ROI, Ex. F17, at Bates 598).

She also cites a Deputy position at AIT-Taipei (Farris Dep., Mar. 3, at 45-46).  The Department deferred filling this position for a year (<u>Id</u>.).  In other words, the Department was no longer

29

seeking applicants for this position during that bidding cycle.
There is no evidence whatsoever that it made this decision just
to deny the plaintiff the position.  The issue of the deferral
was raised with her on one of her very first inquiries concerning
this position.  This was also the case for the Deputy position in
Hong Kong (ROI, Ex. F2b, at 20).  For this position she alleges a
"possible" element of discrimination, but again proffers no
evidence. (Farris Dep., March 3, at 46).  Other positions
included Deputy Chief of Mission at the U.S. Mission to the
European Union, which "raised questions in [her] mind" (Id., at
47).  She does not know who got the position and makes no attempt
to demonstrate that she had superior qualifications. (Id.).  She
also sought a Deputy position in Hong Kong (Id., at 48-49).
This, too was deferred, and there is no evidence whatsoever on
the record linking that deferral to the plaintiff (Id.).
Plaintiff sought a public diplomacy position at USNATO, but the
incumbent (a woman) extended in the position (Id., at 51-52).
These are but a few examples of the positions on which plaintiff
"speculates" that she was not selected for discriminatory
reasons.  Plaintiff's unsupported speculation about motives and
personal beliefs about her qualifications cannot sustain her
burden of proof.

The record is replete with evidence that plaintiff was less
competitive for jobs in the European regions where she had never

30

served and for jobs outside her cone.  Nevertheless, of the 24

bids she claims were "denied her" in 1999-2000, 10 were Deputy

Chief of Mission (DCM) (or other "deputy") jobs at critical U.S.

Embassies and consulates, including USNATO, Brussels, Bern,

Geneva, Canberra, Santo Domingo, Amman, Colombo, Hong Kong

(discussed above), and Taipei (discussed above).  Two were for

positions as head of the entire Consulate in Ciudad Juarez and

Shanghai.  Six were for high-level political jobs outside her

cone and region:  USNATO (discussed above), NATO-IS, the U.S.

Mission to the European Union, London, Paris, and the OECD.

Plaintiff fails to demonstrate in any way that she was

objectively qualified for these positions and completely fails to

demonstrate that she was significantly better qualified than the

selectees.  Three were POLAD jobs in The Hague (discussed above),

SHAPE (discussed above), and Stuttgart (ROI, Ex. F2c, at 13-14).

The incumbent in the Stuttgart job extended (ROI, Ex. F18f).

There is not a scintilla of evidence in the record that suggests

a "pattern of discrimination" against plaintiff.  Rather, it

evidences that plaintiff's list of bids was, at best, wholly

unrealistic.  Plaintiff's unsupported beliefs and erroneous

conclusions are insufficient to sustain her burden of proof.

Stewart v. Ashcroft, 352 F.3d at 429-430.

     Finally, plaintiff's pattern and practice argument lacks

merit because the Supreme Court recognizes such claims in only

31

two contexts: where the government brings suit on behalf of others or in a private class action suit.  See Cooper v. Fed'l Reserve Bank of Richmond, 467 U.S. 867, 876 (1984); Franks v. Bowman Transp. Co., 424 U.S. 747, 772 (1977); see also, Celestine v. Petroloeos DeVenezuella SA, 266 F.3d 343, 355 (5th Cir. 2001); Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 759 (4th Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999); and Gilty v. Village of Oak Park, 919 F.2d 1247, 1252 (7th Cir. 1990). Neither applies in this case.

### C.  Plaintiff's Retaliation Claim

The DCM, Ms. Huhtala, was aware of plaintiff's prior EEO activity which was filed in September 2000.  The actions taken by Ms. Huhtala to investigate possible improper receipt of SMA payments almost a year later fails to demonstrate a prima facie case of retaliation.  Forkkio v. Powell, 306 F.3d 1127, 1136-1138 (D.C. Cir. 2002); Clark County School District v. Breeden, 532 U.S. 268, 273 (2001) (finding that a 20-month lag suggests no causality at all) (quoting with approval cases finding 4-month and 3-month lags insufficient to establish causality); see also Devera v. Adams, 874 F. Supp. 17, 21 (D.D.C. 1995) (eight months does not strongly suggest causal link).  Ware v. Burlington, 344 F. Supp. 2d 63 (D.D.C. 2004) (initiation of an investigation by itself is not an adverse action).  In any event, the undisputed evidence reveals that plaintiff's husband and son returned to

Bangkok in mid 2000 contrary to the Ambassador's request (ROI, Ex. F3a at 13-14).  As a result, plaintiff was not entitled to SMA.  The Deputy Chief of Mission was obligated to investigate any case of waste, fraud or abuse with respect to erroneous or illegal payments to embassy staff (Huhtala Dep. at 55).  The U.S. Attorney's Office instituted a False Claim Act suit to recover the SMA payments.  The suit was resolved by a stipulation of settlement which required repayment to the government (see Def. Ex. 9).[11]

Plaintiff's claim of retaliation is meritless.  She was not entitled to the SMA payments.  Indeed, her husband and son were not supposed to be in the country.  It is axiomatic that because plaintiff has a pending EEO complaint, it does not entitle her to more favorable treatment than she would otherwise be entitled.  Moreover, plaintiff's disagreement (or even frustration) with the Department's decision concerning her husband's medical clearance and the Ambassador's understandable request that her husband not return to post, does not give her either the right to collect SMA or to have her family at post.  It certainly does not permit her to do both.  Plaintiff cannot sustain her claim of retaliation.

---

[11] Although the plaintiff denied liability in the False Claims Act settlement, the fact that the settlement amount exceeded the amount owed is significant and suggests otherwise.

### IV.  **Plaintiff Cannot Show Irreparable Harm**

Plaintiff fails to make the requisite showing of irreparable harm. There is at best a conclusory statement in plaintiff's motion that after 34 years of service her career as a Foreign Service Officer will be shortened and her promotion opportunities limited, even if she is successful in her present suit and reinstated before the mandatory retirement age of 65.  Contrary to plaintiff's assertion, under Title VII the court has full equitable power to protect against any irreparable injury and an award of compensatory damages would also be available. Injunctive relief is limited and  "[a] n injunction should not be issued unless the threat of injury is imminent and well-founded, and unless the injury itself would be incapable of being redressed after a final hearing on the merits." Weick, supra, 350 A.2d at 388 (emphasis added). See also Wisconsin Gas Co. v. FERC, 244 U.S. App. D.C. at 354, 758 F.2d at 674.  Plaintiff's claim of irreparable harm clearly fails to meet the standard articulated in well-settled case law.

Plaintiff relies solely on Bonds v. Heyman, 950 Supp. 1202 (D.D.C. 1997) for the proposition that she has suffered irreparable harm.  The instant case is clearly distinguishable. In Bonds, the Court found that plaintiff demonstrated a very strong likelihood of success on the merits, including significant evidence of pretext not found here.  Moreover, the plaintiff's

34

position was to be abolished by a RIF, while the defendant in

Bonds purported to eliminate the plaintiff's position as part of

a broader RIF, the plaintiff was the only employee who actually

lost her job.  In the instant case, unlike the Civil Service

Personnel System applicable in Bonds, FSOs are automatically

retired unless they receive a promotion within a specified time.

This "up or out" system applies to all FSOs, not just the

plaintiff as was the case in Bond.[12]  Plaintiff's claim of

irreparable injury is no less than any other FSO who is

mandatorily retired for excessive time-in-class who have not

filed EEO complaints and who have excellent performance records.

Plaintiff's retirement, while not in itself alleged to be an act

of retaliation, creates no likelihood of a chilling effect on

other Foreign Service Officers.

Plaintiff's claim that she may be denied the opportunity for

further promotions or less time in the Foreign Service because of

the mandatory retirement age is not the type of harm which

constitutes irreparable injury. See Nichols v. AID, 18 F. Supp.

---

[12] See, e.g., Molineaux v. United States, 12 F.3d 264, 264-66 & n.3 (D.C. Cir. 1994) (describing "up or out" system and noting that in the absence of a limited career extension, "[t]ime-in-class limitations require that SFS Officers be involuntarily retired should they not receive a promotion to a higher SFS class level."); Kelly v. United States, 34 F. Supp. 2d 8, 10-11 (D.D.C. 1998) (noting that "[p]ursuant to the TIC regime that the Foreign Service Act established, an Officer typically must be mandatorily retired if he or she does not garner a promotion to the next highest salary class within the maximum TIC prescribed by regulation.").

at 5 (finding no irreparable injury based on such conclusory statements).  Moreover, while plaintiff makes the vague assertion that her "life is intertwined with her career", she presents no evidence of unique circumstances or hardship that would take this case out of the normal foreign service paradigm.  There is simply no basis to enjoin the statutorily required process given the available remedies under Title VII.

### V.  **Harm to Others and the Public Interest.**

Balancing the harm and public interest does not favor the plaintiff's request for injunctive relief.  Assignments for the 2005-2006 cycle have already been made.  Enjoining the State Department from using its longstanding, statutorily required "time-in-class" provisions for retiring FSOs in an "up or out" system when it has not been shown that the action was either discriminatory or retaliatory would cause an undue disruption in the operation of the Department's unique personnel systems.  It is not in the public interest to disrupt the functioning of the highly specialized and unique Foreign Service Personnel System, particularly one with as important a role as the Department of State, without a strong showing that the discrimination plaintiff alleges is real rather than perceived.  Moore v. Summers, 113 F. Supp. 2d at 6; Nichols v. AID, 18 F. Supp. 2d at 10.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for preliminary injunction should be denied and defendant's motion for summary judgment, should be granted.

Respectfully submitted,

/s/
KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/
DIANE M. SULLIVAN, D.C. Bar #12765
Assistant United States Attorney
555 4TH St., N.W.,
Room E4919
Washington, D.C.  20530
(202) 514-7205

OF COUNSEL:

DAVID HUITEMAN
Department of State