# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VIRGINIA LOO FARRIS, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 05-1975 (RMU) |
| ) | |
| CONDOLEEZA RICE, ) | |
| ) | |
| Defendant ) | |

## PLAINTIFF VIRGINIA LOO FARRIS' REPLY MEMORANDUM IN SUPPORT OF HER MOTION FOR PRELIMINARY INJUNCTION

The Plaintiff Virginia Loo Farris ("Plaintiff" or "Loo Farris"), through counsel, hereby files this Reply Memorandum in support of Plaintiff Virginia Loo Farris' Motion for Preliminary Injunction.

Defendant filed a Memorandum in Support of Motion for Summary Judgment as well as in Opposition to Plaintiff's Motion for Preliminary Injunction. Defendant addressed various areas and issues not raised by Plaintiff in her filing, and beyond the bounds of issues necessary for purposes of the Motion for Preliminary Injunction. This Reply addresses only arguments necessary for the Preliminary Injunction. Despite the lengthy brief, Defendant's argument is notable in part for what it does not address.

The Court must apply a balancing test for the four factors to be considered for a preliminary injunction, which factors are not considered in isolation from one another; no one factor is dispositive. See CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C.Cir.1995). The factors "interrelate on a sliding scale and must be balanced against each

other." <u>Davenport v. International Brotherhood of Teamsters</u>, 166 F.3d 356, 361 (D.C. Cir.

1999).

## I.     PLAINTIFF DEMONSTRATED THAT SHE WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF INJUNCTIVE RELIEF

### A.     Reintegration Is Impractical, Leading to Irreparable Harm, According To Ms. Harvey, Former Deputy Assistant Secretary of State

Defendant, for example, does not take issue with the Declaration of Minister-Counselor

Barbara Harvey, former Deputy Assistant Secretary of State for Personnel, affirming that if Ms.

Loo Farris is forcibly retired she will suffer irreparable harm and could not be reintegrated easily

into the U.S. Foreign Service. Ex. 24 to Plaintiff's Memorandum in Support of Injunction

("Plaintiff's Memorandum").

### B.     Each Day Is a Day Lost That Cannot Be Regained

In <u>Lee, et al. v. Christian Coalition of America, Inc</u>., 160 F. Supp. 2d 14, 28, 45-47

(D.D.C. 2001), this Court found the irreparable harm requirement satisfied, because if defendant

could terminate plaintiffs, plaintiffs would have had to use public assistance, which would count

against the five-year limit for certain types of public assistance. Such assistance, if taken by

plaintiffs there, would count against the time limits for plaintiffs. Every day of assistance would

count against Plaintiffs. Similarly, every day Plaintiff misses work, is a day that she will lose

from her career, because she must retire at age 65 under foreign service regulations. 22 U.S.C.

§4052(a)(1). Defendant does not address this argument.

### C.     Irreparable Harm Follows from Termination, under Bonds

Neither does the Defendant really dispute irreparable harm in the case of termination,

under <u>Bonds v. Heyman</u>, 950 F. Supp. 1202, 1215 (D.D.C. 1997) (holding that a federal

employee facing termination as retaliation for having brought a prior suit was entitled to a preliminary injunction preventing her termination). See also Segar v. Civiletti, 516 F. Supp. 314 (D.D.C.1981). A prospective termination of a federal government worker after a long career is the sort of irreparable harm to be remedied by a preliminary injunction. The Court focused on the fact that Ms. Bonds worked her way up, over many years, and that she would not be able to find comparable work at her age and experience level. Id. Ms. Bonds is in the same exact position as Ms. Loo Farris. Ms. Loo Farris also has had long and distinguished career with the Foreign Service, and has worked very hard over the years. If she is forced to retire, she would not be able to find anything comparable to her current position.

## II.  PLAINTIFF WILL PREVAIL ON THE MERITS BECAUSE THE DEFENDANT HAS DISCRIMINATED AGAINST THE PLAINTIFF BECAUSE OF HER RACE AND GENDER

Plaintiff under the McDonnell-Douglas framework will have to show enough evidence to give rise to an inference of discrimination for jury purposes. To succeed on a claim of gender discrimination under Title VII, for example, the plaintiff must show that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Mansfield v. Billington, 432 F.Supp.2d 64, 71 (D.D.C. 2006), citing Stella v. Mineta, 284 F.3d 135, 145 (D.C.Cir. 2002). No one disputes that Ms. Loo Farris is a member of a protected class, nor does Defendant dispute that she has suffered an adverse employment action. The question is whether she has presented enough evidence to raise an inference of unlawful discrimination. She clearly has.

### A.  A Good Old Boy Network Can Buttress Title VII Claims, and Does So Here

Under the Department of State's complicated personnel system, foreign service officers on many occasions have essentially been pre-selected for positions, yet the positions are listed as

3

open for bidding to comply technically with the bidding process.   In <u>Ingram v. Missouri Pacific</u> <u>R.R.</u>, 897 F.2d 1450, 1455 (8th Cir. 1990), the court held where promotions were granted according to a "good old boy" network, and a black employee was given the run around when trying to obtain a promotion, and further, white employees were being promoted over the black employee with no indication why the employee was passed over by his employer.  Where a woman filed for discrimination based on her gender, the court found the plaintiff had in fact been treated disparately when a male was pre-selected for a position for which the female plaintiff was more qualified and further, the employer retracted a previous advertisement for the position which specified the need for experience the plaintiff had that the pre-selected male did not (under the guise the employers made a mistake by asking for those specific qualifications). <u>Hartman v.</u> <u>Wick</u>, 600 F. Supp. 361 (D.D.C. 1984).

The Defendant, citing an EEOC decision and courts in other jurisdictions, contends that preselection is not prohibited when based on qualifications.  Preselection <u>per se</u> is not prohibited, but as the court noted in <u>Kolstad v. American Dental Ass'n</u>, 108 F.3d 1431 (D.C. Cir. 1997), an employer's preselection of a job candidate is "undeniably relevant to the question of discriminatory intent," <u>Krodel v. Young</u>, 748 F.2d 701, 709 (D.C.Cir.1984), and "operates to discredit the employer's proffered explanation for its employment decision." <u>Kolstad</u>, at 407, citing <u>Goostree v. State of Tenn.</u>, 796 F.2d 854, 861 (6th Cir.1986); <u>see also</u> <u>Krodel</u>, 748 F.2d at 709 (improper selection procedures relevant to determination that employer's nondiscriminatory explanation unworthy of belief). <u>See also</u> <u>Shelborne v. Runyon</u>, 1997 WL 527352 (preselection is relevant evidence of motivation).

For the USNATO position, the European Bureau picked a junior white male officer already working in Brussels.  State Memorandum in Support of Summary Judgment and in

Opposition to Injunction ("State Memorandum"), at 6-8. The European Bureau, picking favored sons internally, makes it difficult for outsiders to break into choice postings in Western Europe, and as in Hartman and Ingram, this kind of system buttresses claims of discrimination.

## B.    There Is a Prima Facie Case as to the NATO Position

### 1.    Plaintiff Has Established a Prima Facie Case under McDonnell-Douglas as to the USNATO Position

As to the USNATO position, the State Department does not dispute that a junior candidate who was a white male was selected over Ms. Farris. Department of State Memorandum of Points and Authorities ("State Memorandum"), at  6, 7.   Neither does the Department dispute that Ms. Farris was qualified for the position. As noted below, and to prevent favoritism, unlawful discrimination, and to preserve designated positions for senior foreign service officers, cedes are rarely granted. Ms. Loo Farris was the only qualified senior foreign service officer bidding at grade on the USNATO position, which required an officer of her rank and experience in dealing with colleagues and counterparts.

The move to request a cede under the circumstances was a circumvention not only of the Department's policy, see Ex. 1 to Plaintiff's Memorandum, but of position requirements established earlier.

If the circumstances had changed as to warrant the assignment of a junior officer with less experience, then the Chief of Mission at USNATO (then Ambassador Vershbow) should have moved to reduce the rank requirements of the position to reflect reduced responsibilities and expectations of the position; this was not done. Although the State Department admitted that Ms. Loo Farris, a qualified senior foreign service officer, was available, and Ambassador Vershbow noted that she was an excellent officer, State Mem. at 7, the decision was made to circumvent the requirements and apply for a cede.

The Department discusses the PAO Athens position at great length, but this is a red herring. Ms. Farris does not dispute that she was offered that position, nor has she ever claimed she was not offered the position. Her claim has been that she was in fact was offered that position (which was at best a lateral transfer with a smaller staff and less resources than the position she then occupied), to increase pressure on her to withdraw her bid for the career enhancing USNATO position. As to the USNATO position, the European Bureau and the USNATO Chief of Mission had preselected a candidate who would otherwise not be eligible to considered for the position – unless a cede was obtained, and a two-grade "stretch" assignment made for the junior officer. In a blatant statement supporting Plaintiff's assertion of pre-selection, the Bureau Personnel Officer, Mr. Tiernan, in advance of the selection and the ostensibly objective "shoot-out" panel (a final review panel to decide the position), told Ms. Farris she should accept that she would not be chosen for the position. Ex. 6 to Plaintiff's Memorandum.

Plaintiff has made out a substantial case on the merits. She made out a prima facie case of unlawful discrimination based on her disparate treatment and has shown pretext based on inconsistent and apparently false statements made to her throughout the bidding process. The Court in St. Mary's Honor Center, et al v. Hicks, 509 U.S. 505 (1993), held that, under the proper understanding of the McDonnell-Douglas framework, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may…suffice to show intentional discrimination." Id. at 511.

**2.    The Department's Own Witness Contradicts Defendant's Statement That Mr. Goodman Was Not Preselected for the USNATO Posting**

The Department argues that Mr. Goodman was not pre-selected for the USNATO position. State Memorandum, at 8. The "shoot-out" between Ms. Loo Farris and Mr. Goodman

admittedly occurred on June 6, 2000. State Memorandum, at 6. However, Mr. Tiernan of the

European Bureau, in contrast, was demanding Ms. Loo Farris withdraw as early as May 12, 2000

because Mr. Goodman was allegedly going to get this position in any case. Deposition of

Thomas Tiernan ("Tiernan Dep."), Ex. 12 to Plaintiff's Memorandum, 117-18; E-mail of

Thomas Tiernan, Ex. 13 to Plaintiff's Memorandum, bates no. 598. Tiernan demanded that Ms.

Loo Farris withdraw to clear the way for Mr. Goodman to obtain the position without having to

obtain a "cede." Ex. 3 to Plaintiff's Memorandum. Obviously, if Mr. Goodman was selected at

the "very last minute," Plaintiff's Memorandum at 8, Ms. Loo Farris would not have been

pressured to withdraw earlier. Ambassador Vershbow's memo stating that Mr. Goodman was

not pre-selected simply appears on its face to be false, and is thus evidence of pretext.

3.    **There Is Additional Evidence of Pretext, as the Department Either Lied to Ms. Farris or Changed Its Position on Cedes to Bypass Ms. Farris for the NATO Position.**

"Cedes" are personnel actions where the Personnel Bureau waives the rank requirement

on an advertised, or open, assignment — either because no officer of the required rank and

eligibility to fill a given position has bid on the assignment, or under extraordinary

circumstances, because a senior foreign service officer declares their lack of interest in said

position and allows the Department, in contravention of standard operating policy, to accept a

bid by an officer junior in rank. James Whitlock, Ms. Loo Farris' career development officer,

states in a February 8, 2000 e-mail that cedes are not granted where a senior bidder at grade is

bidding for a job. Ex. 1 to Plaintiff's Memorandum. Whitlock earlier confirmed that such cedes

were appropriate only where there were no senior bidders. Jan. 31, 2000 e-mail, Ex. 2 to

Plaintiff's Memorandum. Robert Dance describes a cede as a position "when, for example, a

senior level assignment cannot be filled by a senior level officer." Dance Statement, Ex. 3 to

7

Plaintiff's Memorandum, at 5. It is undisputed that Ms. Loo Farris was a senior foreign service officer, qualified by virtue of her rank and possession of the required French language rating of 3/3 – the only two published criteria -- and that she was bidding for the position at USNATO. See Ex. 4 to Plaintiff's Memorandum, confirming 3/3 language rating. Since she did not withdraw her bid no "cede" should have been granted and the position should have been filled with Ms. Loo Farris.

Ms. Loo Farris had many years of managerial experience in directing sections within embassies and at headquarters, including the supervision of dozens of employees. She had also worked on a joint unified command staff and had graduated from the National War College. Ex. 4 to Plaintiff's Memorandum. Ms. Loo Farris' record indicates that Ms Loo Farris possessed extensive reporting and editing in the political arena. Id. Given the extensive Congressional oversight and frequent Congressional and staff delegations which visit USNATO, her experience and contacts derived from her experience as a Congressional Foreign Affairs Fellow would prove invaluable to the USNATO Political Section.

Unlike the pre-selected junior, white-male candidate, Ms. Loo Farris' qualifications were distinguished by extensive involvement in reporting and editing on political matters in her duties as Editor of "Current Scene," a United States Government publication devoted to assessment of the People's Republic of China – a region of major USG concern; her service as a senior staff member at USPACOM, a joint unified command, where she gained negotiation skills through interagency deliberation by representing the Command at various multi/bilateral negotiations; the recognition of her performance and skills by an award of the Secretary of Defense Civilian Meritorious Honor Medal from the Vice President; and her subsequent selection and graduation

from the senior Department of Defense military education institution, the National War College - - where she earned a Master's in National Security Strategy.   Ex. 4 to Plaintiff's Memorandum.

The aforementioned facts, in addition to her demonstrated experience in supervising staffs of dozens of officers and foreign service nationals while administering multi-million dollar budgets are crucial credentials on which a selection decision should have been made, but instead were ignored, or at best minimized.  See Curriculum Vitae of Ms. Loo Farris at Ex. 4 to Plaintiff's Memorandum.  These are all credentials which the pre-selected candidate lacked, as his apparent sole defense experience consisted of earlier service as a major in the USAF Reserve. Andrew Goodman, who obtained the USNATO position instead of Ms. Loo Farris, had NATO experience as a mid-level officer but no substantial managerial experience. See Robert Hall e-mail attached as Ex. 5 to Plaintiff's Memorandum.

Evidence that the Department's rationale is false, or other inconsistencies and inaccuracies that raise questions of credibility as to defendant's assertions, shows pretext that is sufficient for Ms. Loo Farris' claims to survive summary judgment.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146, 147 (2000).  Here, multiple inconsistencies, and the contrast between what Ms. Loo Farris was told at different times, show that the Department's shifting rationales for denying Ms. Loo Farris assignments were false and raise questions about the credibility of Department witnesses.

Without a "cede" from Ms. Farris, Mr. Goodman was not even eligible to be considered for the USNATO position because he had only recently assumed the position he then occupied (thus being ineligible to bid), and because he lacked the required rank. See Robert Hall e-mail of 3/15/00 at Ex. 5 to Plaintiff's Memorandum.  Mr. Tiernan thus pressured Ms. Farris to withdraw her bid for the USNATO position entirely.  Thomas Tiernan e-mail of 5/14/00 at Ex. 6 to

Plaintiff's Memorandum.  Mr. Tiernan strongly advised Ms. Loo Farris to take the PAO Athens position, id., (which confirms that under Department policy, they should not simply grant a "cede") and clear the way for the junior white male officer to take the USNATO position.

In this case, Ms. Loo Farris, a senior officer, was applying for the USNATO position. For that reason, another senior Foreign Service officer e-mailed to Ms. Loo Farris his view that the Department might be compelled to give her the USNATO position. Hall e-mail at Ex. 5 to Plaintiff's Memorandum.  The Department's own operating procedures state that such cedes are in any case rare.  Operating Procedures at Ex. 7 to Plaintiff's Memorandum, p.2, 5th paragraph. However, in this case, the Department took an extraordinary step and "ceded" the USNATO position on which Ms. Loo Farris bid, even though she possessed the requisite French proficiency as earlier certified by the Department's own Foreign Service Institute in awarding her a 3/3 rating, and was the only senior officer bidding.  See Ex. 8 to Plaintiff's Memorandum; CV at Ex. 4 to Plaintiff's Memorandum.

Plus, the Department again can produce no final documents on applicable assignment procedures in 1999, just draft documents.  See Chandler letter of April 27, 2004, Ex. 9 to Plaintiff's Memorandum.

Mr. Goodman, who received the USNATO position, "isn't that popular with the troops here – and probably is a pretty poor manager, too."  Ex. 5 to Plaintiff's Memorandum, at bates 627.  That e-mail from a senior Department officer, who routinely served as acting USNATO Deputy Chief of Mission, suggests that Ms. Loo Farris would be hard pressed not to get that USNATO position due to her seniority.  Id.

That e-mail also notes inexplicably that Ms. Loo Farris' name was apparently not on the bid list, as "there were no SFS [senior foreign service] applicants," Ex. 5 to Plaintiff's

Memorandum, at 626, Ms. Farris in fact did bid for that position earlier, by November 19, 1999, and reiterated her interest on December 22, 1999 and other occasions. Ex. 10 to Plaintiff's Memorandum.

Thus, as to the USNATO position, there was a comparator, Mr. Goodman, and the Department's position that the white male was chosen in part due to his management skills, appears to be false, given e-mail produced by the Department from a senior foreign service officer, experienced at serving for extended periods as acting USNATO Deputy Chief of Mission, that questioned Mr. Goodman's management skills.  Ex. 5 to Plaintiff's Memorandum.

**C.**     **There Is A Prima Facie Case as to The Hague POLAD Position**

The State Department has finally conceded that The Hague POLAD position went to a white male foreign service officer.  State Memorandum, at 26-27.   The Defendant represents that he was of the same rank as Ms. Farris, but that fact is not in the prior record.  Even if at the same rank, Ms. Farris had a lengthy history, was a skilled officer, and was given various inconsistent explanations about this position.  Ms. Loo Farris, after initially inquiring about The Hague POLAD position with Patrick Moon in October 1999, Patrick Moon Statement, Ex. 14 to Plaintiff's Memorandum, at bates 286, and being told that it was filled, again inquired about The Hague POLAD position on November 17, 1999 when it remained on the bid list. Ex. 15 to Plaintiff's Memorandum, second paragraph.  On November 18, 1999 her CDO Mr. Whitlock informed her that to his knowledge the position was still open on November 18, 1999.  Ex. 16 to Plaintiff's Memorandum.  Although Ms. Loo Farris' earlier bid may have been diverted by Mr. Moon's representations that the position recommendations had gone forward within days of the position being advertised, she nevertheless reentered a valid bid on the position no later than November 19, 1999, according to the Department's records.  Ex. 17 to Plaintiff's Memorandum.

Ms. Loo Farris thus bid on the job no later than November 19, 1999, according to the records. Ex. 17 to Plaintiff's Memorandum. Then on November 21 Ms. Loo Farris was informed that the short list had gone forward, to a commanding general, apparently without her name. Ex. 18 to Plaintiff's Memorandum.

By December 22, 1999 Ms. Loo Farris noted that a list sent by Mr. Whitlock showed that The Hague POLAD job was on a hard-to-fill cable, which was inconsistent with the existence of any bids and short lists already having been submitted. Ex. 19 to Plaintiff's Memorandum. Ms. Loo Farris had thus been misled earlier, when she was told the list had already gone forward. The hard-to-fill designation is apparently used, and possibly misused, to allow a "favorite son," or an otherwise ineligible bidder to bid early or out-of-cycle. See excerpt from Department disclosure regarding Open Assignments 1999-2000, Ex. 20 to Plaintiff's Memorandum, pages 4 and 5, bates no. FAR 751-52.

Unlike Mr. Whitlock, who had told Ms. Farris that the list had gone to a U.S. commanding general, Mr. Moon stated that a short list went to NATO authorities. Ex. 14 to Plaintiff's Memorandum, response to question 17. Mr. Tiernan stated that the Department of Defense made such decision. Tiernan Dep., Ex 12 to Plaintiff's Memorandum, at 54, 59-60.

Regardless of who made such decision, it is clear that the State Department submitted a short list, which had to have gone through Mr. Tiernan, Tiernan Dep., Ex. 12 to Plaintiff's Memorandum, at 58, and given its disappearance may well have contained only one name. That State Department shortlist may have been generated by the NATO desk at the State Department, as Mr. Tiernan testified, id., but the list went through Mr. Tiernan as the Bureau representative to Human Resources at State. Id. at 59. Such document must exist somewhere if Mr. Tiernan is correct. According to Mr. Tiernan, Human Resources at State made the final decision but that

12

was little more than a "rubber stamp" of a DoD decision based on an unwritten agreement between State and DoD.  Id., Ex. 12 to Plaintiff's Memorandum, at 59-60.

Mr. Moon seemed to recall nothing about the position in his 2001 affidavit, but recalled much more a year later, in 2002, including talking to Ms. Farris about it and indicating who was selected.    See 2002 and 2001 Statements attached as Ex. 14 to plaintiff's Memorandum.

Thus, the Department's own witnesses have testified variously that short lists were passed to a U.S. commanding general, to NATO authorities, or to DoD, which person or persons then made the decision on the job – or maybe not, since the State Department's Human Resources people had a final say, which was possibly no more than a rubber stamp.  In any case, it appears undisputed that the Department prepared a short list of candidates, which might well have been limited to one person, but did not include Ms. Loo Farris.  The Department's inconsistent statements, and completely contradictory statements to Ms. Loo Farris, show substantial evidence of pretext.

Ms. Loo Farris was misled by the Department in several instances about The Hague-POLAD position.  She kept trying to apply, but another foreign service officer was selected, who was a white male.  The Department apparently did not even put Ms. Loo Farris on the list to be submitted for the position at The Hague, ensuring that there was no way she could be chosen for this position.  The Department itself cannot even agree on who made this selection, but various witnesses reference various other decisionmakers.  Mr. Tiernan testified that the list for this position went through him but fell back on the argument that the Department of Defense made the final selection.  Tiernan Dep., Ex. 12 to Plaintiff's Memorandum, at 54, 59, 60.  Mr. Moon of the Department in his affidavit stated that the final choice was made by NATO authorities.  Moon Affidavit, Ex. 14 to Plaintiff's Memorandum, second document, at 2.  However, Ms. Loo

Farris' allegation is that the Department would not even consider her for inclusion on a short list, ensuring that she could not be chosen.

Thus, although foreign service officers were screened by the State Department, and it may be that only one person was on the State Department list, Ms. Loo Farris (whose name was apparently not included on the list) was told, at various times, that NATO, the Defense Department, Human Resources at the State Department, and the commanding general made the decision on the selectee.

This flurry of misleading and inconsistent explanations shows pretext.   The State Department attributes a continued listing of the position on the hard-to-fill cable, after it had possible already gone forward for decision, to "a mistake on the computer generated list."   State Memorandum, at 27.  But that explanation is specious, given there is no evidence proffered that there was a mistake, and the various explanations.

**D.    Retaliation**

To make out a prima facie claim of retaliation, a plaintiff must establish that he engaged in a statutorily protected activity, that the employer took an adverse personnel action, and that a causal connection existed between the two.  See Ficken v. Rice, 2006 WL 123931 D.D.C. 2006, citing Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23, 31 (D.C.Cir.1997).  It is undisputed that Ms. Huhtala was aware of Ms. Loo Farris' prior protected activity, that is, her EEO complaint.  Deposition of Marie Huhtala, Ex. 21 to Plaintiff's Memorandum, at 33, and Ms. Huhtala admitted that she was surprised by such complaints from Ms. Loo Farris. Huhtala Dep., Ex. 21 to Plaintiff's Memorandum, at 35.   Ms. Loo Farris' formal EEO complaint was filed on September 6, 2000.  Ex. 22 to Plaintiff's Memorandum.  Ms. Farris had directly complained to Ms. Huhtala, as well as to Ambassador Hecklinger at the Embassy in Bangkok, alleging

wrongful discrimination. Huhtala Dep., Ex. 21 to Plaintiff's Memorandum, at 33, 34 (as to

Huhtala).    Ms. Huhtala learned in the spring of 2001 that Mr. Farris had made frequent visits to

Bangkok, which by itself was not prohibited, as even Ms. Huhtala admitted that 30 days visits

for up to 30 days were appropriate. Huhtala Deposition excerpts, at 50, 51, attached hereto as

Ex. 1 hereto.   Ms. Huhtala immediately undertook an investigation. Id.    Ms. Huhtala testified

that in all her years in Bangkok, and in her years since Bangkok in Kuala Lumpur, Malaysia, she

has never initiated, nor heard of, an investigation for "waste, fraud and abuse" except in the case

of Ms. Farris.   Huhtala Dep. at 55, Ex. 1 hereto.   That Ms. Farris was the only person ever

investigated for waste, fraud and abuse under Ms Huhtala's initiative seems highly suspicious.

The SMA rules cited by the Agency that limit the application of the SMA benefit apply to

voluntary separations where the spouse lives within 300 miles.   State Standardized Regulation

263.7, at Ex. 2 hereto.   Here, the Farris' separation was involuntary because Mr. Farris was

prohibited from returning to the country; thus, the rules cited by, and relied upon, by the Agency

limiting SMA do not even apply.   Huhtala knew that such separation was involuntary because

she was the DCM and Mr. Farris had to obtain permission to visit the embassy in 2001. Huhtala

Dep. at 93-96, Ex. 1 hereto.   Plus, Huhtala acknowledged that visits were appropriate in any

case.[1]

Another retaliation issue, not directly related to the preliminary injunction issue, is that

the standard for retaliation has been clarified in the last year, in Burlington Northern and Santa

Fe Railway Co. v. White, 126 S. Ct. 2405 (U.S. 2006).   Any retaliatory action that might deter a

person from making an EEO complaint is now prohibited under Title VII, whereas the various

circuits had enunciated mixed standards prior to that time.

---

[1] Ms. Loo Farris ultimately resolved this SMA matter without admitting any liability. Defending the matter would likely have cost more than the resolution.

**E.**     **The Public Interest and Balance of Harms Both Favor an Injunction**

There is no dispute that Ms. Farris is an "excellent" officer, as set forth in the State

Memorandum, at 7, quoting Ambassador Vershbow.   There will be no harm to the State

Department in having Ms. Farris stay at the Department pending her lawsuit.   Yet there will be

substantial damage to Ms. Loo Farris' career is she is forced to leave.   At this stage, the State

Department needs skilled officers who have served in developing nations, Ms. Loo Farris'

experience in Pakistan, Tunisia, Jamaica, Thailand, and South Africa, and elsewhere, rather than

being detrimental, would prove invaluable to the State Department.   The public interest strongly

favors the retention of a skilled officer such as Ms. Loo Farris. laintiffs cannot be expected to

come forward with testimony from individuals who are too afraid to bring their claims but not

too afraid to put their fears on the record.

To be entitled to injunctive relief, plaintiffs are required only to produce evidence

showing that the action complained of is likely to have a chilling effect on other employees" who

would then refrain from coming forward with their claims. Bonds, supra, 950 F.Supp. at 1215

(emphasis added).  The case of Moore v. Summers, 113 F.Supp.2d 5 (D.D.C. 2000), cited by

Defendant, State Memorandum at 36, involved class action Plaintiffs who wanted actins to

change the personnel system.  The Court did not note any special standard applicable because a

federal  personnel scheme was involved and found that the standards for some types of injunctive

relief were not met anyway.   (The court did grant injunctive relief in a related context.).   Oil,

Chemical & Atomic Workers Intern. Union, AFL-CIO v. Pena, 18 F.Supp.2d 6 (D.D.C. 1998),

the other case cited by Defendant on the issue of the public interest, involved environmental

clean-up claims, not Title VII.

16

Ms. Farris does not seek to change any broad governmental scheme. She simply seeks injunction for her case, in the context of her Title VII claims.

## CONCLUSION

For the foregoing reasons the Plaintiff's Motion for Preliminary Injunction should be granted.

Respectfully submitted,

VIRGINIA LOO FARRIS
By Counsel


/s/    George Doumar
George R.A. Doumar (D.C. Bar #415446)
George R. A. Doumar, PLLC
2000 N. 14th Street
Suite 210
Arlington, VA  22209
Phone: (703) 243-3737
Fax: (703) 524-7610

# EXHIBIT 1

50

1  in 1999, and the rules for a separate

2  maintenance allowance are quite clear.  This

3  allowance is not to be paid if the spouse or

4  the person for whom it is being given to you

5  returns to post.

6       For instance, if you get a

7  separate maintenance for your spouse, it is

8  all right for him to make a brief visit.

9  This is under the separate maintenance rule.

10      Q    Right.

11      A    But for no more than 30 days at a

12  time, and aside from that 30 days at a time,

13  he cannot be living within 30 miles of the

14  post of assignment.  We found out in the

15  spring of 2001 that George Farris had been

16  coming back frequently to Bangkok.  We found

17  this out from Virginia herself.

18      So I asked the regional security

19  officer to undertake an investigation to

20  find out if George had been living in

21  Bangkok in contravention of the SMA rule.

22      It turned out that he and their

BETA REPORTING
(202) 638-2400    1-800-522-2382    (703) 684-2382

51

1    son had returned to Bangkok in the

2    year 2000, and had been living from the

3    summer of 2000 until the summer of 2001 in

4    Bangkok.  Again Ms. Farris was continuing to

5    receive SMA payments during that whole time.

6         Q    Were they living with her, or just

7    in the vicinity?

8         A    They were not living with her.

9    They were somewhere in Bangkok.

10        Q    She would have been living in an

11   Embassy residual compound; is that correct?

12        A    Yes.

13        Q    Did you live within that same

14   compound with her?

15        A    Yes, we were next door neighbors.

16        Q    Next door neighbors?

17        A    Yes.

18        Q    So it is your understanding of the

19   SMA rules that if she is living -- if the

20   family is living within -- in the same

21   country, or like within 30 miles, that a

22   foreign service employee is not entitled to

                    BETA REPORTING
     (202) 638-2400    1-800-522-2382    (703) 684-2382

54

1    workings of the Embassy.

2            Up until that point, I was under

3    the impression that George had been staying

4    in the United States.  So when she herself

5    said in this letter that he had come back at

6    least 5 times, I knew that she was on SMA,

7    and I knew that I had to ask the SRO to

8    begin an investigation.

9        Q    Well, you said that on SMA that a

10   spouse could come back for a short visit for

11   up to 30 days, and that's correct?

12       A    That's correct, and that is what

13   I -- you know, that is what it could have

14   turned out to be.  I did not know at that

15   point that he was living there, that he had

16   an apartment.  I didn't know that yet.

17           But I thought that if he has been

18   coming back that often, and no one has told

19   me or the Ambassador about this until now,

20   that it has to be investigated.

21           One of my work requirements for my

22   own job was to investigate any case of

BETA REPORTING

(202) 638-2400    1-800-522-2382    (703) 684-2382

55

1    waste, fraud, or abuse, that would be

2    costing the U.S. Government.  So I had to

3    initiate an investigation just to see what

4    the truth was.

5         Q    During your time at DCM how many

6    waste, fraud, and abuse investigations did

7    you initiate with the regional security

8    officer?

9         A    That is the only one.

10        Q    That is the only time?

11        A    Yes.  That is the only formal

12   investigation that I initiated, but I was

13   always on the lookout for any possible cases

14   of waste, fraud, or abuse.

15        Q    So you were always on the lookout

16   for waste, fraud, or abuse, but this was the

17   only case of waste, fraud, and abuse where

18   you actually launched a formal

19   investigation?

20        A    That's right.

21        Q    Did you inform the Ambassador

22   about that?

93

1    Q    Was it a city block?

2    A    Probably about a quarter of a city

3    block.

4    Q    So you could see the house?

5    A    I could see it, sure.

6    Q    But there is a garden in between?

7    A    There was a garden and some trees

8    in between her house and mine, but I could

9    clearly see the outline of it, yes.

10    Q    Was Mr. Farris essentially after

11    February of '99, was he essentially banned

12    from the Embassy?

13    A    Banned from the Embassy?

14    Q    That is a colloquial phraseology.

15    A    After February of '99, he had been

16    asked by the Ambassador not to return.  So I

17    did not know that he was even in the

18    country.

19    Q    Did you ever know if he ever tried

20    to come back into the Embassy grounds after

21    February of '99?

22    A    No, I never heard that he did.

94

```
 1        Q    Did you have any indication that

 2   he had visited the country at any time after

 3   February of '99 until Ms. Farris' letter of

 4   early 2001?

 5        A    Yes.  On at least one occasion

 6   someone from the Embassy told me that they

 7   had seen him at a movie house, at a theater.

 8        Q    Oh, when was that?

 9        A    I don't know.  It was sometime

10   between February of '99 and March of 2001.

11   I don't remember exactly when it was.

12        Q    Who told you that?

13        A    One of the employees in the

14   Embassy.

15        Q    Was it a Thai employee?

16        A    An American employee.

17        Q    Who was that?

18        A    It was the successor to the

19   Administrative Counselor, the new

20   Administrative Counselor.

21        Q    Do you know that person's name?

22        A    Kathleen Hodai.
```

95

```
 1        Q     What is her first name?

 2        A     Kathleen.

 3        Q     Is that with a C or a K?

 4        A     With a K.

 5        Q     What is the last name again?

 6        A     H-O-D-A-I.

 7        Q     Ms. Hodai was the successor to the

 8   Administrative Counselor?  Had she been

 9   there earlier at the Embassy when Mr. Farris

10   was there in '98?

11        A     No, but she knew him from previous

12   times in the Foreign Service.  She knew who

13   he was and what he looked like.

14        Q     I see.  Or was his picture still

15   circulating on that wanted poster?

16        A     I don't know.

17        Q     How did that wanted poster get

18   around in 2001 if it had been distributed

19   in 1998?

20        A     You know, in 2001, it was the

21   first time that I had even heard of it.  I

22   knew that in December of '98 that the guards
```

96

1    had been alerted not to let George into the

2    compound.  I didn't know that they had made

3    up some flyers.

4        Q    All right.  So as of December

5    of '98, the guards had been alerted not to

6    let Mr. Farris into the compound?

7        A    During that period, yes.  As I

8    recall, he was given one opportunity to be

9    escorted into the house when Virginia and

10   the children were not there to take any

11   personal belongings that he wanted.

12       Q    That was in late '98?

13       A    That's right, in December of '98.

14   But aside from that occasion, he was not to

15   go into the compound.

16       Q    When he was escorted, I gather he

17   had permission to do that?

18       A    Oh, yes.

19       Q    Otherwise, the only other time he

20   got permission -- he got permission in 2001

21   when Ms. Farris was on temporary duty, or

22   assignment elsewhere; is that correct?

BETA REPORTING

(202) 638-2400    1-800-522-2382    (703) 684-2382

# EXHIBIT 2

## Department of State Standardized Regulations   -DSSR Index
Released by the Bureau of African Affairs
Released by the Office of Allowances
November 5, 2002

### 260 Separate Maintenance Allowance

### 261 Description

#### 261.1 Definitions

a. "Separate maintenance allowance", hereinafter referred to as SMA, means an allowance to assist an employee who is compelled by reason of dangerous, notably unhealthful, or excessively adverse living conditions at the post of assignment in a foreign area, or for the convenience of the Government, to meet the additional expense of maintaining family members elsewhere than at such post.

This allowance may also be authorized to an employee who personally requests such an allowance, based on special needs or hardship involving the employee or family member.

b. "Member of family" means an individual as defined in Section 040m (1) through (4), except that to be considered a member of family for separate maintenance allowance: parents, sisters and brothers must have resided with the employee for a period of at least one year immediately prior to the date of separation. (See also Section 262.1)

#### 261.2 Scope

SMA is intended to assist in offsetting the additional expense incurred by an employee who is compelled by the circumstances described below to maintain a separate household for the family or a member of the family. An employee who is receiving SMA on behalf of a member of family is not eligible for other allowances or benefits under these regulations on behalf of that member of family except as provided under Sections 242.7, 252.8, 262.3b and 267.2.

### 262 Circumstances Warranting SMA

SMA may be granted to an employee whenever the head of agency determines that the employee is compelled to maintain any or all members of family elsewhere than at the post of assignment because of the following circumstances:

#### 262.1 Involuntary SMA - For the Convenience of the Government

An agency may authorize SMA when adverse, dangerous, or notably unhealthful conditions warrant the exclusion of members of family from the area or when the agency determines a need to exclude members of family from accompanying an employee to the area. (See also Section 264.l)

#### 262.2 Voluntary SMA -- For Special Needs or Hardship of the EmployeeAn agency may authorize SMA when an employee requests SMA for special needs or hardship prior to or after arrival at post for reasons including but not limited to career, health, educational or family considerations for the spouse, children or other family member. Children, including sisters and brothers, unless attending secondary school must be under age 18 or incapable of self-support.

#### 262.3 Transitional SMA - (Effective 3/23/03 TL:SR-623; added 262.3c, Effective 9/21/03 TL:SR-629)

a. Following the Termination of an Evacuation and the Conversion of a Post to an Unaccompanied Status

EX. 18

An agency may authorize a higher level of SMA when a post is converted to any unaccompanied status upon termination of an authorized/ordered departure. The purpose of Transitional SMA is to assist an employee with additional costs incurred when eligible family members are required to occupy commercial housing while establishing permanent housing following an evacuation. Commercial housing is considered a hotel, motel, commercially-leased house or apartment, or other transient-type commercial establishment. Non-commercial housing is considered private such as living with family, friends or others in a location which is not commercially leased or rented.

Transitional SMA shall be granted for a period up to sixty (60) calendar days after the end of an evacuation. For Transitional SMA rates, refer to the tables at Section 267.1 b.

When the head of an agency, or an authorizing official determines, on a case by case basis, that extreme or unusual circumstances are present, the period of time for Transitional SMA may be extended for not more than thirty (30) additional calendar days. An example would be that the employee has made every effort to get the full Household Effects (HHE) shipment to the family members but due to restrictions or difficulties in transport, the family has not received the full HHE shipment necessary to establish a permanent residence.

b.  Following the Termination of an Evacuation and Reversion of Post to Accompanied Status for Educational Consideration

An agency may authorize a higher level of SMA when family members are in commercial housing and choose to remain for completion of the current school year if a child is in the final semester of the current school year (grades K through 12). The purpose of Transitional SMA is to assist an employee with additional costs incurred when eligible family members are required to occupy commercial housing as a result of the evacuation and choose to complete the school year at the safehaven location. Commercial housing is considered a hotel, motel, commercially-leased house or apartment, or other transient-type commercial establishment. Non-commercial housing is considered private such as living with family, friends or others in a location which is not commercially leased or rented.

Transitional SMA under this paragraph (b) shall be granted for a period of up to ninety (90) calendar days after the end of an evacuation. For Transitional SMA rates, refer to the tables at Section 267.1 b.

c.  Following the Termination of an Evacuation and Reversion of Post to Accompanied Status for Other Situations - (Effective 9/21/03, TL:SR 629)

If an employee and/or family members cannot return to post for a reason's) beyond the employee's control, and the employee with family members, or eligible family members alone, were occupying commercial lodging at the time that an evacuation ended and the post reverted to accompanied status, then the agency may authorize TSMA on a case by case basis for up to 30 calendar days.

**262.4 Separation from Eligible Family Member**

a. The separation from the eligible family member must reasonably appear to require a separation for at least 90 consecutive calendar days and be for conditions described in Section 262, except as provided below:

Exceptions: The 90 day period may be reduced to 30 days and the change of election provisions of DSSR 264.2(2) do not apply when:

(1) adequate medical facilities in the area are not available for pre and post natal care; or

(2) members of family are detained in the United States for medical clearance; or

(3) children must begin or complete a school year before employee has arrived at post or after employee has departed on transfer to another post in a foreign area.

After expiration of the 90 or 30 day periods, a grant previously not authorized under this section may

be made for the entire period of separation if the condition necessitating separate maintenance continued for a longer period.

**NOTE:**  Involuntary SMA is effective the first day of separation providing form SF-1190 is submitted.

b. Unless specifically designated otherwise by the head of agency, eligible family members on SMA (voluntary) are considered to be officially residing in the U.S. However, when SMA is granted for the convenience of the Government (involuntary), and a foreign area is designated as the official involuntary SMA location, a child authorized to be residing at that location can be authorized an education allowance within the applicable "school at post" education allowance established in these regulations for the officially designated foreign involuntary SMA location.

c.  Following the termination of an authorized or ordered departure, the 90 day separation requirement does not apply to eligible family members receiving involuntary SMA benefits  (eff.  9/26/03), pub. TL:SR 631).

### 263 Circumstances Not Warranting SMA

### 263.1 Member of Family Not Normally Residing With Employee

When a member of family would not normally reside with the employee, this individual does not meet the definition of member of family;

### 263.2 Married Couple Employees

When the spouse of an employee is either a member of the military services or is a U.S. Government civilian employee subject to worldwide assignment availability. However, a career or probationary career employee in leave without pay status (LWOP) is considered a dependent;

### 263.3 Separation/Divorce

When a legal separation exists between an employee and spouse; or a separation occurring through a divorce decree, whether limited interlocutory or final. A legal separation is deemed to exist at such time as either the employee or spouse shall have initiated action (1) affecting the status of the marriage such as a separate maintenance action, or (2) separation from bed and board short of application for divorce. A separate maintenance action is one against a spouse for permanent or temporary support and maintenance for the moving spouse, and for support, maintenance and education of minor children;

### 263.4 Lack of Legal Custody of Child

When a child's legal custody is vested wholly, or in part, in a person other than the employee or the employee's current spouse, except as follows: SMA may be granted when the employee (or current spouse) has joint legal custody and child does not reside with the other parent and it is established that except for the circumstances described in Section 262 the child would reside with the employee and the employee's current spouse;

### 263.5 Child Receiving A School Away from Post Education Allowance

When a child is receiving a "school away from post" education allowance grant under these regulations;

### 263.6 Child on Educational Travel

When a child travels on "educational travel" at the secondary level, for the 12-month period following that travel/trip;

### 263.7 Voluntary SMA Within the Same Country or Within 300 Miles of Employee

When the member of family on voluntary SMA is residing within the same country or within 300 miles (one-way

road mileage) from the employee;

### 263.8 SMA Payment Withheld if Per Diem Payable

While the member of family is eligible for travel per diem.

### 264 Application and Supporting Data: (In addition to data required by Section 077.32a)

### 264.1 Involuntary SMA - For Convenience of the Government

An SMA application based on "for the convenience of the Government" reasons should be annotated in box 15 of the SF-1190 to reflect the following circumstances where appropriate:

> (1) Where housing facilities at the post are subject to control by United States military authorities, a foreign government, or some other authority, and are not available for use by the eligible family member.

> (2) Where, in the interest of the Government, the agency has;

>> a. withheld or terminated authority for the eligible family member's transportation to the post, or

>> b. recommended that the eligible family member leave the post of assignment.

> (3) Applications based upon health factors shall be supported by a statement from the attending physician. Grants shall also be supported by a ruling by reliable medical authority, that is, the ranking medical officer attached to the agency, or by such other person or group of persons as the head of agency may designate.

### 264.2 Voluntary SMA - Based on Special Needs or Hardship of the Employee

(1) An SMA application based on the needs or hardship of the employee should include in box 15 of SF-1190 a statement from the employee certifying the circumstances of special need or hardship and stating that such circumstances do not:

> a. include legal separation (see Section 263.3) between employee and spouse or separation occurring through a divorce decree, whether limited, interlocutory, or final; or

> b. involve a child whose legal custody is vested wholly, or in part, in a person other than the employee or the employee's current spouse. When the employee has joint legal custody, a statement must include that child will not reside with the other parent;

> c. include a child, brother or sister, 18 years of age or over (see Section 262.2). If the child will be attending secondary school beyond age 18, the employee when applying for SMA must certify that SMA will be terminated within three months from the day the child leaves the secondary school.

(2) At the time of assignment an employee must elect (1) to have an eligible family member included on the employee's travel orders or (2) not placed on the travel orders and instead be placed on SMA (voluntary). After this initial election, the employee may request that SMA (voluntary) either commence/terminate, depending on the initial election, only once for each member of family during a tour. However, this change can not occur during the employee's first or last 90 days at post (for exceptions, see 262.4a).

EXCEPTION: Following termination of an authorized/ordered departure an employee may elect voluntary SMA at the official safehaven for eligible family members previously eligible for SEA payments under Chapter 600 and for whom round-trip travel expenses have already been authorized. The employee may be permitted to then terminate this voluntary SMA and these eligible family members may be permitted to return to post

provided return travel to post does not occur during the employee's last 90 days at a post of assignment. Such termination and return are available only if no other allowances or benefits under these regulations are authorized for eligible family members during a period of SMA commenced under this exception. No additional expenses for travel, access to goods in storage, shipment of household effects or other such SMA-related expenditures may be incurred on their behalf.

**264.3 Transitional SMA – Following the Termination of an Evacuation and Conversion of Post to Unaccompanied Status (262.3a)**

1. A Transitional SMA application under this paragraph (a) for days 1 through 60 should be annotated in box 15 of the SF-1190 to reflect the following circumstances:

      (a) The employee's eligible family members were evacuated from post.
      (b) The evacuation has been terminated and post has been converted to any unaccompanied status.
      (c) The eligible family members are occupying temporary commercial quarters.

2. In addition to 264.3a requirements, a Transitional SMA application for days 61 through 90 should include in box 15 of the SF-1190 the extreme or unusual circumstances which warrant extension of transitional SMA beyond 60 days.

3. A Transitional SMA application should include documents certifying that the eligible family members are occupying commercial quarters at the time of the application. These documents may include, but are not limited to, receipts and/or lease agreements.

b. Following the Termination of an Evacuation for Educational Consideration (262.3b)

1. A Transitional SMA application under this paragraph (b) for days 1 through 90 should be annotated in box 15 of the SF-1190 to reflect the following circumstances:

      (a) The employee's eligible family members were evacuated from post.
      (b) The evacuation has been terminated during the final semester of the current school year and the family members wish to remain at the safehaven in order for the eligible family members attending grades K-12 at the safehaven to complete the current school year.
      (c) The eligible family members are occupying temporary commercial quarters.
      (d) The family members intend to return to the post following completion of the current school year. However, if return to post would be within employee's last 90 days at post [see 264.2(2) under EXCEPTION], then family members would need to be placed on voluntary SMA following the 90 days under 262.3b TSMA for the remainder of employee's time at post. Note: If within the 90 day TSMA 262.3b period, the family members intend not to return to post, the employee must submit an updated SF-1190 stating date the family intended not to return to post. Voluntary SMA would commence from the day following the date intending not to return to post.

2. A Transitional SMA application should include documents certifying that the eligible family members are occupying commercial quarters at the time of the application. These documents may include, but are not limited to, receipts and/or lease agreements. The last day of school should also be noted on the TSMA application.

**265 Commencement And Continuation of Grant**

**265.1 Upon Assignment to a New Post**

The grant of SMA to an employee in connection with assignment to a new post shall commence as of the latest of the following dates:

      (1) date on which employee submits SF-1190 application for SMA grant (See also Section 262.4a); or

      (2) date of assignment; or

(3) date on which the employee begins official travel under an order of assignment; or

(4) date on which the separation from the member of family occurs (See also Section 263.8).

## 265.2  During Assignment to a Post

If SMA is granted to an employee during the period of service at a post of assignment, the grant shall commence as of the latter of the following dates:

(1) date on which employee submits SF-1190 application for SMA grant (See Section 262.4a); or

(2) date on which the separation from the member of family occurs (See also Section 263.8).

## 265.3  During Employee's Absence from Post

The grant shall continue during the absence of the employee from the post provided the employee maintains quarters at the post, unless terminated under the provisions of Sections 266.2 or 266.3.

## 265.4 During Visit of Member of Family to Post

The grant of SMA on behalf of a member of family may continue during the family member's visit to post when the visit is for thirty days or less, providing the member of family is again en route to the SMA point by the 31st day.

## 266 Suspension/Termination of Grant

### 266.1 During Visit of Member of Family to Post

The grant of SMA on behalf of a member of family shall be suspended the day that the family member arrives at post when the stay is or will be in excess of thirty days. No other allowances or benefits under these regulations may be authorized for this member of family while visiting post.

SMA payments may be resumed effective the day the member of family departs en route to the SMA point.

### 266.2 Transfer

When an employee is transferred from a post at which the employee has been granted SMA, such grant shall terminate as of the earliest of the following dates:

(1) date the employee commences travel under the transfer order; or

(2) effective date of transfer when no travel by the employee under the transfer order is involved.

### 266.3 Separation

When an employee is separated (Section 040r) while assigned to a post at which the employee has been granted SMA, such grant shall terminate as of the earlier of the following dates:

(1) last day of employment; or

(2) date on which the employee is reunited with member of family.

### 266.4 Transitional SMA

Transitional SMA shall terminate as of the earliest of the following dates:

1. date the employee commences travel under transfer orders from the evacuated post or date of transfer when no travel by the employee under the transfer order is involved.
2. date the authorized period for Transitional SMA ends.
3. date the complete Household Effects (HHE) shipment is delivered to family. (Only pertains to 262.3a TSMA.)
4. date the family members occupy non-commercial quarters.
5. date the family members occupy permanent quarters. (Only pertains to 262.3a TSMA, however, this would also pertain under 262.3b TSMA in an unusual circumstance of the family members deciding to stay permanently and not return to post.)

Three days after the last day of school. (Only pertains to 262.3b TSMA)

**267 Payment**

**267.1 Determination of Rates**

**a. Voluntary/Involuntary SMA**

The annual rate of the SMA grant to an employee is determined by the number of family members maintained elsewhere than at the post of assignment. The rates in the following table do not vary by location of the separate household:

| 1 Child Only | 2 or More Children | 1 Adult Only | 1 Adult and 1 Additional Family Member | 1 Adult and 2 or 3 Additional Family Members | 1 Adult and 4 or More Additional Family Members |
|---|---|---|---|---|---|
| $4,300** | $7,500** | $8,400** | $10,700** | $13,200** | $15,900** |

A "child" is a family member who is unmarried and under 21 years of age as defined in Section 040m(2) and (4).

An "adult" for the purposes of the above SMA table includes the employee's spouse and any of the relatives defined in Sections 040m and 261.1b as family members who are 21 years of age or older.

**b. Transitional SMA- Following Termination of Evacuation**

Transitional SMA is to be paid at a daily rate, varying only by the number of eligible family members maintained at a location other than the post of assignment. The rates in the following table do not vary by either the location of post or the location of the separate household.

(1) For the 1st 90 Calendar Days Following the Termination of an Evacuation

| Per Family Not Per Person | Day 1-30 | Day 31-60 | Day 61-90 |
|---|---|---|---|