UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ) | |
| VIRGINIA LOO FARRIS, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 05-1975 (RMU) |
| ) | |
| CONDOLEEZA RICE, ) | |
| ) | |
| Defendant ) | |
| ) | |

## PLAINTIFF VIRGINIA LOO FARRIS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff Virginia Loo Farris ("Plaintiff" or "Loo Farris"), through counsel, hereby files this Opposition to Defendant's Motion for Summary Judgment.

## STATEMENT OF FACTS

This matter is at an early stage of discovery, and summary judgment is premature. There was some administrative discovery, but discovery has just commenced in this proceeding. Plaintiff Virginia Loo Farris, an Asian American woman, dedicated over thirty-four (34) years of service to the Foreign Service. See Curriculum Vitae at Ex.1. She is a recipient of the Secretary of Defense Civilian Meritorious Honor Award, the United States Information Agency Director's Award for Superior Achievement, three United States Information Agency Meritorious Honor Awards, two Department of State Meritorious Honor Awards, and the Department of State Franklin Award. Id.

In August of 1998 Ms. Loo Farris was assigned as the Public Affairs Officer at the U. S. Embassy Bangkok, Thailand. Ms. Loo Farris was accompanied by her spouse George Farris ("Mr. Farris"), her daughter, Florence, and her son, Geoffrey.

1

On December 16, 1998, the Ambassador revoked Mr. Farris' diplomatic status and Mr. Farris departed Thailand for medical evacuation. Defendant's Memorandum in Support of Refiled Motion Summary Judgment, ("Def.'s Mem."), at 5. As the Defendant has noted, Ms. Loo Farris was the victim of alleged physical abuse. Id.

In December 1998 Mr. Farris departed Thailand. Def.'s Mem., at 5. After Mr. Farris underwent therapy, Ms. Loo Farris worked to reunite her family, to no avail. Virginia Loo Farris Declaration ("Farris Dec."), Ex. 2, at ¶ 3. During February 1999 Mr. Farris came to Thailand on a visit after medical treatment. Ms. Loo Farris had advised the Deputy Chief of Mission ("DCM") at the Embassy in advance, and Ms. Loo Farris understood that the Department would "follow her lead." See November 14, 2001 Form at Ex. 3, at p. 2. But within days of Mr. Farris' arrival Ms. Loo Farris received word from U.S. diplomatic security services, a division of the State Department, that if Mr. Farris did not leave Thailand immediately she would lose her security clearance and would be relieved of her position as Public Affairs Officer ("PAO"). Id.

Ms. Loo Farris strongly believed that she should keep her family together and work on her marriage. Other Department personnel advised Ms. Loo Farris to divorce her husband, and Ms. Loo Farris' refusal to take such advice led to the unraveling of her career. See Farris Dec., Ex.2, at ¶5. After that point, in late 1998, Ms. Loo Farris believed that the Department viewed her as a subservient Asian-American woman unable to stand up to her husband – which is absolutely not the case. Farris Dec., Ex. 2, at ¶5. Ms. Loo Farris in fact stood up to pressure from the Department, so that she could maintain and work on her marriage. Id. Ms. Loo Farris does not believe in divorce, but considered the advice of Ms. Huhtala and others and rejected it. Id.

2

The Department in 1999 allowed Ms. Loo Farris to bid early for an ongoing position, but passed her over for assignment in favor of what she thought were junior white male officers in her two favored assignments. Ms. Loo Farris made an EEO complaint regarding being passed over, and complained to her supervisor, Ms. Marie Huhtala, the Deputy Chief of Mission, whom Ms. Loo Farris believes retaliated against her, and even threatened Ms. Loo Farris' security clearance. Farris Dec., Ex. 2, at ¶4. As the Deputy Chief of Mission, Ms. Huhtala in effect served as the Chief Operating Officer of the Embassy, with overall authority over all Embassy matters. Farris Dec., Ex 2, at ¶6. After Ms. Loo Farris complained to Ms. Huhtala that Ms. Loo Farris was the subject of discriminatory treatment based on her race and gender, Ms. Loo Farris believes Ms. Huhtala did not like that Ms. Loo Farris had made an EEO complaint, which reflected negatively on Huhtala's management and thus indirectly implicated Ms. Huhtala, and sabotaged Ms. Loo Farris' career. Farris Dec., Ex. 2, at ¶7.

Ms. Loo Farris is entitled to obtain discovery in this proceeding as to who Ms. Huhtala talked to, and when, to try to confirm this information. For example, Ms. Loo Farris understood from a retired foreign service officer, Peter Kovacs (former Director of Public Diplomacy at the State Department), that Ms. Huhtala, when she was later Deputy Assistant Secretary of the East Asian and Pacific Bureau, thought Ms. Loo Farris should not obtain a favorable forward assignment, and made clear to Mr. Kovacs that she would prevent Ms. Loo Farris from obtaining a position in Indonesia, an assignment that Mr. Kovacs favored. Farris Dec., Ex. 2, at ¶13. Although Ms. Huhtala did not retaliate immediately after learning of the EEO complaint, Ms. Huhtala negatively influenced Ms. Loo Farris' future assignments and other career prospects when she had the opportunity.

3

After Ms. Huhtala served as Deputy Chief of Mission in Thailand, she served as Assistant Secretary for the East Asia and Pacific Bureau at the State Department, where she would have influenced all job assignments for East Asia and talked to people across all areas of the State Department in Washington.  Ms. Loo Farris believes that Ms. Huhtala and others felt offended by Ms. Loo Farris' filing of an EEO complaint, and retaliated.  See Farris Dec., Ex.2, at 7.  Huhtala Dep., Ex. 4, at 35 (noting "surprise" at EEO complaint).

As part of such retaliation Ms. Huhtala initiated an investigation of Ms. Loo Farris for "waste, fraud and abuse," Ms. Loo Farris' medical clearance to a subsequent posting was delayed, and her family's case was bandied about publicly by State Department personnel at a worldwide conference.  At this stage, Ms. Loo Farris deserves a chance to at least pursue Ms. Huhtala's contacts, and what she said to others about Ms. Loo Farris.  Also, Ms. Loo Farris is entitled to discovery on the qualifications of the two white male officers who were selected over her for her two favored assignments in 1999.

## SUMMARY OF ARGUMENT

Ms. Loo Farris is entitled to discovery that could provide crucial support for her case.  Such discovery could refute any non-discriminatory rationale for discrimination, and discovery could also trace Ms. Huhtala's communications with other Department personnel in 1999 and afterwards, thus buttressing retaliation claims, and possibly supporting that Ms. Huhtala even negatively influenced Ms. Loo Farris 1999 bids.

Ms. Loo Farris has made out a prima facie case of unlawful discrimination based on her disparate treatment, in connection with bids for jobs in 1999.  Ms. Loo Farris lost out on a position at USNATO to a junior white male officer.  She thought the white male officer for the Hague position was also junior, though the Department represents that he

4

was in fact not junior. Def.'s Mem. at 11. As to the USNATO position, the Department pressured her to withdraw, and finally just ignored her bid to "cede" the position to a junior white male officer. That officer was touted by his chief supporter, Ambassador Vershbow, but Ambassador Vershbow's e-mail constitutes almost all the available information regarding that officer. One e-mail sent to Ms. Loo Farris questioned such officer's management skills and leadership ability. At the least, Ms. Loo Farris is entitled to reviews, evaluations and other information that would buttress her claims that she was not only more senior, but far more qualified than Mr. Goodman. Mr. Goodman's personnel files are crucial if Ms. Loo Farris is to support the concerns she has raised regarding his management and leadership skills.

For The Hague position, Ms. Loo Farris had difficulty even bidding for the job, because she received inconsistent explanations as to the bidding process, and her bid's status, at different times in late 1999. Almost no information is available regarding the white male – Mr. Jack Segal -- who obtained that post. Ms. Loo Farris understood he was junior to her, though the Defendant now represents otherwise. Discovery on that issue is crucial as well, to reveal any issues with Mr. Segal's qualifications, and his actual status as equal or junior to Ms. Loo Farris.

Ms. Loo Farris has also pled a case on the basis of retaliation based on the investigation against her, a "waste, fraud and abuse" investigation initiated by Ms. Huhtala, given the absence of any similar investigations against anyone else, much less anyone else in her circumstances. Other retaliatory actions took place as well, including a delayed medical clearance and a public discussion of Ms. Loo Farris' personal circumstances.

Ms. Loo Farris complained about her being passed over, as a matter of unlawful discrimination, in late 1999. Ms. Huhtala then engaged in retaliatory actions that sabotaged Ms. Loo Farris' career. Ms. Loo Farris is entitled to discovery on that issue, such as documents from diplomatic security services, the inspector general, the East Asia Bureau, and other points of contact within the Department, to determine the extent of Ms. Huhtala's contacts with these sections, and exactly what Ms. Huhtala told other employees. That information would be crucial to learning who was aware of Ms. Loo Farris' EEO complaints and how that influenced their actions.

The EEO complaint, Ms. Loo Farris believes, caused her career to stagnate, as she was "low-ranked," passed over for promotion, her personal issues were publicized within the Department, and she was investigated. No matter how Ms. Loo Farris addressed the issue, a lingering stereotype, and an effort to limit her career based on a response to her EEO complaint, undid her as she believes she was considered either a passive person unable to take strong stands or a troublemaker for filing an EEO complaint. But her performance and efficiency reports show an entirely different and highly effective officer. At this stage, Ms. Loo Farris should at least be entitled to discovery to further examine the issues underlying her being passed over for the USNATO and The Hague positions, and as to retaliation.

## MATERIAL FACTS IN DISPUTE

Ms. Loo Farris proffers a short list of genuine issues of material fact that preclude summary judgment in this matter. Ms. Loo Farris elaborates on these facts in the arguments set out in this memorandum:

1.    Whether Ms. Loo Farris was stereotyped as a subservient Asian-American woman in 1998, and subsequently passed over for positions in favor of junior white males based on her gender and race.

2.    Whether Ms. Loo Farris should have been passed over for the USNATO and The Hague positions given her seniority and experience with the military and with Congress.

3.    Whether the granting of a "cede" when a senior officer such as Ms. Loo Farris was bidding for the USNATO position was even possible, to pave the way for a junior officer.

4.    Whether Mr. Goodman's purported credentials were in fact pretextual reasons for discrimination given evidence from another State Department employee, via e-mail, that Mr. Goodman was of lower rank, not popular and likely a poor manager.

5.    Whether Mr. Goodman was in fact preselected well in advance of the assignment panel hearing, or was in fact a last minute selection as claimed by Ambassador Vershbow.

6.    Whether Mr. Goodman was in fact better qualified, as the Defendant argues, based on his evaluations, reviews and reputation.

7.    Whether multiple inconsistent explanations given to Ms. Loo Farris regarding the process for filling "The Hague" position were in fact falsehoods and lies that served as a pretext for unlawful discrimination.

8.    Whether the selection of a white male, Mr. Andrew Goodman, for the US NATO POLAD position, and another white male, Mr. Jack Segal, for The Hague

position, reflected a preference for white males in the Department of State's European bureau.

9.      Whether Mr. Segal in fact was junior to Ms. Loo Farris, or of equal rank, and whether she was in fact more qualified than him for The Hague position, based on background, reviews and reputation.

10.      Whether the State Department's stonewalling of Ms. Loo Farris' attempts to obtain any multifunctional or interfunctional position was part of a pattern of discrimination against women in general and Asian–American women in particular.

11.      Whether Ms. Huhtala harbored ill will toward Ms. Loo Farris based on Ms. Loo Farris making an EEO complaint.

12.      What Ms. Huhtala said in terms of recommendations or statements to others, regarding Ms. Loo Farris, especially after Ms. Huhtala returned to Washington, D.C. as Deputy Assistant Secretary of the East Asia and Pacific Bureau at the State Department.

13.      Whether the publicity surrounding Ms. Loo Farris' case in the U.S. Foreign Service represented retaliation and also reflected a stereotypical view of Asian-American women, which influenced her consideration for positions in 1999.

14.      Whether an investigation of "waste, fraud and abuse" relating to Ms. Loo Farris -- initiated by Ms. Huhtala – was retaliatory, given that Ms. Huhtala apparently never initiated any similar such investigation of any other person.

15.      Whether and to what extent Ms. Loo Farris' personal issues were discussed within the State Department, and whether such discussion was in retaliation for her EEO complaint.

8

16.    Whether Ms. Loo Farris' name being twice removed from DCM short lists after having been selected for inclusion by the respective substantive, or geographic, bureaus, was retaliatory for her EEO complaint.

17.    Whether Ms. Loo Farris has, after being selected, in fact, been denied her next assignment to Beijing, based on the SMA investigation that is retaliatory.

18.    Whether subsequently being passed over for promotion, and having her security clearance questioned, is evidence of underlying discrimination against Ms. Loo Farris based on her being an Asian-American woman.

## ARGUMENT

### A.    The Summary Judgment Standard Requires That the Motion Be Denied If Any Facts, Making Inferences in Plaintiff's Favor, Could Sustain a Verdict

A court cannot grant summary judgment unless there are no genuine issues of material fact.    Hairston v. Washington Metro. Area Transit Auth., 1995 U.S. Dist. LEXIS 20851, 5 (D.D.C.), quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court must also make all reasonable inferences in Plaintiff's favor at the summary judgment stage. Id. at 6.

A court does not weigh evidence or make credibility determinations but determines only if there are issues for trial. Hutson v. Department of Defense, EEOC Appeal No. 01A23350 (Dec. 4, 2003), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).    Where credibility is at issue, summary judgment is improper as credibility determinations are functions for a jury.    Alexis v. District of Columbia, 44 F.Supp. 2d 331, 337 (D.D.C. 1999) citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). See also  Hutson v. Dept. of Defense, EEOC Appeal No. 01A23350 (Dec. 4, 2003).  Truncation of the discovery process, at an early stage of discovery, improperly

deprives Plaintiff of a full and fair hearing. Pilon v. U.S. Dept. of Justice, 796 F. Supp. 7, 11 (D.D.C. 1992) (holding where Plaintiff had not had the opportunity for discovery, summary judgment was improper and unfair). See also  Prince v. Dept of State, EEOC Appeal No. 01A13715 (June 19, 2002).

**B.    Under Rule 56(f), Summary Judgment Is Improper at This Early Stage, Before any Discovery in Federal Court – Which Discovery Is Crucial for Ms Farris To Respond to the Motion**

A nonmoving party can oppose a motion for summary judgment under Rule 56(f) by stating "that it has not had the opportunity to discover information that is essential to his opposition." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n. 5 (1986). Burlington Ins. Co. v. Okie Dokie, Inc., 439 F.Supp.2d 124 (D.D.C. 2006).   Often this is done by affidavit, but the nonmoving party's objections before the court may serve as the equivalent of such an affidavit. Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244-45 (4th Cir. 2002).

Under Rule 56(f), a court "may deny a motion for summary judgment or order a continuance to permit discovery if the party opposing the motion adequately explains why, at that timepoint, it cannot present by affidavit facts needed to defeat the motion." Strang v. United States Arms Control & Disarmament Agency, 864 F.2d 859, 861 (D.C. Cir. 1989). "[T]he purpose of Rule 56(f) is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." Dickens v. Whole Foods Market Group, Inc., 2003 WL 21486821, at 2 n. 5 (D.D.C. Mar.18, 2003) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986)).

In this case, Plaintiff has conducted no discovery in federal court. In its administrative proceeding, a report of investigation was done, and Ms. Loo Farris undertook limited discovery, but had no subpoena power over former Department employees, and had limited discovery in the administrative proceeding, both due to administrative rules and to try to conserve resources should a federal court filing prove necessary.

There has been no discovery in this proceeding. Deposition testimony in the administrative proceeding was limited to phone depositions of Ms. Huhtala and Mr. Tiernan only (Ms. Loo Farris was deposed by the State Department). Although Ms. Huhtala was deposed there was no discovery obtained regarding her contacts. For example, Ms. Loo Farris has recently had informal discussions with Peter Kovacs, who had promoted her candidacy in 2004 for a position in Indonesia, and in China; Mr. Kovacs did suggest that Ms. Huhtala poisoned the well for Ms. Loo Farris in Washington, D.C. Farris Dec., Ex. 2, at ¶13. Given that knowledge, Ms. Loo Farris has also had no discovery regarding whom Ms. Huhtala may have spoken to when Ms. Loo Farris was applying for positions in 1999. Id.

1. **Discovery of Policies and Procedures, and Qualifications of Comparator for the US NATO Position, Mr. Goodman**

As to the USNATO position, Plaintiff Ms. Loo Farris strongly believes that a "cede" was not appropriate under what she knew were State Department policies as set forth in e-mails from Mr. Whitlock, her Career Development Officer. She is entitled to discovery on the "final" policies and procedures for bidding, as well as potentially a deposition of Mr. Dance, the former Deputy Director, Office of Career Development and Assignment, which could well support her theory in this regard. Only draft policies and

procedures for bidding were made available in the administrative proceeding. Granting a cede in violation of procedures and lying to Ms. Loo Farris about it would be evidence of pretext. She also should be entitled to background information on Mr. Goodman, which would potentially support the theory, as evidenced in an e-mail, that he was not popular or a good manager. Hall Email at Ex. 8. Ambassador Vershbow's e-mail, proffered by the Defendant, is not the only item in the State Department regarding Mr. Goodman, but it is almost the only item in the record.

<p style="margin-left: 2em">**2.**    **Discovery of Comparator as to The Hague Position**</p>

As to the Hague position, Ms. Loo Farris is entitled to evidence and discovery on the alleged qualifications of Mr. Segal, as well as clarification on the actual procedure for choosing The Hague POLAD position. Ms. Loo Farris understood he was junior to her, but the Department represent her was at the same rank Def.'s Material Fact, No. 27. The cited source for defendant's statement, the ROI, Ex. F8a, does not appear to confirm his rank.

<p style="margin-left: 2em">**3.**    **Discovery of Ms. Huhtala's Actions and, for Purposes of Retaliation, Communications With Others in the State Department**</p>

As to retaliation, Ms. Loo Farris is entitled to discovery as to discussions about her that took place about her, particularly by Ms. Huhtala with other persons at the State Department. Ms. Loo Farris submits that Ms. Huhtala, upset with Ms Loo Farris for filing an EEO complaint, retaliated by having Ms. Loo Farris investigated and sabotaging her remaining career. back.

Plaintiff is entitled to this discovery to buttress her prima facie case, and support her claims that Defendant's rationales for choosing two white males are pretext. To rebut a prima facie case, the government will actually have to present testimony in support of

their position, and those witnesses will be subject to cross-examination and discovery that could throw doubt on their claims and prevent the government from meeting its burden of proof.  If, for example, Mr. Goodman does have a checkered history as to management skills, then the Defendant may not effectively be able to rebut the prima facie case and shift the burden of proof back to Plaintiff under the McDonnell-Douglas standard.  The same is true regarding Mr. Segal's background.  And as to retaliation, the scope of knowledge around the State Department regarding Ms. Loo Farris' EEO complaint is important.  There is evidence that Ms. Huhtala sabotaged Ms. Loo Farris's chances to obtain a forward assignment in Indonesia; Plaintiff does not know if Ms. Huhtala may have sabotaged her position in Beijing too.  Ms. Huhtala was serving as a Deputy Assistant Secretary in the same Bureau.  Ms. Loo Farris had a "handshake agreement" to be posted to Beijing, but that assignment never came.  Farris Dec., Ex. 2 at ¶12.  Ms. Loo Farris later understood that the dispute over the separate maintenance investigation had allegedly held up her assignment to Beijing.  Id.

**C.    Ms. Loo Farris Meets the Standards under McDonnell-Douglas, at Least As Far as Surviving Summary Judgment at a Preliminary Stage**

In McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court set out a burden-shifting approach to employment discrimination claims in cases where the plaintiff lacks direct evidence of discrimination.  To proceed under McDonnell-Douglas, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." Id. at 802.  Plaintiff must show that she belongs to a protected class and was treated differently than a white male.  As Defendant notes, as part of that analysis, a plaintiff must be qualified for the job at issue.  Def.'s Mem. at 19.  Even Ambassador Vershbow's e-mail makes clear that Ms. Loo Farris was

an "excellent officer" with "exposure to Politico-Military issues." Def.'s Mem at 9, quoting Ambassador Vershbow. It is undisputed that Ms. Loo Farris was a senior foreign service officer bidding for positions that were her grade.

Although under McDonnell-Douglas, Plaintiffs have the initial burden of showing a prima facie case of unlawful discrimination, this burden is not meant to be onerous. The Supreme Court has explained that the elements are flexible, and were "never intended to be rigid, mechanized, or ritualistic." Tex Dep't of Comty Affairs v. Burdine, 450 U.S. 248, 253 (1981).

If the plaintiff meets this burden, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action. Id. Once the employer has done so, "the presumption [of discrimination] raised by the prima facie case is rebutted," and "drops from the case." Aka v. Washington Hospital Center, 156 F.3d 1284, 1287 (D.C. Cir. 1998), quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993). The defendant's evidence does not mean plaintiff loses the case, it is simply that the presumption of unlawful discrimination falls away. If the employer meets its burden, then the plaintiff must "be afforded a fair opportunity to show that the employer's stated reason ... was in fact pretext" for unlawful discrimination. Id. at 804. See also Chappell- Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006).

The plaintiff has "'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that race [or some other discriminatory basis] was." Aka, supra, 156 F.3d at 1287, quoting St.

Mary's Honor Center, 509 U.S. at 507-08.  At this stage, Defendant has not had an opportunity fully to cross-examine the Defendant's witnesses.

As the Court noted in Aka, in reversing summary judgment for Defendant, the term pretext "can be slippery; sometimes it means that an employer's explanation is incorrect, and sometimes it means both that the explanation is incorrect and that the employer's real reason was discriminatory."  Id. 156 F.3d at 1289, n.3.  Title VII in fact is meant to be flexible.  The Aka Court instead looked for evidence "that the employer's explanation is false, that it is a lie, or that the employer's real motivation was discriminatory" as pretext.  Id.

As the Court in Aka also noted, in some cases the plaintiff [on summary judgment] on the basis of his initial prima facie case alone, "combined with effective cross-examination of the defendant." Aka, 156 F.3d at 1289, n.4, quoting Burdine, 450 U.S. at 255 n.10.   This suggests that a prima facie case alone may be enough by itself to survive summary judgment.

As was customary, Ms. Loo Farris applied for jobs at her rank and, on occasion, for positions within the senior foreign service never more than one grade above her personal rank. Without cedes from her, junior officers would not even have been eligible for such positions.  Standard Operating Procedures, Ex. 2 to Def.'s Mem. at bates 440; Ex. 21 hereto. Using rank to determine eligibility for jobs avoids subjective judgments.

There were at least two positions amongst those for which Ms. Loo Farris initially bid in 1999 that warrant closer scrutiny and were the subject of administrative claims -- a political counselor position at the USNATO post in Brussels, and a subsequent Political Advisor (POLAD) position in The Hague, Netherlands area, where white male foreign

service officers were selected.  In both cases Ms Loo Farris has made a prima facie case, and raised issues of pretext on which she is entitled to discovery.

        **1.**      **Ms. Loo Farris Has Made Out a Prima Facie Case As to the USNATO Position**

Although the Department has never produced documents on The Hague POLAD position, and thus there is little information on the white male, Mr. Segal, selected for that post, the successful candidate for the USNATO position, Andrew Goodman, was a white male junior to Ms. Loo Farris.  Farris. Dec., Ex. 2, at ¶ 8.  See Def.'s Mem at 7. (noting that Mr. Goodman was junior to Ms. Loo Farris.).

        **2.**      **There Is Evidence of Pretext, as the Department Either Lied to Ms. Loo Farris or Changed Its Position on Cedes to Bypass Ms. Loo Farris for the USNATO Position, At Least Meriting Discovery Regarding Mr. Goodman's Qualifications and Applicable Policies and Procedures**

"Cedes" are personnel actions where the Personnel Bureau waives the rank or seniority requirement on an advertised, or open, assignment — either because no officer of the required rank and eligibility to fill a given position has bid on the assignment, or under extraordinary circumstances, because a senior foreign service officer declares their lack of interest in said position and allows the Department, in contravention of standard operating policy, to accept a bid by an officer junior in rank.  Standard Operating Procedures, Ex. 21 at 24.

Ms. Loo Farris was bidding for positions at her rank.  The standard operating procedures cited by the Department address "stretch assignments" where officers, such as Mr. Goodman, may bid for higher graded jobs.  Ex. 2 to Def.'s Mem. Those regulations indicate that "cedes" are needed before a junior officer is even eligible to bid for a senior job, and that such cedes are rare where there are unassigned senior officers.  Id., Ex. 2 at

16

bates 440. Here, Ms. Loo Farris was a senior officer actually bidding for the USNATO position, and Mr. Goodman was given an extremely unusual two-grade stretch in order to leapfrog over Ms. Loo Farris.

     a.     **Cedes Are Not Granted Where Senior Officers Bid**

    James Whitlock, Ms. Loo Farris' career development officer, states in a February 8, 2000 e-mail that cedes are not granted where a senior bidder at grade is bidding for a job. Ex. 5 hereto. The State Department has argued in contrast that cedes were granted, potentially even in circumstances where a senior officer bid. Def.'s Mem. at 27-28. Discovery would be crucial to determining this issue, and if the Department could not grant a cede, its explanation as to why it chose Mr. Goodman would be false and pretextual. Whitlock earlier confirmed that such cedes were appropriate only where there were no senior bidders. Jan. 31, 2000 e-mail, Ex. 6. Robert Dance describes a cede as a position "when, for example, a senior level assignment cannot be filled by a senior level officer." Dance Statement, Ex. 7, at 5.

    In this case, though, there was a senior officer, Ms. Loo Farris, applying. For that reason another senior foreign service officer e-mailed to Ms. Loo Farris his view that the State Department might be compelled to give her the USNATO position. Hall e-mail at Ex. 5.

    Further evidence shows that a cede is not granted where a senior officer bids. Mr. Goodman was apparently not even eligible to be considered for the USNATO position if Ms. Loo Farris bid. See Hall e-mail of 3/15/00 at Ex.8; Whitlock e-mail at Ex. 5. Mr. Tiernan thus pressured Ms. Loo Farris to withdraw her bid for the USNATO position entirely. Tiernan e-mail of May 12, 2000, Ex. 9, bates no. 87-88. Mr. Tiernan

strongly advised Ms. Loo Farris to the point of demanding that she take the PAO Athens position, id., (which strongly suggests that the State Department could not simply grant a "cede") and clear the way for Mr. Goodman to be selected for the USNATO position.

Ms. Loo Farris was a senior foreign service officer, and since she did not withdraw her bid, no "cede" should have been granted. Defendant argues that "cedes" are expressly provided for in the Defendant's operating procedures, but such cedes are only referenced, and it is not discussed how they occur, other than that they do. Def.'s Mem. at 7, citing Standard Operating Procedures. Ms. Loo Farris understood that cedes should not be granted where a senior officer bids; the procedures mention cedes but do not rebut Ms. Loo Farris' view that cedes should not be granted where a senior officer is bidding. Farris Dec., at ¶9. Def.'s Mem. at 7 (citing to operating procedures).

The State Department somehow took an extraordinary step and "ceded" the one, and possibly two, positions that Ms. Loo Farris had bid for, at USNATO and Hague Political Advisor, though she was a senior officer -- apparently the only senior officer -- bidding. Ex. 10. two positions that Ms. Loo Farris had bid for, at USNATO and Hague Political Advisor, though she was a senior officer -- apparently the only senior officer -- bidding. Ex. 10. To the extent the State Department misrepresented the "cede" policies and procedures, that would evidence pretext, to the extent the Department's explanation was false. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146, 147 (2000).

**b.     Discovery As to the Applicable Procedures in 1999 Is Appropriate, As Only Draft Procedures Were Produced**

Plus, in the administrative proceeding the State Department produced no final documents on applicable assignment procedures in 1999 and 2000, just drafts. See Chandler letter of April 27, 2004 plus draft procedures, Ex. 11. The actual, final policies,

or the reasons why such policies were not finalized, are important, as is whether the draft policies applied despite not being finalized.

### c.    Mr. Goodman's Credentials May Have Been Exaggerated, And Ms. Loo Farris' Bid Appeared To Have Been "Lost" At One Time

The e-mail of Mr. Hall notes that Goodman "isn't that popular with the troops here – and probably is a pretty poor manager, too." Ex. 12.  That e-mail suggests that Ms. Loo Farris would be hard pressed not to get that USNATO position due to her seniority.  Id.  That e-mail also notes inexplicably that Ms. Loo Farris's name is not on the bid list, as "no senior bidder has bid," Id.  Yet Ms. Loo Farris in fact did bid for that position earlier, by November 19, 1999, and reiterated her interest on November 22, 1999.  Ex. 12.  Ms. Loo Farris is entitled to discovery on Mr. Goodman's background, evaluations, and personnel reviews, to assess his reputation and qualifications.

Thus, as to the USNATO position, there is a comparator, Mr. Goodman, a white male, and the Department's position that the white male was chosen in part due to his superior management skills and experience, appears to be false, at least in part, given e-mail by the State Department from another senior foreign service officer at post that questioned Mr. Goodman's management skills.   Ms. Loo Farris has not had the opportunity to undertake discovery on Mr. Goodman's background, to confirm whether he was in fact a poor manager. Evaluations, reviews, e-mails and correspondence are all important.   His personnel file is critical.   The glowing review of Mr. Goodman's chief promoter and apparent mentor, Ambassador Vershbow, quoted in detail by Defendant, Def.'s Mem. at 8-9, is basically the only piece of paper in the record regarding Mr. Goodman.

19

Contrary to Defendant's argument, Ms. Loo Farris strongly believes that she was better qualified than Mr. Goodman for the USNATO position. Ms. Loo Farris had many years of managerial experience and of directing her own departments within embassies and at headquarters, including the supervision of dozens of employees. She also worked on a joint unified command staff and graduated from the National War College. See Curriculum Vitae of Ms. Loo Farris at Ex. 1. Mr. Goodman had NATO experience as a mid-level officer but no substantial managerial experience. See Robert Hall e-mail attached as Ex. 8. Plaintiff Ms. Loo Farris does not dispute that she had not been previously posted to Europe. Def.'s Mem. at 10. Ms. Loo Farris had served on four differential posts in Asia, the Caribbean, and in Africa, and that should have worked in her favor, if anything, under the "fair share" policies, which were designed to avoid the "revolving-door assignment policy that so often takes place in Europe.

Evidence that the Department's rationale is false, or other inconsistencies and inaccuracies that raise questions of credibility as to defendant's assertions, shows pretext that is sufficient for Ms. Loo Farris' claims to survive summary judgment. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146, 147 (2002); Aka v. Washington Hospital Center, 156 F.3d 1284, 1287 (D.C. Cir. 1998). Here, multiple inconsistencies, and the contrast between what Ms. Loo Farris was told at different times, show that the Department's shifting rationales for denying Ms. Loo Farris assignments were false and raise questions about the credibility of Department witnesses.

The standard practices on cedes were, in Ms. Loo Farris' view, violated as a cede was given though she refused to withdraw her bid.

**d.**    **Other Inconsistencies As to the Last Minute Nature of the Successful Candidate Raise Questions of Credibility**

Other inconsistencies in the Defendant's argument raise genuine issues of material fact. Ambassador Vershbow denied that Mr. Goodman was preselected for the position, and stated that he was chosen "at the very last minute." Def.'s Mem., at 10. The "shoot-out" occurred on June 6, 2000, just after Ambassador Vershbow's e-mail of May 30. However, as early as May 12, 2000, Mr. Tiernan of the European Bureau, in contrast, was begging Ms. Loo Farris to withdraw because Mr. Goodman was allegedly going to get this position in any case, as early as May 12. Tiernan Dep., Ex. 13, at 114; E-mail of Thomas Tiernan at Ex. 9. Mr. Tiernan, on his own initiative, and representing the Bureau, requested in strong terms that Ms. Loo Farris withdraw to clear the way for Mr. Goodman to obtain the position without having to obtain a "cede." Ex. 9. Obviously, if Mr. Goodman was selected at the last minute, Ms. Loo Farris would not have been pressured to withdraw earlier.

There was enormous pressure being placed on Ms. Loo Farris to withdraw because without her withdrawal the Department would have been compelled to select her for the USNATO position under normal procedures. When she would not withdraw, the State Department had to obtain a cede, even if outside the normal course, as the only way to panel Mr. Goodman into the position.

**e.**    **Although Preselection Itself Is Not Discriminatory, It Can Serve as Evidence Buttressing Wrongful Discrimination**

Where a woman filed a discrimination complaint based on gender, the court found the plaintiff had in fact been treated disparately when a male was pre-selected for a position for which the female plaintiff was more qualified; further, the employer retracted

a previous advertisement for the position that specified the need for experience the plaintiff had that the pre-selected male did not (under the guise the employers made a mistake by asking for those specific qualifications). Hartman v. Wick, 600 F. Supp. 361 (D.D.C. 1984). Also, in Ingram v. Missouri Pacific R.R., 897 F.2d 1450, 1455 (8th Cir. 1990), the court held where promotions were granted according to a "good old boy" network, and a black employee was given the run around when trying to obtain a promotion, and further, white employees were being promoted over the black employee with no good indication why, the employer had unlawfully discriminated against his employee. In these case, the issue of preselection and the "old boy network," while not themselves discriminatory, can corroborate discriminatory intent.

The European Bureau, for the USNATO position, picked a junior white male officer already working in Brussels. Def.'s Mem., at 25,27. The old boy network in the Department and in particular in the European Bureau, picking favored sons internally, makes it difficult for outsiders to break into choice postings in Western Europe, and as in Hartman and Ingram, buttresses claims of discrimination. See statistical analysis at Ex. 26.

**D.    Ms. Loo Farris Is Entitled to Discovery on The Hague Position As to a Prima Facie Case**

    **1.    Ms. Loo Farris Understood that The Hague Position Went to a Junior Officer**

The Department has represented for the first time, at least to Ms. Loo Farris, in its motion that the white male officer selected for The Hague position was of similar rank to Ms. Loo Farris. Def.'s Mem, at 11. That itself was contrary to Ms. Loo Farris' prior understanding, and Ms. Loo Farris should be entitled to discovery of the successful

officer's credentials, to confirm her belief that she was senior to him and substantially more qualified than him.  The successful officer was identified in the administrative file as Jack Segal. ROI, Ex. F8a, at 5.  Again, his personnel file would be a crucial initial document to obtain, both to buttress Ms. Loo Farris' prima facie case and to rebut any non-discriminatory rationale proffered by Defendant.

>    **2.    There Is Evidence of Pretext for The Hague Position as Ms. Loo Farris Was Told a Blizzard of Inconsistencies As To the Bidding**

>    **a.    <u>The Limited E-mails Show That Ms. Loo Farris Was Misled</u>**

After initially inquiring about The Hague POLAD position with Mr. Moon in about October 1999, Ms. Loo Farris was told a short list had already been put forward. <u>See</u> ROI, Moon Dec., Ex. 14 at bates no. 286; ROI, Farris statement, Ex.15 hereto, at bates no. 69.  Ms. Loo Farris again inquired about the Hague POLAD position through her CDO on November 17, 1999. Ex. 16.  Her CDO, Mr. Whitlock, informed her on November 18 that to his knowledge the position was still open. Ex.17.  Ms. Loo Farris thus bid on the job no later than November 19, 1999, according to the records.  Ex. 18.  Despite her prior bid, on November 21 Ms. Loo Farris was informed that the short list had gone forward, to a commanding general or generals, apparently without her name. Ex. 19.

By December 22 Ms. Loo Farris noted that a list sent by Mr. Whitlock showed that The Hague POLAD job was on a hard-to-fill cable, which was inconsistent with her being told that bids and short lists already having been submitted. Ex. 20.  The hard-to-fill list is apparently used, and possibly misused, to allow an otherwise ineligible bidder to bid early or out-of-cycle.  <u>See</u> excerpt from State Department draft policies, Ex. 21, (noting draft "hard-to fill" rules).

The presence of The Hague position on a "hard-to-fill" list on December 22 suggested that Ms. Loo Farris had been misled earlier. The State Department now claims that was a mistake, Def.'s Mem. at 29, but Ms. Loo Farris is entitled to discovery to determine whether in fact she was lied to.

Mr. Moon provided a first affidavit dated December 3, 2001 where he disclaimed even any knowledge of The Hague POLAD position. Ex. 14, second document, response to question 4. But in his later declaration of September 4, 2002, Mr. Moon recalled that The Hague POLAD position was actually based in the nearby town of Brunsum, and went to a Mr. Jack Segal, a white male foreign service officer. Ex. 22, response to question 18. Unlike Mr. Whitlock, who had told Ms. Loo Farris that the list had gone to a commanding general, Mr. Moon stated that a short list went to NATO authorities. Ex. 22, response to question 17. No such short list or correspondence relating thereto was ever produced, so Ms. Loo Farris has not been able to confirm who was on the list or who made the final decision. ether cSo no one can tell who made the final decision. Mr. Tiernan stated that the Department of Defense made such decision. Tiernan Dep., Ex. 13, at 54, 59-60.

**b.      False Information Regarding the Shortlist Evidences Pretext**

Regardless of who made such decision, the State Department submitted a short list, apparently, which had to have gone through Mr. Tiernan, Dep., Ex. 13, at 58, and given its disappearance may well have contained only one name. That State Department shortlist may have been generated by the NATO desk at the State Department, as Mr. Tiernan testified, id., but the list went through Mr. Tiernan to Human Resources at State. Id. at 59. A document showing the "short list" must exist somewhere if Mr. Tiernan is

correct, and Ms. Loo Farris is entitled to discovery as to that list. Then according to Mr. Tiernan, Human Resources at State made the final decision but that was little more than a "rubber stamp" of a DoD decision based on an unwritten agreement between State and DoD. Id. at 59-60.

Thus, the Department's own witnesses state variously that short lists were passed to a commanding general, to NATO authorities, or to DoD, which person or persons then made the decision on the job – or maybe not, since the State Department's Human Resources people had a final say, which was possibly no more than a rubber stamp. The State Department may have prepared a short list of candidates, which might well have been limited to one person, but did not include Ms. Loo Farris. The Department's inconsistent statements, and contradictory statements to Ms. Loo Farris, require that Ms. Loo Farris be given a chance to undertake discovery to find the "short list," determine if she was lied to regarding whether the list was submitted before she bid, to show evidence of pretext. If inconsistent explanations resulted from an effort to mislead Ms Loo Farris, that would be evidence of pretext. If the "short list," when found only contains the name of Ms. Segal, an inference could be made that Mr. Segal was slotted for the job and Ms. Loo Farris improperly passed over.

Ms. Loo Farris was misled by the Department in several instances about The Hague-POLAD position. She kept trying to apply, but a white male foreign service officer was selected. The Department itself cannot even agree on who made this selection, but various witnesses reference various other decision-makers. Mr. Tiernan testified that the list for this position went through him but fell back on the argument that the Department of Defense made the final selection. Tiernan Dep., Ex. 13, at 54, 59, 60.

Mr. Moon of the Department in his affidavit stated that the final choice was made by NATO authorities. Ex. 14 at 2. However, Ms. Loo Farris' believes that the Department personnel took steps to ensure she could not be included on a short list, ensuring that she could not be chosen.

> **3.**    **At the Very Least, Ms. Loo Farris Is Entitled to Discovery To Obtain Potentially Crucial Information as to Mr. Segal's Background**

Ms. Loo Farris is entitled to discovery on the issue of how the successful candidate for The Hague procedure was really chosen, amidst the different stories, and whether Mr. Segal was in fact of equal rank, or whether he was junior to, Ms. Loo Farris. Regardless of his rank the Defendant does not dispute that he was a white male.

At the administrative level, for The Hague POLAD position, the State Department, interestingly, could produce no e-mail and no documents relating to this position or the bidding process. There was a short list of people, maybe, submitted for this position in 1999, but afterwards the job was still on an open assignments list and Ms. Loo Farris bid for the job as was her right. Def.'s Mem., at 11.

Mr. Moon does not dispute that he may have submitted names before bidding was closed, nor does he dispute that the position was later on a hard-to-fill list. Ex. 22. For some reason, the position did not get filled in late 1999 despite Ms. Loo Farris's bidding on the job and reiterating her interest multiple times. Then Ms. Loo Farris was told it was too late to bid even thought the job was still on an open list. Later, though she was told it was too late, Ms. Loo Farris noted that the job was on a "hard-to-fill" list and asked about what the State Department calls an "apparent contradiction." Def.'s Mem at 11. Ms. Loo Farris was told that someone else in the State Department had been "misinformed." Id.

Mr. Moon indicated that it was NATO that made the final selection, but the State Department ensured that Ms. Loo Farris could not be selected by, apparently, not submitting her name. That the State Department produced no documents on this issue should raise an inference against the State Department as well.

**E.    The Athens Position Is a Red Herring, As Ms. Loo Farris Makes No Claim Regarding that Position**

Ms. Loo Farris does not deny that she was offered a job in Athens, but her objection to that offer was misconstrued, in that Ms. Loo Farris' actual complaint is that she was being forced to take that job to get her out of the way for another, more desirable job that she was seeking at USNATO. See e-mail attached as Ex. 9. Mr. Tiernan's e-mail of May 12, 2000 pressured Ms. Loo Farris into taking such position. Tiernan Dep., Ex. 13, at 128. Because she was the only senior officer, bidding for the USNATO position, she should have been entitled to that job, and that is why the State Department was pressuring her to withdraw her bid there and accept Athens.

**F.    The Denial of Multi/Interfunctional Bids Further Evidences Discrimination**

As to multi/interfunctional bids, Ms. Loo Farris's excellent employee evaluations are replete with multiple references that Ms. Loo Farris should be promoted and that she earned the opportunity to serve as DCM or as principal officer. See illustrative EER (evaluation) at Ex. 23. These positions were outside her "cone," as the Department notes, Def.'s Mem. at 13, but Ms. Loo Farris was eligible to bid for them. Ms. Loo Farris was not applying for a secondary multifunctional skill code. See Def.'s Mem. at 13, citing 3 FAH 2620 et seq. Ms. Loo Farris was simply using multi/interfunctional as a generally recognized term in her profession. Ms. Loo Farris was consistently turned down for such bids in 1999 and subsequently. The State Department itself noted that such bids

went through the same assignments committee as other bids.  Dance Affidavit, Ex. 22; Def.'s Mem. at 3 (most assignments fall under a general assignments committee).

## G.    There Are Material Factual Issues in Dispute as To Retaliation

### 1.    Acts of Alleged Retaliation Merit Discovery Regarding Ms. Huhtala's Authority and Communications

As to retaliation, Ms. Huhtala testified that in all her years in Bangkok, and in her years since Bangkok in Kuala Lumpur, Malaysia, she has never initiated, or heard of, an investigation for "waste, fraud and abuse" except in the case of Ms. Loo Farris.  Huhtala Dep. at 55, Ex. 4 hereto.  Ms. Huhtala initiated an investigation as to whether Ms. Loo Farris would be allowed to collect a separate maintenance allowance ("SMA") when her spouse, who was  prohibited from returning to Bangkok and involuntarily separated, had been living in the area.  Huhtala Dep. at 53-54, Ex. 4 hereto.

SMA permits officers to collect supplemental payments when they are separated from spouses and children, and thus have to maintain separate residences.  The SMA rules cited by the State Department that limit the application of the SMA benefit apply to voluntary separations where the spouse  lives within 300 miles.  State Standardized Regulation 263.7, at Ex. 24  hereto.  Def.'s Mem. at 14.  That regulation terminates SMA payments only in the case of voluntary separations, whereas the separation of the Farrises was involuntary.  The Farris' separation was involuntary because Mr. Farris was prohibited from returning to post; thus, the rules cited by, and relied upon, by the State Department  limiting SMA do not even apply.  Ms. Huhtala knew that such separation was involuntary because she was the DCM and Mr. Loo Farris had to obtain permission to visit the embassy in 2001.  Huhtala Dep. at 93-96, Ex. 4.

28

Also, the Farrises did live separately throughout the time in dispute, from 2000 to 2001. Ms. Loo Farris' son was enrolled in a local school. Huhtala Dep, at 99, Ex. 4. Ms. Huhtala admitted in her deposition that Ms. Loo Farris, even if she sacrificed her SMA, would have been eligible for a school allowance for her son. Huhtala Dep. at 100, Ex. 4. That school allowance would have exceeded what Ms. Loo Farris allegedly received as a separate maintenance allowance. Ms. Loo Farris settled a civil complaint, without admitting any liability, for $10,800, simply because it was not economically rational to fight such matter in federal court. See Def.'s Mem., Ex. 8.

It makes no sense for Ms. Huhtala to investigate an issue that she should have known was at best a wash, with no gain to the Treasury, except unlawfully to retaliate against Ms. Loo Farris. Ms. Huhtala was aware of Ms. Loo Farris' prior protected activity, that is, her EEO complaint, Huhtala Dep. at 33, Ex. 4, and Ms. Huhtala admitted that she was "surprised" by such complaints from Ms. Loo Farris. Huhtala Dep. at 35, Ex. 4. Ms. Loo Farris' formal EEO complaint was filed on September 6, 2000. ROI, Ex. 26, bates no. 1. Indeed, Ms. Loo Farris had complained to Ms. Huhtala directly alleging wrongful discrimination as well. Huhtala Dep., Ex. 4, at 33-35.

As to timing, Ms. Huhtala did not retaliate against Ms. Loo Farris immediately in 1999, but she took the opportunity to retaliate later by initiating the SMA investigation when she could and by blocking assignments when she was Deputy Assistant Secretary for East Asia and Pacific Affairs. Ms. Huhtala simply did not have an effective opportunity to retaliate until those times, or in connection with communications with other persons.

2.      **The Law Has Changed in the Last Six Months, Broadening the Scope of Retaliation under Title VII and Making Discovery Crucial**

Another retaliation issue, not directly related to the preliminary injunction issue, is that the standard for retaliation has been clarified, and broadened, in the last year, by the Supreme Court in Burlington Northern and Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006). See also, Howard v. Gutierrez, 2006 WL 1888953, 3 (D.D.C.) and Pegues v. Mineta, 2006 WL 2434936, 6 (D.D.C. 2006). Any retaliatory action that might deter a person from making an EEO complaint is now prohibited under Title VII, whereas the various circuits had enunciated mixed standards prior to that time. The administrative judge in this matter ruled that actionable retaliation must affect a material term or condition of Ms. Loo Farris' employment, a narrow definition of retaliation that arguably precluded Ms. Loo Farris' claims. The State Department had similarly argued that retaliation had to affect a material term or condition of Ms. Loo Farris' employment.

Administratively, Ms. Loo Farris had claimed as acts of retaliation – in addition to the investigation of her for "waste, fraud and abuse" -- that she had been delayed in receiving a medical clearance in 2000, in discussing her marital situation at a worldwide medical conference, and in having State Department personnel discuss her marital situation with personnel in South Africa. Ms. Loo Farris strongly believes that if she had not made an EEO claim, none of this would have happened, and all of it was embarrassing to Ms. Loo Farris.

3.   **Ms. Loo Farris Made Certain Retaliatory Claims Administratively That Need To Be Repled in an Amendment in Light of Burlington Northern**

Under <u>Burlington Northern</u>, these acts arguably did not involve a term or condition of her employment, but all of these things might well have deterred her, and any reasonable person, from making an EEO claim. Thus, Ms. Loo Farris will promptly seek leave to amend her complaint to add these three additional grounds for retaliation, which were not alleged in the Complaint given the law in 2005, but which would be alleged given the Supreme Court's ruling in <u>Burlington Northern</u>. None of these matters have been subject to any discovery.

G.   **Statistical Analyses Provides Support for Ms. Loo Farris**

Statistical analyses provided by the Defendant in discovery supports Ms. Loo Farris's allegations of discrimination, and support an inference of discrimination. Statistical evidence is relevant to claim of disparate treatment and should be given proper effect by the courts. <u>Bauer v. Bailar, 647 F.2d 1037, 1045 (10th Cir. 1981)</u>. Further, statistics demonstrating a general pattern of discrimination are probative on the question of whether reasons proffered of a particular action are pretextual. <u>Id</u>. <u>See also</u>, <u>Casillas v. Department of the Navy, 735 F.2d 338 (9th Cir. 1984)</u>.

A gender breakdown of Foreign Service generalists overall shows that 67.6% are male and 32.4% are female in 2000. Ex. 27 at FAR-724. In the senior foreign service the percentage of males rises to approximately 72%. <u>Id</u>. <u>See also</u> Ms. Loo Farris' response to discovery, Ex. 28 hereto, at 7.

At the highest level of the Foreign Service, the rank of career-minister, there are no Asian-Americans at all – 0% of a group of 34. Ex. 27, at 7. Only nine of 34 are women. Id.

At the Minister-Counselor level, the next rank down, only 1 of 304 are Asian-American women, about 0.3%. Id. At Ms. Loo Farris's level, the OC level, which is next, only 4 of 390 officers are Asian-American women. Id.

Older statistics that the State Department provided in discovery going back to the early 1980's show the generalist breakdown as 85% are male and 15% are female, a percentage that now stands at 67.6% male. Bates no. FAR-724, Ex. 27. A similar gender breakdown of foreign service specialists, in contrast, shows that 61.4% are male and 38.6% female, Ex. 27 bates no. FAR-725. But the Defendant's civil service employee base has been and remains predominantly female. Ex. 27, bates no. FAR-723. The further up the management ladder, the more the State Department becomes overwhelmingly male. State Department discovery production include sheets that are cut off and thus incomplete, but the printout by ethnic breakdown of generalists and specialists by grade shows that at the highest levels, Asian-American females are only 0.9% of the foreign service. Ex. 27, bates no. FAR-634. This last percentage was not broken down by generalists and specialists – presumably because showing the percentage of foreign service generalists that are Asian-American women at high levels, if any, would be damaging to the State Department's arguments.

In her own foreign service class of twelve, six were white males, five of whom were promoted at least to Ms. Loo Farris' rank and four were promoted to a higher grade. Of the six remaining in her class, five were non-whites, four of those were not promoted

to at least Ms. Loo Farris' level, only one was promoted higher, and five of six have, one way or the other, left the State Department.    See Ex. 27, at p. 7.

At the least, the inconsistencies and misstatements involved in her bids form the USNATO and Hague POLAD jobs raise substantial credibility questions that preclude summary judgment.

## CONCLUSION

For the foregoing reasons the Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,

VIRGINIA LOO FARRIS
By Counsel

/s/    George Doumar
George R.A. Doumar (D.C. Bar #415446)
George R. A. Doumar, PLLC
2000 N. 14th Street
Suite 210
Arlington, VA  22209
Phone: (703) 243-3737
Fax: (703) 524-7610

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **VIRGINIA LOO FARRIS,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05-1975 (RMU)** |
| | ) | |
| **CONDOLEEZA RICE,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Court, having considered Defendant's Motion for Summary Judgment and

Plaintiff's' Opposition hereto as well as any Reply, hereby DENIES such Motion.

Date _____

_____
The Honorable Ricardo M. Urbina
United States District Judge

# CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October 2006, a copy of the foregoing was served via the ECF system, on the following:

**Diane M. Sullivan**
UNITED STATES ATTORNEY'S OFFICE
555 4th Street, NW
Civil Division
Washington, DC 20530

_/s/ George Doumar_____