# EXHIBIT INDEX

| DESCRIPTION | EXHIBIT NO. |
|---|---|
| Virginia Loo Farris Curriculum Vitae | 1 |
| Declaration of Virginia Loo Farris | 2 |
| Information of Record Form | 3 |
| Marie Huhtala Deposition Excerpts | 4 |
| 2/8/00 James Whitlock e-mail | 5 |
| 1/31/00 James Whitlock e-mail | 6 |
| Statement of Robert Dance | 7 |
| 3/15/00 Robert Hall e-mail | 8 |
| 5/12/00 Thomas Tiernan e-mail | 9 |
| Email Confirming Ms. Loo Farris' bidding eligibility, but noting cede of positions, in contrast to Exs. 5 and 6 | 10 |
| 4/27/04 Melinda Chandler letter, draft procedures | 11 |
| 11/19/99 and 12/22/99 Farris e-mails expressing interest in positions | 12 |
| Thomas Tiernan Deposition Excerpts | 13 |
| 12/3/2001 Statement of Patrick Moon | 14 |
| 9/04/01 Farris Statement | 15 |
| 11/17/99 Farris inquiry into Hague POLAD position | 16 |
| 11/18/99 James Whitlock e-mail on availability of Hague POLAD position | 17 |
| 11/19/99 Farris bid on Hague POLAD position | 18 |
| 11/21/99 Farris informed she was not included on short list | 19 |
| 12/22/99 Farris email discussing Hague POLAD job on hard to fill cable | 20 |
| Excerpt from Agency discovery- Standard Operating Procedure | 21 |
| 9/4/2002 Statement of Patrick Moon | 22 |
| Illustrative docs- Employee Evaluations | 23 |
| State Standardized Regulation 263.7 | 24 |
| EEO Complaint of Virginia Loo Farris | 25 |
| Foreign Service Statistical Analysis | 26 |
| Ms. Loo Farris Response to Discovery | 27 |

# EXHIBIT 1

Curriculum Vitae
VIRGINIA LOO FARRIS
AMERICAN EMBASSY - BOX 48
APO AP 96546-0001
E-mail: VLooFarris@aol.com
or: farris@exchange.usia.gov

Residence Tel: 011-(66-2) 205-4186          Office Tel:   011-(66-2) 205-4485
                011-(66-2) 254-1179              Office Fax:   011-(66-2) 650-8921

## ASSIGNMENT HISTORY:

**1998-**    **Public Affairs Counselor, American Embassy, Bangkok**
Manages an active public diplomacy program in Thailand with a budget of $2.5 million and provides assistance to smaller regional posts in Vietnam, Myanmar, Laos and Kampuchea. Supervises 7 Americans, 32 FSNs, 18 PSC employees. Produced seminars on economic recovery and corporate restructuring. Enhanced research capability of the new Thai International Trade and Intellectual Property Rights Courts.

**1997-1998**    **National War College-NDU, Fort Lesley J. McNair, DC**

**1997-1997**    **Acting Director, Geographic Liaison Office, Information Bureau, USIA**
Supervised a staff of 106 working in a team based environment for five geographic regions (Europe, East Asia, Latin America, Africa, and Near East & South Asia) and two centralized teams (Information Resources and Central Processing). Oversaw a budget in excess of $5.12 million. Ensured essential programs and services were delivered to posts worldwide. Motivated staff to develop effective working relations with the Area Offices, USIS client posts, and other USG elements.

**1995-1997**    **Team Leader, Near East and South Asia, Information Bureau, USIA**
Led one of five regional geographic teams within the Information Bureau, managing all Wireless File (English and Arabic), book, and speaker programs for the Middle East, North Africa and South Asia, with a budget of $600,000. Supervised 16 team members.

**1994-1995**    **East Asia & Pacific Program Officer, Information Bureau, USIA**
Developed budget and coordinated speaker programs for East Asian posts. Cultivated professional contacts with experts and institutions involved in East Asia and recruited caliber candidates. Facilitated interaction and productivity across Bureau teams and developed operational procedures and guidelines within this new Bureau to foster responsiveness to post and successful completion of projects. As an additional duty served on the USIA Information Bureau Design Team.

**1992-1994**    **Public Affairs Officer, American Embassy, Kingston**
Directed the public diplomacy program in Jamaica, supervising an American deputy and 10 FSNs and managed $250,000 budget. Served as Embassy lead for inter-departmental efforts with Haitian refugees. Supervised two additional USIA officers and coordinated the efforts of 12 other public affairs officers from different USG departments during the Haitian migrant processing operation, including the DOD Joint Task Force Operation Sea Signal V. Implemented a highly effective upgrade in the Post computers.

**1990-1992**    **USIA Advisor to the Commander-in-Chief, U.S. Pacific Command**
Advised the CINC on public diplomacy issues and served as liaison for USIA with USCINCPAC. Twice planned, implemented and secured funding for the Symposium on East Asia Security (SEAS) which enhanced understanding of America's security role in the Pacific Rim by key defense participants from nine Asian nations. Assumed contacts with East-West Center and some Pacific Island programs when the USIA offices in Hawaii dealing with those areas closed.

EXHIBIT 4

1985-1990   Cultural Affairs Officer, American Embassy, Bangkok
Coordinated educational and cultural exchange programs, including grantees, speakers, book translations, and student counseling. Frequently served as Acting PAO. Oversaw the operations of the binational center with an enrollment of more than 3,000 students. Organized major seminars on economics, narcotics, environment and American Studies as well as key cultural presentations such as Preservation Hall and the New York Philharmonic, coordinating participation with the Royal Family. Handled thorny public affairs issues and negotiations for the return of a lintel from the Art Institute of Chicago to the archeology park at Phnom Rung.

1984-1985   Foreign Service Institute: Area Studies and Thai Language Program

1983-1984   Congressional Foreign Affairs Fellow
Tracked legislation, prepared position papers, and negotiated with other Congressional staffers to gain support for legislative initiatives. Handled a variety of foreign affairs, defense and trade issues for Representative Robert Lagomarsino (R) CA and Senator Frank Lautenberg (D) NJ. Helped organize and participated in an exchange between Washington and Ottawa with Canadian Parliamentary staff.

1980-1983   USIA Deputy Country Affairs Officer - China, Hong Kong, & Taipei
Liaised with posts and served as principal resource on China affairs for other Agency elements and for general public. With the establishment of diplomatic relations with the PRC, coordinated with other USG agencies and the private sector on US-PRC scientific, educational, cultural and artistic exchanges. Organized first American Film Festival in PRC and escorted official film delegation on China road tour.

1977-1980   Cultural Affairs Officer, American Consulate General, Hong Kong
Coordinated speaker, educational, and grantee programs. Supervised operation of library and outreach program, particularly to pro-PRC audiences. Organized briefings and provided assistance to delegations going to or returning from PRC, including Vice Presidential visit and numerous CODELS. Executed first exhibit of American educational technology in the PRC. Served as Executive Editor of *Current Scene*, a scholarly journal covering developments in the People's Republic of China.

1975-1977   Information Center Director, American Embassy, Tunis
1974-1975   Information Center Director, American Consulate General, Lahore

AWARDS & HONORS:
- 1997   United States Information Agency Meritorious Honor Award, 3d Award
- 1996   United States Information Agency Director's Award for Superior Achievement
- 1995   United States Information Agency Meritorious Honor Award, 2d Award
- 1992   Secretary of Defense Civilian Meritorious Honor Medal
- 1984   United States Information Agency Meritorious Honor Award
- 1969   Phi Beta Kappa, Epsilon Chapter (MSU)

EDUCATION AND TRAINING:
| | | |
|---|---|---|
| 1997-1998 | National Defense University | MA, National Security Strategy |
| 1970-1972 | University of Michigan | MA, Chinese Studies |
| 1966-1970 | Michigan State University | BA, Social Sciences, *Magna cum laude* |

FOREIGN LANGUAGES:
Thai (3+/5)
French (3/3)
Basic Chinese (1+)

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **VIRGINIA LOO FARRIS ,** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Case No. 05-1975 (RMU)** |
| | ) | |
| **CONDOLEEZA RICE,** | ) | |
| | ) | |
| Defendant | ) | |

## PLAINTIFF VIRGINIA LOO FARRIS' DECLARATION

I, Virginia Loo Farris, declare as follows, pursuant to 28 U.S.C. §1746:

1.     I was a career foreign service officer for more than 34 years.

2.     In August 1998 I was assigned as Public Affairs Officer at the Embassy in Bangkok, Thailand.

3.     To the best of my recall my husband voluntarily left Post on a medical evacuation on, or about, December 16, 1998, because of a domestic dispute.  By February 1999, I began to try to reunite my family after my husband had been evaluated by a Department of State appointed doctor and two credentialed therapists with whom my husband worked after his return to the United States, all of whom recommended that we undergo joint marital therapy.  Ms. Huhtala, the DCM at the Embassy, and other persons, who were not professionally trained and who were not privy to all the relevant facts, rejected the professional medical advice.  She recommended that I should divorce my husband.  After thorough consideration including consulting within the Catholic church I rejected that advice.

1

4.    In early 1999, around February, I felt it appropriate that my husband George come back for a visit, especially to see the children. I told the DCM that and she indicated that the Embassy would "follow your lead."   Nonetheless within a day of my husband's arrival, the diplomatic security branch threatened me with the revocation of my security clearance and relief of my position at the Embassy unless my husband left immediately.   I was in an untenable position and my husband did leave.

5.    I did not really believe in divorce, and felt I had to stand up to my supervisors to preserve my marriage and my family.   It was apparent they were harboring an incorrect and erroneously stereotypical view of me because I was of Asian ethnicity.   They were implying I lacked the necessary strength to handle my own personal affairs. This was contrary to the truth.

6.    My rating officer, Ms. Huhtala, placed considerable pressure on me in this regard. I thought Ms. Huhtala's views were inappropriate and later told her, as I thought, that she was being discriminatory.   Ms. Huhtala, as the DCM, was essentially the chief operating officer at the Embassy and oversaw security.

7.    Ms. Huhtala was aware that I had requested a conference with the Deputy Assistant Secretary of State for Equal Employment Opportunity during her visit to Bangkok in late 1999. Later when I was passed over for all the jobs on which I bid, to include USNATO and The Hague positions for which Ms. Huhtala would have routinely been consulted for her opinion of me, I informed her that I thought my being passed over was discriminatory. I told Ms. Huhtala, after I was passed over that I had made a formal EEO complaint. Ms. Huhtala seemed surprised and disturbed that I would file an EEO complaint.

8.    For the USNATO position, I understood Andrew Goodman, a junior officer, received that job, though as a senior officer bidding I thought I would be highly competitive for

2

that job. Most of what I know about Mr. Goodman is from an e-mail from Ambassador Vershbow that the Department used in the administrative EEO proceeding. I talked to an officer in Brussels, Robert Hall, who was an old friend, and he sent me e-mail at the time giving his first-hand observations of Mr. Goodman and suggesting that Mr. Goodman was not a good manager and not popular with staff. Mr. Goodman's annual evaluations, personnel file, and other information are important to determine his qualifications.

9.    My understanding from Mr. Whitlock, my career development officer, was that "cedes," that is an exception to standard policy allowing a job to go to someone of a lower rank than the grade determined to be required for the position, were not granted if a senior officer, of the proper rank, was bidding. Because the USNATO job was posted for someone of my rank, and I was the only senior officer bidding, and because I had experience working with the military given my stint with the U.S. Pacific Command, I believe I should have been selected for that position.

10.    I had heard conflicting reports that the officer who was appointed to The Hague POLAD position was a junior white male. I later learned his name was Jack Segal, and now understand from the State Department's brief that he was at the same level as I was. However, I have no other information on him. His personnel file would be crucial to determining his qualifications.

11.    The investigation of my separate maintenance allowance surprised me. I was the one who volunteered the information to Ms. Huhtala and the Ambassador in 2001 that my husband had spent several months in Thailand, living in a hotel, the cost of which I covered from my own funds. There was no unjust enrichment. At no point did either the DCM or the

3

Ambassador raise the issue of separate maintenance allowance with me before initiating a waste, fraud and abuse investigation relating to my husband.

12.    I had a "handshake agreement" in 2004 to be posted to Beijing, but that assignment never came through. I later understood that the lingering separate maintenance investigation had allegedly held up my assignment to Beijing. That did not make sense to me, as that relatively small and public issue should not have held up my posting.

13.    I was casually informed in 2005, by Peter Kovach, then serving as Public Diplomacy Director of the Bureau of East Asian and Pacific Affairs, that Ms. Huhtala, then Assistant Secretary for East Asian and Pacific Affairs, mentioned she would make sure I was not posted as Public Affairs Officer, Jakarta, Indonesia. He was promoting me for that position and usually took the lead in making assignments in public diplomacy. He only told me about this recently when I asked him if Ms. Huhtala had talked to him about my being assigned to Indonesia. If this case were to go forward, we could get information from Mr. Kovach on this issue.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON OCTOBER 20, 2006 IN WASHINGTON, DISTRICT OF COLUMBIA

VIRGINIA LOO FARRIS

4

# EXHIBIT 3

U.S. Department of State
Office of Inspector General

Information of Record Form

| Case No: 02-003 | | Date: November 14, 2001 |

### VIRGINIA L. FARRRIS
Former Public Affairs Officer
U.S. Department of State (Department)
U.S. Embassy Bangkok, Thailand

FARRIS was advised of the identity of Special Agents (SA) Scott Walters and Arthur Willhite, Office of Investigations, Office of Inspector General (INVIOIG), Department. FARRIS was also advised that she was being interviewed in connection with an official investigation concerning an allegation that she had improperly received a separate maintenance allowance (SMA) through the Department. FARRIS consented to be interviewed after executing the attached Employee Advisement of Rights — Non Custodial waiver (Garrity Warnings) (ATTACHMENT 1). Present during the interview was Union Representative Sharon **Papp,** American Foreign Service Association (AFSA). Prior to the interview, Papp executed the attached Advisory to Union Representative form, certifying that she was appearing at an official OIG investigation interview, as a union representative (ATTACHMENT 2). FARRIS provided the following information:

### SUBNIISSION of FOREIGN ALLOWANCES APPLICATION

FARRIS was presented with the attached copy of a Foreign Allowances Application, Grant and Report that FARRIS completed and submitted to the Department on September 17, 1999 (ATTACHMENT 3). FARRIS verified that she completed and signed the application. However, she explained that her recollection of the information on the application was vague since she submitted it nearly 3 years ago. Although FARRIS could not recall whether she actually typed the application herself, she thought that she probably did. Prior to submitting the application, she stated that she read through the instructions so that she could properly complete the form. Additionally, FARRIS recalled that the embassy staff helped "guide" her in preparing the application.

When asked if all of the information on her application was correct, FARRIS answered that the agency name (block 3) had changed from "USiS" to the U.S. Department of State. To the best of her knowledge, all other information on her SMA application was correct at the time that she submitted it.

# COPY

| Interviewed On: September 17, 2001 | At: Arlington, VA _____, |
| Date Drafted: __ September 18, 2001 | _____ .By:    illhite |
| | SAS Scott Walters & Arthur |

*This document* contains *neither recommendations nor conclusions of the OIG. It is the property of the OIG and is loaned to you for official purposes only. It and its contents are not to be distributed without permission of the OIO.*

FARRIS                                                                                    02-003

FARRIS was asked to explain the "career and health" reasons that she reported as justifications (block 15) to receive SMA. FARRIS stated that the health reason related to her husband's (George Farris) medical evacuation on December 18, 1998, following a domestic-violence incident. FARRIS explained that she also decided to claim a "career" justification since she recognized that her husband had fewer and limited career opportunities as a dependant spouse living overseas. FARRIS acknowledged that although her husband had written a couple of articles for an on-line magazine, worked to develop a website for a Thai organization, and was briefly employed to help with the 2000 Census in Hawaii, she has "basically" supported him since 1998. FARRIS emphasized that she did not "agonize over" what justifications to claim at the time she prepared her SMA application.

## GEORGE FARRIS RETURNS to THAILAND

FARRIS stated that the primary focus at the time of her husband's departure from Thailand was "the best interests" of FARRIS' family. She stated that there was always an "understanding" that she and her husband would "work things out" and that her husband would eventually return to Thailand to be with his family. However, the U.S. Ambassador in Thailand, Richard Heckinger, refused to allow her husband's return, claiming that it "would precipitate a crisis." During the interview, FARRIS provided the attached written chronology of events (ATTACHMENT 4) and a **copy of her correspondence** with Ambassador **Hecklinger** and **Papp** (ATTACHMENT 5).

**FARRIS reported that her husband returned to Thailand in February 1999. Prior to his return, FARRIS stated that she notified the embassy that her husband planned to visit and would be staying at a Bangkok hotel. FARRIS stated that she discussed these details in a meeting with the embassy's deputy chief of mission (DCM) and the regional psychologist. She claimed that the DCM told her that George's visit was "fine" and that the embassy's security would "follow her lead." However, during her husband's visit, she received a telephone call from U.S. Information Service Director William Maurer. She claimed that Maurer told her that her security clearance would be in jeopardy unless her husband immediately departed Thailand. As a result, her husband departed for Singapore where she later met him.**

In April 1999, FARRIS stated that she asked Hecklinger if he would allow her husband to return to Bangkok for a visit. Hecklinger declined her request, so FARRIS again met her husband in Singapore.

On June 8, 1999, FARRIS stated that her son, Geoffrey Farris, departed Thailand to live with his father in Pearl Harbor, Hawaii. She explained that her son wanted to go to school in the United States and to be a companion to his father. FARRIS paid for her son's travel to Hawaii.

I *This document contains neither recommendations nor conclusions of the OIG. It is the property of the OIG and is loaned to you for official purposes only. It and its contents are not to be distributed without permission of the OIG.*

FARRIS                                                                              02-003

By September 1999, FARRIS stated the Department's Office of Medical Services (MED) had cleared her husband to return to Thailand, with the stipulation that she and her husband receive marital counseling. FARRIS once again asked Hecklinger to allow her husband to return for a visit. Hecklinger once again denied her request. She stated that the Ambassador also threatened to send an "interest of the post" cable to curtail FARRIS if her husband returned to Thailand. Because her husband was not permitted to return to Thailand, FARRIS decided to apply for SMA funds to help pay for the costs of maintaining two households.

In December 1999, FARRIS stated that she wrote a letter to Hecklinger. Her letter asked for an explanation as to why the Ambassador would not allow her husband to visit her in Thailand. Although her husband told her he would provide a written response to her letter, FARRIS stated that the Ambassador never did. In March 2000, FARRIS stated that she again wrote the Ambassador and asked for the written response that he had promised her.

In April 2000, FARRIS stated that her husband and son visited her in Thailand for a week, and then returned to the United States. In early June 2000, FARRIS stated that she met her husband in **Hong** Kong for their 20th wedding anniversary. FARRIS returned to Thailand without her **husband.**

On June 14, 2000, her **husband** and son returned to Thailand to visit FARRIS. FARRIS stated that her husband stayed at a hotel in Bangkok. FARRIS stated that she did know how long her **husband and** son were going to stay in Thailand. By August 2000, FARRIS stated that the new **school** year **had** begun, and it was now time for her son and **daughter** to return to school. **FARRIS** stated that she and her **husband** did not know what to **do about** Geoffrey's education. She **explained** that they **had originally planned** for *Geoffrey* to return to Holy Family Academy in Hawaii. **However,** her **husband and son** still remained in Thailand since **"being** apart was difficult" **and** she **and her husband** "were trying to figure out what to do." In September 2000, she **and her husband decided to** **enroll** Geoffrey in a **Bangkok school. She reported** that Geoffrey attended the **Bangkok school** until the **school** year ended in June 2001. FARRIS confirmed that **George and** Geoffrey left **Thailand periodically** to re-validate their tourist visas.


**GEORGE FARRIS' RESIDENCES**

**FARRIS** stated that after her husband's December **1998** departure from Thailand, he flew to **California, where he stayed with relatives over the holidays. In January 1999, he flew to**

*This document contains neither recommendations nor conclusions of the OIG. It is the property of the OIG and is loaned to you for official purposes only h and its contents are not to be distributed without permission (lithe OIG.*

FARRIS                                                  02-003

Hawaii and checked into a hotel. George Farris stayed in Hawaii and eventually moved into an apartment on Dealy Circle in Pearl Harbor, HI.

FARRIS thought that her husband might have stayed with her, during a June 2000 visit, for the first couple of weeks, before checking into a hotel. She stated that he stayed at a location other than her residence, since he did not want to be seen by anyone at the embassy. However, FARRIS stated that she stayed with her husband on Friday and Saturday nights. FARRIS stated that her husband departed Thailand, in June 2001, one day prior to FARRIS' departure.


## CANCELLATION of SMA

In June 2001, FARRIS's assignment at the U.S. Embassy Bangkok ended. While processing out, FARRIS was required to submit a Foreign Allowances Application, Grant and Report to terminate her SMA payments. This came as no surprise to FARRIS, because she knew that her SMA payments would terminate when she left her assignment. FARRIS confirmed that she completed and signed the attached document to stop her SMA payments (ATTACHMENT 6).

**When asked why she provided a Hawaii post office box number as her husband and son's "address" on the SMA termination application, FARRIS explained that her husband could still be reached through his post office box at the time. However, FARRIS later admitted that using the post office box address was incorrect, since her husband and son were "in Bangkok" when she completed the form.**


## FRAUDULENT ACCEPTANCE of SMA PAYMENTS

**FARRIS denied that she ever submitted a false application to receive SMA payments from the Department. She e-explained that when she completed the application in September 1999, George was living in Hawaii. Therefore, FARRIS argued her application for SMA was true and proper at the time it was submitted.**

FARRIS characterized her **husband** and son's June 2000 return to Thailand as an extended visit. She **subsequently discussed** this **issue** with others, and has "been told" that she might have **violated** departmental SMA **regulations.** If so, FARRIS stated that she **would** be willing to pay **back** any SMA money that she was **not** entitled to receive. FARRIS **explained** that she "wasn't **focusing"** on this as an issue, **and** was just "trying to have some sort of normal family life." **Additionally,** FARRIS stated that she had **forgotten** what the rules said after she **began receiving** SMA payments.

*This document contains neither recommendations nor conclusions of the OIG. It is the property of the OIG and is loaned to you for official purposes only. It and its contents are not to be distributed without permission of the OIG.*

FARRIS                                                                02-003

**INVESTIGATOR'S NOTE:**

FARRIS was given the opportunity to make a written statement at the conclusion of the interview, but declined to do so upon the advice of her AFSA union representative. FARRIS provided the INV/OIG with a copy of her tourist passport (ATTACHMENT 7).

**attachments**

*This document contains neither recommendations nor conclusions of the OIG. It is the property of the OIG and is loaned to you for official purposes only. It and its contents are not to be distributed without permission of the OIG.*

# EXHIBIT 4

1

```
 1              UNITED STATES OF AMERICA
        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
 2              WASHINGTON FIELD OFFICE

 3    ---------------------------x
      VIRGINIA LOO FARRIS,       :
 4                               :
                 Claimant,       :
 5                               :
 6           v.                  : No. 100-A3-7318X
                                 :
 7    UNITED STATES DEPARTMENT   :
      OF STATE,                  :
 8                               :
                 Respondent.     :
 9    ---------------------------x

10                            Arlington, Virginia

11                            Thursday, March 29, 2004

12    Deposition of

13                    MARIE T. HUHTALA

14    a witness, called for examination by counsel for

15    Claimant, pursuant to notice and agreement of

16    counsel, beginning at approximately 8:00 a.m., at

17    the Law Offices of the Doumar Law Group, at 2200

18    Wilson Boulevard, Arlington, Virginia, before Paul

19    S. Intravia, Sr., of Beta Court Reporting, notary

20    public in and for the Commonwealth of Virginia,

21    when were present on behalf of the respective

22    parties:
                        BETA REPORTING
      (202) 638-2400    1-800-522-2382    (703) 684-2382
```

VIRGINIA LOO FARRIS  v.
UNITED STATES DEPARTMENT OF STATE

MARIE T. HUHTALA
March 29, 2004

[9] A: I think I probably heard the name,
[10] yes.

[11] Q: Do you know where Mr. Good-
man is [12] now, stationed now?

[13] A: No, I don't.

[14] Q: Just for the record, did you hear
[15] anything about Ms. Farris applying for
a [16] position in The Hague?

[17] A: No, I did not know about it at the
[18] time.

[19] Q: Is that something that may have
[20] been discussed generally just in
connection [21] with her bids, and you
don't specifically [22] recall it, or you are
sure that you didn't

Page 33

[1] know anything about it at all at the
time?

[2] A: As I stated before, I knew that [3] she
was bidding on a number of jobs in [4]
Europe, but I did not know the specifics.

[5] Q: When were you aware that [6] Ms.
Farris had some EEO issues that she was
[7] raising?

[8] A: She told me herself that she was [9]
unhappy with the way that her family [10]
problems had been dealt with, and that
she [11] believed it was due to discrim-
ination.

[12] Q: That is covered in your [13] dec-
laration, I think, as well?

[14] A: I think it is, yes.

[15] Q: Do you recall the time frame that
[16] you did that?

[17] A: I believe it was in the middle [18] of
1999.

[19] Q: Do you recall the circumstances
[20] under which she told you that?

[21] A: I remember that we were alone in
[22] my office.

Page 34

[1] Q: Had she come to you to complain
[2] about that specifically, or was this in
the [3] context of a conversation where
you were [4] discussing other matters as
well?

[5] A: My recollection is that she had [6]
come in to discuss the longstanding
question [7] of whether or not her
husband could return [8] to post.

[9] Q: That she made this discrimination
[10] allegation in connection with that?

[11] A: That's correct.

[12] Q: Did you raise her discrimination
[13] allegations or discuss the fact that she
had [14] made a discrimination allegation
with anyone [15] else at post or at the
State Department?

[16] A: I believe I probably told the [17]
Ambassador about that.

[18] Q: Did you discuss it with anyone [19]
else?

[20] A: No, I did not.

[21] Q: Did you comment back to her
about [22] the allegation that she was
making?

Page 35

[1] A: I told her that I was very [2]
surprised. I assured her that (a) I never [3]
discriminate against a person on the
basis [4] of their gender, or race, or origin,
and (b) [5] the decisions that had been
made with regard [6] to her husband had
not been influenced in [7] any way by that
sort of discrimination.

[8] Q: You told her at the time of that [9]
first meeting?

[10] A: Yes, I did.

[11] Q: Were you aware that she filed a [12]
formal EEO complaint?

[13] A: No.

[14] Q: Are you aware today of when she
[15] filed a formal EEO complaint?

[16] A: No, I am not.

[17] Q: Were you aware that she met with
[18] Diedre Davis at some point? Well, do
you [19] know who Diedre Davis is?

[20] A: Yes, I do.

[21] Q: Who is she?

[22] A: Diedre is the Deputy Assistant

Page 36

[1] Secretary for Equal Employment Op-
portunity.

[2] Q: Did she visit Bangkok at some [3]
point?

[4] A: Yes, she did.

[5] Q: Do you recall when that was?

[6] A: I don't recall exactly when.

[7] Q: Were you aware that Ms. Farris met
[8] with her during her visit regarding her
EEO [9] complaint?

[10] A: I knew that Ms. Farris met with [11]
her, but I do not know what it was about.

[12] Q: Is it reasonable to presume that [13]
Ms. Farris had made a discrimination [14]
complaint to you personally? Was it [15]
something that you thought that she
might [16] have done; that is, she would
reiterate that [17] complaint to Ms. Davis,
given that she was [18] with the Civil
Rights Office?

[19] A: You know, Ms. Davis came to [20]
consult with the Ambassador and myself
on [21] several issues, completely un-
related to [22] Virginia Farris. That was
what was on my

Page 37

[1] mind at the time when Ms. Davis
arrived, and [2] when we met with her.

[3] Q: What are these other issues that [4]
would have been on your mind generally
[5] speaking?

[6] A: Well, we had — one other thing [7]
that she came — that Ms. Davis came to
talk [8] about was the Department's
policy against [9] sexual harassment, and
we talked about that [10] at some length,
and I was specifically [11] interested to
find out that the protections [12] against
sexual harassment would apply to [13]
local Thai staff, as well as American staff.

[14] Q: Is there anything else that you [15]
remember specifically?

[16] A: The other thing is that we had one
[17] other employee at the Embassy who
had a [18] physical handicap, and that Ms.
Davis was [19] going to meet with that
person, and was [20] concerned, to make
sure that that person was [21] being
treated fairly.

[22] Q: Anything else?

Page 38

[1] A: No, that's all.

[2] Q: Do you recall how long Ms. Davis [3]
stayed at the Embassy?

[4] A: Not long, one or two days.

[5] Q: After that meeting in mid-1999 [6]
with Ms. Farris, in which she indicated
that [7] she had been discriminated
against based on [8] her — I guess being a
Chinese-American [9] woman; is that
basically what you recall?

[10] A: Yes.

[11] Q: After that first meeting or after [12]
that first complaint from Ms. Farris, did
[13] she complain to you again about [14]
discrimination?

[15] A: I don't recall her doing so, no.

[16] Q: When do you recall becoming
aware [17] that she had filed an EEO
complaint?

[18] A: After I left Bangkok, when I [19]
received the request to submit this first
[20] affidavit.

[21] Q: That would have been sometime
in [22] late 2001?

Page 39

[1] A: Yes.

[2] Q: This first affidavit, it looks [3] like
you executed it in December. Do you [4]
recall how long after you received
notice of [5] these questions that you
answered it? That [6] is, I am trying to get
an idea. Was it a [7] few days, or a few
weeks, that it took you [8] to answer the
questions?

[9] A: I was pretty prompt. I believe it [10]
was in a few days.

[11] Q: Did you ever talk to anyone in [12]
Washington about Ms. Farris in the 1998
[13] to 2001 period?

[14] A: You mean while I was in Bangkok,
[15] right?

[16] Q: Right.

52

1    a separate maintenance allowance?

2         A    That's correct.

3         Q    How did you become aware in 2001

4    that Ms. Farris had visited the country,

5    frequently as you said?

6         A    In the spring of 2001, Virginia

7    Farris asked the Ambassador whether George

8    could be allowed to come back in and stay at

9    her house for 2 weeks or so, as she herself

10   had to go away on temporary duty, and to

11   take care of the children.

12        Q    Okay.

13        A    The Ambassador granted that

14   request, but he put conditions on it.  You

15   know, George was only to go up to their

16   house, and he was not to go anywhere else in

17   the embassy, or any other part of the

18   compound that we all lived in.

19        Q    Okay.

20        A    Virginia agreed to that.  When she

21   returned, she wrote the Ambassador a letter

22   complaining about an incident that happened

BETA REPORTING
(202) 638-2400      1-800-522-2382      (703) 684-2382

53

1    while George was staying in the house.

2         Q    Now, what was that?

3         A    The incident was that one of the

4    guards of the compound brought a piece of

5    paper to their teenage daughter, and the

6    piece of paper said on it that -- it had

7    George's picture, and it said, "Warning, do

8    not let this person into the compound."

9    That sort of thing.

10        Q    Right.

11        A    I asked that the RSO investigate

12   that, and it was just a silly mistake.  That

13   warning paper had been given to the guards

14   back in 1998 when we were very worried about

15   Virginia's safety.  But Virginia was angry

16   about that.

17             She wrote a letter to the

18   Ambassador complaining about it, and in it,

19   in that letter, she said that I don't

20   understand why you did this, because my

21   husband has been at post at least five times

22   recently, and has never interfered with the

54

1    workings of the Embassy.

2              Up until that point, I was under

3    the impression that George had been staying

4    in the United States.  So when she herself

5    said in this letter that he had come back at

6    least 5 times, I knew that she was on SMA,

7    and I knew that I had to ask the SRO to

8    begin an investigation.

9        Q    Well, you said that on SMA that a

10   spouse could come back for a short visit for

11   up to 30 days, and that's correct?

12       A    That's correct, and that is what

13   I -- you know, that is what it could have

14   turned out to be.  I did not know at that

15   point that he was living there, that he had

16   an apartment.  I didn't know that yet.

17             But I thought that if he has been

18   coming back that often, and no one has told

19   me or the Ambassador about this until now,

20   that it has to be investigated.

21             One of my work requirements for my

22   own job was to investigate any case of

BETA REPORTING

(202) 638-2400      1-800-522-2382    (703) 684-2382

55

1    waste, fraud, or abuse, that would be

2    costing the U.S. Government.  So I had to

3    initiate an investigation just to see what

4    the truth was.

5         Q    During your time at DCM how many

6    waste, fraud, and abuse investigations did

7    you initiate with the regional security

8    officer?

9         A    That is the only one.

10        Q    That is the only time?

11        A    Yes.  That is the only formal

12   investigation that I initiated, but I was

13   always on the lookout for any possible cases

14   of waste, fraud, or abuse.

15        Q    So you were always on the lookout

16   for waste, fraud, or abuse, but this was the

17   only case of waste, fraud, and abuse where

18   you actually launched a formal

19   investigation?

20        A    That's right.

21        Q    Did you inform the Ambassador

22   about that?

BETA REPORTING
(202) 638-2400     1-800-522-2382     (703) 684-2382

56

1       A    Yes, I did.

2       Q    How many waste, fraud, and abuse

3    investigations have been launched, say, in

4    Malaysia since you have been there?

5       A    I don't think we have had any

6    here.

7       Q    Okay.

8       A    These things are relatively rare

9    in the Foreign Service.

10       Q    Now is that something -- with

11    Ms. Farris, the waste, fraud, and abuse, is

12    that something that an officer can be

13    administratively disciplined for?

14       A    Yes.

15       Q    Who would be responsible for doing

16    that?

17       A    It would be done back in the

18    Department of State.

19       Q    That would happen back in

20    Washington?

21       A    Yes, that is my understanding.

22       Q    That is not something that the

57

1    Ambassador would or could do locally?

2         A    For a case like this that involves

3    potentially defrauding the U.S. Government,

4    the Ambassador would take his cue from the

5    Department of State.

6         Q    Did you ever discuss -- once you

7    saw that letter that I think -- well, that

8    letter was written to the Ambassador in

9    early 2001 by Ms. Farris; is that what you

10   recall?

11        A    Yes.

12        Q    Would there be a copy of that

13   letter anywhere in the files of the State

14   Department?

15        A    I don't know.

16        Q    Would there be files kept in the

17   U.S. Embassy in Bangkok of correspondence

18   to the Ambassador?

19        A    I don't know.

20        Q    Well, what is the typical

21   record-keeping procedures for an overseas

22   Embassy, and in particular the Embassy in

BETA REPORTING

(202) 638-2400     1-800-522-2382     (703) 684-2382

58

1    Bangkok, during the period from 1998

2    to 2001?

3        A    I don't know.

4        Q    Do you normally maintain a copy of

5    your correspondence as Ambassador?

6        A    I keep some of my correspondence,

7    but not all.  I believe that my secretary

8    has some of it.

9        Q    Are you saying that you keep some

10   of it and your secretary keeps some of it,

11   or would your secretary --

12       A    When I get personal letters, thank

13   you letters and things like that, I often

14   keep them in my own files.

15       Q    Aside from the personal or thank

16   you letters, does your secretary typically

17   maintain a copy of your correspondence that

18   is work related?

19       A    I believe she does.

20       Q    Would that be a standard procedure

21   at the State Department?

22       A    Yes.

59

1      Q    Ms. Farris' correspondence to the

2   Ambassador in 2001 regarding her complaint,

3   that would be considered as work related

4   correspondence, correct?

5      A    Yes.

6      Q    So assuming that copies of work

7   related correspondence were maintained,

8   there should be a copy of that letter

9   somewhere in the files?

10      A    I don't know what the Ambassador

11   did with that letter.

12      Q    Would you have expected a United

13   States Ambassador and the State Department,

14   or his staff, to maintain copies of an

15   official correspondence or work related

16   correspondence?

17      A    Yes.

18      Q    You are just saying that you don't

19   know specifically what the Ambassador did

20   with this letter?

21      A    I don't know where the original of

22   the letter is.  But I kept a copy so that I

90

```
 1        Q    Do you recall someone stationed at
 2    the Embassy in Bangkok named Skip Booth?
 3        A    Yes.
 4        Q    Who was he?
 5        A    He was the head of the JUSMAG.  He
 6    was a U.S. Army Colonel.
 7        Q    What is JUSMAG?
 8        A    It is the Joint U.S. Military
 9    Advisory Group.
10        Q    Thank you.  Was he there during
11    the entire time during your tenure?
12        A    No, he wasn't.
13        Q    When was he there, to the extent
14    that you remember?
15        A    I think it was for the first year
16    of my tenure.  I believe he transferred out
17    in the summer of '99.
18        Q    Did you ever discuss the Farris
19    family situation with Colonel Booth?
20        A    No, I did not.
21        Q    Do you know if anyone else did?
22        A    Not to my knowledge.
```

91

1       Q    You don't know of anyone who would

2    have told Colonel Booth that they had thrown

3    George's ass out of the country, or anything

4    like that?

5       A    No.

6       Q    You never heard anything like

7    that?

8       A    No.

9       Q    Did you ever meet George Farris?

10      A    Oh, yes.

11      Q    How many times, or was it

12   frequent?

13      A    It was frequent.  I met him even

14   before we ever came to Bangkok.  I met him

15   in Washington with Virginia, and then during

16   those few months when he was at post, I saw

17   him a lot at social occasions and things

18   like that.

19      Q    All right.  During these few

20   months that he was at post, when he left

21   post in December of 1998 did you ever see

22   him after that?

92

1          A    No, I did not.

2          Q    You testified that you recall that

3     he was seen arguing with his wife in

4     February of '99, but you didn't actually see

5     that?

6          A    That's right.

7          Q    You did not see him at any other

8     time?

9          A    Right.

10          Q    You were Ms. Farris' next door

11     neighbor in Bangkok?

12          A    Yes.  But our houses were

13     separated by a good space of land.  You

14     know, they are old colonial styled houses,

15     and we had a garden in between them.  So I

16     was not able if I wanted to even, I was not

17     able to observe the comings and goings at

18     her house from my house.

19          Q    How much land do you think

20     separated the two houses?

21          A    You are asking someone who is

22     really bad at estimating these things.

93

1      Q    Was it a city block?

2      A    Probably about a quarter of a city

3   block.

4      Q    So you could see the house?

5      A    I could see it, sure.

6      Q    But there is a garden in between?

7      A    There was a garden and some trees

8   in between her house and mine, but I could

9   clearly see the outline of it, yes.

10      Q    Was Mr. Farris essentially after

11   February of '99, was he essentially banned

12   from the Embassy?

13      A    Banned from the Embassy?

14      Q    That is a colloquial phraseology.

15      A    After February of '99, he had been

16   asked by the Ambassador not to return.  So I

17   did not know that he was even in the

18   country.

19      Q    Did you ever know if he ever tried

20   to come back into the Embassy grounds after

21   February of '99?

22      A    No, I never heard that he did.

94

1        Q     Did you have any indication that

2   he had visited the country at any time after

3   February of '99 until Ms. Farris' letter of

4   early 2001?

5        A     Yes.  On at least one occasion

6   someone from the Embassy told me that they

7   had seen him at a movie house, at a theater.

8        Q     Oh, when was that?

9        A     I don't know.  It was sometime

10  between February of '99 and March of 2001.

11  I don't remember exactly when it was.

12        Q     Who told you that?

13        A     One of the employees in the

14  Embassy.

15        Q     Was it a Thai employee?

16        A     An American employee.

17        Q     Who was that?

18        A     It was the successor to the

19  Administrative Counselor, the new

20  Administrative Counselor.

21        Q     Do you know that person's name?

22        A     Kathleen Hodai.

95

```
1        Q    What is her first name?

2        A    Kathleen.

3        Q    Is that with a C or a K?

4        A    With a K.

5        Q    What is the last name again?

6        A    H-O-D-A-I.

7        Q    Ms. Hodai was the successor to the

8   Administrative Counselor?  Had she been

9   there earlier at the Embassy when Mr. Farris

10  was there in '98?

11       A    No, but she knew him from previous

12  times in the Foreign Service.  She knew who

13  he was and what he looked like.

14       Q    I see.  Or was his picture still

15  circulating on that wanted poster?

16       A    I don't know.

17       Q    How did that wanted poster get

18  around in 2001 if it had been distributed

19  in 1998?

20       A    You know, in 2001, it was the

21  first time that I had even heard of it.  I

22  knew that in December of '98 that the guards
```

96

1    had been alerted not to let George into the

2    compound.  I didn't know that they had made

3    up some flyers.

4         Q    All right.  So as of December

5    of '98, the guards had been alerted not to

6    let Mr. Farris into the compound?

7         A    During that period, yes.  As I

8    recall, he was given one opportunity to be

9    escorted into the house when Virginia and

10   the children were not there to take any

11   personal belongings that he wanted.

12        Q    That was in late '98?

13        A    That's right, in December of '98.

14   But aside from that occasion, he was not to

15   go into the compound.

16        Q    When he was escorted, I gather he

17   had permission to do that?

18        A    Oh, yes.

19        Q    Otherwise, the only other time he

20   got permission -- he got permission in 2001

21   when Ms. Farris was on temporary duty, or

22   assignment elsewhere; is that correct?

97

```
 1        A     She had to go to a conference, and
 2    she was going to be away for a couple of
 3    weeks.  I believe it was in March of 2001,
 4    and the Ambassador agreed to let George live
 5    in the house with their teenage daughter
 6    during that period.
 7        Q     Aside from that incident we
 8    discussed, where the guard showed up with a
 9    wanted poster that Mr. Farris should not
10    have been there, did you hear about any
11    other incidents or problems regarding
12    Mr. Farris?
13        A     No, nothing at all.
14        Q     You would agree I take it that he
15    had a right as an American Citizen to travel
16    to Thailand?
17        A     Yes.
18        Q     That would have been during 2000,
19    as well as at any other time?
20        A     Sure.  Yes.
21        Q     Have you ever heard the name of
22    Franklin Huddle?
```

98

```
 1        A    Yes.

 2        Q    Who is Mr. Huddle?

 3        A    He is a member of the Foreign

 4   Service.  Franklin.  You mean Poncho Huddle?

 5        Q    Poncho Huddle.

 6        A    Yes.  He is a Foreign Service

 7   Officer.

 8        Q    Were there any allegations

 9   regarding him performing electronic

10   surveillance of people under his

11   supervision?

12        A    I have never heard of anything

13   like that.

14        Q    You never heard anything like

15   that?

16        A    No.

17        Q    Have you ever heard anything like

18   that in the Foreign Service at all?

19        A    No, I have not.

20        Q    That doesn't take place, correct?

21        A    Right.

22             MR. DOUMAR:  Let me review my
```

99

1    notes.  I might be done.  So we will go off

2    the record.

3              (Recess)

4              BY MR. DOUMAR:

5        Q    We are back on the record with

6    some follow-up questions, which are in a

7    variety of areas.  You said that the RSO's

8    investigation of the separate maintenance

9    allowance issue revealed that George Farris

10   and his son had been living in Bangkok since

11   some time in 2000?

12       A    Yes.

13       Q    George Farris' son, or Virginia's

14   son, was he attending school there?

15       A    He enrolled in school in the fall

16   of 2000.

17       Q    Would Virginia Farris have been

18   eligible for an education allowance for her

19   son?

20       A    Yes.

21       Q    Do you know if she applied for

22   that?

100

```
 1        A    I don't think she did.  I think
 2    she only had it for her daughter.
 3        Q    Do you know why she would not have
 4    applied for that?
 5        A    I don't know.  The son was on SMA,
 6    along with the father.  The son had gone to
 7    live with the father, and the daughter had
 8    stayed with Virginia.
 9        Q    I see.  So if she didn't get SMA,
10    she might have been eligible for the
11    education allowance?
12        A    That's correct.
13        Q    So the two are -- can't be had at
14    the same time I take it?
15        A    That's right.  Just the logic of
16    it would mean or makes them mutually
17    exclusive.
18        Q    We talked about that you had never
19    testified like this in any other proceeding,
20    being deposed over the phone; is that
21    correct?
22        A    Yes.
```

# EXHIBIT 5

In a message dated 2/9/00 9:27:17 AM, WhitlockJC@state.gov writes:

Colleagues,

Cede requests:
------------------
Various bureaus are requesting cedes of senior positions to 0-1 officers. PER/CDA/SL is granting these only, reluctantly and on a case-by-case basis where it appears that no senior officer will be prepared to take the job. Six generalist position cedes have been granted thus far this year. With about 110 senior officers (not including those picked by the DCM committee, etc.) still up for assignment in mid-2000, cedes will continue to be difficult to obtain.

For those interested, cedes have been requested for the following positions.
Please let me know if you are interested in any of these and I will enter
your bid. They correspond to the latest senior open assignments cables
(State 17122, unless otherwise indicated, and State 17124).

FE-MC

EAP/K
EAP/RSP,
Tokyo (Pol.)

FE-OC

EAP/RSP (C)
IIP/SC v. Keegan (ETD 8/00, on State 17124)
NEA/PD (deputy director)
Ankara
Beijing (Pol.O) (ETD 7/01, on State 17124)
Cairo (Pol/Econ)
Lima (Admin)
Mexico (S&T)
New Delhi (Econ)
Panama (Pol/Econ)
Rabat (PAO)
Tokyo (Econ O)

Recent Assignments
--------------------------
The following positions shown on State 17122 have been filled:

FE/M

HK (EC)
Lima (Pol, Deputy PAO)

EXHIBIT 01

FE-OC

IO/ESA
PER/OE
PER/REE/EX
La Paz (Admin)
Lagos (Consular)

Once again I will be happy to remove from distribution those addressees who request it.  Please let me know

Warm regards
Jim
</XMP>

-------------------- Headers --------------------------
Return-Path: <WhitlockJO@state.gov>
Received: from  rly-yb03.mx.aol.com (rly-yb03.mail.aol.com [172.18.146.3]) by air-yb02.mail.aol.com
(v67_b1.24) with ESMTP; Tue, 08 Feb 2000 14:27:17 -0500
Received: from  franklin.state.gov (castle.us-state.gov [199.76.102.19]) by rly-yb03.mx.aol.com (v67_b1.24) with
ESMTP; Tue, 08 Feb 2000 14:26:57 1900
Received: from jefferson.state.gov by franklin.state.gov
      via smtpd (for rly-yb03.mx.aol.com [205.188.156.99]) with SMTP; 8 Feb 2000 19:26:55 UT
Received: from iscan.state.gov (mailscan.us-state.gov [99.1.12.2])
      by us-state.gov (8.8.8+Sun/8.8.8) with SMTP id OAA22379;
      Tue, 8 Feb 2000 14:17:50 -0500 (EST)
Received: by americas02.irm.state.gov with Internet Mail Service (5.5.2448.0)
      id <1MB050K7>; Tue, 8 Feb 2000 14:34:23 -0500
Message-ID: <EED0E52557F2D211896A0008C75DEB3F016E9321@persite.per.state.gov>
From: "Whitlock, James O Jr." <WhitlockJO@state.gov>
To: Ben Fairfax <FairfaxSF@state.gov>, Carl Chan <ChanCK@state.gov>,
      Christopher Fitzgerald <FitzgeraldC@state.gov>,
      'Daley, Roger J      001" <DALEYRJ@wo.state.gov>,
      'Dell, Christopher W' <DELLCW@wo.state.gov>,
      Edward Dong
      DongEK@state.gov, Frank Coulter <CoulterF@state.gov>
      Frederick Cook
      'CookFR2@state.gov>
      Gail Gulliksen <GulliksenGX@state.gov>,
      Gene Christy <ChristyGB@state.gov>,
      Geoffrey Chapman
      ChapmanGW@state.gov,
      Gerard Gallucci <GallucciGM@state.gov>, Janey Cole <ColeJD@state.gov>,
      Jim Collins <CollinsJA@state.gov>, John Sligh <SlighJ@state.gov>
      Lawrence Greenwood <GreenwoodLC@state.gov>,
      Louise Crane <CraneLK@state.gov>, Martin Cheshes <CheshesML@state.gov>,
      Milton Drucker <DruckerM@state.gov>,
      Morton Dworken <DworkenMR@state.gov>,
      Roberts Fitts <FittsRW@state.gov>, Susan Clyde <ClydeSA@state.gov>,
      Thomas Furey <FureyTP@state.gov>, Timothy Dunn <DUNNTJ@state.gov>,
      W. Frank <FrankWD@state.gov>
      'J. Dalglesh'
      albert.dalglesh@osd.pentagon.mil'
      'Bill Griffith
      'bill.griffith@mail.house.gov'
      'Bob Debolts <bobdebolts@usin.po.... .....an Debolts <bobdebolts@emchanne.us.gov>
      'Brendan Flscomer'
      'Thomas B Howard.edu'
      'Brendan Jean. cob@howard.edu'
      'bobdebolts.penten'   <bobdebolts.penten     ......ov.org.com>
      'cndchuhuo'
      .............

Pete Chaveas
  <CHAVEAS@unt11.eucom.mil>,
    Rosemary Dicarlo <rdicarlo@exchange.usia.gov>,
    Virginia Faris <VLooFarris@aol.com>
Subject: Update on Assignments
Date: Tue, 8 Feb 2000 14:23:40 -0500
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2448.0)
Content-Type: text/plain

# EXHIBIT 6

In a message dated 1/31/00 11:23:44 AM, WhitlockJC@state.gov writes:

Ginny,

I have checked and am told that you are not on the POLAD short lists as prepared by the D committee.

There is a job you might want to consider, in view of your background in SE Asia, that of EAP/RSP Office Director.  It covers regional affairs, ASEAN etc. it is a FE-MC job and the bureau has asked for a senior cede to permit an 0-1 to take it since there are no at-grade bidders.

Jim

EXHIBIT 02

# EXHIBIT 7

EXHIBIT F7

STATE OF VIRGINIA

COUNTY OF ARLINGTON

## STATEMENT

I, Robert Lawrence Dance, make the following statement freely and voluntarily to John J. Lokos, who has identified himself to me as a Contract Investigator for the US Department of State, investigating a complaint of discrimination filed by Virginia Loo Farris, knowing this statement may be used in evidence. I understand this statement is not confidential and may be shown to any interested party with a legal right to know.

I hereby state I am an African American male commissioned Foreign Service Officer (FS-01) with the US Department of State. I hold both U.S. Government Consular and Foreign Service Commissions. I am currently a student at the Department of State's National Foreign Affairs Training Center in Arlington, Virginia, studying in preparation to my being posted as the Deputy Chief of Mission at the United States Embassy, Mbabane, Swaziland.

At the time the alleged case of discrimination was supposed to have taken place, I was the Deputy Director of the Office of Career Development and Assignment in the Department of State's Bureau of Human Resources. As such, I handled administrative and budgeting issues within the office as a whole. I also monitored general and mid-level assignments meetings and occasionally was a substitute voting member. In addition, as a former member of the now defunct United States Information Agency, I informally

Page 1 of 11

261

monitored issues dealing with other former members of USIA, now State Department

Public Diplomacy Officers, that came to the attention of the Office Director.

    Mr. John Lokos has asked me to answer the following questions:

1.    How is the bidding assignment process at State different from that at USIA?

2.    What is the effect of designating a position as a "stretch" position?

3.    What is a "shoot out" and what, in your own words, is/was your involvement, or knowledge of the facts, in NATO and Hague?

4.    What are the differences between a FE-OC and a FS-01, and does an FS-01 qualify for an FE-MC position? Explain how the "stretch" process out applies.

5.    What is a cone, and how does it enter into the process?

6.  What is a "cede"; how did it affect results?

    Following are my answers to his queries, along with additional information that might pertain to the complaint.

1.  I am commissioned officer in the Foreign and Consular Services of the United States of America serving in the Department of State. I hold the grade of FS-01 (O-6 equivalent). My heritage is a mixture including African American and Native American. I am in my 41st year of Federal service. I am a member of the Public Diplomacy (PD) cone currently in training to be the Deputy Chief of Mission in Swaziland.

2.  I first met Virginia Farris in May or June of 1994 when I was sent TDY to Kingston, Jamaica, to assist her during the USG operation for screening potential Haitian refugees on the USNS *Comfort*, a U.S. Navy hospital ship reactivated just for the operation. Ms. Farris is an excellent officer.

*Page 1 of 11*

During the course of normal business, I was aware that Ms. Farris had bid on a position at USNATO in Brussels and that she was one of several bidders.

3. At the time of the shootouts, I was the Deputy Director of HR/CDA. In that capacity, I usually was an observer of the paneling process. Though I don't remember her nomination specifically, I vaguely remember being in the actual sessions concerned.

4. The assignment processes at USIA and at State were similar in nature. The differences were in the size and coverage of the voting bodies. At USIA, all assignments for officers in the grade of FS-01 and below were handled by the regular assignment panel, which consisted of the head of the assignments branch, the three career counselors, and the five area personnel officers. Factors considered in making an assignment were a bidder's request for the assignment, that bidder's record of past assignments, and the desire of the concerned area office. When two or more candidates applied for the same position, the panel would discuss the merits of each candidate and then take a vote. Most of the time, the panel decision prevailed. Occasionally, for various reasons, a vote was overturned by higher authority. This latter situation was very, very rare.

Senior Foreign Service assignments were handled by the Senior Assignments Committee. The committee consisted of the heads of the Assignments Branch (SFS), the Office of Human Resources (SES), and the Bureau of Management (SES) along with the Counselor of the Agency (SES--The person was equivalent to the Director General, the head of the Bureau of Human Resources in the State Department. The committee made assignments in the same manner as above.

263

At State Department, there are also two assignment committees. The general committee handles assignments of entry level (non-tenured) personnel and all personnel FS-01 and above (i.e., Senior Foreign Service). The Mid-Level Committee handles assignments of all tenured officers from the grades of FS-04 through FS-02. Each committee has, I believe, 14 voting members with the chair of the committee as the tiebreaker. In the general committee, the voting members are two officers each from the Entry-Level, Mid-Level, and Senior-Level Assignment Branches (6), six Area Personnel Officers, the head of the CDT Branch (an African-American female), and the CDA Continuity Representative (also an African-American female). The Director of HR/CDA chairs the committee and casts tie-breaking votes. I believe that one of the roles of the Continuity Representative is to ensure that the precepts of EEO are exercised in the assignment process. From my experience, she conscientiously and assiduously carries out her duties.

An informal aspect of the State assignment system that was absent at USIA is the influence of lobbying. Candidates for positions will contact area bureaus and prospective supervisors to express interest in and be interview about filling positions on which they have bid. This means that a person who is a known quantity stands a better chance for being recommended for a position than one who has bid and done very little more.

Also, in most cases, preference for filling a position goes to a person who is in the cone under which the position falls or who has experience working in that type of position.

5. Definition of Terms:

Cone: This is the branch to which a Foreign Service officer belongs. There are five branches or cones: Administrative, Consular, Economic, Political, and Public Diplomacy. The cone with the greatest number of officers is the Political cone. The cones that are understaffed are Public Diplomacy and Administrative.

Stretch Assignment: A stretch assignment occurs when an officer is assigned to a position that calls for a different grade. For example, a FS-02 officer assigned to an FS-01 position would be in a stretch assignment. Likewise, the same officer in an FS-03 position would be in a stretch assignment. The former, an up-stretch is considered better than the latter, a down-stretch.

Cede: A cede occurs when, for example, a senior-level assignment cannot be filled by a senior level officer. Then the assignment may be "ceded" to the Mid-level Branch.

Mid-Level Officer: A mid-level officer is an officer in grades FS-03 (Major equivalent) to FS-01 (Colonel equivalent). Tenured FS-04 officers (Army Captain equivalent) are also considered as mid-level officers.

Senior-Level Officer: Any officer who is a member of the Senior Foreign Service. The grades in the Senior Foreign Service equivalent of a general or flag officer ranks in the military. Grade FE-OC or Counselor is the equivalent to a Brigadier General; Grade FE-MC or Minister-Counselor is the equivalent to a Major General. Ms. Farris holds the grade of Counselor (FE-OC).

265

**Senior Seminar:** The primary State Department professional development program for senior-level officers. This course is highly selective.

**Shootout:** A shootout occurs when two or more persons bid on the same position. When there are multiple bidders on a position, anyone who is not the choice of the affected bureau or office is apprized of the situation. If that person still wishes to maintain the bid, the Career Development Officers (CDO) of the bidders prepare presentations supporting each person's reasons for bidding. When scheduled during one of the weekly assignment meetings, each involved CDO makes a presentation about why his or her client would be the best choice for the position. The concerned Area Assignments Officer puts forth the affected bureau's choice for the position with rationale. The voting members of the committee then decide, based on the information presented, who would be assigned to the position. This is what should have happened in Ms. Farris's case.

6. Assignment Particulars:

a. For all practical purposes, there is little difference between an FE-OC and an FE-MC position. The idea of stretch does not usually come into play for assignments at this level.

b. Though FS-01 officers are considered mid-level officers on paper, their assignments are handled by the Senior-Level Assignments Division. I do not know for sure, but I think that this was done, in part, to even out the workload between the branches. I cannot remember the particulars of assigning an FS-01 to a Senior-Level position, though I do know that a FS-01 officer who has received a Meritorious Step Increase, for bidding

*Page 9 of 11*

266

purposes, is considered as a senior-level officer. An actual example of how this has worked is the case of the PD Director for the AF Bureau. She was the choice of the then AF Bureau Director for the position. At the time of selection, she was an FS-01. The position is an FE-MC position. Because she had been selected to attend the Senior Seminar, she was considered a senior-level officer for bidding purposes. Since FE-OC and FE-MC positions are considered interchangeable, she was allowed to bid upon and was appointed to the FE-MC position of Director of the Office of Public Diplomacy in the Bureau of African Affairs. The officer, an African American woman from the political cone with AF and NSC experience, beat out several senior PD officers for the position.

7. BACKGROUND: I vaguely remember elements of Ms. Farris's case. I do remember being told that Ms. Farris had expressed interest in attending the Senior Seminar. She was deemed as not being eligible, as she had recently completed the National War College at Fort McNair, Washington, District of Colombia. I never heard any mention of her race in any form or manner. I would say that some factors that may have weighed against her in bidding on the positions involved in the case were that she was from bidding out of cone and had little, if any, regional experience in Europe. The individuals chosen had more, and more current regional experience. By the way, this points up another difference between USIA and State assignment practices. In USIA, that an officer was assigned to a specific geographic area, particular in Europe, for successive tours was a rare exception rather than the rule. USIA officers were encouraged to seek a

diversity in area experience. In the State Department, officers seem to "homestead" in certain areas, seemingly giving credence to the belief that one must be a member of a particular "area club" to get an assignment in that area.

8. MY INVESTIGATION: I have checked into the shootouts that took place. On the dates mentioned, I can find nothing about Ms. Farris being involved in a shootout over a position in The Hague. Following is the information I could find about the shootouts involving Ms. Farris:

a.      On June 6, 2000, there was a shootout involving the nominations of Ms. Farris and Andrew Goodman for the USNATO Brussels position. The position called for expertise in the area. Mr. Goodman, an FS-01 officer who was occupying the number two political position at USNATO, was selected to fill the position by the vote of the assignments panel. I would say the Ms. Farris's lack of area and subject matter experience weighed against her. The position is a position that needed someone who could "hit the ground running immediately." Mr. Goodman filled the bill. That said, Ms. Farris was given full consideration by the panel. Race was never an issue.

b.      One June 20, 2000, the nominations of Ms. Farris, FE-OC Dune, and FS-01 Leslie Lebl were involved in a three-way shootout for the Political Counselor position at USEU Brussels. Ms. Lebl won the shootout. An economics officer, Ms. Lebl has extensive political experience in the EUR area, particularly Sarajevo, and has worked in the Legislative Affairs Office of the State Department. She speaks Russian, German, French, Czech, and Polish fluently, and has some Spanish. Ms. Farris speaks

 Thai, French, and some Spanish. The Assignments Committee selected Ms. Lebl.

Again, race was never an issue.

9. ANALYSIS: I understand that Mr. James Whitlock (FE-OC Retired), both Ms.

Farris's and my former Career Development Officer, told Ms. Farris that she could bid on

the positions. I would point out that her bidding on a position did not mean that she

automatically would get any job upon which she had bid. I would surmise that she was

still assigned as PAO Bangkok at the time with a TED of sometime in 2001. I would say

that the Assignment Committee did not look very favorably upon her bid. First, she was

bidding out of cone and probably had little prior experience, at least as far as State was

concerned, in either the political field or the EUR area. This was still in the first year of

integration, and State officers had (and still have, in many cases) little concept of the

range of skills of former USIA (now Public Diplomacy) officers. Ms. Farris was an

unknown quantity to the EUR Executive Office. The other persons were well known and

had more current experience in the area. The bottom line is that though Ms. Farris did

bid on the positions, there was no guarantee that she would get either of them. As to the

matter of race, it was not an issue. I would daresay that reasoning supporting her not

being selected could be broken down into three areas: Though she was at grade, she was

bidding out of cone. In fact, her cone was new and something of an unknown in the State

Department. This might have been overcome, if not for the next item. She had little, if

any, relevant EUR experience. I would think that at the grade level required for the

position, particularly with the issues that were confronting both missions, experience was

*Page 5 of 11*

a major factor. She was a new and unknown quantity in both State as an organization and EUR as a bureau. The persons selected were not. She probably did not do the necessary networking involved in successfully bidding on a position in the State Department. Unlike USIA, in which assignments were more dependent on grade and general qualification and less on with whom you have made contact beforehand, a major factor in the State assignment process is networking in the prospective bureau and "selling" one's self for the position. Though I don't know for sure, I think Ms. Farris failed to do this. Actually, most USIA officers failed to do this during the first year of integration. Being newly acquired into a larger organization, we did not understand the system of the subsuming agency--State. We were unaware of this aspect of the State system. I believe that Ms. Farris had another year left on her assignment in Bangkok. Probably no compelling case was made for breaking her out of the last year of her assignment. I don't remember any such case being made. Actually, I vaguely remember only one shootout.

10. CONCLUSION: The individuals chosen to fill the positions were the choices of the EUR Bureau, the major organizational stakeholder in this affair. They possessed area and conal experience, which Ms. Farris did not possess. That said, the best case possible was presented for each person, including Ms. Farris, by his or her CDO during the shootouts. The voting members of the general assignments committee voted on their individual consciences based on the facts given. They chose those whom they thought were the best persons for the jobs. From my perspective, race did not come into play.

Page 10 of 11

I have read the above statement consisting of 11 pages. I declare under the penalty of perjury that my statement is true, correct, and complete to the best of my knowledge, information, and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Robert L. Dance

SIGNATURE OF AFFIANT                    Date:  September 10, 2001


SIGNED BEFORE (Witnessed)

Claris X. Dance