# EXHIBIT 8

## RBH to VLF-15Mar00 Harris Comments

YOur situation. I mentioned to Sandy as we were walking down the hall that
you might be interested and applying. He doesn't know anything about you.
I said you had good rep, were SFS, that i knew you long time ago and you
were impressive then. I-couldn't remember if you had any NATO experience,
but mentioned CINCPAC and the fact that you had served in Germany (was that
right ?), and had French. ANyway I think his instinct is to go with the
person he knows even if the guy isn't quite suitable - more on that in
second. I think you could only get the job if you can get someone like Marc
Grossman or Pat Moon or someone in State EUR who knows Sandy well to call
Sandy and tell him that they recommend you. I don't mean to imply i have no
influence with Sandy, but i probably have only marginal influence in this
area. He thinks i have been lost to Stat/USIA for too long and only know
DOD people and stuff. He is pretty right about that. He is going to need
to be pressed a bit from the State side. There is also a small USIA problem
in that Elizabeth Pryor at one time expressed interest. She has a slight
medical condition now and I don't think she wants it anymore because of
that, and also - everyone agrees she is not suitable. (She is a really bad
manager of people, all her staff hates her and keeps quitting -- please keep
that to yourself.)

Going for you would be the fact that Goodman getting the job would be a
stretch. State doesn't want to do that on important jobs. They'd have
trouble denying you the chance and then putting in a stretch. Also he isn't
that popular with the troops here -- and probably is a pretty poor manager
too. Interesting, but pretty arrogant guy. Also only cares about Russia
stuff - and that is only one piece of the job -- as head of the section he
would have to cover the full gamut. Even now as one of Bill's deputies, he
supervises a number of subjects but only seems to care about the Russia
account.

I think this will be decided in the next couple of days or so -- so you
should get on this case fast.

# EXHIBIT 9

Athens. I'm deeply indebted to EUR/PD and Post for their patience and continued expression of confidence. For my part I feel confident I could do an excellent job. However, having supervised a staff of more than 30 in my present position as Public Affairs Counselor I am interested as to what additional skills or credentials you feel PAO Athens would provide which would enhance my qualifications when I next bid for the "many DCM and Principal Officer jobs" you imply lie just over the horizon, particularly so when conventional wisdom would dictate a return to Washington following my next overseas assignment.

Tom, you expressed a belief that you "have no doubt that integration will work well for me." For that to happen it will need to take place prior to my retirement. You further wrote that, "State's assignment system must be a bit of a mystery..." My thoughts on that may be radical within the halls at State, but I don't think that it should be so. The system should be transparent and if it's not then perhaps for the benefit of all concerned it needs a test case to move it in that direction. My basic understanding and earlier observations of the bidding process is that within certain parameters officers bid on positions for which they are interested and feel qualified, then the Bureaus and Posts in conjunction with Personnel select the best qualified candidates.

Until reading your letter I was unaware that simply based on an early conal affiliation less experienced officers could, as you phrased it, "lay claim to [counselor jobs] without regard to grade." While it's not my place to tell EUR or PER which eggs to pick, as an experienced SFS Officer and an educated woman of color I do feel I've been around long enough to determine if an egg smells rotten.

Your e-mail borders on being patronizing when you say, "We need to come to closure on all the jobs in question, as many people's lives are in the balance," as it seems to indicate that somehow my life, and my family's are less important than those of the other candidates under consideration. I take umbrage with that proposition.

Prior to receiving your letter, in an effort to make the Athens job both more professionally rewarding, and more attractive in the spirit of Secretary Albright wanting a more "family friendly" Foreign Service, I had raised with Dick Virden the possibility of studying Greek within an immersion environment in Athens Dick's response has been that if there was a chance for approval it would need to be advanced on the basis of cost savings. While I had found supportive data, the rigid tone of your letter has discouraged my efforts.

Tom, I'd welcome the opportunity to work with you in a constructive manner to find an appropriate utilization of my talent which would benefit the Department and further U.S. foreign policy goals while enabling me to develop professionally. However, if your solution is for me to fall on my proverbial sword in order that the interests of a favorite son candidate can be advanced then we may have a bumpy road ahead of us.

Given the manner in which the bidding process is developing your intimate involvement in my EUR assignment possibilities may be an asset to us both in crafting a creative and effective answer to the current impasse. However, in the final analysis I gather where there is a lack of consensus in such decisions the call is made by Central PER.

Regards,
Ginny

-----Original Message-----
From:    Tieman, Thomas J
Sent:    Friday, May 12, 2000 4:15 AM
To:      Farris, Virginia Lee
Subject:    onward assignment

Ginny, I hope you remember me from our contacts earlier in the cycle when you expressed belated interest in some DCM and principal officer positions in EUR, I'm the head personnel guy in EUR/EX. I've become intimately involved with your EUR assignment possibilities over the past several weeks and want to

Page 13 of 16 Pages                                    Initial ___

087

EXHIBIT 05

give you the lay of the land from where I sit.

First, its clear that you'd like to be in Brussels (who wouldn't; it's a great place to live), but I do not think that will work out this cycle. We've been advised that NATO is going with another candidate for the Mc-Connell job on the International Staff. Your competition for the SHAPE PolAd job is three ambassadors, all with extensive regional and political/military experience. And both the USEU and USNATO ambassadors are holding very firm (as is EUR) for our O-1 stretch candidates for those two jobs. Central PER is ready to grant us the senior codes needed to panel those two officers as soon as you are paneled to another job, extend in Bangkok, or withdraw your candidacy for those jobs. (There are no other senior bidders.)

Ginny, I know that State's assignment system must be a bit of a mystery to you, and that the code concept might be confusing. There is no dictum that a senior automatically has priority for a senior job. While there is a general presumption in favor of at-grade officers for jobs at all grades, the qualifications and background of the senior officer for the job in question are key factors. In other words, multifunctional or program direction jobs (DCM, office director, etc.) are the ones that are easiest for senior officers to lay claim to without regard to cone. But, conversely, counselor jobs like the USEU and USNATO jobs are the ones that are easiest for conal officers to lay claim to without regard to grade. Bureaus, officers, and central PER tend to operate according to these basic assumptions, and will not normally put a senior officer into a job for which they do not have the background at earlier stages of their careers.

So I recommend that you turn your attention to the Athens job. You're at grade, in cone, and the bureau and post are enthusiastic about your candidacy. We need to come to closure on all the jobs in question, as many people's lives are in the balance.

So my advice (admittedly I'm hardly a neutral voice, but I am speaking for all elements of EUR on this) is to: 1) accept that you aren't going to be selected for the NATO jobs; 2) tell EUR/PD and Athens that you accept the Athens job; 3) tell all of this to your CDO Jim Whitlock.

In the spirit of full disclosure: 1) Athens comes with a year here at FSI (not a bad fate), as neither PER nor EUR can support at-post language training; 2) if you have your heart set on a PolAd job, there are still possibilities at KFOR in Pristina and OHR in Tuzla, Bosnia, but I assume given your family that they aren't exactly a major draw.

Ginny, I know most of this information is not what you were hoping to hear. But you have an excellent reputation, and I have no doubt that integration will work well for you. Athens is a great job for this year, and when next you bid, you'll certainly be extremely qualified for many DCM and Principal Officer jobs.

I know I've given you a lot to digest here, but we need you to let us all know very soon of your decisions. As always, I'm happy to discuss/clarify anything in this message.

Take care, Tom >>

In a message [Re: Responding to your suggestion to follow-up.] dated 03/27/00 10:31:06, BayJF@state.gov writes:
Ginny, thanks for you message. I am asking Kevin McGuire and Jim Whitlock to look at your specific questions and to review any other opportunities that are still available for summer 2000. I enjoyed very lmuch having a chance to chat with you. Janice

-----Original Message-----
From: VLooFarris@aol.com [SMTP:VLooFarris@aol.com]
    Sent: Monday, March 27, 2000 2:43 PM
    To:    BayJF@state.gov

                        Page 14 of 16 Pages                Initial___

# EXHIBIT 10

**23) 18 May 00 E-mail from CDO Whitlock informing of cedes on the USNATO
& USEU positions.**

In a message dated 05/18/00 06:27:19, WhitlockJC@state.gov writes:
<< Ginny,

As a follow-up to my earlier message, you should know that it has been
decided to cede two senior jobs on which you are the only senior bidder-
USNATO and OECD. EUR is expected to bring their O-1 candidates to
Panel on Tuesday, May 23. You have the right to have your name brought
forward in a shootout. If you want to compete for the jobs, please send me
talking points ASAP but to arrive here no later than May 22.

Warm regards, Jim >>

EXHIBIT 05

# EXHIBIT 11



**United States Department of State**

*Washington, D.C. 20520*

April 27, 2004

<u>BY MESSENGER</u>

George R.A. Doumar
2200 Wilson Boulevard
Suite 800
Arlington, VA  22201

Re:  <u>Virginia Farris v. DOS</u>

Dear Mr. Doumar:

Consistent with the Agency's continuing obligation to produce additional documents in discovery as they become available, enclosed please find two drafts of the 1999-2000 assignments precepts.  The Department continues to be unable to locate the final version.

Sincerely,

Melinda Chandler
Agency Representative

EXHIBIT 09

# Open Assignments
# The 1999-2000 Cycle

I.  Alphabetical Index ...................................................................(p. 3)

II.  Glossary  ...............................................................................(p. 4)

III.  1999-2000 Open Assignment Cycle Timeline............................(p. 5)

IV.  Open Assignments Policies and Procedures ............................(p. 6)

A.  What's New for 2000...................................................(p. 6)
    1.  Bid deadlines
    2.  Core Bids
    3.  Out-Year World Languages
    4.  6/8 Year Waivers
    5.  Fair Share/Early Assignments
    6.  Medical Clearances
    7.  CDA reorganization
    8.  Early Stretch Season Dates
    9.  Early Designation

B.  The 2000 Cycle .........................................................(p. 6)

C.  Your Role in the Assignment Process ...............................(p. 7)
    1.  Developing Your Bid List
    2.  Failing to Bid/Refusing to Accept an Assignment
    4.  Networking

D.  Special Bidding Requirements and Guidance .......................(p. 10)
    1.  Fair Share Assignments
    2.  Tandem Couples
    3.  Security Clearances
    4.  Limited Non-Career Appointments (LNAs)
    5.  Opportunities Outside the Department of State

APPENDIX A.  Laws, Regulations, and Assignments Criteria .........(p. 12)
    1.  Assignments Authority
    2.  Goal of the Assignments Process
    3.  Assignments Criteria
    4.  Assignments Panels

EXHIBIT 20

7

## C. Your Role in the Assignment Process

The Department is committed to making the open assignments system work as smoothly as possible, consistent with the requirements of fairness and discipline. To achieve that goal, bidders must also take an active role in the process.

All employees eligible for transfer in summer 2000 (May 1 through October 31, 2000) must submit bid lists by October 1, 1999. Employees with summer 2000 TEDs may bid on any advertised position. These bids (up to a maximum of 15) must be marked as "High," "Medium," or "Low" preference. You should also use the bidding narrative to communicate your priorities, particularly among the six core bids. **You may be paneled and assigned to any position on your bid list without further consultation.**

Please direct all correspondence to your CDO or personnel technician by name (rather than just CDA or CDA/EL, ML, SL or ASD). Include your name, social security number, personal grade and primary skill code, current post and onward post of assignment (if pertinent). If you are not on unclassified e-mail, please provide a telephone and fax number; if you are overseas, your home phone number is often useful. This information will enable CDA to provide a timely response.

### 1. Developing Your Bid List.

Developing and maintaining a bid list requires close attention to basic bidding rules, procedures, and the tools available to assist you. Your entire bid list may be invalidated by your CDO if it does not comply with the core bid and fair share requirements.

   **a. Core Bids.** If you are due for reassignment in summer 2000, six bids must be on positions that are at your grade and in-cone. For these bids to count as "core," you must already have the required language proficiency or, in the case of certain out-year world languages (see subsection d below) or any hard language vacancies, the time to get the language. Long-term training other than language and details may not be counted among the core bids. No more than three core bids may be in one bureau or its posts or in the same geographic area (e.g., an IO job in Geneva is counted as an EUR and an IO bid). If all bids are on domestic positions, no more than three may be in one bureau. There are further requirements if you have been identified as a fair share bidder (see p. 10).

**Generalist Core Bids:** IROG jobs may be included as in-cone bids. Not all jobs advertised in the Interfunctional Section of the open assignments cables are IROG. For example, a Pol/Econ job may be advertised in the interfunctional section of the cable but is in-cone and can be considered a core bid only for political and economic officers, not administrative or consular officers. Senior officers may include up to three bids on senior DCM or Principal Officer (PO) positions in their core bids. FE-OC officers must include four bids at the OC level. FS-1 generalists may include two FS-1 DCM, DCM/SEP or PO bids as core bids. FS-2 generalists may include one FS-2 DCM, DCM/SEP or PO bid as a core bid. All junior officer positions are considered at-grade for untenured junior officers. FO-O3 positions are considered at-grade for tenured FO-O4 generalists.

10

Should an employee refuse to accept an assignment after having been subjected to "identification" or "designation" under Sections I F 10 or I F 11, appropriate disciplinary action would be pursued. (See 3 FAM and Section 610 of the Foreign Service Act of 1980.)

   **3. Networking.** Employees should be aware of the significant role that posts and regional and functional bureaus play in the selection of candidates for mid-level and senior vacancies. It has become increasingly useful (in some cases essential) to make yourself known to your prospective supervisors when pursuing an onward assignment. While there are no hard and fast rules about whom you or your intermediaries should approach, at a minimum you should contact the incumbent and direct supervisor.

For additional suggestions, contact your CDO who may refer you to the relevant CDA Assignments Officer (AO).

## D. Special Bidding Requirements and Guidance

 To address a variety of special circumstances, CDA has developed a number of requirements.

   **1. Fair Share Assignments.** All Foreign Service employees should expect to be available for their share of hardship assignments. You are a fair share bidder if you have not served at least 18 months in a differential post during the eight years prior to your upcoming transfer. For the 2000 cycle, fair share bidders must submit at least two bids on at-grade and in-cone or interfunctional 2000 summer cycle jobs at differential posts among their six core bids. Exceptions are made for a) officers overseas who bid only Washington jobs and b) officers assigned to Washington, who have sufficient time remaining before they reach the six-year limit on domestic service and who bid only domestic assignments. Fair share bids must meet your normal core requirements. They must be for positions at your grade, either in cone/specialty or IROG, for which you already have the language if the position is language-designated or sufficient time to obtain the language before arriving at post. (Certain bids on DCM, DCM/SEP, or PO jobs at differential posts may count as fair share bids. See Section C, 1.a. above.) To determine whether a post has a differential, consult the Bidding Tool, which may be found in post personnel/administrative offices and bureau Executive Offices. Fair share bidders (or accompanying EFMs) with limited medical clearances should consult their CDO well before the bid deadline to identify appropriate fair share bids. CDOs will consult with MED as needed. Bid messages which do not include fair share bids, if they are required, will be rejected.

   **Fair Share** bidders are eligible to be paneled into differential positions in the "early season" (see the timeline).

   **2. Tandem Couples.** If you are part of a tandem couple, include a special line in the automated portion of your bid message as noted in the bid instructions. (See sample format in Appendix E of this message.) In addition, tandem members should include a final narrative paragraph providing information to assist in the assignment process. Each member should indicate his/her spouse's employing agency, skill code, present post of assignment (or if on LWOP), transfer eligibility date, and **name of spouse's career counselor.** Tandem members who wish to be assigned together should submit coordinated bid lists while continuing to meet

15

-- For Watch Officer positions (S/S-O, NRRC, etc.), one position is viewed the same as another as long as the grade and skill code are the same. That means a bid on one is a bid on all.

-- All of your bids will be accepted and considered provided they meet the core and fair share criteria. Other positions in line with your skills, rank, qualifications, and expressed general preferences may be suggested to you by your CDO.

-- Employees being proposed for assignment to designated countries, a.k.a. critical threat posts (see your RSO or EX office for a list), are vetted by DS prior to assignment (see Section IV-D-3).

-- Summer cycle officers who are unassigned as of February 16, 2000, and who did not comply with bidding rules, may be placed by CDA in accordance with service need, whether or not they have bid on the position to which they will be assigned.

 **4. Early Season**. Assignments to DCM, Principal Officer, and Office Director positions, SEP posts, all 24-hour Watch positions, and some seventh floor "key" positions will begin October 27, 1999. In addition, assignments to certain specialties, such as security and medical positions requiring training prior to assignment abroad, may be made during the early assignments season in advance of December. It is important that these specialists ensure that their bid lists are received in CDA by the October 14th deadline.

 **5. Special Embassy Program (SEP) Assignments**. Department concern for the needs of SEP posts will be demonstrated in this assignment cycle through several mechanisms. First, SEP vacancies will be addressed in the early assignment season, along with other high-priority positions. Second, SEP vacancies receiving two or fewer bids at grade and cone by the October 1, 1999 bid deadline may be filled by qualified stretch candidates. Third, CDA will consider cross-conal assignments when warranted. Finally, identifications may be employed early in the cycle as needed to ensure that SEP posts are adequately staffed. (Posts designated as SEP are listed in Appendix F, pg. 30.)

 **6. DCM/SEP**. Almost all SEP embassies have DCMs, and experience in these positions will count toward multifunctionality. DCMs at most SEP embassies will also be expected to perform other functional duties. Interested bidders should contact regional bureaus and their CDOs to learn more about specific positions.

Special assignment procedures apply for DCM/SEP positions. Although preference is given to qualified at-grade bidders, **stretches** into DCM/SEP positions will be permitted at any point in the assignment cycle. DCM/SEP assignments go through the DCM/SEP Committee. CDA and the regional bureau (in consultation with the Ambassador) recommend a candidate to the Director General from a short list of qualified candidates. The DG's decision is final.

 **7. Hard-to-Fill Positions**. CDA will continue the Hard-to-Fill (HTF) exercise to assist bureaus in filling certain underbid overseas differential and domestic bureau positions. Bureaus may request to designate as HTF any position receiving only zero, one, or two bids at-grade and in-cone as of December 21, 1999. This date will allow for some follow-up bids to be submitted after DCM, Principal Officer, Office Director, SEP, and key positions have been filled in the

16

early season. The **key incentives** in the program are: (1) favorable consideration for a **one-year waiver of the six year rule** for employees wishing to spend a seventh year (or a two-year tour involving a sixth and seventh year) in one of these positions in the Department, and (2) a more liberal approach toward **early stretches** and cross-conal assignments to fill these vacancies. Officers are reminded that service in a functional bureau or a cross-conal assignment can be a factor in qualifying for the multifunctional skill code and eventual competition for multifunctional promotion in addition to in-cone promotion. You should contact your CDO for further information.

Under procedures separate from the open assignments process, **Civil Service** employees may compete for positions designated by the bureaus as HTF starting April 6, 2000. They may also compete for all unfilled overseas positions at the FO-01 level and below (excluding junior officer positions) after May 31, 2000.

    **8. Shoot-outs.** If at an assignments panel two or more bureaus are competing for one officer, or if there is more than one candidate proposed for a single position, a shoot-out occurs. In such a case, the requirements of the positions and bureau preferences, if any, are presented to the panel by the relevant Assignments Officer, while the desires, career development concerns, and qualifications (including discussion of strengths and weaknesses) of each candidate are presented by the employee's CDO. When it appears that a shoot-out will be on the agenda, CDOs contact their affected clients to discuss the proposed panel item. Employees who are being considered for shoot-out decisions may want to prepare talking points for their CDO. Such talking points are always helpful, and CDOs may use some or all of them as part of their presentation at panel.

    **9. Holds.** Any assignment proposal may be delayed ("held") for a maximum of two weeks by any panel member or combination of members. Holds may, for example, be used by bureaus intending to compete for an employee proposed to another bureau, and by CDOs intending to propose an alternative candidate to the one put forward by a bureau. Additionally, a CDO may sometimes hold a proposal in the interest of locating a more suitable assignment for the employee concerned, and a bureau may place a hold if it wants time to seek an alternative candidate to one that is being put forward by a CDO. Holding an assignment beyond two weeks is permitted only when the panel chairman determines that exceptional circumstances exist.

    **10. Identifications.** Identifications for service need may take place at any time during the assignments cycle. Your CDO will notify you if the Department's need for timely staffing is likely to result in your being considered for assignment by identification to a specific advertised vacancy on which you have not bid. The panel, in deciding whether to make such an assignment, will take into account such factors as service need, career development, viable alternative bids, and any relevant personal circumstances of the individual concerned. If the panel makes an identification assignment, you will be notified. You may, within ten working days of acknowledged receipt of notification, appeal the panel's decision to the Director General. The Director General may remand the issue to the assignment panel in light of new information.

    **11. Designations.** Service need is one of the principal criteria in the assignments process. Thus, after a suitable period in the cycle has elapsed, eligible qualified personnel who have not expressed interest in particular positions may be proposed for assignment by designation. **All bidders who did not comply with the bidding rules may be considered for**

# EXHIBIT 12

Subj: **More Bids**
Date: Friday, November 19, 1999 23:39:54
From: VLooFarris
To:    whitlockjc@state.gov

Jim - Thanks for your fax giving me copies of the emails you sent. You are correct that I had not received them as the State unclassified email system often freezes.

I appreciate your candid assessments on the bids I have already submitted. You mentioned that I am not on the short list for several of my high priority bids and that the prospects for success in bidding on EUR DCM positions are not very good as having the European experience is considered a major factor. Likewise bids on functional jobs at the senior level tend to go to officers in those cones. I had hoped that the USCINCPAC and National War College experience would make me competitive for USNATO jobs but you seem to indicate that this is not necessarily the case.

Since a slam dunk assignment hardly seems likely we may be in for a continuing exchange as various situations develop. It may seem to you that I'm only bidding on "holiday destinations." I'd like to dispell that impression as I am not "cherry picking," at least not in the manner you might think. While it is important for each of us to find a position where we can both contribute and advance, before I submit a bid it is paramount I also consider the likelihood of getting the necessary medical clearances for my entire family. In reality the number of PAO jobs (my functional speciality) are limited and located in countries where it's unlikely my family members could receive medical clearance.

So, while I am not ignoring the wisdom of your advice, the situation compels me to continue to look at locations where it is more likely clearances would be forthcoming. In turn the situation leads me to look at what might be considered a disproportionate number of DCM/PO positions or positions in other functional cones. I am attempting to follow your advice on having someone senior intercede with a recommendation to the relevant DAS' before I remove more of my bids from consideration.

Jim, you were most kind in offering to check on the Belgian and The Hague POLAD positions. Could I ask you to likewise to flesh out the Stuttgart POLAD position (Stuttgart/324045/POLAD/91433001/Chaveas), as to duties? I gather that it's based at USEUCOM. Assuming that it's within reach and given the state of play mentioned in your emails of Nov 17 and 18, and the past changes I've made, I'll

enter the following bids:

| Belgium-M | POLAD | Vacant | 321245/10001000 | 0400 | High |
|---|---|---|---|---|---|
| NATO-IS | Pol Ofcr | McConnell | 505230/41027000 | 0600 | High |
| Paris | Pol Ofcr | Parmly | 323601/10017002 | 0800 | High |
| Stuttgart | POLAD | Chaveas | 324045/91433001 | 0800 | High |
| The Hague | AF POLAD | Vacant | 325601/10789111 | 0900 | High |
| USEC, Brussels | Pol Ofcr | Becker | 321023/10166000 | 0600 | High |

That means my updated bid list is would look like this:
&START/BB/575500283/FARRIS/VIRGINIA/L;
&1/AIT TAIPEI/330230/DPO/77001000/YOUNG/0801/H;
&2/ROME/325067/DEP US REP/00554000/TRACY/0800/H;
&3/BRUSSELS N/321213/DPTY CHF M/00029001/MCELHANEY/0800/H;
&4/GENEVA/327667/DEP US REP/00014003/ARIETTI/0700/H;
&5/BRUSSELS/321201/DPTY CHF M/00005002/CHESHES/0700/H;
&6/BERN/327601/DPTY CHF M/00001075/BELL/0900/H;
&7/BELGIUM-M/321245/POLAD/10001000/VACANT/0400/H;
&8/BRUSSELS N/321213/POL OFCR/16030000/HARRIS/H;
&9/ATHENS/321801/PUBLIC AFF/60888059/JACQUETTE/0801/H;
&10/LONDON/323201/POL OFCR/10282000/JOHNSON/0800/H;
&11/NATO-IS/505230/POL OFCR/41027000/MCCONNELL/0600/H;
&12/PARIS/323601/POL OFCR/10017002/PARMLY/0800/H;
&13/STUTTGART/324045/POLAD/91433001/CHAVEAS/0800/H;
&14/THE HAGUE/325601/AF POLAD/10789111/VACANT/0900/H;
&15/BRUSSELS-U/321023/POL OFCR/10166000/BECKER/0600/H;
&STOP/BB/999999999/23/NOV

What is not clear to me is once the short lists are compiled and were I not to be on a list would my name be formally removed from the appropriate bid book? Or having been so notified that I'm not on the short list, am I simply allowed to enter additional bids? The other position in EUR which is interesting, but on which I have little information is Paris-OECD/323614/IECON/ 20226000/Dolan. Can you obtain any information on that position? Can you also confirm that the language requirement for PAO Rabat position listed below is either French or Arabic and not both? Subject to availability of the positions on which I've made inquiries as soon as it's permissible I'll also enter bids on the following:

| Paris-OECD IECON, | Dolan | 323614/20226000 | 0800 | High |
|---|---|---|---|---|
| Manila Econ Ofcr | Brease | 331401/20026000 | 0600 | High |

| Brasilia PAO | Gullicksen | 310601/60149001 | 0700 | Med |
|---|---|---|---|---|
| Berlin PAO | Arnett | 324001/60888065 | 0700 | Med |
| Rabat PAO | McCreery | 345601/60295000 | 0702 | Med |

Is it be too late to enter bids on CG Shanghai or Capetown? I'll use the information you provide, along with your earlier advice, to try and craft a more effective strategy. Also since the unclassified State e-mail system is down so often if you have the capability to respond to <<VLooFarris@aol.com>> your mail will reach me much faster.

Many thanks,
 Virginia

### 21Nov99 JCW to VLF e-mail in re Short Lists Gone Forward

In a message dated 11/21/99 13:11:44, WhitlockJC@state.gov writes:
<< Dear Virginia,

I am told that short lists have already gone forward to the commanding
generals on the Hague and Belgium (Mons) POLAD jobs. With the support of
the general, Chaveas is asking to extend for one year in Stuttgart. With
regard to the senior functional jobs (POL and ECON), these will presumably
go to officers out of those cones. I will enter your bids, however. You
are correct that the Rabat job is French or Arabic, not both. The DCM
Committee has already selected an officer for Capetown but postponed until
early December a decision on Shanghai. That job will require a 3/3 in Chinese.

In answer to your question about the short list, only the short list is sent
to the relevant ambassador/general, etc. The only way that someone not on
the short list can be considered is for the ambassador/general to give
reasons for rejecting all of the candidates and then the process begins
anew. So you can remove your bids if you are not on the short list and then
bid anew if, as rarely happens, the drawing board is rolled out again.

Let me know what bids you want to delete (e.g., the three POLAD jobs appear
to be no longer viable) and what you want to add.

As before, I am using the "reply" function this should go to you at aol.com.
But since that doesn't seem to work, I will also fax this message.

Warm regards, Jim >>

619

EXHIBIT F18h

**22Dec99 VLF to JCW email in re Hard to fill cable.**

Subj: **Re: Hard to fill cable**
Date: Wednesday, December 22, 1999 12:04:27 PM
From: VLooFarris
To:    WhitlockJC@state.gov

Jim - Thanks for the call yesterday and the updated listings of Summer 2000 openings. However your Hard to Fill cable was surprising and confusing to me as several of the positions on which I had entered High Priority bids or was told the short lists with other candidates had already gone forward are now listed as hard to fill vacancies. I'm referring in particular to the following 3 positions:

Brussels Political (Harris) 321213/16030000 - FE-MC
Belgium (M) Polad (vacant) 321245/10001000 - FE-MC
The Hague AF Polad (vacant) 325601/1078911 - FE-OC

I had entered bids for the Brussels Political and The Hague AF Polad but withdrew the bid on the latter when Patrick Moon in EUR/RPM said they had had a very short deadline and that the list had already gone forward in late September. Likewise I believe I spoke with him concerning the Belgium (M) Polad position and he said the list had already been drawn up and I wasn't on it. So are these positions still available despite what Moon said? I am interested in these positions as I think my background at USCINCPAC and at the National War College would be very germane. I know you think that my not being in the Political cone is a major handicap, nonetheless I would like to register my bids for the 2 Polad jobs listed above.

My bid for the Brussels Political Officer is already in (sent in November 10 email to you). In looking at that position in the bid count cable of Nov 23 (State 222212), which lists total bids as 2, with none at grade and 2 in skill code, am I to assume that my bid is one of the two listed (even if I'm not in skill code) or did the system not register my bid in the overall tally?

As we discussed last night I would be very interested in any word on the status of the DPO-AIT Taipei job. As always I look forward to hearing from you but I did also want to wish you Happy Holidays.

Ginny

# EXHIBIT 13

# In The Matter Of:

## VIRGINIA FARRIS   v.
## U.S. DEPARTMENT OF STATE

---

## THOMAS TIERNAN
## April 13, 2004

---

*BETA REPORTING & VIDEOGRAPHY SERVICES*
*910 SEVENTEENTH STREET, NW*
*SUITE 200*
*WASHINGTON, DC  USA  20006*
*(202) 638-2400    FAX: (202) 833-3030*

Original File AATIERNA.TXT, 191 Pages
Min-U-Script® File ID: 1579566178

**Word Index included with this Min-U-Script**

EXHIBIT 12

[2] A: Yes. John Heffern.

[3] Q: How long has Mr. Heffern been in [4] that position? If you know.

[5] A: He's been there since I got here [6] in '01. I think he got there in the summer [7] of 2000, but maybe 2001.

[8] Q: Do you know what happened to [9] Andrew Goodman?

[10] A: Yeah.

[11] Q: What happened?

[12] A: I don't know. I mean, I — John [13] couldn't have been in that position [14] until 2002, because Goodman was here [15] when I [15] got here. I think John — also [16] like [16] Goodman, I think he began as a [17] deputy and [17] moved up.

[18] Q: Okay.

[19] A: Goodman left in 2002 and went [20] where? I don't remember, to tell you [21] the truth. I think back to Washington.

[22] Q: Go ahead.

---

Page 47

[1] A: That's — obviously I can get that [2] information. I'm not a hundred percent [3] sure of that.

[4] Q: Do you recall anything about [5] Mrs. Ferris' background or qualif- [6] ications, [6] sitting there in that room today?

[7] A: Yes, a little bit.

[8] Q: What do you recall?

[9] A: Well, I mean, it's what I recall [10] from reading this stuff last week, or what I [11] recall from four years ago?

[12] Q: Well, that's a good question. [13] What do you recall from three or four [14] years ago?

[15] A: That she appeared to be a very [16] good public diplomacy officer. She was, [17] you [17] know, articulate in her own [18] cause and so [18] forth, and really wanted the job at NATO. [19] But I remember thinking at the time, as we [20] got into it more and more and as she pushed [21] more and more for it that, it just really [22] wasn't a good fit. Her background in public

---

Page 48

[1] diplomacy would make her an ex- [2] cellent public [2] affairs officer at a post [3] and maybe even a [3] good DCM at certain posts, but not the [4] political counselor or not the head of a [5] political section at any [6] moderate-to-large-sized embassy, and [7] certainly not at a place like NATO.

[8] Q: Did you know if she had any prior [9] experience dealing with military issues?

[10] A: I didn't remember then. At least [11] I don't think did. I might have known [12] it, but then I didn't remember until I [13] read it [13] last week that she had been a [14] political [14] advisor for one of the

---

military — I think [15] it was CinCPAC, or whatever.

[16] Q: Right.

[17] A: Yeah. I probably knew that [18] because we would have her PAR, her r [19] sum, [19] if you will.

[20] Q: What's that?

[21] A: I just didn't happen to recall it.

[22] Q: You say the power?

---

Page 49

[1] A: PAR, I'm sorry. Using another [2] acronym, and I don't even think we use it [3] anymore. The Personnel Allotted [4] Report. [4] It's basically your r sum .

[5] Q: I see.

[6] A: That would be used by offices [7] when [7] they're reviewing candidates for jobs.

[8] Q: Did you recall at the time that [9] there was a shoot-out with Ms. Ferris and [10] Mr. Goodman?

[11] A: Yes.

[12] Q: You say here that you don't know [13] who spoke on behalf on each can- [14] didate.

[14] A: That's right.

[15] Q: At the time, 2001, did you know if [16] there had been a shoot-out, or did you [17] really have some idea that there was [18] in fact [18] a shoot-out?

[19] A: If there was a shoot-out, I would [20] have known it from my position. I [21] mean, [21] there would be no way I wouldn't know that.

[22] Q: Right.

---

Page 50

[1] A: Because I was charged with, you [2] know, giving to a charg , a bureau's [3] candidate for a job. Then after the panel, [4] making sure — you know, finding out [4] what [5] happened. Did the panel approve all of the [6] candidates or not? So there's no way that a [7] shoot-out would occur without me knowing it.

[8] Q: Right. So in 2001, you should [9] have known there was a shoot-out?

[10] MS. CHANDLER: A point of [11] clar- [11] ification. Mr. Doumar, you keep [12] saying 2001. Do you mean 2000?

[13] THE WITNESS: 2000.

[14] BY MR. DOUMAR:

[15] Q: In 2000, you have know there was [16] shoot-out? That's true.

[17] A: That's right.

[18] Q: When you —

[19] A: The reason I say, no that I didn't [20] even recall if there was shoot-out, there [21] was so much discussion back and forth about [22] whether she would or she wouldn't, that I

---

Page 51

[1] had really forgotten how it played it out. [2] But had there been a shoot-out, if [3] there was [3] one, I knew it at the time, yeah.

[4] Q: You say HRCDASL is in the best [5] position to provide that information. I [6] suppose as to the shoot-out?

[7] A: That's the senior officer division [8] in HR, yeah.

[9] Q: So they're called SL, I suppose?

[10] A: I guess. That's what they were [11] called. I mean, I think they still are. [12] Yeah, SL. Senior level I guess is what it [13] stands for.

[14] Q: You said the ambassador's choice [15] carries an enormous amount of weight?

[16] A: Yes.

[17] Q: That's the ambassador to NATO [18] for that position?

[19] A: That's correct.

[20] Q: Does the ambassador always have [21] his sort of recommended candidate for that [22] kind of position?

---

Page 52

[1] A: That's a good question. I would [2] say, for that kind of position at that kind [3] of post, it would be highly unusual for [4] the ambassador not to weigh in with at least his [5] number two and say this is who I'd like to [6] see in that job.

[7] It's certainly possible now and [8] then that the ambassador cedes that position [9] to his number two, his deputy chief [10] admission. The position in question is [11] the number-three-person in the mission, so [12] it would be a rare ambassador who wouldn't [13] to have a say in that, you know.

[14] Q: Who's the ambassador to NATO now?

[15] A: Nick Burns.

[16] Q: I think you told me that. How [17] long has he been in that position?

[18] A: He got there in September of '01.

[19] Q: Did he replace Ambassador [20] Vershbow?

[21] A: That's correct.

[22] Q: Do you know what happened to

---

Page 53

[1] Ambassador Vershbow?

[2] A: Yeah. He's the ambassador in [3] Moscow.

[4] Q: It sounds like the way this [5] process works, according to your statem- [6] ent, [6] is that the ambassador would typically weigh [7] in with his choice, then the bureau, EUR, do [8] they select the candidate? Then HR approves [9] that selection?

THOMAS TIERNAN
April 13, 2004

VIRGINIA FARRIS    v.
U.S. DEPARTMENT OF STATE

[10] A: That's probably a fair [11] description. I mean, formally, it's HR. [12] Yeah, HR has to approve it. Their approval [13] is, you know, obviously essential. Without [14] that, you don't have the assignment. But, [15] yeah, that's an apt description of it.

[16] Q: The HR assignment's panel is this [17] group of 10 to 15 people who serve for [18] two-year terms, as we discussed?

[19] A: That's right.

[20] Q: Now, sitting here today, do you [21] recall from 2000 and 2001 — you have in [22] your statement "you have no recollection of

Page 54

[1] the decisionmaking process involved in the [2] selection of this political advisor [3] position." But you've described —

[4] A: In the Hague.

[5] Q: In the Hague. That was a separate [6] position?

[7] A: That's a separate position. [8] Right.

[9] Q: I see. That is at issue here. [10] Sitting here today, do you have any [11] recollection of the selection of the [12] political advisor position in the Hague?

[13] A: No, I don't.

[14] Q: Do you know what that position was [15] even?

[16] A: Yeah. That position — I mean, my [17] only recollection of it comes from the [18] material that Ms. Chandler sent me last [19] week, and that triggered some memories in my [20] mind. But at the time, I was very [21] peripherally involved, if at all, which is [22] why I don't have any memory of it. That's

Page 55

[1] different. The position was called [2] political advisor; same title as the one at [3] NATO, but it was a classic political advisor [4] that worked for military commanders.

[5] So the process for filing those [6] jobs was a little different, because instead [7] of the ambassador or anyone in the State [8] Department in HR making the final call, it [9] would be the military commander that the [10] advisor was going to be working for.

[11] So they didn't need to go through [12] our HR system except to formally rubber [13] stamp it at the end so that they could get [14] travel orders and everything and [15] bureaucratically get them in the system. [16] But the decisionmaking process wasn't done [17] by the bureau, it was done by the military [18] command. So my office really didn't [19] involved in that.

[20] It was — it gets confusing, but [21] the NATO — not the NATO, but the desk, the [22] military desk — turned out to be the NATO

Page 56

[1] desk in this case, that office would be the [2] ones that would get the candidate lists and [3] forward them to the military command, and [4] get the druthers of that command and pass it [5] back. They'd pass it through me and I'd [6] pass it on to CDA, but it was such a small [7] role that I had that it wouldn't register on [8] my radar screen.

[9] Q: So the person who would have that [10] more conduit role is a NATO desk? Is that [11] within the State Department?

[12] A: Yeah. DEUR/RPM (?).

[13] Q: What does RPM stand for?

[14] A: Oh, God, what does it stand for?

[15] Q: That's the NATO desk?

[16] A: Political and military, I think.

[17] Q: Okay.

[18] A: It's been that acronym for, you [19] know, 20 years or more.

[20] Q: I've seen it around in this case, [21] so I thought maybe you could finally clarify [22] that for me.

Page 57

[1] A: I think it's regional political [2] military.

[3] Q: You were EUR, but they're sort of [4] a separate entity or somewhat off to the [5] side?

[6] A: No, they're one of the offices in [7] the EUR that, you know — I don't know, a [8] dozen or so. They're one of the offices [9] that would have day-to-day operational [10] responsibility for policy relations with the [11] embassy under their command, under their, [12] you know, portfolio.

[13] As part of that, they also dealt [14] with these political advisor jobs, because [15] they were closest office that the EUR had to [16] one that dealt with PALMEL (?) issues, [17] because they were the NATO desk. So they [18] would pick up these sort of stray cats and [19] dogs, like these military political [20] advisors, of which there are a handful in [21] Europe — I think maybe three, four, five — [22] you know, it's not a lot of them.

Page 58

[1] So someone had to sort of pay [2] attention to that and be the bureaucratic [3] liaison with the military and with that [4] office. But it wasn't one of their main [5] functions, but they had to do it.

[6] Q: Right. So they would pass the [7] choice on to the assignments committee in [8] HR.

[9] A: No, they would have gone through [10] me.

[11] Q: They would have gone through you?

[12] A: Because we were — I was the only

[13] voice that dealt with HR — my office, for [14] clarity purposes, so that different people [15] weren't calling him and saying EUR-1, CUR-1. [16] I would be the voice of EUR in that sense. [17] So they would have worked it through me, but [18] I — you know, because it wasn't part of the [19] State system, I wasn't getting, you know, [20] e-mail communication from embassies. I [21] didn't know these military commanders were. [22] I had no role except to sort of pass through

Page 59

[1] what they said — the commander wants so and [2] so, and I'd pass that onto HR for [3] assignments. HR really had next to know [5] [4] role. They would rarely do anything other [5] than rubber stamp that choice. It was sort [6] of an unspoken — I believe still sort of an [7] unspoken agreement between State and DoD [8] that if people put their name forward, State [9] will convey all the names and DoD will make [10] the selection.

[11] Q: State conveys the names to DoD? [12] Is that —

[13] A: Uh-huh.

[14] Q: Then there's some command?

[15] A: Yeah. I mean, that would have to [16] be the way it would have worked. Yeah.

[17] Q: Then the commander has a list of [18] names to review and to pick from?

[19] A: That's right.

[20] Q: How's the commander pick — if [21] he's a DoD person looking at how State [22] Department personnel, how would he decide?

Page 60

[1] A: I don't have a clue. Good [2] question. Better put that to somebody in [3] RPM. He probably would talk — he and his [4] deputies would talk back to the people in [5] RPM if they didn't understand the r sum, [6] They might call the people directly at the [7] post and interview them, you know. I don't [8] know how they did it, frankly.

[9] They'd have to satisfy themselves [10] that they were getting the best in whatever [11] way they could do that.

[12] Q: In your last sentence in your [13] statement, you say, "in the judgment of [14] myself, the European bureau, and the HR [15] assignment's panel, the best qualified [16] candidates were selected in each case."

[17] A: Uh-huh.

[18] Q: When you say "in each case," do [19] you mean in every case? Or in these two —

[20] A: I think I mean each of these two [21] cases that I was asked about: the Hague and [22] NATO. I mean, I happen to

Page 61

believe that in

[1] every case, you know, because no one's —[2] what would be anybody's motivation to not [3] take the person they could get, you know, [4] for their job? I mean, that's what we all [5] want usually. But, yeah, here I was [6] speaking just about those two cases.

[7] Q: You would say that's based, on [8] your experience, true in every case?

[9] A: Well, in theory, yes. You know, [10] yeah.

[11] Q: In practice, is it true?

[12] A: Well, yes. It depends how you [13] define best qualified. I mean, I may not [14] always have agreed with the decision that [15] the decisionmaker made. I might have been [16] frustrated, say why didn't he take, you [17] know, candidate B instead of A? I think B [18] would be better, but that's always a [19] subjective judgment.

[20] I'm just saying I think the [21] decisionmaker, the ultimate decisionmaker [22] in each one of these cases, took the person

Page 62

[1] that they believed to be best qualified.

[2] Q: Do you know who got the political [3] advisor position in the Hague?

[4] A: No, I do not.

[5] Q: Do you know anything more than [6] what you've just told me about the [7] decisionmaking process for that position?

[8] A: No, I do not.

[9] Q: So the basis for your view that [10] they took the best qualified candidate in [11] that case is what?

[12] A: It is just the way I saw the [13] system always operating, which was like I [14] just said; that people — no one is [15] motivated to not take the best person they [16] can get from the ones that are showing an [17] interest in the job. So in my experience, [18] that's what they do. Now, maybe I shouldn't [19] have worded it like that, because I really [20] don't have that much, you know, specific [21] memory of the Hague. So I really — you [22] know, that's all I can say.

Page 63

[1] Q: All right.

[2] A: I was probably being more general [3] than I should have been in that answer, when [4] I look at it.

[5] Q: Do you know how you came to [6] prepare this statement that we've just [7] discussed, Mr. Tiernan?

[8] A: How I came to prepare it?

[9] Q: Yes. Was this something you typed

Page 61

[10] up?

[11] A: I did, yes. Here in my office. [12] Yeah.

[13] Q: It sounded like you'd gotten an [14] e-mail, potentially, from Mr. Lokos.

[15] A: I believe so. He's the one that [16] requested this statement?

[17] Q: I believe so.

[18] A: Yeah.

[19] Q: I'm just trying to find out if [20] that's the case or my knowledge could [21] be wrong.

[22] A: I believe that's correct. He's

Page 64

[1] the guy in Texas?

[2] Q: I believe so.

[3] A: Uh-huh.

[4] Q: Did you ever talk to him on the [5] phone?

[6] A: I do not believe so. Might have [7] once, but I don't believe so. I think it [8] was all just e-mail.

[9] Q: You say you might have once. Why [10] do you think that?

[11] A: I don't remember.

[12] Q: I see.

[13] A: If there was, it was to like get a [14] fax number or something. I have a vague [15] memory of that. I think we faxed this to [16] him, my secretary. But I don't — I think [17] it was all done by e-mail.

[18] Q: The witness here is Ruth [19] Underwood?

[20] A: My secretary at the time.

[21] Q: Is your secretary. You don't [22] recall hanging up on Mr. Lokos at any time,

Page 65

[1] do you?

[2] A: No.

[3] Q: It sounds like you're not sure you [4] talked to him at all.

[5] A: No. I don't have a memory of it, [6] but I — have some memory of needing a fax [7] number. And I can't remember — I really [8] don't remember if we got that by e-mail [9] then or if I or my secretary called him. I [10] mean, I don't — really don't remember.

[11] Q: Let's go through another document [12] here. I think we're making pretty good [13] progress. This is your declaration of [14] Thomas Tiernan, which I'll have the court [15] reporter mark as number 2.

[16] Do you have that in front of you? [17] This is the page 1 of 9 document that we [18] were discussing earlier.

[19] (Deposition Exhibit No. 2 was [20] marked for identification.)

[21] THE WITNESS: Yes, I do.

[22] BY MR. DOUMAR:

Page 66

[1] Q: Looked like in 2001, you had [2] drafted and written up this statement, and [3] yet in 2002, you do a declaration. Do you [4] recall how you came to draft up this [5] declaration after you had previously done a [6] statement?

[7] A: The one in 2002?

[8] Q: Yes.

[9] A: No. My memory was I just kept [10] being contacted by people in this case, [11] thinking, my God, is this still alive, you [12] know? I don't know why. No.

[13] Q: Do you recall if it was the same [14] investigator, Mr. Lokos, or a different [15] investigator?

[16] A: In all honesty, I just don't [17] recall. I'm sorry.

[18] Q: I'll go through this statement, at [19] least some of it. It asked you if you'd [20] participated in protected EEO activity, [21] and you have no idea. Let me ask that [22] question a different way.

Page 67

[1] A: Well, I was — yeah, okay.

[2] Q: Have you ever made a claim of [3] discrimination yourself?

[4] A: No, I have not.

[5] Q: Have you ever made a grievance [6] claim against the State Department?

[7] A: No.

[8] Q: Have you ever made a claim against [9] any private party that was a legal [10] claim?

[11] A: No.

[12] Q: Why did you get offended that [13] they asked you your race?

[14] A: Do I have to answer that? I don't [15] know. I mean, I just always find that a [16] little offensive. Because either my [17] answer's following to me with — if [18] they're honest answers, then it doesn't [19] matter what my race is. I always get [20] offended at that [21] question. Don't you have to answer that [22] question in lots of contexts nowadays?

[22] A: Probably, and I always get

Page 68

[1] offended. If given the choice to not fill [2] it in, you know, like on a census form or [3] something, I don't fill it in. That's [4] me. [5] The reason I say I have no idea on the [6] protected EEO activity is because I didn't [7] know what that meant.

[8] Q: I figured that, which is why I [9] asked the question to you a little bit [10] differently. I think some of this we've [11] covered as I go through. I have an outline [12] with it, but based on your answers to

THOMAS TIERNAN
April 13, 2004

VIRGINIA FARRIS  v.
U.S. DEPARTMENT OF STATE

prior [12] questions, I'll try not to retread the same [13] ground, although I'm sure I'll do it a [14] little bit.

[15] A: Uh-huh.

[19] Q: On page 2, it covers your jobs [17] from 1998. Let me ask, did you ever know [18] Ms. Ferris or have contact with her before [19] this job assignments process?

[20] A: No, I didn't.

[21] Q: Did you ever meet with her at any [22] time during, before, or after the job

Page 69

[1] assignments process?

[2] A: No, I did not.

[3] Q: As you sit there today, you've [4] never met Ms. Ferris?

[5] A: I don't believe I have.

[6] Q: Okay.

[7] A: No.

[8] Q: Let me ask what —

[9] A: Trick question?

[10] Q: No, it's not a trick question.

[11] A: I don't believe I have. No.

[12] Q: Let me go back and ask sort of a [13] preliminary question. You're sitting in [14] your office there today in Brussels? Is [15] that correct?

[16] A: Yes.

[17] Q: Is anyone else in the room with [18] you?

[19] A: No.

[20] Q: Has anybody else been in the room [21] with you since we started the deposition?

[22] A: No.

Page 70

[1] Q: I think going to question 11, [2] we've covered some of that. I don't [3] always [3] understand these acronyms and statements, [4] and maybe this is something that you can [5] explain. Question 11, there's this [6] parentheses, Harris-321213/1603000. Do you [7] know what that refers to?

[8] A: Yeah. That's the way they [9] identify positions. Harris would have been [10] the incumbent that was leaving. The [11] numbers — the first set of numbers are — [12] what do they call this? Organization codes. [13] Each post in the world has a six-digit [14] number. The seven-digit number is the [15] position number. It's sort of a — you [16] know, codes for the computer and everything. [17] So that identifies that specific job.

[18] Q: I see. You say here, "the [19] ambassador to NATO is the person who's [20] ultimately responsible, with the assistant [21] secretary of the European bureau"?

[22] A: Yes, for filling the job. That's

Page 71

[1] correct. For responding to that question. [2] The ones that — you know, want it filled [3] and care about it.

[4] Q: So the ambassador sort of weighs [5] in and then the European bureau decides; it [6] is actually the assistant secretary.

[7] A: That's right. Well, it's the [8] assistant secretary, but he or she now had [9] delegated it at the time to the principal [10] desk, because if you can imagine, those [11] people are very business. So they don't get [12] into all the assignments in the bureau. But [13] they're the ones technically responsible, [14] but they delegate it to their assistant.

[15] Q: Okay.

[16] A: Who further delegates most of the [17] time. But he in every case approved the [18] list before we would send it every week to [19] HR, or who ER wanted. So, yeah, it went [20] that high every single job.

[21] Q: Right. The U.S. NATO position. [22] You discuss that a little bit on 11.2. You

Page 72

[1] say that would have been the office director [2] of EUR/RPM.

[3] A: Uh-huh.

[4] Q: Is that correct? I thought you [5] said that would be the person for the Hague [6] job.

[7] A: For both jobs. That RPMNC office, [8] their main function is to be NATO desk. [9] They deal with NATO on a day-to-day basis, [10] and then they do those political jobs, [11] political advisor jobs, military command [12] jobs. Like in places like the Hague is sort [13] of a sideline, if you will. But their main [14] function is NATO relations.

[15] Q: Right. Help me understand, [15] because you said you didn't really have [17] anything to do with the filling of the [18] political advisor position on the Hague.

[19] A: Right.

[20] Q: But obviously you had quite a — [21] not quite a bit, but some contact with this [22] U.S. NATO political advisor position. How

Page 73

[1] did —

[2] A: More contact with it. Yes.

[3] Q: How did you come to have more [4] contact with it than with the Hague [5] position?

[6] A: Again, because the Hague position [7] is under military command, and there are a [8] handful of those; because no one in the [9] State system in any of our embassies is [10] really weighing in on

that. No one is [11] sending State e-mails on who they want or [12] don't want and all that. So I would have [13] naturally had less contact on that job than [14] I would routinely have on any other of [15] the 600 jobs that we were filling. It just [16] wasn't an in-house job, you know? If you [17] understand?

[18] Q: I understand what you're saying. [19] Now, they ask whether you'd had discussions [20] with the people responsible for filling the [21] positions, such as Ambassador Vershbow.

[22] A: Uh-huh.

Page 74

[1] Q: You said you obviously had [2] discussions, because you knew that [3] Ms. Ferris was not the bureau's choice. Who [4] did you have discussions with?

[5] A: Well, not with Vershbow. He and I [6] never spoke about it. I would have with the [7] RPM — see, I don't remember the specific [8] names of the people at this point. I know I [9] had them with Ferris' counselor in senior [10] officer division of HR. I remember talking [11] to him about it.

[12] But I would have talked to, most [13] likely, Pat Moon, the deputy in RPM at the [14] time in that office. I may have spoken with [15] somebody out at U.S. NATO. Probably [16] Mr. Harris would be my guess. That would be [17] typically how that would work. There would [18] be e-mails back and forth. You know, there [19] was a whole array of ways that you got [20] information on this, but certainly knew of [21] the case. But I can't remember [22] specifically, you know, who told me that the

Page 75

[1] other guy was our candidate.

[2] Q: You said you spoke to Ms. Ferris' [3] counselor. Who would that be?

[4] A: Whitlock.

[5] Q: James Whitlock. Do you recall [6] anything about your discussion with [7] Mr. Whitlock?

[8] A: No, they were mainly in the nature [9] of me trying to ascertain if and when we [10] would be able to get a senior cede from that [11] division so that we could bring our [12] candidate to panel. Then he — of course, [13] his job as a counselor is to help Ms. Ferris [14] and all of his other, you know, clients get [15] the jobs that they want.

[16] So of course, at the beginning, he [17] was interested in well, is there any chance [18] that she's going to be the candidate for [19] that job? So it would have been those kinds [20] of discussions. Working, discussing with [21] him about why, you know, the bureau was [22] going with the other guy, and then seeing if

Min-U-Script®

BETA REPORTING (202) 638-2400

[19] Q: You say you've become intimately
[20] involved with your EUR assignment
[21] possibilities over the last several —
[22] A: Yes. That's my way of — you

### Page 114

[1] know, that's my way of saying, hey, you
[2] know, we've been back and forth over
[3] your [3] assignment spec here and I've
[4] been paying a [4] lot of attention to it
[5] lately, and I want to [5] try to let you know
[6] where it sits from where [6] I stand.

[7] Q: Right.

[8] A: Or where it stands from where I [9]
[9] sit, is another way to put it.

[10] Q: First, you're pretty clear to her [11]
[11] that she'd like to be in Brussels, but it's
[12] not going to work out from the first
[13] sentence of the second paragraph.

[14] A: Right.

[15] Q: Actually, we're having Brussels [16]
[16] weather today. I can see about 100 feet
[17] outside my window. It's all cloudy
[18] and grey [18] and about 50 degrees.

[19] A: We're in the same boat.

[20] Q: You're in that same boat 10
[21] months [21] a year, it seems like, over
[22] there.

[22] A: Right. Exactly.

### Page 115

[1] Q: But obviously, it is a good place [2]
to live.

[3] A: It is.

[4] Q: What's the McConnell job on the [5]
international staff?

[6] A: I don't remember now what the [7]
title of the job is, but he was a senior [8]
officer, an ex-ambassador that had a [9]
position on the international staff. [10]
Again — well, not again. I don't think [11]
I've covered this before. We, in the [12]
bureau — they're kind of like the
political [13] advisor job at the Hague.
These [14] international staff positions at
NATO are [15] decided by non-State
Department people, [16] either the sec-
retary general of NATO or [17] designee.

[18] But American officers would apply
[19] for it and bid on those jobs whenever
there [20] was an opening there. Really,
it's the U.S. [21] mission to NATO per-
sonnel office that was [22] sort of the
liaison with NATO international

### Page 116

[1] staff on those positions. If an American
[2] was selected, they would convey that
[3] information to us in the EUR/EX and
we'd [4] convey it to the assignment
panel so that [5] the person could be
formally assigned to [6] Brussels. But
really, the State Department [7] and the
Europe bureau had no real control or [8]
say over those decisions.

[9] Q: I see. What's the Shape Polad [10]

job?

[11] A: That's another — and I don't [12]
remember anything about this one ei-
ther. [13] It's Shape headquarters in Mons,
Belgium, [14] about 50 miles from Brus-
sels. There is a [15] political advisor
position like the one in [16] the Hague,
and I think there's one in [17] Stuttgart
and in Naples. I don't know where [18]
else, and she must have bid that job. I [19]
totally — I have no memory of that at the
[20] time of her now. I might be one of the
[21] those where the military — the
Shape [22] commander would make the
call.

### Page 117

[1] Q: But you said "both U.S. European [2]
Union and U.S. NATO ambassadors are
holding [3] very firm for our '01 stretch
candidates for [4] those two jobs." What
does that mean?

[5] A: Well, and I don't remember the [6]
U.S. EU job, frankly, either. What that [7]
means is the same situation was applying
at [8] NATO, was that there must have
been another [9] position at U.S. EU that
she was bidding on, [10] that senior
position that U.S. EU wanted [11] an '01
candidate into like Andrew Goodman
[12] for the NATO job. I don't even know
what [13] job that is now, or what the
circumstances [14] of that job were, to tell
you the truth.

[15] Q: It says "central PER." That's, I [16]
guess, the human resources?

[17] A: Right. It's now known as HR. [18]
Yes.

[19] Q: "Is ready to grant the senior [20]
cedes needed to panel these two office-
rs." [21] We talked about a senior cede for
the U.S. [22] NATO position.

### Page 118

[1] A: Right.

[2] Q: What are the two cedes you're [3]
referring to here?

[4] A: Apparently for the U.S. EU job as [5]
well. But I don't remember that job right
[6] now, because I guess she hasn't made
an [7] issue of that one particularly. I don't
[8] know about that job. I mean, I just have
no [9] memory of it.

[10] Q: It sounded like they wouldn't
make [11] the cede.

[12] A: Right.

[13] Q: It says make the cede as soon as [14]
you are paneled to another job —

[15] A: Right. Or withdraw your [16] can-
didacy. That's fairly typical. Early [17] on —
well, May 12th is very early on in the [18]
cycle, but everybody gets more des-
perate to [19] wrap things up as it gets on
toward the [20] summer. It's fairly typical,
I think, that [21] the senior division does-
n't want to cede a [22] job as long as one of

their officers, a

### Page 119

[1] senior officer, one of their clients, was
[2] still interested in it. They were hoping
[3] against hope always — if they don't
[4] cede it the job, we'll have to roll over
and say, [5] okay, we'll take the senior
candidate.

[6] So in this case, I was getting [7]
indications from Mr. Whitlock that they
[8] understood that she wasn't partic-
ularly [9] qualified for the job compared
to Goodman, [10] yet she was still one of
their clients. [11] They were not yet ready
to cede the job. I [12] don't remember
anything about the EUR job. [13] So they
knew that we were necessarily EUR, [14]
but they're not ceding, wasn't going to
[15] suddenly say, okay, we'll take Ms.
Ferris [16] for NATO.

[17] But there was sort of this [18] standoff
between the bureau and HR on that, [19]
and that they weren't ready to cede the
job. [20] Some point down the road, they
probably [21] would and that allowed the
shoot-out to [22] occur, but they weren't
yet at the time of

### Page 120

[1] the e-mail.

[2] MR. DOUMAR: Hold on, Mr. Tiernan,
[3] while I get some water for our court [4]
reporter.

[5] (Pause.)

[6] MR. DOUMAR: I'm sorry, [7] Mr. Tier-
nan.

[8] BY MR. DOUMAR:

[9] Q: We're talking about the senior [10]
cedes at that time. Did eventually [11]
personnel cede the job even though [12]
Ms. Ferris didn't extend, withdraw, or get
[13] panel to another job?

[14] A: Yes.

[15] Q: It sounded like at the time of the
[16] e-mail at least, they weren't going to
cede [17] the job unless she did get
another job, [18] extend, or withdraw.

[19] A: Right. That sounds correct. Like
[20] I said, that's fairly typical, you know,
[21] before a cede is granted, that they
aren't [22] willing to do it. They don't like
to do them.

### Page 121

[1] you know. More often than not, they
don't [2] like to do them.

[3] Q: Do you recall how they decided to
[4] do it in this case?

[5] A: I think they accepted the fact [6]
that Mr. Goodman was objectively more
[7] qualified at that point in time to
assume [8] the duties at NATO than Ms.
Ferris was. So [9] by giving us the cede
eventually, that [10] allowed us to bring
our candidate to the [11] panel. Without

128

in the URPD, had told me that.  I might have

heard it from post directly via e-mail, but

I don't have a recollection of that.

    Q    Do you think the Athens job could

have been a career-enhancing move for

Ms. Ferris?

    A    It wouldn't have been a career

unenhancing move, whatever the word would

be.  She's a senior officer in that cone,

and that's a big post.  Now, coming from the

same job in Bangkok might not have been any

better for her.  It would have been maybe a

lateral move, but not a bad move.  If her

goal was to get into the European bureau and

move herself, or to eventually have to do

something else in Europe in the

multifunctional area, she would get known if

she went to Athens and did a good job by

that universe of people.

         So in that sense, it would be

career-enhancing.  Really, it depends on

what she wants to do with her career, you

129

1  know.  It was certainly not a negative in

2  any way.  To get a senior counselor job at

3  any big European post is generally seen as a

4  good thing for officers in the relevant

5  cone.

6         Q    What if she had taken a smaller

7  step in Athens than she had in Bangkok?

8         A    Well, it depends what she wanted

9  to do next.  If she -- that wouldn't be a

10  bad thing necessarily.  If she wanted to be

11  in the Asian bureau as a DCM next, that

12  probably be not a very good move to go to

13  the European bureau in a job with a small

14  step.  But if she wanted to get an onward

15  job as a DCM in the European bureau, that

16  would be a very good move.  So it just

17  really depends on what her long-term goals

18  were.

19         Q    Right.  On the second page, you

20  say that the Athens job would be something

21  that would make her extremely qualified for

22  many DCM and principal officer jobs.

# EXHIBIT 14

## AFFIDAVIT
## PATRICK MOON

I, Patrick S. Moon, white, male, make the following statement freely and voluntarily to John J. Lokos, who has identified himself to me as an EEO Contract Investigator for the United States Department of State, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party. I hereby solemnly swear:

### RESPONDENT QUESTIONNAIRE
### EEO Case No. 0074

1. Your role/responsibility pertaining to the vacancy announcements in question.

I was the Deputy Director of EUR/RPM at the time and was responsible for managing the process to fill positions at the U.S. Mission to NATO and international positions, such as the Polad jobs, at NATO. I had no responsibility for filling the PAO position in Athens, and I am not familiar with Ms. Farris' candidacy for that job.

2. Please state whether you were aware of the Complainant's race, sex, and prior EEO activity.

Because of her name and several phone calls, I was aware that Ms. Farris is a woman. I had no knowledge of her race or any prior EEO activity.

3. Please state whether you have any knowledge of any prior EEO involvement by Complainant. If yes, indicate the nature of that involvement and when and how you became aware of her involvement.

I do not understand how this question is different from question 2 above, which I answered.

4. To the best of your knowledge, did any of these positions appear on bid lists as hard to fill, after Complainant was allegedly advised these positions had developed existing "short lists"?

I do not remember whether they appeared on the hard-to-fill list. I must also clarify that I'm not sure which Polad job is referred to above. There is no NATO Polad job in The Hague. If this is a Foreign Service position at Embassy The Hague, I had no responsibility for filling such jobs. I do not remember whether there was ever a "short list" for the USNATO Political Counselor position. As I recall, there were not many candidates for this position.

Page 1 of 5                                                                Initials: ___

5. To the best of your knowledge, were any of these positions filled through a "shoot out"? If so, who participated in the "shoot out"?

I have no knowledge of Ms. Farris' candidacy for the Athens PAO job. Candidates for NATO Polad jobs are interviewed by NATO, which makes the decision for the jobs and not the Department. I do not remember whether there was a "shoot out" for the USNATO political counselor position. However, the person who was paneled for the job was below grade which would have required special action by the assignment board.

6. Was the Complainant qualified to have applied for these positions? If no, why not?

While Ms. Farris met the grade qualification for these jobs, she did not have the type of career experience which would have made her a strong candidate for Polad positions and the USNATO Political Counselor job. In both cases, we were looking for people who had strong experience working on security issues in Europe, in particular, at NATO or USNATO or working on security issues at an Embassy in a NATO or other European capital. As I recall, Ms. Farris had worked in a public diplomacy job at a US military command in the Pacific. For NATO Polad jobs, the US candidates have to compete against candidates from Allied countries who normally have extensive political-miltiary job experience. In all my conversations and correspondence with Ms. Farris, I was candid that her qualifications were not strong for the jobs she sought.

7. State to the best of your knowledge who applied for the vacancies, and who was selected.

As I stated in responding to question 4, I'm not sure which Polad job is referred to above. I do not remember who else may have been a candidate for the USNATO political counselor job, but I know that the deputy political counselor at USNATO was eventually paneled for the political counselor job.

8. Were the positions filled?

As I stated in responding to question 7, the Political Counselor job at USNATO was filled. Again, I'm not sure which Polad job is referred to above.

9. Why do you believe the Complainant was not selected to fill the vacancies in question?

As I explained in responding to question 6, Ms. Farris did not have the type of political military career experience which was judged essential for the incumbents in these positions. As I recall, she did not have experience as a political officer, which was also hurt her candidacy for the political counselor job. I want to stress again that NATO and not the Department, makes the final selections for all international staff positions,

Initials:

including Polad jobs. However, she was treated as a serious candidate for all the jobs for which she applied.

10. By Comparing the Complainant's qualifications with those selected, why do you believe the selectees were considered better qualified than Complainant?

I have largely answered this question in responding to preceding questions. Although she was the right grade, Ms. Farris did not have the kind of career experience which was considered essential. Other candidates with much more relevant experience got the jobs. The person who was paneled for the USNATO Political Counselor job was a political officer with extensive political-military experience in Europe, including at USNATO.

I have read the above statement consisting of 3 pages, and I have made all the necessary changes, additions, or corrections, and I have signed or initialed every page. I hereby declare under penalty of perjury that the foregoing statement is true and complete to the best of my knowledge and belief.

_____
(Affiant's signature)

SUBSCRIBED AND SWORN
BEFORE ME AT _Zagreb, Croatia_
THIS THE _3_ DAY OF _December_ 2001

_____
(Witness Signature)
Patricia Ann Wingerter

Page 3 of 3

Initials: _____

299

# EXHIBIT 15

EXHIBIT F2a

VIRGINIA LOO FARRIS
DISTRICT OF COLUMBIA
STATEMENT

I, Virginia  Loo  Farris, make the following statement freely and voluntarily to John J. Lokos, who has identified himself to me as a Contract Investigator for the Department of State, investigating a Complaint of discrimination filed by me, Virginia Loo Farris, knowing this statement may be used in evidence. I understand this statement is not confidential and may be shown to any interested party with a legal right to know.

I hereby state I am a female of Chinese ethnic background who is employed by the US Department of State as a Senior Foreign Service Officer (SFSO) at the rank of Officer-Counselor. Prior to the October 1, 1999 consolidation with the Department of State, I had been employed by the United States Information Agency (USIA) as a foreign service officer since October 1972. USIA was an organization created in the mid 1950's with a dual mission: 1) to provide information about the United States, its policies, history, and society to foreign audiences in an effort to increase mutual understanding and to influence foreign opinion leaders and 2) to provide information on foreign public opinion to US policy makers.

While USIA was an independent agency in Washington until the 1999 merger, USIA (called 'USIS" overseas) foreign service officers were recruited through the same Foreign Service examination as State Department foreign service officers and formed one of the five traditional foreign service cones: public affairs (later termed public diplomacy), political, economic, administrative and consular. When overseas, USIS officers worked as an integral part of the Embassy, albeit with a separate budget and answering both to the Ambassador at post as well as to the appropriate USIA regional bureau back in Washington.

USIS was generally the "public face" of the official US presence overseas with USIS officers serving as spokespersons for the Embassy, arranging speakers, handling press and media relations, selecting cultural programs in support of Embassy objectives, managing educational exchange to include Fulbright programs—which send Americans scholars overseas and bring foreign academics to the US for short and long term programs. To carry out these programs, USIS officers generally have extensive contacts in the foreign country including foreign government officials, academics, media, and social leaders.  Often these contacts extend across a broader cross section of the host nation's leadership and society than is the case with other embassy officers, including those in the political and economic cones.

My  foreign service career has included cross-departmental assignments which indicate preparation for service in positions of increasing responsibility. I served as a Congressional Fellow from September 1983 to August 1984. From 1990 to 1992 I was assigned as the Public Diplomacy Advisor to the Commander-in-Chief, Pacific Command (USCINCPAC), and subsequently was selected to attend the National War College during 1997-98 where I earned an additional Masters in National Security Studies. These assignments were in addition to overseas postings in Pakistan, Tunisia, Hong Kong, Jamaica and Thailand as well as assignments in Washington dealing principally with East Asia and the Middle East/North Africa/South Asia, as well as

**066**
Page 1 of 8 Pages    **Exhibit** _5_    Initial _ULF_
**Page** _1_ **of** _9_

global responsibilities as Acting Director of the Geographic Liaison Office within the Bureau of Information. Since my entry into the foreign service with an BA and MA, I have been selected by the USG for long term language and area studies, an additional masters, and numerous contract provided management, leadership, and negotiation courses.

As earlier stated I am a Senior Foreign Service Officer (FE-OC) who, after arriving in Thailand in August 1998 served as the Counselor for Public Affairs (or PAO) of the American Embassy in Bangkok until June 24, 2001. As Counselor for Public Affairs, I supervised seven Americans and 24 Thai staff and oversaw a budget of about $1 million. Traditionally public diplomacy officers (because they were heads of an agency rather than a head of section, as was the case after consolidation) have considerably more responsibility managing staff and program resources when compared with political and economic officers (somewhat parochially considered the "elite" cones within the foreign service).

The following is a representative list of my work requirements and responsibilities while serving in Thailand:

1. Provide the ambassador and other Mission officers with public diplomacy guidance and input on all relevant issues, working proactively where possible to contain potentially contentious issues. Coordinate public affairs support for SecState and other VIP visits.

2. Manage all post programs and resources to ensure that public diplomacy activities closely correlate with Mission Program Plan objectives in Thailand and are well integrated into overall Mission activities. Collaborate with other Embassy sections, particularly the Political and Economic Sections, in identifying trends and policy directions and in contributing to relevant post reporting.

3. In coordination with those sections of the Embassy involved in information management, enhance and increase the technological tools to more effectively reach and serve our target audiences.

4. Sustain close working relations with key Thai institutions which have a bilateral focus and look for ways to involve them in programs which support Mission objectives.

5. Coordinate with other Embassy sections in developing programs related to environment, health, protection of women and children, and in strengthening contacts with appropriate NGOs.

Prior to the consolidation between USIA and the Department of State a number of policy statements were made by Secretary Albright assuring equal career opportunities of all USIA personnel in what was then being characterized as the "new State Department," and which were in turn incorporated into several integration agreements.

In Summer 1999, ostensibly for compassionate reasons due to family circumstances, I was granted permission to begin bidding on advertised State Department

Initial ___

Exhibit 5
Page 2 of 9

vacancies and sought opportunities within the reorganized State Department to serve United States foreign policy interests and advance my career. In what I considered an appropriate progression based on my training and experience in a series of assignments characterized by ever increasing positions of responsibility, I looked at multifunctional positions such as Deputy Chiefs of Mission, Consul Generals (where designated as Principal Officers), and Deputy Principal Officers. Since the number of senior public diplomacy cone positions in places which would accommodate a Class II Medical clearance are limited, and based on advice I received from several ambassadors and senior officers, I also bid on several Political Counselor positions as they were commonly viewed within the State Department as traditional stepping stones to service in multifunctional positions.

Given the Congressional intent to have SFSO generalists be interchangeable, and based on the hopeful atmosphere surrounding integration, which was then being promoted, I looked forward to finding a position that would be a good match for the United States Government, my career, and my family within the confines of the medical clearance restrictions. While I was aware of the legitimately competitive nature of the bidding process, with five previous assignments overseas assignments in three geographic regions including two assignments as a country PAO or head of an agency/section at American embassies, a legislative stint on Capitol Hill, a cross-departmental assignment with the DOD's largest unified command, and three substantive tours in Washington ranging from a Desk Officer to an Acting Office Director, I believed my credentials and performance indicated that I was at an appropriate juncture to be considered for the types of multifunctional positions for which I was applying.

Having a background in Chinese Studies which includes my initial graduate degree, an area studies concentration from the National War College, two previous substantive China assignments, and extensive official delegation travel, I was interested in two Deputy Principal Officer positions which had been advertised—Hong Kong (330401/DPO/ 00002039) and Taipei (330230/DPO/77001000). Both positions were advertised as immediate openings in the 1999 bid cycle to report in summer 2001.[1] As both posts could support a Class II Medical Clearance, which my family required, I aggressively pursued these opportunities by contacting the appropriate offices in EAP & PER as well as both the Consul General in Hong Kong and the Director of the American Institute in Taiwan (AIT) concerning my interest in the respective positions.

Given my background and availability I was surprised that both the CG and AIT Director indicated they were not pushing to fill those positions immediately as they "preferred" to wait for someone with "strong Chinese," i.e. someone already qualified

---

[1] The purpose of listing a position is to allow any officer lacking a required language capability to complete the necessary training, in this case a two year Mandarin Chinese language course to gain the appropriate level of proficiency. Since I had taken two years of Chinese while at the university and had been tested at the Foreign Service Institute as having a 1/1 less time would be required to attain full proficiency.

Exhibit _5_

Page _3_ of _9_

in Mandarin Chinese at the 3/3 level, to apply in the 2000 bidding cycle. By deferring the filling of these positions, I was being effectively eliminated from consideration as there would be insufficient time for me to study Chinese to achieve the required 3/3 in Mandarin. The Consul General in Hong Kong candidly stated he wished to retain the incumbent, John Medeiros. Similarly, the Director of AIT, after telling me that he desired a candidate with "strong Mandarin," offered his opinion that the DPO, Hong Kong, John Medeiros, might be a strong candidate for the Taipei job. It struck me as unusual in that a white male officer who lacked any Mandarin proficiency was being considered while I was being told that I was not qualified because I didn't already have enough Mandarin. State "deferred" consideration of both "immediate" positions to the 2000-2001 bidding cycle thereby eliminating the opportunity for most officers who were not already fully language qualified to apply.

The number of apparent manipulations and deviations from the intent of published Personnel policies was discouraging, but in no way limited to EAP. In fact it was in the European Bureau that I routinely encountered discriminatory irregularities. In September 1999, The Hague AF Political Advisor (POLAD), 325601/1078911, an FE-OC position, was announced as part of the overall bid list. Bidders were asked to submit their bid lists by early October. I was interested in this position on the basis of my experience with security issues while at the National War College and at the US Pacific Command. The position was responsible for serving as a liaison between the State Department foreign policy apparatus and the Department of Defense, providing advice to the CINC on bilateral and multilateral security issues, assisting in arranging meetings for the CINC with appropriate foreign officials and with US embassies.

Within two weeks of the announcement of the position and before the official bid lists were due, I was told by the Deputy Director, Office of European Security and Political Affairs (EUR/RPM), Patrick Moon, that the short list for The Hague AF POLAD position had already been submitted because "they" (ostensibly Personnel management) were in a hurry as DOD was pressing for candidates. I was advised by my Career Development Officer (CDO) James Whitlock to withdraw my bid as it would only encumber one of the 15 maximum bids I was allowed to submit, and it would lessen my chances for being selected for other positions. I did so.

In mid-November 1999, after The Hague AF POLAD continued to appear on the biweekly bid list updates, I inquired with my CDO as to what was happening with this position. Contrary to prior statements, on November 18, 1999, my CDO Jim Whitlock conveyed to me that to the best of his knowledge "The Hague POLAD position is still there. For whatever reason, no bids have registered on it. I will be happy to enter yours if you want."

However, when I entered a bid the following day Mr. Whitlock soon conveyed to me that he was "told that the short lists had already been sent forward." Yet, in late December 1999 the State Department issued a "Hard to Fill" cable stating The Hague position was still listed as an immediate vacancy. After citing this contradictory cable

to my CDO, his apologetic answer was that the individual responsible for "listing The Hague position in the "Hard to Fill" cable had been misinformed." While I was able to accept earlier excuses, after reviewing the correspondence I began to form the inescapable conclusion that the assignment system was being inappropriately manipulated.

The State Department bidding process is far from a static process. While one is allowed to register up to 15 bids, as positions are filled it is prudent for officers to submit additional bids to maximize one's chances for selection. Generally, the DCM, PO, and DPO positions are filled first thus allowing the unsuccessful candidates to shift their interests and bid on other positions. Given that at least four of the DCM positions for which I had applied were being otherwise filled and since my multifunctional bids were not reaching fruition, I followed the widespread conventional wisdom and applied for at least five political officer positions to provide me with additional relevant experience in the "new State Department."

On November 10, 1999, I applied for the USNATO Political Counselor (Advisor) position (Harris-321213/16030000), an FE-MC position. The bid count cable on November 23, 1999 (State 222212) listed the total number of bids as 2, with none at grade. The Political Counselor position at USNATO would be responsible for keeping abreast of multilateral security issues, presenting US policies and negotiating with other European counterparts, and overseeing the political reporting on positions held by NATO allies and other European countries. Prior to the end of November 1999 I had also bid on the United States Mission to the European Union (USEU) Political Officer position (Becker-321023/10166000). Both posts are in Brussels and require a 3/3 in French. These bids were far from frivolous in that I had the required 3/3 French language qualification, and previous experience in the pol-mil arena along with a Masters in National Security Strategy from the National War College.

As mentioned above, by December 1999 the State Department issued a "Hard to Fill" cable listing immediate vacancies. After determining the USNATO position was listed in the "Hard To Fill" cable as a Senior Foreign Service Officer position without any SFSO competition I intensified my efforts to be selected for that particular job. Since it was State Department Personnel Bureau's policy not to grant a "cede" (exception to policy), unless there were no other SFS bidders, I felt the State policies would favor my selection. This was later buttressed when I discovered that the only other officer applying for the position had just assumed a lower-level position at USNATO in August 1999, so under State Personnel policies this officer would not have been in the bidding cycle.

On February 8, 2000 my CDO sent an "Update on Assignments" to all his clients confirming that "Various bureaus are requesting cedes of senior positions to O-1 officers. PER/CDA/SL is granting these only reluctantly and on a case-by-case basis where it appears that no senior officer will be prepared to take the job. Six generalist position cedes have been granted thus far this year. With about 110 senior officers

Exhibit _5_
Page _5_ of _9_

(not including those picked by the DCM committee, etc.) still up for assignment in mid-2000, cedes will continue to be difficult to obtain." However, the European Bureau seemed to be able to obtain the cedes it desired with little or no problem even though the cedes contradicted the published policies.

By March 2000 I began to feel increased pressure in that orders were published and sent to Post announcing the assignment of my successor a year early and before I received any assignment that would allow for my early departure. Upon later reflection this marked the start of a seemingly organized move to have me withdraw my bids for the USNATO and USEU. It was only some four months later that I learned from the officer in question that he had been told, by the CDO we mutually shared, in effect not to concern himself as "Ginny Farris would be out of Bangkok one way or another before a conflict arose with his assignment orders." On March 20, 2000, I responded firmly to my CDO that those orders (prior to June 2001) without my being paneled would be premature and a violation of a bidding agreement which had been reached prior to integration.

Nonetheless, by early April 2000 I received confirmation that the European Bureau had an FS-01 candidate they were strongly backing for the USNATO Political Counselor position and for whom they would ultimately request a cede. If EUR prevailed with this candidate, this would in essence constitute a two grade "stretch" as the position was ranked at the MC level. According to normal procedures, with a Senior Officer bidding, the FSO-1 whom the EUR Bureau was backing was not even eligible to bid having only been assigned to his current position as Political Officer for less than a year.

On April 26, 2000, I received a note from the Deputy Director EUR/PD (Public Diplomacy), Dick Virden, asking me for a commitment on the PAO Athens position. Because I was booked the following week for an interview in Brussels with the NATO International Staff we entered into an exchange of e-mail that led to the establishment of May 24, 2000, as their cutoff date.

Early on May 12, 2000, I received a call from the USNATO DCM, Doug McElhaney indicating that he had heard that the positions that I had applied for in Brussels were likely to be filled by others and that if I had other options I might wish to consider them. Shortly there afterwards I received a call from Ambassador Hecklinger in Bangkok saying he understood that my Brussels positions were being filled and that it might be prudent to look at the PAO Athens option.

Next on May 12, 2000, Mr.Thomas Tiernan dispatched his first written communication to me in which he claimed to speak for the Bureau and all posts involved. According to Mr. Tiernan, USNATO and USEU remained resolute in sponsoring their FS-01 candidates. Early in my attempts to bid on some positions within Western Europe I was in touch with Mr. Tiernan, who handled Personnel issues within EUR Bureau. While I had earlier provided Mr. Tiernan with a copy of my c.v. he had encouraged me

to deal directly with the posts. He was now writing that I should, "1) accept that I wasn't going to be selected for the NATO jobs; 2) tell EUR/PD and Athens that I accept the Athens PAO job; 3) tell all of this to my CDO Jim Whitlock." He went on to relate that, "Athens is a great job for this year, and when next you bid, you'll certainly be extremely qualified for many DCM and Principal Officer jobs."

On the following business day, May 15, 2000, my CDO Jim Whitlock sent a letter informing me that "Because so many other assignments are being held up by your own assignment, I am told that we have to come to closure on whether you are to stay in Bangkok or leave this summer. The choice is yours but a decision has to be made soon. I am told that you have to let me know by e-mail by May 18 Washington time whether you want to stay in Bangkok until 2001 or want to go to Athens (which you have bid) in 2000."

As I was responding comprehensively to my CDO's letter of May 15, 2000, point-ing out that my eligibility to bid and my position in Bangkok were the result of an inte-gration agreement arrived at by USIA Personnel and State in consultation with the EA Director, myself, and Post, I received a supplemental letter from my CDO Jim Whitlock on May 18, 2000. It informed me that I "should know that it has been decided to cede two senior jobs on which you are the only senior bidder—USNATO and OECD [sic][2] . EUR is expected to bring [both] their O-1 candidates to Panel" within three business days later. I was informed that I had the right to have my name brought forward in a shootout. I was told "if you want to compete for the jobs, please send me talking points ASAP but to arrive here no later than" within two business days. The short lead-time proposed is further evidence these efforts were in themselves discriminatory as Mr. Tiernan, on May 12, 2000, had already assured me that I would not be considered or selected.

Mr. Tiernan wrote on May 21, 2000 to say that, "Perhaps USIA could afford to tailor each assignment more closely to the optimal career development path for every officer, but the larger State system simply cannot do that in every case, especially this late in the cycle," in response to inquiries about my USIA qualifications as opposed to the eventual selectee's.

Since I was determined to see the shootout process through I concurred with EUR/PD that they should locate another candidate for PAO Athens. After all, PAO Athens was a smaller post with commensurately less leadership and management responsibilities than I had in the position I then occupied in Bangkok. In my view, if I had accepted it, the additional experience of this position would not qualify me for "many DCM and Principal Officer jobs" as implied by Mr. Tiernan. I withdrew from con-sideration for PAO Athens in order to avoid withdrawing my bids for USNATO and USEU positions.

---

[2] Should have been USEU.

Initial _____

Exhibit 5

Page 7 of 9

I next received a call from Kevin McGuire, head of the SFS assignments, who outlined that my chances of succeeding in either shootout were slim because the qualifications of the competition were "more fulsome." Mr. McGuire also explained to me that my CDO would make a case for me based on my talking points before a panel of 14 officers from Personnel. I asked how a tie vote was broken with an even number of votes on the panel, but I have never received an answer. My CDO delegated his vote because both candidates were his clients. After I was given a three day deadline initially to produce talking points, that deadline of May 23, 2000 was postponed. Two days later I received e-mail from my CDO stating that I was "EUR's favored candidate for PAO Athens" and that the Bureau had entered me on the panel agenda for the following Tuesday. In my response of May 27, 2000, I again withdrew my bid for PAO Athens in order to be considered for the NATO and USEU positions.

At the pro-forma meetings of the panels on June 6 and June 20, 2000, for the USNATO and USEU positions, the Bureau's candidates, both of whom were under grade, were selected. The officer chosen for the USNATO position was a Caucasian male and was selected for a two-grade stretch assignment. As a woman of color my complaint is based on discrimination on the bases of both race and gender, but also on more subtle, but pervasive discrimination against me based on my status as a former USIA officer. These discriminatory actions were taken in the bidding and assignment process. I believe that facts support that I was treated differently. As a result I believe my career and chances for advancement have been seriously harmed.

I have read the above statement consisting of eight pages. I declare under the penalty of perjury that my statement is true, correct, and complete to the best of my knowledge, information, and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_____    _____
SIGNATURE OF AFFIANT                Date:

_____    _____
SIGNED BEFORE (Witnessed)           Date

Initial _____

Exhibit 5
Page 8 of 9

# EXHIBIT 16



Subj:     Update?
Date:     Wednesday, November 17, 1999 05:23:56
From:     VLooFarris
To:       jwhitlock@state.gov

Jim:

I learned from my Public Diplomacy colleagues in EUR that the incumbent in the PAC USNATO job has asked to extend (or should I say withdrawn curtailment). As a result that prospect seems to have disappeared after being told that I was being favorably considered for that position. Could you provide me with some assessment of where I stand in my remaining bids? Am I on the short list for any of the bids? Should I continue to maintain bids even if I am not on the short list on the off chance that my direct contacts with the Ambassador or by others on my behalf with the Ambassador may cause him/her to consider my bid? I realize that the DCM/PO jobs are paneled first and others follow so that individuals are constantly revising bids. What is less clear is when I will definitely know that I am out of the running for a position.

For example, I noticed that a Tokyo Labor Officer position which had been advertised in the September listing as 330801/12544000 is not listed in the October 22 listing. It is a position that I considered but not in my top 15. However should other bids drop off, I may well want to add it. Is the fact that it doesn't appear in the October listing mean it has been filled or is this an oversight. Conversely, I notice that the The Hague AF Polad position (325601/10789111) is still in the October listing despite the fact that someone in RPM said the deadline for submitting bids to NATO passed the end of September and no further bids were being taken.

I'd welcome your further elucidations into how the bidding process works and how best to play my hand. Many thanks for your help.

Virginia Farris



EXHIBIT 15

# EXHIBIT 17

In a message [JCW Nov 18 fax] dated 11/19/99 7:34:18 AM, Whitlock writes:

To my knowledge the Hague Polad position is still there. For whatever reason, no bids have registered on it. i will be happy to enter yours if you wnat. The (Belgium PolAd) also shows no bids. I think it is under NATO. Both jobs will eventually be filled but the PolAd will be hand-picked by the resident general. I will see what I can find out about these 2 jobs.

As a general principle, best way is to go after something where you have a background that makes you competitive and then lobby with the powers that control it (usually executive officer in the Dept and relevant DAS), if you are not well known in the bureau, it is useful to have someone senior (Amb, DCM) make a call on your behalf. At senior level this direct approach is how it works.

4/30/2004

EXHIBIT 16

# EXHIBIT 18

Subj:   **More Bids**
Date:   Friday, November 19, 1999 23:39:54
From:   VLooFarris
To:    whitlockjc@state.gov

Jim - Thanks for your fax giving me copies of the emails you sent. You are correct that I had not received them as the State unclassified email system often freezes.

I appreciate your candid assessments on the bids I have already submitted. You mentioned that I am not on the short list for several of my high priority bids and that the prospects for success in bidding on EUR DCM positions are not very good as having the European experience is considered a major factor. Likewise bids on functional jobs at the senior level tend to go to officers in those cones. I had hoped that the USCINCPAC and National War College experience would make me competitive for USNATO jobs but you seem to indicate that this is not necessarily the case.

Since a slam dunk assignment hardly seems likely we may be in for a continuing exchange as various situations develop. It may seem to you that I'm only bidding on "holiday destinations." I'd like to dispell that impression as I am not "cherry picking," at least not in the manner you might think. While it is important for each of us to find a position where we can both contribute and advance, before I submit a bid it is paramount I also consider the likelihood of getting the necessary medical clearances for my entire family. In reality the number of PAO jobs (my functional speciality) are limited and located in countries where it's unlikely my family members could receive medical clearance.

So, while I am not ignoring the wisdom of your advice, the situation compels me to continue to look at locations where it is more likely clearances would be forthcoming. In turn the situation leads me to look at what might be considered a disproportionate number of DCM/PO positions or positions in other functional cones. I am attempting to follow your advice on having someone senior intercede with a recommendation to the relevant DAS before I remove more of my bids from consideration.

Jim, you were most kind in offering to check on the Belgian and The Hague POLAD positions. Could I ask you to likewise to flesh out the Stuttgart POLAD position (Stuttgart/324045/POLAD/91433001/Chavedo), as to duties? I gather that it's based at USEUCOM. Assuming that it's within reach and given the state of play mentioned in your emails of Nov 17 and 18, and the most changes I've made, I'll enter the following bids:

| Belgium-M | POLAD | Vacant | 321245/10001000 | 0400 | High |
|-----------|-------|--------|-----------------|------|------|
| NATO-DP | Pol Ofcr | McConnell | 505230/41027000 | 0500 | High |
| Paris | Pol Ofcr | Permly | 323501/ 10017002 | 0800 | High |
| Stuttgart | POLAD | Chavedo | 324045/91433001 | 0800 | High |

1/30/2000

EXHIBIT 17

| | | | | | | |
|---|---|---|---|---|---|---|
| The Hague | AF | POLAD | Vacant | 325601/10789111 | 0900 | High |
| USEC, Brussels | | Pol Ofcr | Becker | 321023/10166000 | 0600 | High |

That means my updated bid list is would look like this:
&START/BB/575500283/FARRIS/VIRGINIA/L;
&1/AIT TAIPEI/330230/DPO/77001000/YOUNG/0801/H;
&2/ROME/325067/DEP US REP/00554000/TRACY/0800/H;
&3/BRUSSELS N/321213/DPTY CHF M/00029001/MCELHANEY/0800/H;
&4/GENEVA/327667/DEP US REP/00014003/ARIETTI/0700/H;
&5/BRUSSELS/321201/DPTY CHF M/00005002/CHESHES/0700/H;
&6/BERN/327601/DPTY CHF M/00001075/BELL/0900/H;
&7/BELGIUM-M/321245/POLAD/10001000/VACANT/0400/H;
&8/BRUSSELS N/321213/POL OFCR/16030000/HARRIS/H;
&9/ATHENS/321801/PUBLIC AFF/60888059/JACQUETTE/0801/H;
&10/LONDON/323201/POL OFCR/10282000/JOHNSON/0800/H;
&11/NATO-IS/505230/POL OFCR/41027000/MCCONNELL/0600/H; .
&12/PARIS/323601/POL OFCR/10017002/PARMLY/0800/H;
&13/STUTTGART/324045/POLAD/91433001/CHAVEAS/0800/H;
&14/THE HAGUE/325601/AF POLAD/10789111/VACANT/0900/H;
&15/BRUSSELS-U/321023/POL OFCR/10166000/BECKER/0600/H;
&STOP/BB/999999999/23/NOV

What is not clear to me is once the short lists are compiled and were I not to be on a list would my name be formally removed from the appropriate bid book? Or having been so notified that I'm not on the short list, am I simply allowed to enter additional bids? The other position in EUR which is interesting, but on which I have little information is Paris-OECD/323614/IECON/ 20226000/Dolan. Can you obtain any information on that position? Can you also confirm that the language requirement for PAO Rabat position listed below is either French or Arabic and not both? Subject to availability of the positions on which I've made inquiries as soon as it's permissible I'll also enter bids on the following:

| | | | | | | |
|---|---|---|---|---|---|---|
| Paris-OECD | IECON, | Dolan | 323614/20226000 | 0800 | High | |
| Manila | Econ Ofcr | Breese | 331401/20028000 | 0800, | High | |
| Brasilia | PAO | Gullicksen | 310601/60149001 | | 0700 | Med |
| Berlin | PAO | Arnett | 324001/60888085 | 0700 | Med | |
| Rabat | PAO | McCreery | 345601/60295000 | 0702 | Med | |

Is it be too late to enter bids on CG Shanghai or Capetown? I'll use the information you provide, along with your earlier advice, to try and craft a more effective strategy. Also since the unclassified State e-mail system is down so often if you have the capability to respond to <<VLooFarris@aol.com>> your mail will reach me much faster.

Many thanks,
 Virginie

# EXHIBIT 19

In a message dated 11/21/99 1:11:44 PM, WhitlockJC@state.gov writes:

Dear Virginia,

I am told that short lists have already gone forward to the commanding generals on the Hague and Belgium (Mons) POLAD jobs. With the support of the general, Chaveas is asking to extend for one year in Stuttgart. With regard to the senior functional jobs (POL and ECON), these will presumably go to officers out of those cones. I will enter your bids, however. You are correct that the Rabat job is French or Arabic, not both. The DCM Committee has already selected an officer for Capetown but postponed until early December a decision on Shanghai. That job will require a 3/3 in Chinese.

In answer to your question about the short list, only the short list is sent to the relevant ambassador/general, etc. The only way that someone not on the short list can be considered is for the ambassador/general to give reasons for rejecting all of the candidates and then the process begins anew. So you can remove your bids if you are not on the short list and then bid anew if, as rarely happens, the drawing board is rolled out again.

Let me know what bids you want to delete (e.g., the three POLAD jobs appear to be no longer viable) and what you want to add.

As before, I am using the "reply" function this should go to you at aol.com. But since that doesn't seem to work, I will also fax this message.

Warm regards, Jim

4/30/2004

EXHIBIT 18

# EXHIBIT 20

In a message dated 12/23/99 6:39:19 AM, WhitlockJC@state.gov writes:

Ginny,

The hard-to-fill and bid count cables are inherently unreliable and should not be read in isolation from the open assignments cable. For these cables, the data are taken off the computer, without human intervention, and the cables are no better that the computer data (garbage in, garbage out).

The open assignments cable, on the other hand, is assembled with some care and generally reflects accurately what is yet unassigned. By looking at the open assignments cable, you will see there is no senior job at NATO occupied by Harris. There is one occupied by Becker where your bid shows, one of 14 bidders (eight seniors, the seven other than you are political officers).

Regarding the POLAD jobs, only The Hague shows on the open assignments list and Pat Moon tells me the selection has been made. It is not yet been paneled, however, and thus still shows on the open assignments list. Pat also confirmed that the list for applicants for the POLAD jobs closed in September.

To be realistic, the POLAD jobs in EUR will go to officers with an extensive EUR background and usually only then if they have RPM-type experience. People move into these areas early in the career and often specialize in them. Movement from one cone to another at the senior level is not easy.

Have a good Christmas and New Year, Jim

I sent you an e-mail, which evidently did not reach you (the internet is not reliable) but which said that the decision on the Taipei job has been put off until next year.

-----Original Message-----
From:    VLooFarris@aol.com [SMTP:VLooFarris@aol.com]
Sent:    Wednesday, December 22, 1999 5:04 PM
To:      WhitlockJC@state.gov
Subject: Re: Hard to fill cable

Jim - Thanks for the call yesterday and the updated listings of Summer 2000 openings. However your Hard to Fill cable was surprising and confusing to me as several of the positions on which I had entered High Priority bids or was told the short lists with other candidates had already gone forward are now listed as hard to fill vacancies. I'm referring in particular to the following 3 positions:

Brussels Political (Harris) 321213/16030000 - FE-MC
Belgium (M) Polad (vacant) 321245/10001000 - FE-MC
The Hague AF Polad (vacant) 325601/1078911 - FE-OC

I had entered bids for the Brussels Political and The Hague AF Polad but withdrew the bid on the latter when

4/30/2004

EXHIBIT 19

Patrick Moon in EUR/RPM said they had had a very short deadline and that the list had already gone forward in late September. Likewise I believe I spoke with him concerning the Belgium (M) Polad position and he said the list had already been drawn up and I wasn't on it. So are these positions still available despite what Moon said? I am interested in these positions as I think my background at USCINCPAC
and at the National War College would be very germane. I know you think that my not being in the Political cone is a major handicap, nonetheless I would like to register my bids for the 2 Polad jobs listed above.

My bid for the Brussels Political Officer is already in (sent in November 10 email to you). In looking at that position in the bid count cable of Nov 23 (State 222212), which lists total bids as 2, with none at grade and 2 in skill code, am I to assume that my bid is one of the two listed (even if I'm not in skill code) or did the system not register my bid in the overall tally?

As we discussed last night I would be very interested in any word on the status of the DPO-AIT Taipei job. As always I look forward to hearing from you, but I did also want to wish you Happy Holidays.

Ginny
</XMP>

---------------------- Headers ------------------------------
Return-Path: <WhitlockJC@state.gov>
Received: from rly-yb04.mx.aol.com (rly-yb04.mail.aol.com [172.18.146.4]) by air-yb05.mail.aol.com (v67.7) with ESMTP; Thu, 23 Dec 1999 11:39:18 -0500
Received: from cambridge1-smrly2.gtei.net (cambridge1-smrly2.gtei.net [199.94.215.244]) by rly-yb04.mx.aol.com (v67.7) with ESMTP; Thu, 23 Dec 1999 11:38:58 -0500
Received: from marshall-a-hme0.state.gov (marshall.state.gov [198.76.102.24])
    by cambridge1-smrly2.gtei.net (Postfix) with SMTP id A624639F9
    for <VLooFarris@aol.com>; Thu, 23 Dec 1999 16:38:57 +0000 (GMT)
Received: from franklin.state.gov by marshall-a-hme0.state.gov
    via smtpd (for cambridge1-smrly2.gtei.net [199.94.215.244]) with SMTP; 23 Dec 1999 16:38:57 UT
Received: from mailscan.state.gov by franklin-a-qfe3.state.gov
    via smtpd (for [169.253.7.2]) with SMTP; 23 Dec 1999 16:38:57 UT
Received: by pubhost.state.gov; id LAA05614; Thu, 23 Dec 1999 11:32:13 -0500 (EST)
Received: by europe01.irm.state.gov with Internet Mail Service (5.5.2448.0)
    id <ZKZK4BFC>; Thu, 23 Dec 1999 11:44:33 -0500
Message-ID: <E5D8E52557F2D211896A0008C75DEB3FDAEBE0@persntse.per.state.gov>
From: "Whitlock, James C Jr." <WhitlockJC@state.gov>
To: "'VLooFarris@aol.com'" <VLooFarris@aol.com>
Subject: RE: Hard to fill cable
Date: Thu, 23 Dec 1999 11:35:25 -0500
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2448.0)
Content-Type: text/plain