# EXHIBIT 21

## STANDARD OPERATING PROCEDURE

B-2
Revised: 5/2000
Approved: 7/2000

### STRETCH ASSIGNMENT POLICY

The assignment of Foreign Service Employees to at-grade, in-cone positions is the most effective use of State Department human resources. Stretch assignments, both above and below the bidder's grade, should be made only after a full review of the stretch candidate's qualifications and in accordance with guidelines laid down in this SOP. Because of the nature of their career paths, the stretch policy for specialists must be distinct for each category of specialist and different from the stretch policy applied to generalists.

Stretch assignment categories are:

Service Need (includes Hard to Fill)
Directed
Career Enhancing
Extension in Stretch
Downstretch

When upward stretch assignments are made, the proposed candidate's qualifications must be thoroughly reviewed as well as the availability of eligible at-grade bidders. The stretch category must be included in the remarks section of the agenda item when brought to panel. For downstretches a downstretch letter (a sample letter is in the CDA Handbook) must be on file and so noted in the remarks section of the agenda item.

#### Generalists

Any assignment of a generalist to a position classified higher or lower than the officer's personal grade is a stretch assignment, except as noted below. Because the generalist selection process screens for the same basic knowledges, skills and abilities for all cones, an out-of-cone assignment is not considered to be a stretch assignment for a generalist.

EXHIBIT C-

Stretch assignments are permitted at different points in the assignment cycle. Off-cycle stretches have similar restrictions within the off-cycle assignments timeframe. As a result, late-season off-cycle career enhancing stretches may be made during the summer assignments season before such stretches are allowed for summer cycle positions. In the period before regular assignments begin (early season) stretches can be made in assignments to key positions, Special Embassy Program posts, as directed assignments or as timely extensions in stretch assignments.

The annual Open Assignments package (negotiated with AFSA prior to the start of the assignments cycle) establishes start dates during regular season for considering stretch assignments to high (15% or higher) differential posts, Hard-to-Fill positions and Most-Difficult-to-Staff posts. Down stretches and non-timely extensions in stretch assignments may be considered during the regular season. Downstretches are not encouraged. However, there are circumstances where downstretching an employee is a reasonable option; such proposals will be reviewed on a case by case basis.

Career-enhancing stretches are part of the late season, generally starting in March or April for summer cycle assignments. The exact timetable is established in the annual Open Assignments package. Such stretch assignments must be well justified.

There are risks associated with "holding out for a stretch." For the officers: at-grade possibilities will go to other officers while they wait. For Bureaus: at-grade bidders might insist on being brought to panel before the stretch candidate is eligible for consideration. Furthermore, qualified, at-grade bidders may be assigned elsewhere leaving the Bureau no acceptable candidates if the stretch proposal is not successful.

Stretches across the senior threshold have special requirements. There must be a cede from the Senior Officer Division. Such cedes are rare when unassigned senior officers remain. Double stretches across the senior threshold require the approval of the DG in addition to a senior cede. When a cede is called for, it must appear in the remarks section of the agenda item; it is valid only for one agenda and must be renewed weekly if the assignment is held or deferred.

In accordance with the Steigman Rule, an officer already stretched into a senior-level position may extend in that position without a senior cede so long as the request is timely and consistent with other tour of duty provisions. If the extension is not timely, a senior cede must be obtained before the extension can be brought to panel.

A tenured O-4 generalist going to his/her third assignment is considered at-grade for an O-3 position.

Downstretches of mid-level (ML) bidders into entry-level (EL) positions are generally not in order. Any such downstretches require the explicit concurrence of the EL division. Such assignments will take the standard EL tour of duty (TOD) rather than the TOD of the post. Exceptions to this policy include certain domestic assignments, such as positions in S/S-O and staff assistant positions. Other exceptions may be considered on the basis of compassion, tandem concerns or other extraordinary circumstances.

The following cases are not considered to be stretch assignments:

1. Seniors of any grade assigned to any senior grade position.
2. Untenured junior officers assigned to O-4 and below positions; e.g. an FP-04 assigned to an O-5 position.
3. Details - - always considered to be at grade for the incumbent.
4. Y Tours - - always considered to be at grade for the incumbent.
5. If an assignee is at grade when paneled, s/he is not considered to be in a downstretch if s/he is subsequently promoted.

Specialists

Stretch considerations do not apply to Printers, Construction Engineers, English Language, Information Resource, Diplomatic Security (DS) and Medical (MED) specialists, as long as the assignment is within the bidder's skill code. DS Specialists must get a senior cede for assignments across the senior threshold. Tenured specialists selected for positions advertised under the Specialist Excursion Program will be considered at grade for that excursion tour position.

For Admin. Specialists (GSO, PER and FMO):

Tenured FP-05 and –04 GSO, PER and FMO Specialists who have attained their skill code through the Career Mobility Program are considered at-grade for FP-03 positions within their skill codes.

FP-04 Personnel Specialists are considered at grade for PER positions at the FP-03 level.

For Office Management Specialists (OMS):

A job at the OM level includes grades FP-03 and FP-04 for bidding and assignments purposes. OMS in grades FP-07 and FP-08 are considered at grade for jobs at the FP-07 and FP-08 levels.

For Information Management Specialists (IM):

Information Management Technical Specialist (IMTS) FP-05 and FP-04 positions are considered interchangeable and should not be considered as stretch assignments within these two grades.

Information Management Specialist (IMS) FP-05 and FP-06 positions are entry-level positions and are considered interchangeable within these two grades.

Assignment of all other IM specialists at the grade of FP-04 and above to any position other than at the employee's personal grade is considered a stretch assignment, including tenured FP-04 IRM specialists proposed for FP-03 positions.

Panels

Proposals for stretch assignments within the mid-level will be brought to the ML Assignments Panel. All other stretch assignment proposals, including downstretches into EL positions, will be brought to the ID (Inter-Divisional) Assignments Panel.

FAR - 441

# EXHIBIT 22

EXHIBIT F8a

## DECLARATION OF PATRICK MOON

In accordance with the provisions of Title 28, United States
Code, Section 1746, I, Patrick Moon, make the following
declaration:

1.   What is your full name?

A:   Patrick Steven Moon


2.   What is your race?

A:   Caucasian


3.   What is your sex?

A:   male

4.   Have you yourself ever participated in protected EEO
     activity?

A:   no

5.   What is your current title?

A:   Deputy Chief of Mission


6.   In what Office or Bureau, and in what location, of the
     U.S. Department of State do you work?

A:   U.S. Embassy Zagreb, Croatia


7.   Since what date have you been employed in your current
     position and location?

A:   August 1, 2001


8.   Who are currently your immediate and second level
     supervisors?

A:   Immediate supervisor:  Ambassador Lawrence Rossin
     I have no second level supervisor.

284

Page 1 of

Initials

EXHIBIT 14

9.    If your position has changed since August 1998, please
      detail all positions held from August 1998 through
      November 2001 (to include title, location, and
      immediate and second level supervisors).

A:    August 1998-July 2000: Deputy Director, EUR/RPM
      (Regional Political and Military Affairs, Bureau of
      European Affairs, Department of State, Washington, DC)
      Immediate Supervisor: Barbro Owens-Kirkpatrick (Aug 98
      to Aug 99) and Walter Andrusysyn (Aug 99-Jul 00);
      Second level supervisor was Deputy Assistant Secretary
      Ron Asmus
      September 2000-July 2001: Language Student, Foreign
      Service Institute, Department of State

10.   Do you now have, or have you ever had direct work
      relationship to Ms. Farris while you were posted in
      Bangkok?  If so, what was the nature and duration of
      that relationship?

A:    I have never been posted in Bangkok.

11.   The position of Hague AF Political Advisor (FE-OC) –
      (325601-1078911) was advertised in September 1999.  Ms.
      Farris asserts that she bid on the position but, prior
      to the date that the official bid lists were due, you
      informed her that the short list for the position had
      already been submitted because DOD was pressing for
      candidates.

      11.1.    Do you recall making this statement?

      A:    No.  Although the position was advertised as being
in The Hague, it was actually the Political Advisor to the
NATO military commander located at Brunsum, Netherlands.
Furthermore, the position is a NATO International Staff
position and not a Department of State position.  As such,
the timetable for selection (and thus the submission of USG
candidates for the position) was set by NATO and was not
tied to the Department of State bidding and assignment
process. As a matter of course, we put these NATO positions
on the Open Assignment cables in order to advertise them to
all FSOs.  I do not remember any pressure from DoD to submit
the names of candidates (there would be no reason for DoD to
do so).  It is possible, however, that the NATO authorities
were pressing for a list of names, but I do not remember the
facts of the process.  All other NATO member countries had
the opportunity to submit candidates.  Although we would
submit the names of USG candidates for NATO International
Staff positions, the final selection for such positions is

Initials

made by NATO authorities, not by USG officials.  I explained all of this in great detail to Ms. Farris.

    11.2.       Why was a short list forwarded before official bid lists were due to be submitted?

    A:   This is an assertion of fact and not a question. I do not remember when the list of names was submitted to the NATO authorities nor do I remember the names on the list.  As I indicated above, the position in question is a NATO International Staff position and not a Department of State nor even USG position.  Furthermore, the date for submission of the names was dictated by NATO and was not linked to the Department of State's assignment process.

    11.3.       Had Ms. Farris' bid list been received at the time that the short list was forwarded?

    A:          I do not remember.

    11.4.       If so, was Ms. Farris' name forwarded on the short list?

    A:          I do not remember.

    11.5.       If not, how were you aware that Ms. Farris was interested in this position, and why did you inform her that the short list had already been forwarded?

    A:          Ms. Farris communicated with me a number of times by phone and email regarding her interest in this job and others at the U.S. Mission to NATO.

12.  What was your role in filling this vacancy?

A:  I was responsible for identifying qualified Department of State candidates to propose to NATO for the position.  I consulted with my supervisors regarding which candidates we would recommend to NATO for International Staff positions.

13.  If you had a role in filling this vacancy, did you seek input regarding Ms. Farris from Marie Huhtala or Richard Hecklinger?  If yes, what information was shared with you regarding Ms. Farris?

A:  I do not know these people and do not remember seeking any information from them.



14.  If you were not directly responsible for filling the
     vacancy, who was responsible for filling the position?

A:  As I indicated above, the position is a NATO
International Staff position and not a USG position.  The
USG proposed candidates, and the NATO authorities made the
selection from our candidates and those of other NATO member
states.

15.  Did you ever speak to any of the individuals
     responsible for filling this position?  If so, what was
     discussed?  Was any information shared regarding Ms.
     Farris' family situation, her husband's Medical
     Clearance, or the reasons for allowing her to enter the
     bidding cycle early?  If so, please detail any
     information that was shared with those responsible for
     filling the Hague position.

A:  I did not speak to any NATO authorities regarding Ms.
Farris.  I had no knowledge of Ms. Farris' husband's medical
condition/clearance or that there was ever an issue in this
regard.  If I had any knowledge of why she was permitted to
bid early, I do not remember it now.  Frankly, I am not sure
what is meant by "bidding early."

16.  Ms. Farris states that, in mid-November 1999, the Hague
     position continued to appear on biweekly bid list
     updates.  She asserts that the position also appeared
     in a December 1999 State Department Hard-to-Fill cable
     as an immediate vacancy.  If a short list had been
     forwarded prior to the closing date for bids, why did
     the position remain unfilled for an extended period?

A:  I cannot verify whether Ms. Farris' statements are
accurate and cannot answer this question.  I would note
again that the position in question was not a Department of
State position.  The NATO authorities establish a deadline
for the submission of candidates.  These deadlines are not
tied to the Department's bidding cycle or procedures (thus
the Department's Open Assignments bid deadline was
irrelevant for this position).  The only way we could
advertise for candidates for the NATO positions was to put
the jobs in the Open Assignments cables.  The final decision
on filling the position was made by the NATO authorities.  I
explained all of this to Ms. Farris.

17.  Ms. Farris contends that, by listing the Hague opening
     on the bid list, then closing it before bids were due
     on October 4, 1999, it appeared that the Department had

no intention of allowing for open and fair competition for the position. She contends that the other candidates were junior in rank and experience to her, and that her bid was being discouraged due to the fact that the rank and qualifications of the preselected candidate at the time of the bidding process were inferior to hers. How do you respond?

A:    Once again, the "closing date" for bids for such NATO positions is often not tied to the Department's procedures because the positions are filled according to NATO's procedures. (I do not remember NATO's deadline for submitting our list of candidates for the position in question.) I explained this to Ms. Farris. I remember who was finally selected by the NATO authorities for the position, but I do not remember who the other candidates were. I know that the candidate who was selected by the NATO authorities for the job was an FE-OC who had significant experience with the development and implementation of U.S. foreign policy toward Russia and managing U.S. policies in Europe, including at the NSC.

18.   Who was ultimately selected for the Hague position at issue? What is the race and sex of that employee?

A:    As I recall, Mr. Jack Segal was selected by the NATO authorities for the NATO Political Advisor position at Brunsum, Netherlands. He is a male and Caucasian.

19.   Was Ms. Farris' race a factor in your informing her that the short list had been submitted prior to the receipt of her official bid list, or in her nonselection for the position?

A:    No. I was never aware of Ms. Farris' race. I never met her personally, and no one ever told me her race. Race was not a factor in the selection process for the short list. It was the NATO authorities who made the final decision.

20.   Was Ms. Farris' sex a factor in your informing her that the short list had been submitted prior to the receipt of her official bid list, or in her nonselection for the position?

A:    No.

288

initials

21. Ms. Farris asserts that she first made contact with Deirdre Davis of the Equal Employment Opportunity and Civil Rights Office regarding her situation in October 1999.

21.1.  Were you aware of this meeting?

A:  No.

21.2.  If so, when and how did you become aware of Ms. Farris' EEO involvement?

A:  N/A

21.3.  How do you respond to Ms. Farris' allegation that she was retaliated against for this EEO involvement when the Department acted unfavorably in her bid for the Hague position?

A:  I had no knowledge of Ms. Farris' reported EEO involvement until reading about it in this statement.

22. Is there anything that you would like to add at this time?

A:  No.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this day:

_____
September 4, 2002
Date

_____
Signature of Witness Moon

Subscribed and sworn to before me at _Gaynep Croatia_ on this __4__ day of _September, 2002_

_____
Signature of Affiant's Witness

289

# EXHIBIT 23

| UNITED STATES INFORMATION AGENCY | Rated Officer's Social Security Number _____ ___ - ___ |
|---|---|

**UNITED STATES INFORMATION AGENCY**

Officer Evaluation Report
for
Senior Foreign Service Officers
and Foreign Service Generalists

**IA**

**Rated Officer's**
Social Security Number _____ ___ - ___

**Type of Report (Check One)**

| X | Regular |
| | Change of Duties |
| | Departure of Rated Officer |
| | Departure of Rating Officer |
| | Other, Specify |

| ...icer Being Rated (Surname first)<br>Virginia Loo | Class<br>FO-O1 | Functional Title<br>Team Leader | |
|---|---|---|---|
| ...ganization<br>(Bureau of Information) | Period Covered<br>July 28, 1995 - May 15, 1996 | | |
| ...icer (Typed, surname first)<br>Pamela | Reviewing Officer (Typed, surname first)<br>Hoffmann, Myron | | |
| ...ice Director, I/G,     Class: FE-OC | Title: Deputy Director, I Bureau     Class: FE-MC | | |
| ...rt Submitted to Element | Date Report Received in Element | Date Report Received in Office of Personnel X 1 15 76 | Date Release to Files |

## I. WORK REQUIREMENTS

...ion must be completed during the first 45 days of the rating period and updated as necessary. A copy of this statement must be ...he appropriate area or element office. The minimum rating period is 90 (ninety) calendar days. The last day of annual rating period ...h.

...er's Position - State concisely where the position fits in the staffing pattern and the number and type of personnel (American and ...tionals) supervised by the officer. If the Rating and Rated Officer are not at the same post, state distance apart and amount of ...ng Officer actually observes Rated Officer in work situation. Do not exceed space provided.

...The Near East Team Leader (I/GNEA) leads one of five regional teams within the Information Bureau's ...graphic Office and is responsible for management of all Wireless File, book, and participant (speaker/ ...ialist) programs for the Middle East, North Africa and South Asia, representing a budget of approximate- ...800,000. She reports to the Office Director of I/G, with whom she communicates and works daily. She ...ctly supervises a staff of 13 team members and has oversight responsibility for two field-based ...ormation Resource Officers.

...ork Requirements and Priorities - In priority order, list the general work requirements directed at meeting post/area/office objectives ...ssion of USIA agreed upon at the beginning of the rating period between the Rated and Rating Officers. Any modifications to these ...later date should be clearly indicated. Do not exceed space provided.

...Administer effective I/GNEA team activities matched to overall "I" Bureau objectives and Post/Mission ...ads, while remaining informed of policy issues pertinent to U.S.-NEA relations.

...Manage the daily I/GNEA Wireless File, both in English and Arabic, to provide a tailored and balanced ...oduct attuned to Bureau, Area Office and Post objectives; encourage team participation in planning the ...le's content; and seek methods of integrating File-assigned team members into the rest of the I Bureau.

...Monitor all speaker/specialist activities for NEA and facilitate constructive relationships between I/G and I/T ...ensure high-level participant recruitment, smooth program logistics, detailed follow-up and accountable ...ancial reconciliation of the new "fungible" program system.

...Assume expanded responsibilities for overseeing I/GNEA's Information Resource Offices and work to ...ance IRO-I/GNEA teamwork in approaching and fulfilling assignments and workload.

...Maintain the morale among I/GNEA team members, encourage involvement in cross-Bureau activities, and ...ep all staff alert to ways of improving their skills, productivity and intra-team relationships.

...Sustain productive relations with the Area Office and remain aware of program opportunities that could ...olve participation of other U.S. Government agencies and private sector professionals.

**406**

Exhibit _16_

...-191
...81)

## II. EVALUATION OF PERFORMANCE

A **GENERAL APPRAISAL** - This section is to be completed for members of the SENIOR FOREIGN SERVICE. The purpose of this section is to provide a basis for making salary level adjustments (MOA V-B 237) and recertification decisions (see recertification standards on pages 3 and 4 of attached instruction).

SFS Member, Salary Level Adjustment - performance was excellent or better:

[ ] yes        [ ] no

SFS Member, Recertification - performance was excellent or better:

[ ] yes        [ ] no

B **DISCUSSION OF WORK PERFORMANCE** - Comment on the quality of the Rated Officer's work, focusing on the Work Requirements and Priorities in Part I. A list of tasks performed is not acceptable as a substitute for an evaluation of how work requirements and priorities were met. Using specific examples describe what was accomplished, what basic professional skills were demonstrated by the Rated Officer in pursuit of these accomplishments and how these accomplishments contribute to the post/area/office objectives and the mission of USIA. Comment on any special circumstances. Describe the work/program context, and the public diplomacy environment if the position is overseas. Do not exceed the space provided. Please sign at the bottom of page 4.

Ms. Farris' selection as I/GNEA team leader was the most welcome and salutary assignment made in the Office of Geographic Liaison during this rating cycle. Her exceptional performance has turned a nearly dysfunctional unit into a productive, professional team. As third in a series of I/GNEA team leaders assigned during a scant eight-month period, Ginny rapidly moved to create stability and enhance morale in a team understandably demoralized and lacking in cohesiveness. She successfully led her team by exercising leadership techniques that incorporate organizational, analytical and mediation skills.

A word about "team leaders." In a more hierarchical structure they would be Division Chiefs, except they would also be doing the jobs of Branch Chiefs. This year is the second cycle of a dramatic new experiment, in which the Bureau's inaugural initiatives saw further downsizing and yet more change. With the I Bureau's reduced hierarchy, the success of the leader is expressed by how well the entire team conducts itself by driving and managing a high-pressure agenda. By this measure Ginny takes the lead.

Covering a disparate and geographically diverse area of responsibility, I/GNEA staffers have complementary skills but come from complex and often competing cultural backgrounds. Ginny quickly established credibility by drawing on experience gained in previous assignments in North Africa and South Asia. She has a rare ability to *listen* to the concerns, suggestions, and complaints of her team members. This ability enables her to rapidly forge consensus on how to achieve a quality-rich product during a time of decreasing resources. As a result of her sensitivity to cultural issues, labor relations have improved appreciably.

Ginny produces the Wireless File daily, in English and Arabic. She uses the File as a vehicle to illuminate U.S. policy perspectives on crucial stories such as Secretary Christopher's shuttle diplomacy, the Rabin-Arafat signing ceremony, the Amman Summit, and the U.S. response to terrorism. She has qualitatively improved the Wireless File by dispatching her staff to The White House, Capitol Hill, Foggy Bottom, and beyond. She has her staff prowling for stories relevant to NEA: Hillary Rodham Clinton's addressing a Muslim Women's League, or the American Muslim Council's forming a political action committee (PAC). She transmitted the full text of Arms Control and Disarmament Agency statements on nuclear and missile proliferation in less than 24 hours, thereby providing a clear and unequivocal U.S. foreign policy position to both India and Pakistan. Under Ginny's tutelage the NEA team has developed a reputation for responding rapidly. As the Tunis IO commented, "We call upon Ginny often because we know she'll get us results." Importantly, she also insures coverage of incremental but substantive issues or events contributing to the peace process. An example was the telepress conference on *U.S. Commercial Policy in the Gulf*, in which State and Commerce promoted intra-regional trade and cooperation to advance political and economic development of the region.

Her relations with the Area Office are superb. She coordinates daily with their officers on wide-ranging issues—the File, budget updates, the Speaker/Specialist Program, and shifting resources for book programs. Mindful of shrinking resources, Ginny played a crucial role in winning the Area's agreement to our plan to reconfigure Information Resource Officer (librarian) responsibilities. She worked diligently to strengthen links between Washington and the IROs overseas, fostering a flow of ideas, encouraging their outreach activities, and drawing upon the expertise of Washington-based professional librarians as needed.

Page 3

C. **AREAS OF COMPETENCE** - Complete only for rating periods five months (150 days) or longer. After each of the following areas of competence, note briefly the extent to which skills of that nature are required in the Rated Officer's position and evaluate performance, citing specific examples from the rating period. If the area of competence is not required in the position, indicate "n/a." Do not exceed space provided under each item.

1. **Substantive Knowledge** - Degree and level of functional, area and/or technical knowledge. Skill in applying this knowledge in support of post/area/office progm objectives and mission of USIA. Knowledge may include understanding of U.S. foreign and policy and objectives; U.S. society, culture and history; host-country society, culture and history; USIA and other USG programs and operations; key bilateral and multilateral issues; and/or professional and technical information, procedures and regulations.

The Middle East is news. Given the volatility and complexity of the region, America's long-standing commitment to the peace process, and Secretary Christopher's frequent shuttles, the issue has been not what to cover but how to cover it right. Ginny makes sure her team gets the facts and subtle policy nuances straight. She smoothed the process of getting texts and transcripts quickly from the field so they could be carried in the Wireless File on a timely basis. In addition, she directed coverage of visits to the U.S. by Kuwaiti's Amir, Jordan's Queen Noor, Morocco's Minister of Information, Egypt's Economic Ministers Group, and an Omani trade delegation. The field and the Area Office were very grateful.

Drawing on her strong background in "economic security" and acting as an early proponent of utilization of the Internet, Ginny seized the opportunity of the Amman Economic Summit to illustrate the desirability of developing topical "home pages" as a cost-effective means of reaching a larger target audience than might be possible by more traditional means of producing and distributing hard copy. She is particularly well versed also in a broad spectrum of social, political and cultural issues. When an urgent need arose, it was Ginny Farris who generated an objective "backgrounder" on U.S. assistance to the Palestinians, which countered the perception that the U.S. only supported Israel.

Ginny's area-specific expertise strengthens the Wireless File she produces so it can effectively disseminate, explain and clarify U.S. foreign policy goals to a critical audience that spans the globe from Morocco to Bangladesh. The standards of lucidity and accuracy she brings to the File have created a legacy that will serve USIA and American foreign policy objectives in this crucial arena for some time to come.

2. **Communication Skills** - (a) Facility in written and oral communication, including public speaking to achieve post/ area/office program objective and mission of USIA.

Ms. Farris is a most effective communicator—her message comes through clear and strong. She writes succinctly but thoroughly covers all the issues in her well reasoned reports and memos. Within weeks of her arrival, Ginny won wide respect as she increased communication within I/GNEA and between the team and the Area Office. By bringing Arabic File team members who felt they were treated as second class citizens to the weekly NEA meetings, she enhanced morale and substantive expertise. She's an excellent negotiator, able to find common ground that often eludes competing sides.

Her focused comments in discussions led to her selection as a presenter of the I Bureau's new products to the PAO Conference. She so impressed the NEA Area Director he asked her to coordinate three subsequent audio versions of that presentation for mini-PAO conferences in Nepal, Oman and Tunisia. She served on panels explaining the development of the Information Bureau's team based culture. And as a member of an *ad hoc* group, she developed mission and vision statements for overseas libraries while delineating I Bureau and Area support responsibilities. Ginny has led her team to represent USIA effectively to a wide variety of sister agencies, think tanks, and NGOs, eliciting cooperation from such key entities as the Departments of Defense, State and Justice and The White House.

(b) If applicable, efforts (including personal efforts beyond regularly assigned Agency study) and success in attaining/maintaining proficiency in one or more foreign languages. Use of foreign language skills to achieve U.S. public diplomacy/USIA objectives and to develop program contacts which might not otherwise be accessible. If not applicable, indicate "n/a".

In addition to maintaining proficiency in her foreign languages Ms. Farris' personal efforts include a computer-based Chinese language tutorial.

Exhibit 16

Page 36 of 167

3. **Supervisory/Managerial Skills** - Effectiveness in delegating authority and motivating subordinates; timeliness, candor and constructiveness as Rating Officer; skill in training career candidates and other new employees; sensitivity to EEO concerns, including hiring, assigning and making training recommendations; ability to analyze, identify audiences; make policy, plan and allocate resources; organize work, evaluate program and cost effectiveness; make sound and timely decisions and recommendations; coordinate and manage Distribution and Records System.

Ms. Farris had her work cut out for her when she took over as I/GNEA Team Leader. Individual members tended to define their responsibilities narrowly. When Ginny took the helm she encouraged team members to develop a cross-functional approach to their work with Civil and Foreign Service Officers learning about each other's responsibilities. Her approach was validated when, with only 48 hours notice, an FSO executed a teleconference with the help of two Arabic team members. Ginny has supported training, encouraging staff to take courses which would upgrade their skills and enhance cooperation. Leading by example Ginny was certified as a professional facilitator and conducted classes. The result—reduced tensions and resolution of some long-standing problems.

Ginny has been on the cutting edge of utilizing technology to achieve her mission. She overcame staff reluctance and implemented a new standardized Arabic software package, thus improving both the communication with NEA posts and the potential outreach of the Washington File. Her superb supervisory and management skills have demonstrably improved the efficiency of I/GNEA and the quality of the File.

But Ginny's talents extend beyond her team. When the furlough hit, as Acting Office Director, she took the initiative in drawing up furlough guidelines which greatly clarified responsibilities and insured coordination among the rotating skeleton staff. Her managerial skills were further tasked when she was asked to review library procurement procedures, mapping the work flow from request to shipment. Her efforts directly led to streamlining and standardizing procurement procedures.

4. **Personal Relations** - Ability to develop rapport and establish purposeful relationships with foreign contacts and to enlist support of colleagues and counterparts; sensitivity to personal concerns and differing cultural behavior.

I/GNEA's work is in the nature of damage control, as tempers flare over perceived U.S. action or inaction. Ginny's ability to cultivate and maintain strong professional ties aids in speeding official texts to the field, which is crucial in calming the furor. She established a more effective working relationship with our colleagues at State, negotiating a working protocol with the NEA Public Affairs Office to exchange texts digitally, thus appreciably cutting response time. While she aggressively looks for ways to improve the efficiency of her team, Ginny is also a paragon of cooperation with and support for sister agencies as demonstrated by her facilitating the translation from Arabic into English of media coverage of a Commerce Deputy Assistant Secretary's trade mission to Cairo. Another prime example of contact development is Ms. Farris' creation of an area directory of contacts, which greatly expands I/GNEA's outreach capabilities.

D. **FUTURE ASSIGNMENTS AND POTENTIAL** - Indicate what position(s) you believe the Rated Officer may be qualified to fill in the next five years. In what ways is the Rated Officer already qualified to fill the position(s)? What formal training, interim assignments and self-improvement efforts do you recommend for the Rated Officer to be well-qualified to fill the position(s) indicated or to further develop the Rated Officer's career potential? Do not exceed space provided.

Ms. Farris has enormous capacity and could serve the Agency at the highest levels. It's a rare officer who can turn around serious problems in less than a year, but Ginny has done so and has made it look easy. (It isn't!) She would be a fine choice as a Policy Officer in an Area Office or a PAO or DCM in a major, policy-sensitive and/or culturally sensitive environment. Within five years it is easy to imagine her leading an Area Office or one of our largest overseas Posts.

Exhibit 16
Page 37 of 61

I hereby certify that we discussed and agreed to the work requirement and priorities. If this rating covers more than 149 calendar days, I also certify that a mid-period review was held.

409

Date of Rating   8/12/96                  Signature of Rating Officer   Pamela H. Smith

## III.  REVIEWING OFFICER'S STATEMENT

Reviewing Officer must have served in position for at least three months of the rating period to prepare this statement.  If there can be no reviewing statement, explain below.  If no Reviewing Officer, please state so and explain.  For example, there is no Reviewing Officer because PAO is Rating Officer.

Reviewing Officer's Statement should include the following areas: A) organizational relationship, geographic distance, and extent and nature of observation of Rated Officer's performance of assigned responsibilities; B) fairness and reasonableness of work requirements of Rated Officer's position in relation to the positions in post/area/element; C) how well the Rated Officer performed, with specific comment on any differences with appraisal by Rating Officer: and D) relations between Rated and Rating Officers.  Do not exceed the space provided.  Please sign at the bottom of the page.

This is a very complimentary report, and it should be.  I am delighted to endorse it completely.

Ms. Farris is one of seven team leaders in the Geographic Liaison Office (I/G).  Her office is a few yards from mine.  I have had ample opportunity to observe her performance, both in her role as a team leader and on various ad hoc teams and other activities.  We speak informally about the job several times a week.  The work requirements are fair and reasonable in relation to the other team leader positions in I/G.

I am especially pleased that the Rating Officer focused in some detail on Ms.Farris's strong performance as leader of I/GNEA, a team that had been tossed and turned by the winds of change that soared through the bureau as we downsized and reorganized.  The difficulty of the challenge she faced cannot be overstated.  The low morale and lack of esprit had concerned me greatly, and I was not sure how the team would react to yet another change.  After she had been acting team leader for a time, the assignment was regularized.  By then she had had such a salutary effect on the team members that one actually shed tears of joy that she was staying, and others expressed their satisfaction, unanimously I think, to me and the Bureau director.  One said he saw her assignment as proof that management was truly responsive to the needs of their team.  That team is a very disparate group of talented and creative people representing several cultures, a wide range of interests, strongly held opinions and doctrinaire views.  It really isn't entirely clear to me how she managed to turn that agglomeration into a team, but I think the Rating Officer has described the outcome very well.

Ms. Farris gets things done.  No bells and whistles, no self- created crises, no self-promotion.  In her competent and self- assured way she goes about her business, getting things done.   She doesn't posture, and I've never seen her lose her composure, whatever the pressure.  Her team willingly responds to her direction; others also gladly hear out her ideas.  One reason is that people quickly realize she is generally right, but also that she has respect for the opinions of others.  That comes through, and the respect is reciprocated by her team and others with whom she deals.

We talk a lot about communication in the I Bureau, and as we are all communicators we should be good at it.  Most of us aren't as good at it as she is.  I think she realizes that this is a process, not a campaign, and that mutual trust forms the basis for it.  She has built well upon the foundation she has laid.

This is an officer who must not be overlooked when important and challenging assignments are being considered.  As I judge this to be an outstanding rating, I want only to add that my confidence in her ability to take on more challenging and more important assignments is at least as strong as that of the Rating Officer.

7-12-96

Date of Review

410

Signature of Reviewing Officer

Exhibit 16

Page 39 of 167

## IV. RATED OFFICER'S COMMENTS

The Rated Officer may provide his/her views on significant achievements or disappointments during the rating period, any special problems encountered, discussions with the Rated Officer, etc. The Rated Officer must sign at the bottom of this page. If you did not discuss and agree upon the work requirements with the Rating Officer, please state so below. Also, if you did not have a mid-period discussion of performance or periodic performance discussions with your supervisor during the rating period (provided that the rating period was more than 149 calendar days), please state so below. The absence of any such statements will be understood by all to mean that they did take place. Your comments may exceed the space provided. You may attach any significant letters or memoranda of commendation/appreciation for work performed during the period covered by this report. Make sure you sign in the space provided at the bottom of the page.

I am grateful for the support of my efforts by the Rating and Reviewing Officers during the rating period. Their guidance has been helpful in establishing an atmosphere of equity, coordination, and consensus which enabled me to improve the quality and quantity of the I/GNEA Team's output. I felt it important to move the Team forward by demonstrating concern, implementing sound management, and insuring opportunities. I'd like to amplify my focus a bit.

**CHALLENGES MIRRORED:** When I/C Management requested I bid on the I/GNEA Team Leader position it was generally known the NEA members were not a group of "happy campers." Indeed, the personal grudges and disagreements harbored by some of the team members went back years and mirrored many of the problems plaguing the Middle East region. Just as peace has eluded that troubled region because of a lack of cooperation, peace had eluded this team, and its productivity suffered as a result. As I viewed it, the team leader's job would be to improve team productivity by managing the long-festering differences. So, it was with some trepidation and reticence I accepted the challenge.

**OBJECTIVITY:** As NEA Team Leader I made efforts to be transparent by increasing the amount of information flowing downward to the team and encouraging team members' involvement in decisions while insuring team concerns were communicated upward to management. Additionally, I promoted opportunities for team members to expand their skills and expertise. Managing differences between team members has consumed an inordinate amount of time this year, but insisting that the dialogue be kept civil enough to air differing views without acrimony has resulted in improved cooperation and a better work environment.

**CROSS-TRAINING:** I count the development of cross-functional skills among team members as a major achievement in terms of productivity. Now, all the Washington File English writers are able to file edit. Some of the Arabic translators are now doing original writing in English as well as Arabic. One of the two Field Service Officers has likewise done reporting for the File. The English File writers are routinely having their articles reviewed by their Arabic File colleagues. The primary result is increased productivity and flexibility with reduced personnel resources. The training also reduced tensions by increasing understanding of, and appreciation for, the work done by other team members.

**TECHNOLOGY IMPLEMENTATION:** In terms of technology, I implemented a change in the Arabic software used to produce the Arabic File. While the staff grumbled at having to learn a new software and posts had to adopt new macros to receive the file, in the end, the change brought USIA's Arabic File in line with the standard software now in use in the Middle East thus making it easier for posts to download and transmit the file to those DRS audiences with electronic capability.

**RESULTS:** Realities of reduced fiscal and personnel resources created a situation conducive to more creative utilization of our remaining assets. This environment contributed to the fruition of my goals with regard to the team, a fact which the Rating and Reviewing Officers have commented on in such complimentary terms. The challenges I faced have helped me hone analytical and leadership skills which better prepare me to contribute to the formulation and dissemination of U.S. foreign policy. I look forward to the next set of challenges with a positive outlook.

acknowledge receipt of a copy of this report.

Date _7/12/96_      Signature of Rated Officer _Virginia Woo Farris_

# OERFILE

U. S. INFORMATION AGENCY

PERSONNEL EVALUATION REPORT INFORMATION

NAME: _Farris, Virginia Lee_                                    CLASS: _35 -01_

An Evaluation Report for the period __5/16/95__                 thru ___7/28/95___
is not available for the following reason(s):

In leave/training/travel status _____ thru _____
                                (date of departure from          (date of arrival at
                                old post)                         new post)

In _____ language training _____ thru _____

Period of less than two three months not covered because:

    Rated officer departed/arrived post _____

    Rating officer departed/arrived post __7/28/95_____

Other (explain): _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

                                    Prepared by __EMF__ Date _9/26/96_

                                    412

Exhibit 16
Page 40 of 107

IA-1015

# EXHIBIT 24

## Department of State Standardized Regulations   -DSSR Index
Released by the Bureau of African Affairs
Released by the Office of Allowances
November 5, 2002

### 260 Separate Maintenance Allowance

### 261 Description

#### 261.1 Definitions

a. "Separate maintenance allowance", hereinafter referred to as SMA, means an allowance to assist an employee who is compelled by reason of dangerous, notably unhealthful, or excessively adverse living conditions at the post of assignment in a foreign area, or for the convenience of the Government, to meet the additional expense of maintaining family members elsewhere than at such post.

This allowance may also be authorized to an employee who personally requests such an allowance, based on special needs or hardship involving the employee or family member.

b. "Member of family" means an individual as defined in Section 040m (1) through (4), except that to be considered a member of family for separate maintenance allowance: parents, sisters and brothers must have resided with the employee for a period of at least one year immediately prior to the date of separation. (See also Section 262.1)

#### 261.2 Scope

SMA is intended to assist in offsetting the additional expense incurred by an employee who is compelled by the circumstances described below to maintain a separate household for the family or a member of the family. An employee who is receiving SMA on behalf of a member of family is not eligible for other allowances or benefits under these regulations on behalf of that member of family except as provided under Sections 242.7, 252.8, 262.3b and 267.2.

### 262 Circumstances Warranting SMA

SMA may be granted to an employee whenever the head of agency determines that the employee is compelled to maintain any or all members of family elsewhere than at the post of assignment because of the following circumstances:

#### 262.1 Involuntary SMA - For the Convenience of the Government

An agency may authorize SMA when adverse, dangerous, or notably unhealthful conditions warrant the exclusion of members of family from the area or when the agency determines a need to exclude members of family from accompanying an employee to the area. (See also Section 264.l)

#### 262.2 Voluntary SMA – For Special Needs or Hardship of the Employee An agency may authorize SMA when an employee requests SMA for special needs or hardship prior to or after arrival at post for reasons including but not limited to career, health, educational or family considerations for the spouse, children or other family member. Children, including sisters and brothers, unless attending secondary school must be under age 18 or incapable of self-support.

#### 262.3 Transitional SMA - (Effective 3/23/03 TL:SR-623; added 262.3c, Effective 9/21/03 TL:SR-629)

a. Following the Termination of an Evacuation and the Conversion of a Post to an Unaccompanied Status

EX. 18

An agency may authorize a higher level of SMA when a post is converted to any unaccompanied status upon termination of an authorized/ordered departure. The purpose of Transitional SMA is to assist an employee with additional costs incurred when eligible family members are required to occupy commercial housing while establishing permanent housing following an evacuation. Commercial housing is considered a hotel, motel, commercially-leased house or apartment, or other transient-type commercial establishment. Non-commercial housing is considered private such as living with family, friends or others in a location which is not commercially leased or rented.

Transitional SMA shall be granted for a period up to sixty (60) calendar days after the end of an evacuation. For Transitional SMA rates, refer to the tables at Section 267.1 b.

When the head of an agency, or an authorizing official determines, on a case by case basis, that extreme or unusual circumstances are present, the period of time for Transitional SMA may be extended for not more than thirty (30) additional calendar days. An example would be that the employee has made every effort to get the full Household Effects (HHE) shipment to the family members but due to restrictions or difficulties in transport, the family has not received the full HHE shipment necessary to establish a permanent residence.

b.  Following the Termination of an Evacuation and Reversion of Post to Accompanied Status for Educational Consideration

An agency may authorize a higher level of SMA when family members are in commercial housing and choose to remain for completion of the current school year if a child is in the final semester of the current school year (grades K through 12). The purpose of Transitional SMA is to assist an employee with additional costs incurred when eligible family members are required to occupy commercial housing as a result of the evacuation and choose to complete the school year at the safehaven location. Commercial housing is considered a hotel, motel, commercially-leased house or apartment, or other transient-type commercial establishment. Non-commercial housing is considered private such as living with family, friends or others in a location which is not commercially leased or rented.

Transitional SMA under this paragraph (b) shall be granted for a period of up to ninety (90) calendar days after the end of an evacuation. For Transitional SMA rates, refer to the tables at Section 267.1 b.

c.  Following the Termination of an Evacuation and Reversion of Post to Accompanied Status for Other Situations - (Effective 9/21/03, TL:SR 629)

If an employee and/or family members cannot return to post for a reason's) beyond the employee's control, and the employee with family members, or eligible family members alone, were occupying commercial lodging at the time that an evacuation ended and the post reverted to accompanied status, then the agency may authorize TSMA on a case by case basis for up to 30 calendar days.

**262.4 Separation from Eligible Family Member**

a. The separation from the eligible family member must reasonably appear to require a separation for at least 90 consecutive calendar days and be for conditions described in Section 262, except as provided below:

Exceptions: The 90 day period may be reduced to 30 days and the change of election provisions of DSSR 264.2(2) do not apply when:

(1) adequate medical facilities in the area are not available for pre and post natal care; or

(2) members of family are detained in the United States for medical clearance; or

(3) children must begin or complete a school year before employee has arrived at post or after employee has departed on transfer to another post in a foreign area.

After expiration of the 90 or 30 day periods, a grant previously not authorized under this section may



be made for the entire period of separation if the condition necessitating separate maintenance continued for a longer period.

**NOTE:** Involuntary SMA is effective the first day of separation providing form SF-1190 is submitted.

b. Unless specifically designated otherwise by the head of agency, eligible family members on SMA (voluntary) are considered to be officially residing in the U.S. However, when SMA is granted for the convenience of the Government (involuntary), and a foreign area is designated as the official involuntary SMA location, a child authorized to be residing at that location can be authorized an education allowance within the applicable "school at post" education allowance established in these regulations for the officially designated foreign involuntary SMA location.

c. Following the termination of an authorized or ordered departure, the 90 day separation requirement does not apply to eligible family members receiving involuntary SMA benefits (eff. 9/26/03), pub. TL:SR 631).

### 263 Circumstances Not Warranting SMA

### 263.1 Member of Family Not Normally Residing With Employee

When a member of family would not normally reside with the employee, this individual does not meet the definition of member of family;

### 263.2 Married Couple Employees

When the spouse of an employee is either a member of the military services or is a U.S. Government civilian employee subject to worldwide assignment availability. However, a career or probationary career employee in leave without pay status (LWOP) is considered a dependent;

### 263.3 Separation/Divorce

When a legal separation exists between an employee and spouse; or a separation occurring through a divorce decree, whether limited interlocutory or final. A legal separation is deemed to exist at such time as either the employee or spouse shall have initiated action (1) affecting the status of the marriage such as a separate maintenance action, or (2) separation from bed and board short of application for divorce. A separate maintenance action is one against a spouse for permanent or temporary support and maintenance for the moving spouse, and for support, maintenance and education of minor children;

### 263.4 Lack of Legal Custody of Child

When a child's legal custody is vested wholly, or in part, in a person other than the employee or the employee's current spouse, except as follows: SMA may be granted when the employee (or current spouse) has joint legal custody and child does not reside with the other parent and it is established that except for the circumstances described in Section 262 the child would reside with the employee and the employee's current spouse;

### 263.5 Child Receiving A School Away from Post Education Allowance

When a child is receiving a "school away from post" education allowance grant under these regulations;

### 263.6 Child on Educational Travel

When a child travels on "educational travel" at the secondary level, for the 12-month period following that travel/trip;

### 263.7 Voluntary SMA Within the Same Country or Within 300 Miles of Employee

When the member of family on voluntary SMA is residing within the same country or within 300 miles (one-way

road mileage) from the employee;

**263.8 SMA Payment Withheld if Per Diem Payable**

While the member of family is eligible for travel per diem.

**264 Application and Supporting Data: (In addition to data required by Section 077.32a)**

**264.1 Involuntary SMA - For Convenience of the Government**

An SMA application based on "for the convenience of the Government" reasons should be annotated in box 15 of the SF-1190 to reflect the following circumstances where appropriate:

    (1)  Where housing facilities at the post are subject to control by United States military authorities, a foreign government, or some other authority, and are not available for use by the eligible family member.

    (2)  Where, in the interest of the Government, the agency has;

        a.  withheld or terminated authority for the eligible family member's transportation to the post, or

        b.  recommended that the eligible family member leave the post of assignment.

    (3)  Applications based upon health factors shall be supported by a statement from the attending physician. Grants shall also be supported by a ruling by reliable medical authority, that is, the ranking medical officer attached to the agency, or by such other person or group of persons as the head of agency may designate.

**264.2 Voluntary SMA - Based on Special Needs or Hardship of the Employee**

(1)  An SMA application based on the needs or hardship of the employee should include in box 15 of SF-1190 a statement from the employee certifying the circumstances of special need or hardship and stating that such circumstances do not:

    a.  include legal separation (see Section 263.3) between employee and spouse or separation occurring through a divorce decree, whether limited, interlocutory, or final; or

    b.  involve a child whose legal custody is vested wholly, or in part, in a person other than the employee or the employee's current spouse. When the employee has joint legal custody, a statement must include that child will not reside with the other parent;

    c.  include a child, brother or sister, 18 years of age or over (see Section 262.2). If the child will be attending secondary school beyond age 18, the employee when applying for SMA must certify that SMA will be terminated within three months from the day the child leaves the secondary school.

(2)  At the time of assignment an employee must elect (1) to have an eligible family member included on the employee's travel orders or (2) not placed on the travel orders and instead be placed on SMA (voluntary). After this initial election, the employee may request that SMA (voluntary) either commence/terminate, depending on the initial election, only once for each member of family during a tour. However, this change can not occur during the employee's first or last 90 days at post (for exceptions, see 262.4a).

**EXCEPTION:**  Following termination of an authorized/ordered departure an employee may elect voluntary SMA at the official safehaven for eligible family members previously eligible for SEA payments under Chapter 600 and for whom round-trip travel expenses have already been authorized. The employee may be permitted to then terminate this voluntary SMA and these eligible family members may be permitted to return to post

provided return travel to post does not occur during the employee's last 90 days at a post of assignment. Such termination and return are available only if no other allowances or benefits under these regulations are authorized for eligible family members during a period of SMA commenced under this exception. No additional expenses for travel, access to goods in storage, shipment of household effects or other such SMA-related expenditures may be incurred on their behalf.

**264.3 Transitional SMA – Following the Termination of an Evacuation and Conversion of Post to Unaccompanied Status (262.3a)**

1.  A Transitional SMA application under this paragraph (a) for days 1 through 60 should be annotated in box 15 of the SF-1190 to reflect the following circumstances:

> (a) The employee's eligible family members were evacuated from post.
> (b) The evacuation has been terminated and post has been converted to any unaccompanied status.
> (c) The eligible family members are occupying temporary commercial quarters.

2.  In addition to 264.3a requirements, a Transitional SMA application for days 61 through 90 should include in box 15 of the SF-1190 the extreme or unusual circumstances which warrant extension of transitional SMA beyond 60 days.

3.  A Transitional SMA application should include documents certifying that the eligible family members are occupying commercial quarters at the time of the application. These documents may include, but are not limited to, receipts and/or lease agreements.

b. Following the Termination of an Evacuation for Educational Consideration (262.3b)

1.  A Transitional SMA application under this paragraph (b) for days 1 through 90 should be annotated in box 15 of the SF-1190 to reflect the following circumstances:

> (a) The employee's eligible family members were evacuated from post.
> (b) The evacuation has been terminated during the final semester of the current school year and the family members wish to remain at the safehaven in order for the eligible family members attending grades K-12 at the safehaven to complete the current school year.
> (c) The eligible family members are occupying temporary commercial quarters.
> (d) The family members intend to return to the post following completion of the current school year. However, if return to post would be within employee's last 90 days at post [see 264.2(2) under EXCEPTION], then family members would need to be placed on voluntary SMA following the 90 days under 262.3b TSMA for the remainder of employee's time at post. Note: If within the 90 day TSMA 262.3b period, the family members intend not to return to post, the employee must submit an updated SF-1190 stating date the family intended not to return to post. Voluntary SMA would commence from the day following the date intending not to return to post.

2.  A Transitional SMA application should include documents certifying that the eligible family members are occupying commercial quarters at the time of the application. These documents may include, but are not limited to, receipts and/or lease agreements. The last day of school should also be noted on the TSMA application.

**265 Commencement And Continuation of Grant**

**265.1  Upon Assignment to a New Post**

The grant of SMA to an employee in connection with assignment to a new post shall commence as of the latest of the following dates:

> (1) date on which employee submits SF-1190 application for SMA grant (See also Section 262.4a); or

> (2) date of assignment; or

(3) date on which the employee begins official travel under an order of assignment; or

(4) date on which the separation from the member of family occurs (See also Section 263.8).

### 265.2 During Assignment to a Post

If SMA is granted to an employee during the period of service at a post of assignment, the grant shall commence as of the latter of the following dates:

(1) date on which employee submits SF-1190 application for SMA grant (See Section 262.4a); or

(2) date on which the separation from the member of family occurs (See also Section 263.8).

### 265.3 During Employee's Absence from Post

The grant shall continue during the absence of the employee from the post provided the employee maintains quarters at the post, unless terminated under the provisions of Sections 266.2 or 266.3.

### 265.4 During Visit of Member of Family to Post

The grant of SMA on behalf of a member of family may continue during the family member's visit to post when the visit is for thirty days or less, providing the member of family is again en route to the SMA point by the 31st day.

### 266 Suspension/Termination of Grant

### 266.1 During Visit of Member of Family to Post

The grant of SMA on behalf of a member of family shall be suspended the day that the family member arrives at post when the stay is or will be in excess of thirty days. No other allowances or benefits under these regulations may be authorized for this member of family while visiting post.

SMA payments may be resumed effective the day the member of family departs en route to the SMA point.

### 266.2 Transfer

When an employee is transferred from a post at which the employee has been granted SMA, such grant shall terminate as of the earliest of the following dates:

(1) date the employee commences travel under the transfer order; or

(2) effective date of transfer when no travel by the employee under the transfer order is involved.

### 266.3 Separation

When an employee is separated (Section 040r) while assigned to a post at which the employee has been granted SMA, such grant shall terminate as of the earlier of the following dates:

(1) last day of employment; or

(2) date on which the employee is reunited with member of family.

### 266.4 Transitional SMA

Transitional SMA shall terminate as of the earliest of the following dates:

1. date the employee commences travel under transfer orders from the evacuated post or date of transfer when no travel by the employee under the transfer order is involved.
2. date the authorized period for Transitional SMA ends.
3. date the complete Household Effects (HHE) shipment is delivered to family. (Only pertains to 262.3a TSMA.)
4. date the family members occupy non-commercial quarters.
5. date the family members occupy permanent quarters. (Only pertains to 262.3a TSMA, however, this would also pertain under 262.3b TSMA in an unusual circumstance of the family members deciding to stay permanently and not return to post.)

Three days after the last day of school. (Only pertains to 262.3b TSMA)

**267 Payment**

**267.1 Determination of Rates**

**a. Voluntary/Involuntary SMA**

The annual rate of the SMA grant to an employee is determined by the number of family members maintained elsewhere than at the post of assignment. The rates in the following table do not vary by location of the separate household:

| 1 Child Only | 2 or More Children | 1 Adult Only | 1 Adult and 1 Additional Family Member | 1 Adult and 2 or 3 Additional Family Members | 1 Adult and 4 or More Additional Family Members |
|---|---|---|---|---|---|
| $4,300** | $7,500** | $8,400** | $10,700** | $13,200** | $15,900** |

A "child" is a family member who is unmarried and under 21 years of age as defined in Section 040m(2) and (4).

An "adult" for the purposes of the above SMA table includes the employee's spouse and any of the relatives defined in Sections 040m and 261.1b as family members who are 21 years of age or older.

**b. Transitional SMA- Following Termination of Evacuation**

Transitional SMA is to be paid at a daily rate, varying only by the number of eligible family members maintained at a location other than the post of assignment. The rates in the following table do not vary by either the location of post or the location of the separate household.

(1) For the 1st 90 Calendar Days Following the Termination of an Evacuation

| Per Family Not Per Person | Day 1-30 | Day 31-60 | Day 61-90 |
|---|---|---|---|

# EXHIBIT 25

# FORMAL COMPLAINT OF DISCRIMINATION
(Please Print or Type)

Note: Attach additional sheets, if needed. Form must be signed.

| Name of Complainant | Complainant's Telephone Numbers |
|---|---|
| Virginia Loo Farris | Home: |
| | Work    (66-2)  205-4486 |

Complainant's SSN

| Complainant's Address | Is Complainant Represented? (Yes or No)   NO |
|---|---|
| American Embassy – Bangkok | If yes, name of representative |
| Box 48, APO AP 96546 | |

Name of Agency You Believe Discriminated Against You    Department of State

Address of Agency (City, State, Zip code) 2201 C Street, NW, Washington, D.C. 20520

Date On Which Most Recent Alleged Discrimination Occurred (Month, Day & Year)    June 6, 2000

Are You Working for the Federal Government? (Yes or No)    Yes

Name of Agency Where Employed    Department of State

| Address of Current Employer | Title and Grade of Current Position |
|---|---|
| American Embassy – Bangkok | Counselor for Public Affairs, FE-OC |
| Box 48, APO AP 96546 | |

√ Check Below, Why You Believe You Were Discriminated Against

XX Race.. if so, state your race Asian, Ethnici XX Sex. If so, state your sex  Gender: Female

☐ Color. If so, state your color    Chinese ☐ Religion. If so, state your religion

☐ Disability. Mental or Physical (circle one)    ☐ Age. If so, state your age

XX Reprisal    ☐ Sexual Orientation

I Have Discussed My Complaint with an EEO Counselor (Yes or No)    Yes

Name of EEO Counselor    Brenda H. Ross

Date of Final Interview    August 9, 2000

Explain specifically how you were discriminated against, that is, treated differently from other employees or applicants, because of race, color, religion, sex, national origin, age, mental or physical disability, reprisal or sexual orientation. (attach additional sheets, if needed)

(see attached)

What corrective action(s) do you want taken on your complaint? (see attached)

Have you filed a grievance or appeal to MSPB on this matter(s)? (Yes or No)    No

Signature of Complainant

Date    Oct 6, 2000

4/98.

001.

Page

EXHIBIT 22

Explain specifically how you were discriminated against, that is, treated differently from other employees or applicants, because of race, color, religion, sex, national origin, age, mental or physical disability, reprisal or sexual orientation:

I believe the discrimination has been ongoing, at the least, since the start of the 2000 Bidding Cycle which began October 1999.  I have been attempting to secure a reassignment since June 1999 as a result of personal reasons related to my family. Thus far the only accommodation to my case was to allow me bidding eligibility in the 2000 bidding cycle. If a mechanism exists to allow for consideration of reassignment for compassionate purposes it was not exercised in my case. The now ingrained inequities of an anachronistic assignment system undoubtedly sets the stage for routine abuse which perverts the intent of the system.

The nature and origin of the instant discrimination are both complex and subtle, and as such difficult to identify. However, specific examples more clearly emerged on or about May 13, 2000 when demands were levied upon me.  When I refused to yield to those wishes, the subsequent retaliatory actions were taken by the European Bureau Personnel Officer, Thomas J. Tiernan in conjunction with persons as yet to be identified. Mr. Tiernan clearly represented that he was speaking for all elements of the European Bureau in demanding that I withdraw my bid as the only senior officer bidding for USNATO Political Counselor in order that the Bureau and Post's undergrade candidate could be granted a cede (a two-grade stretch at variance with Personnel's own policy) enabling him to be named to the position. When I indicated I was not inclined to withdraw, an orchestrated campaign to force my withdrawal was implemented in retaliation for my wish to see the process through.

As a woman of color my complaint relates to discrimination on the basis of both race and gender, but also on more subtle, but pervasive discrimination based on my status as a former USIA officer. These discriminatory actions were taken in the bidding and assignment process. I believe that facts support that I was treated differently. As a result I believe my career and chances for advancement have been seriously harmed.

Until the consolidation of USIA into the Department of
State my career development, training, promotions, and
performance have been such that  the objective observer
would conclude that every reasonable expectation existed
that I would be selected for positions of increasingly
greater responsibility in the foreign service, leading to
my selection for multifunctional position(s).

In the year preceding this complaint I placed bids on
numerous multifunctional positions and none reached
fruition. My files are replete with numerous phone calls,
letters of introduction with curricula vitae, and even
personal appointments which were conducted to express my
interest and qualifications. Each of these actions was
consistent with the advice I had received from my CDO, but
sequentially I was told that while my credentials were
impressive this was a position that required someone with
more area experience, or more policy experience. This
became a politically correct and expedient method of
excluding me from consideration.

At first I was willing to accept that the competition
consisted of qualified officers. Indeed, in some cases this
was undoubtedly true. However, in addition to my
observations I was advised that most multifunctional
positions go to officers who have served in either the
political or economic cones. The implicit and explicit
message being conveyed to me by my superiors and colleagues
was that to be seriously considered for a multifunctional
assignment one must first serve as a political, pol-mil, or
econ counselor, or in a program direction position (such as
an office director). While my last rated position before
leaving Washington was as an acting office director, my
personal situation makes it extremely difficult to
presently consider a Washington-based assignment.

As a Senior Foreign Service Officer (SFSO) I believed
myself to be well qualified to successfully fill any and
all of the multifunctional assignments for which I had
entered bids. Nonetheless, rather than adopt a sour grapes
attitude I felt I should try and conform with the new State
environment and first seek an assignment in one of the
cones (pol or econ) that so many feel are a virtual
prerequisite to being selected for a multifunctional
assignment.

While I have dealt with a variety of economic issues, focusing on pol counselor or advisor positions seemed the logical choice based on my previous service as the public diplomacy advisor for two Commanders-in-Chief of the U.S. Pacific Command  and the Masters degree in National Security Strategy earned from the National War College in 1998. My stint at USPACOM was recognized by the Secretary of Defense with an award of the DOD Civilian Meritorious Service Medal. These cross departmental assignments in the pol-mil arena were further buttressed by extensive experience as editor of "Current Scene" and of the Near East & South Asian edition of the Washington File.  So as you can see, my assignment strategy was based on actual experience as well as on the advice received from superiors.

I began to perceive, what I at first viewed as, some inconsistencies in the assignment process when I applied in October 1999 for The Hague AF Polad (Vacant) 325601/1078911 - FE-OC position within two weeks of the announcement only to be told that the short list had already been submitted because "they" were in a hurry. I was advised to withdraw my bid as it would only encumber one of the 15 maximum bids I could enter and thus lessen my chances for being selected for another position.

Yet in mid-November my CDO said to the best of his knowledge "the Hague Polad position is still there. For whatever reason, no bids have registered on it. I will be happy to enter yours if you wnat [sic]." When I entered a bid the following day my CDO conveyed to me that he was "told that the short lists had already been sent forward." However, in late December when I received the "Hard To Fill Cable" both The Hague position and the Brussels Political (Harris) 321213/16030000 - FE-MC were listed. I checked with my CDO and was told there was no position in The Hague, but after I again cited the cable, the apologetic response was that the individual responsible was looking in the wrong place and hence provided erroneous information.

Concurrently I was also bidding for the USNATO Political
Counselor. A vague assertion was always floated that
extensive NATO experience was needed to fill the job. Yet,
when the incumbent for the Brussels position was queried on
my behalf, I was informed that in his mind, the argument
that I "don't have NATO experience is specious." It was
also opined that half the job was to manage the subordinate
talent, while the rest was to be learned while performing.
However, it was also, rather prophetically, relayed to me
through back channels that the Post and Bureau strategy was
to stall until all the senior officers received other jobs
so they could request a cede for their "favored son"
candidate.

After seeing the Brussels Political (Harris)
321213/16030000 - FE-MC listed on the "Hard To Fill Cable"
and being told that it should be filled soon as there were
no other Senior Officers bidding I intensified my efforts
to be considered for that position. In February my CDO
informed me that "Various bureaus are requesting cedes of
senior positions to 0-1 officers. PER/CDA/SL is granting
these 'only reluctantly and on a case-by-case basis where
it appears that no senior officer will be prepared to take
the job.' Six generalist position cedes have been granted
thus far this year (up to that time). With about 110
senior officers (not including those picked by the DCM
committee, etc.) still up for assignment in mid-2000, cedes
will continue to be difficult to obtain."

It was about this time that I learned that the FSO-1 whom
the EUR Bureau was backing had been assigned to his current
position for less than a year and could only be considered
for a two-grade "stretch" to the MC position through a
perversion of the personnel system. With more than 100
senior officers unassigned if Personnel adhered to their
own policies the "favored son" candidate of the EUR Bureau
would not even be eligible to bid. Even then I still felt
that I would have an opportunity for a fair hearing.
Unfortunately, that feeling proved wrong.

By March I began to feel increased pressure in that orders
were published and sent to Post announcing the assignment
of my successor a year early and before I received any
assignment that would allow for my early departure. It was
only some four months later that I learned from the officer
in question that he had been told, by the CDO we mutually
shared, in effect not to concern himself as "Ginny Farris

would be out of Bangkok one way or another before a
conflict arose with his assignment orders."

By early April I was openly told that the European Bureau
had an O-1 candidate they were strongly backing and for
whom they would ultimately request a cede once any other
Senior Officers were otherwise assigned--by then I had been
for some time the only Senior Officer bidding. As the time
progressed towards an inevitable selection, and I learned
more about the qualifications of the NATO competition
through various corridor comments, I felt confident then
that my credentials, which included cross-departmental
assignments, congressional liaison work, advanced education
in national security strategy from the National Defense
University, responsible management/leadership experience at
post and in Washington, along with extensive editorial and
reporting experience and my 3/3 qualification in French,
would compare favorably against those of the less
experienced and lower ranked officer whom the Bureau and
Post were so resolutely supporting.

Of course, the above remarks are in no way meant to imply
that the competing officer would not in time gain
comparable qualifications--only that at this stage of his
career he has not acquired qualifications comparable to
those I possess. Even in the absence of any equitable
selection process or the lack of any substantial
demonstration of experience or skills to indicate that a
midlevel officer is qualified for selection in a MC
position my complaint is not directed toward the
"competing" bidder, but rather Mr. Tiernan, and those as
yet unidentified officers whom he assisted, or who worked
with him, and aided his efforts to suppress my objective
consideration in the selection process. After
discriminating against me in this and other positions for
which I applied, I believe these individuals took punitive
measures to ensure I would not receive a job commensurate
with my rank and qualifications in Europe, and quite
possibly within the Department.

On May 12, 2000, Mr. Tiernan dispatched his first
patronizing communication to me in which he in effect said
that the Bureau (in which he claimed to speak for all
elements) and both NATO and USEU remained resolute for
their O-1 candidates. He wrote that I should 1) accept that
I wasn't going to be selected for the NATO jobs; 2) tell
EUR/PD and Athens that I accept the Athens FAO job; 3) tell

006

all of this to my CDO Jim Whitlock. He went on to relate that "Athens is a great job for this year, and when next you bid, you'll certainly be extremely qualified for many DCM and Principal Officer jobs." Of course, this opinion defies all conventional wisdom since by accepting the Athens position I would be moving to a much smaller post with commensurately less leadership and management responsibilities than I had in the position I currently occupy. What additional functional experience this position would provide to qualify me for "many DCM and Principal Officer jobs" he never made clear, in spite of my follow-up attempts to learn from, or work with Mr. Tiernan.

As EUR/PD could no longer hold off filling PAO Athens, a position which I had been considering, I concurred with their assessment that as I desired to continue my candidacy for NATO and USEU positions, they would have to look elsewhere. I withdrew from consideration for PAO Athens in order to demonstrate serious interest in my bids for NATO and USEU.

Mr. Tiernan apparently was displeased with my readiness to see the process through against his "advice." On the following business day May 15, 2000, my CDO sent a rather curt letter informing me that "Because so many other assignments are being held up by your own assignment, I am told that we have to come to closure on whether you are to stay in Bangkok or leave this summer. The choice is yours but a decision has to be made soon...I am told that you have to let me know by e-mail by May 18 Washington time whether you want to stay in Bangkok until 2001 or want to go to Athens (which you have bid) in 2000." The reader will note that pointedly no mention is made of any of the opportunities I was then pursuing within the political cone.

As I was responding comprehensively to my CDO's May 15 letter, pointing out that both my eligibility to bid and my position in Bangkok were the result of an integration agreement arrived at by USIA Personnel and State in consultation with the EA Director, myself, and Post, I received a supplemental letter from my CDO composed less than three days later. It informed me that I "should know that it has been decided to cede two senior jobs on which you are the only senior bidder--USNATO and OECD. EUR is expected to bring [both] their O-1 candidates to Panel" within three business days.

I was informed that I had the right to have my name brought
forward in a shootout. After actively competing for these
for more than six months I was patronizingly told that "if
you want to compete for the jobs, please send me talking
points ASAP but to arrive here no later than" within two
business days. Of course, given my operational
responsibilities at post and the short lead-time proposed
it appeared that the efforts were in themselves
discriminatory in nature and meant to both create
additional stress and impress upon me the futility of
trying to maintain my efforts to obtain a fair hearing.

Next I received a call from the USNATO DCM, Doug McElhaney,
casually explaining that it seemed unlikely that I would be
selected for the position at NATO-IS and if I had any other
job opportunities I might want to consider them.  Then our
Ambassador here in Bangkok "coincidentally" called me to
"explain" why it was unlikely I would receive either the
USNATO or USEU jobs.

Subsequently I received a call from Kevin McGuire, who's
head of the SFS assignments and who outlined what my
chances were (slim because the qualifications of the
competition were "more fulsome"). Kevin also explained to
me that my CDO would make a case for me based on my talking
points before a panel of 14 officers from Personnel, who
would undoubtedly be placing heavy weight on the Bureau's
choices. For a variety of reasons consideration of that
position on the appointed date of May 23, 2000 was
postponed and perhaps predictably two days later I received
e-mail from my CDO stating that I was "EUR's favored
candidate for PAO Athens" and that the Bureau has entered
me on the panel agenda for the following Tuesday. I was
again forced to withdraw my bid for PAO Athens in order to
continue being considered for the NATO and USEU positions.

Mr. Tiernan did write again on May 21, 2000 to say that,
"Perhaps USIA could afford to tailor each assignment more
closely to the optimal career development path for every
officer, but the larger State system simply cannot do that
in every case, especially this late in the cycle." Of
course, he failed to address why they were then able to
tailor the "optimal development" for their "favored son"
for whom he was requesting a cede and a two-grade stretch,
but his disdain for USIA plainly shows in his comments.

008

F

The meeting of the panels on June 6 and June 20, 2000 seemed to be pro-forma and in both instances the Bureau's candidate were selected. Any one, or several, of the incidents I have related may have been accepted as ordinary. However, given the chain of events leading up to the panels I was forced to reach the conclusion that, when viewed in their entirety, the events demonstrate a sustained pattern of discrimination to withhold multifunctional assignments from me and also to prevent my selection for assignments which might be expected to lead to multifunctional positions.

Mr. Tiernan's discriminatory actions (and those who remain to be identified) have been ultra vires, or beyond authority, and the campaign he has orchestrated has unjustly damaged my career and potential for advancement.

What corrective actions do you want taken on your complaint?

I would like to see the proverbial playing field leveled, as I have been disadvantaged and my career adversely affected by individuals both named and unidentified who are administering and influencing the assignments process. Corrective action could include:

1) Selection for the Senior Seminar; and/or Chinese Language & Area Studies School (CLASS) training in Taiwan; with

2) an appropriate ongoing multifunctional assignment.

3) An equal grant of the expanded time in class for my service while on a Congressional Fellowship and at the War College on par with that which is granted to other State Officers, but which has been denied to me as a former USIA officer.

Virginia Hoo Farris
Sept 6, 2000

*Embassy of the United States of America*

η41-00

American Embassy Box 48
APO AP 96546-0001

September 6, 2000

Ms. Deidre A. Davis
Deputy Assistant Secretary for
Equal Employment Opportunity
 And Civil Rights
Department of State
S/EEOCR Room 4216
2201 C Street, NW
Washington, DC 20520-4216

S/EEOCR
2000 SEP 11 A 11: 29
RECEIVED

Dear Ms. Davis:

Enclosed is my formal complaint of discrimination. I had requested that Brenda Ross
provide me with the materials to file such a complaint as she was wrapping up her inquiry
into the particulars of my case. Should you have any questions, please do not hesitate to
call me at 66-2-205-4485 (office) or 66-2-205-4186 (home).

Sincerely,

Virginia Loo Farris
Counselor for Public Affairs

# EXHIBIT 26

## Department of State
### Civil Service

| Category | Fiscal Year 1981 | 1983 | 1985 | 1986 | 1987 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Males | 1,069 34.4% | 1,976 35.6% | 1,621 34.7% | 1,842 35.5% | 1,723 36.3% | 1,914 37.5% | 2,003 37.4% | 2,012 37.7% | 2,063 37.5% |  | 2,056 38.3% | 2,004 38.8% | 1,990 38.6% | 1,978 38.5% | 1,942 37.8% | 2,144 39.0% | 2,540 38.60% | 2,787 39.46% |
| Females | 2,040 65.6% | 2,123 64.4% | 3,021 64.7% | 2,967 64.2% | 3,021 63.5% | 3,190 62.5% | 3,347 62.5% | 3,329 62.3% | 3,442 62.5% |  | 3,308 61.7% | 3,162 61.2% | 3,160 61.4% | 3,158 61.5% | 3,192 62.2% | 3,356 61.0% | 4,040 60.54% | 4,276 60.54% |
| Non-Minorities | 1,836 59.1% | 2,039 61.6% | 2,506 53.7% | 2,476 53.6% | 2,558 53.9% | 2,691 52.7% | 2,873 53.7% | 2,928 54.8% | 2,998 54.5% | 3,000 54.1% | 2,855 54.0% | 2,759 53.4% | 2,700 52.4% | 2,619 51.0% | 2,855 55.6% | 3,003 54.6% | 3,476 52.80% | 3,708 52.43% |
| Minorities | 1,273 40.9% | 1,260 38.2% | 2,136 45.7% | 2,133 46.2% | 2,186 46.0% | 2,358 46.2% | 2,411 45.1% | 2,338 43.8% | 2,390 43.4% | 2,397 43.2% | 2,301 42.9% | 2,189 42.4% | 2,150 41.7% | 2,147 41.8% | 2,178 42.4% | 2,236 40.7% | 2,728 41.40% | 2,813 39.82% |
| Whites | 1,836 59.1% | 2,039 61.6% | 2,506 53.7% | 2,476 53.6% | 2,558 53.9% | 2,691 52.7% | 2,873 53.7% | 2,928 54.8% | 2,998 54.5% | 3,000 54.1% | 2,855 54.0% | 2,759 53.4% | 2,700 52.4% | 2,619 51.0% | 2,855 55.6% | 3,003 54.6% | 3,476 52.80% | 3,708 52.43% |
| Blacks | 1,215 39.1% | 1,180 35.8% | 1,911 40.9% | 1,891 40.9% | 1,930 40.6% | 2,034 39.9% | 2,045 38.2% | 1,972 36.9% | 1,999 36.3% | 1,995 36.0% | 1,912 35.8% | 1,793 34.7% | 1,759 34.2% | 1,747 34.0% | 1,775 34.6% | 1,827 33.2% | 2,280 34.30% | 2,246 31.80% |
| Hispanics | 33 1.1% | 43 1.3% | 107 2.3% | 113 2.4% | 118 2.5% | 171 3.4% | 183 3.4% | 161 3.4% | 199 3.6% | 205 3.7% | 195 3.6% | 189 3.7% | 188 3.7% | 191 3.7% | 193 3.8% | 189 3.4% | 221 3.4% | 263 3.66% |
| Asian-American | 20 0.6% | 29 0.9% | 103 2.2% | 115 2.5% | 120 2.5% | 140 2.7% | 168 3.1% | 171 3.2% | 178 3.2% | 183 3.3% | 179 3.3% | 190 3.7% | 186 3.6% | 192 3.7% | 195 3.8% | 203 3.7% | 223 3.40% | 271 3.80% |
| Native American | 5 0.2% | 8 0.2% | 15 0.3% | 14 0.3% | 18 0.4% | 13 0.3% | 15 0.3% | 15 0.3% | 14 0.3% | 14 0.3% | 15 0.3% | 17 0.3% | 17 0.3% | 17 0.3% | 15 0.3% | 17 0.3% | 22 0.30% | 23 0.32% |
| Unspecified** | 0 0.0% | 0 0.0% | 29 0.6% | 11 0.2% | 4 0.1% | 55 1.1% | 66 1.2% | 75 1.4% | 117 2.1% | 148 2.7% | 168 3.1% | 218 4.2% | 300 5.8% | 370 7.2% | 101 2.0% | 261 4.7% | 378 5.70% | 542 7.70% |
| Total | 3,109 | 3,299 | 4,671 | 4,620 | 4,748 | 5,104 | 5,350 | 5,341 | 5,505 | 5,545 | 5,364 | 5,166 | 5,150 | 5,136 | 5,134 | 5,500 | 6,680 | 7,063 |

* Gender of 'unspecifieds' not identified
** Employee records with missing or undeclared race/ethnic codes at the end of the fiscal year

SOCR (Source HR/RMA -November 28, 2001)

EX 20

## Department of State
### Foreign Service Generalists

| Category | 1981 | 1983 | 1985 | 1986* | 1987 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Males** | 3,984 85.0% | 3,176 83.1% | 3,238 80.7% | 3,398 78.3% | 4,049 78.3% | | 3,752 73.7% | 3,758 74.0% | 3,772 73.9% | 3,747 73.9% | 3,568 73.2% | 3,455 73.0% | 3,322 72.2% | 3,187 71.6% | 3,156 71.0% | 3,148 70.1% | 3,511 67.60% | 3,573 66.15% |
| **Females** | 705 15.0% | 645 16.9% | 776 19.3% | 941 21.7% | 1,119 21.7% | | 1,202 24.3% | 1,264 25.2% | 1,322 26.0% | 1,324 26.1% | 1,309 26.8% | 1,275 27.0% | 1,279 27.8% | 1,266 28.4% | 1,292 29.0% | 1,344 29.9% | 1,682 32.40% | 1,812 33.44% |
| **Non-Minorities** | 4,320 92.1% | 3,354 87.8% | 3,515 87.6% | 3,819 87.9% | 4,565 88.3% | 4,347 87.6% | 4,319 87.2% | 4,381 87.2% | 4,369 85.8% | 4,240 83.6% | 3,937 80.7% | 3,861 82.1% | 3,807 82.7% | 3,650 82.0% | 3,829 86.1% | 3,772 84.0% | 4,339 83.55% | 4,412 81.93% |
| **Minorities** | 369 7.9% | 464 12.1% | 499 12.4% | 520 12.0% | 600 11.6% | 610 12.3% | 623 12.6% | 625 12.5% | 639 12.5% | 637 12.6% | 603 12.4% | 607 12.8% | 610 13.3% | 586 13.2% | 591 13.3% | 592 13.2% | 679 13.07% | 730 13.55% |
| **Whites** | 4,320 92.1% | 3,354 87.8% | 3,515 87.6% | 3,819 87.9% | 4,565 88.3% | 4,347 87.6% | 4,319 87.2% | 4,381 87.2% | 4,369 85.8% | 4,240 83.6% | 3,937 80.7% | 3,861 82.1% | 3,807 82.7% | 3,650 82.0% | 3,829 86.1% | 3,772 84.0% | 4,239 81.55% | 4,412 81.93% |
| **Blacks** | 223 4.8% | 242 6.3% | 254 6.3% | 257 5.9% | 286 5.5% | 273 5.5% | 279 5.6% | 269 5.4% | 268 5.3% | 263 5.2% | 249 5.1% | 246 5.2% | 245 5.3% | 230 5.2% | 224 5.0% | 221 4.9% | 272 5.23% | 288 6.34% |
| **Hispanics** | 104 2.2% | 150 3.9% | 158 3.9% | 166 3.8% | 196 3.8% | 197 4.0% | 200 4.0% | 205 4.1% | 216 4.2% | 213 4.2% | 206 4.2% | 200 4.2% | 205 4.5% | 193 4.3% | 199 4.5% | 197 4.4% | 212 4.08% | 226 4.17% |
| **Asian-American** | 40 0.9% | 58 1.5% | 72 1.8% | 82 1.9% | 101 2.0% | 119 2.4% | 123 2.5% | 130 2.6% | 135 2.7% | 145 2.9% | 132 2.7% | 142 3.0% | 144 3.1% | 147 3.3% | 151 3.4% | 158 3.5% | 176 3.40% | 198 3.67% |
| **Native American** | 2 0.0% | 14 0.4% | 15 0.4% | 15 0.3% | 17 0.3% | 21 0.4% | 21 0.4% | 21 0.4% | 20 0.4% | 16 0.3% | 16 0.3% | 17 0.4% | 16 0.4% | 16 0.4% | 17 0.4% | 16 0.4% | 16 0.30% | 19 0.35% |
| **Unspecified\*\*** | 0 0.0% | 3 0.1% | 0 0.0% | 4 0.1% | 3 0.1% | 7 0.1% | 12 0.2% | 15 0.3% | 86 1.7% | 194 3.8% | 337 6.9% | 242 5.1% | 184 4.0% | 217 4.9% | 28 0.6% | 128 2.8% | 175 3.40% | 243 4.60% |
| **Total:** | 4,689 | 3,821 | 4,014 | 4,343 | 5,168 | 4,964 | 4,954 | 5,022 | 5,094 | 5,071 | 4,877 | 4,730 | 4,601 | 4,453 | 4,448 | 4,492 | 5,193 | 5,385 |

\* Gender of 'unspecified' not identified
\*\* Employee records with missing or undeclared race/ethnic codes at the end of the fiscal year

S/OCR (Source HR/RMA -November 28, 2001)

# Department of State
## Foreign Service Specialists

| Category | Fiscal Year 1981 | 1985 | 1986* | 1987* | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Males | 2,343 61.4% | 2,643 62.8% | 2,828 64.4% | 2,796 65.5% | 2,495 63.7% | 2,415 63.0% | 2,349 62.5% | 2,355 63.0% | 2,321 63.2% | 2,279 63.8% | 2,214 64.6% | 2,143 65.2% | 2,132 66.2% | 2,177 66.7% | 2,397 67.0% | 2,504 66.30% | 2,611 66.13% |
| Females | 1,475 38.6% | 1,556 37.0% | 1,558 35.5% | 1,468 34.4% | 1,422 36.3% | 1,416 37.0% | 1,409 37.5% | 1,385 37.0% | 1,350 36.8% | 1,263 36.2% | 1,214 35.4% | 1,145 34.8% | 1,087 33.8% | 1,089 33.3% | 1,182 33.0% | 1,274 33.70% | 1,337 33.86% |
| Non-Minorities | 3,598 94.2% | 3,796 90.1% | 3,942 89.7% | 3,833 89.7% | 3,476 88.7% | 3,386 88.4% | 3,307 88.0% | 3,242 86.7% | 3,120 85.0% | 2,973 83.2% | 2,802 81.7% | 2,663 81.0% | 2,518 78.2% | 2,805 85.9% | 2,999 83.8% | 3,103 82.10% | 3,186 80.65% |
| Minorities | 220 5.8% | 403 9.6% | 444 10.1% | 433 10.1% | 430 11.0% | 431 11.3% | 433 11.5% | 435 11.6% | 410 11.2% | 385 10.8% | 366 10.7% | 354 10.8% | 363 11.3% | 400 12.2% | 484 13.5% | 570 15.10% | 665 16.84% |
| Whites | 3,598 94.2% | 3,796 90.1% | 3,942 89.7% | 3,833 89.7% | 3,476 88.7% | 3,386 88.4% | 3,307 88.0% | 3,242 86.7% | 3,120 85.0% | 2,973 83.2% | 2,802 81.7% | 2,663 81.0% | 2,518 78.2% | 2,805 85.9% | 2,999 83.8% | 3,103 82.10% | 3,186 80.65% |
| Blacks | 142 3.7% | 216 5.1% | 235 5.3% | 222 5.2% | 207 5.3% | 202 5.3% | 198 5.3% | 195 5.2% | 180 4.9% | 163 4.6% | 152 4.4% | 147 4.5% | 155 4.8% | 162 5.0% | 194 5.4% | 233 6.17% | 278 7.04% |
| Hispanics | 50 1.3% | 113 2.7% | 124 2.8% | 128 3.0% | 136 3.5% | 136 3.5% | 139 3.7% | 139 3.7% | 130 3.5% | 119 3.3% | 114 3.3% | 108 3.3% | 110 3.4% | 125 3.8% | 151 4.2% | 178 4.71% | 203 5.14% |
| Asian-American | 23 0.6% | 47 1.1% | 56 1.3% | 58 1.4% | 63 1.6% | 66 1.7% | 72 1.9% | 76 2.0% | 75 2.0% | 77 2.2% | 76 2.2% | 74 2.3% | 76 2.4% | 89 2.7% | 114 3.2% | 135 3.60% | 150 3.80% |
| Native American | 5 0.1% | 27 0.6% | 29 0.7% | 25 0.6% | 24 0.6% | 27 0.7% | 24 0.6% | 25 0.7% | 25 0.7% | 26 0.7% | 24 0.7% | 25 0.8% | 22 0.7% | 24 0.7% | 25 0.7% | 24 0.63% | 24 0.60% |
| Unspecified** | 0 0.0% | 12 0.3% | 7 0.2% | 5 0.1% | 11 0.3% | 14 0.4% | 18 0.5% | 63 1.7% | 141 3.8% | 214 6.0% | 260 7.6% | 271 8.2% | 338 10.5% | 61 1.9% | 96 2.7% | 105 2.80% | 97 2.50% |
| Total | 3,818 | 4,211 | 4,393 | 4,271 | 3,917 | 3,831 | 3,758 | 3,740 | 3,671 | 3,572 | 3,428 | 3,288 | 3,219 | 3,266 | 3,579 | 3,778 | 3,948 |

* Gender of 'unspecified' not identified
** Employee records with missing or undeclared race/ethnic codes at the end of the fiscal year

SIOCR (Source HR/RMA -November 28, 2001)

U.S. DEPARTMENT OF STATE EEO PROFILE
FOREIGN SERVICE GENERALISTS AND SPECIALISTS - BY GRADE LEVEL
FULL- & PART-TIME PERMANENT

AS OF 09/30/02

1

| TOT MAL | TOT FEM | WHIT MAL | PCT | WHIT FEM | PCT | BLK MAL | PCT | BLK FEM | PCT | HISP MAL | PCT | HISP FEM | PCT | AMER INDN MALE | PCT | AMER INDN FEM | PCT | ASIA AMER MALE | PCT | ASIA AMER FEM | PCT | UNSP | PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 632 | 213 | 561 | 66.4 | 172 | 20.4 | 33 | 3.9 | 25 | 3.0 | 19 | 2.2 | 6 | 0.7 | 2 | 0.2 | 1 | 0.1 | 14 | 1.7 | 8 | 0.9 | 4 | 0.5 |
| 810 | 310 | 701 | 62.6 | 251 | 22.4 | 39 | 3.5 | 36 | 3.2 | 41 | 3.7 | 10 | 0.9 | 5 | 0.4 | 0 | 0.0 | 22 | 2.0 | 12 | 1.1 | 3 | 0.3 |
| 2629 | 1076 | 2266 | 61.2 | 910 | 24.6 | 99 | 2.7 | 70 | 1.9 | 114 | 3.1 | 37 | 1.0 | 11 | 0.3 | 5 | 0.1 | 90 | 2.4 | 36 | 1.0 | 67 | 1.8 |
| 2463 | 1524 | 1854 | 46.5 | 1172 | 29.4 | 154 | 3.9 | 106 | 2.7 | 150 | 3.8 | 69 | 1.7 | 12 | 0.3 | 3 | 0.1 | 112 | 2.8 | 98 | 2.5 | 257 | 6.4 |
| 8 | 84 | 6 | 6.5 | 58 | 63.0 | 0 | 0.0 | 3 | 3.3 | 0 | 0.0 | 8 | 8.7 | 0 | 0.0 | 0 | 0.0 | 1 | 1.1 | 5 | 5.4 | 11 | 12.0 |
| 6542 | 3207 | 5388 | 55.3 | 2563 | 26.3 | 325 | 3.3 | 240 | 2.5 | 324 | 3.3 | 130 | 1.3 | 30 | 0.3 | 9 | 0.1 | 239 | 2.5 | 159 | 1.6 | 342 | 3.5 |

PROVIDED BY HR/RNA

FAR - 634

# EXHIBIT 27

VIRGINIA LOO FARRIS )
)
Complainant, )
)
v. )          EEOC No.
)          100-A3-73148X
DEPARTMENT OF STATE )          Agency No. 00-74
)
Agency )
)

## RESPONSE TO INSTRUCTIONS

1. Complainant was on authorized travel in Egypt when the first discovery request was transmitted on January 05, 2004. Constructive service was received on January 12th when complainant returned to the U.S. Embassy in Pretoria on January 12, 2004.

2. Complainant acknowledges interrogatories and requests for production are continuing in nature and reserves the right to produce additional response after it becomes available.

3. Complainant assumes that all documents in the possession of the Department of State, or archival material from complainant's service with the United States Information Agency, are available to the Department of State. If additional medical release forms are needed, the assumption is the Department will request any releases they require.

4. Complainant has noted in the responses where additional material is required, and in the possession of non-parties, it has been requested and will be provided as noted above in Response 2. It should also be noted that certain digital information was lost due to a hard drive failure. If the state of technology improves to allow retrieval of the information it will be provided at a later date.

5. Instruction 5 is acknowledged and all attempts are being made to comply.

6. Instruction 6 is acknowledged and all attempts are being made to comply.

7. Instruction 7 may apply to material in the possession of the Department of State which is anticipated to be received under the discovery process. Otherwise the information alluded to has been provided in the draft and final reports of investigation, or within the instant responses.

8. Complainant will comply.

9. Complainant defers to the advice of counsel in interpreting this instruction.

EX. 21

10. Complainant will comply.

11. Complainant will comply.

<u>DEFINITION OF TERMS</u>

Complainant defers to the advice of counsel in interpreting the scope of these terms.

<u>COMPLAINANT'S RESPONSE TO
DEPARTMENT'S FIRST DISCOVERY REQUESTS</u>

1.   State the basis for your allegation that your non-selection for the position of USNATO Political counselor/Advisor was based on your race (Asian/Chinese), sex (female).

*Please refer to the ROI Complaint File prepared for the Department of State on my case entitled Virginia Loo Farris, 00-74, Final Copy. All pages in the Exhibit Section are numbered chronologically. See pages 5-9, 145 - 149 (responses to questions 28-36) of the Exhibit Section. This allegation is also based on the statistical composition for officers of my rank o/a September 30, 2000.*

2. State the basis for your allegation that the Agency discriminated against you on the basis of your race and sex when it "acted unfavorably regarding" your bid for Hague AP Political Advisor.

*Please refer to the ROI Complaint File mentioned in the response to Interrogatory #1. See pages 4 (2nd and 3rd paragraphs), 143 - 144 (responses to questions 18-25) of the Exhibit Section.*

3.   State the basis for your allegation that the Agency discriminated against you on the basis of your race and sex when it "acted unfavorably regarding" your bid for PAO Athens.

*Please refer to the Complaint File mentioned in the response to Interrogatory #1. See pages 152-153 (responses to questions 45-54) of the Exhibit Section.*

4. State the basis for your allegation that the Agency discriminated against you on the basis of your race and sex when it  "acted unfavorably regarding" your bid for USNATO Political Counselor/Advisor.

*This interrogatory relates to the response to Interrogatory #1 and my response to question 31 on page 148 of the Complaint File Exhibit Section. The crux is that a white, male officer (Goodman) with fewer years of experience overall, lower level of military education, and certainly less managerial experience was selected as USNATO Political Counselor/Advisor (a senior officer position two grades higher than his own personal grade) and that there was a concerted effort to have me withdraw my bid for this position so as to be able to claim that there were no senior foreign service bidders and thus smooth the way for his selection. Events and dates referred to above indicated that the white male officer (Goodman) was selected after manipulating his eligibility, thus indicating he was "preselected" for the job.*

- 2 of 27 -

5. For each of the positions for which you alleged you were non-selected or not properly "regarded," in Interrogatories 1-4 above, identify every reason why you believe you were more qualified than the person selected.

*For the USNATO Political Counselor/Advisor position, see my response to Interrogatory #4 above and see my response to question #31 on page 148 of the ROI Complaint File Exhibit Section. An independent assessment of the capabilities of the individual selected for the position is given by Robert Hall, a Senior Foreign Service Officer serving at the time in question as USNATO Defense Advisor and DOD Representative of the Secretary of Defense - Europe, in a March 15, 2000 e-mail (see pages 626-627 , especially penultimate paragraph on page 627, of the Complaint File Exhibit Section). It is also my contention that the individual selected was not actually in the bidding cycle having been assigned to Brussels in another position for less than a year (see page 5, 3rd paragraph, and page 70, 3rd paragraph, and page 71, 2nd paragraph of Complaint File Exhibit Section of the ROI).*

*For The Hague AP Political Advisor position, the basis for my complaint is that the assignment procedures for this position were inconsistent, manipulative, and designed to limit a full and open competition. Some of the irregularities follow (see page 4, page 69 2nd paragraph to the top of page 70 of the Complaint File Exhibit Section of the ROI):*

*a. The short list of candidates was prepared before the closing date for bids (see page 4, 2nd paragraph of the Complaint File Exhibit Section). As a result, I withdrew my bid.*

*b. Information was inconsistent and sometimes conflicting. For example, after being told the short list had been sent in October, my CDO told me in a November 18, 1999 fax that "no bids were registered on it" (see page 613, top half, Complaint File Exhibit Section). Yet when I submitted a bid November 19, 1999 (see page 615 and top of 616 of Complaint File Exhibit Section), my CDO in a November 21, 1999 then turned around and said "the short lists have already gone forward" (see page 618 of Complaint File Exhibit Section).*

*For the PAO Athens position, the basis of my complaint again is that the assignment process was manipulated by EUR/EX's Thomas Tiernan, and persons unnamed, in such a way as to force me to take this position so as to remove all Senior Foreign Service bidders from the USNATO Political Counselor/Advisor position and leave the way clear to approve the EUR Bureau's candidate, a white male officer who was two grades lower than the advertised grade of the position and who was not in the bidding cycle. I did not comply with Mr. Tiernan's request but chose instead to withdraw my bid for PAO Athens in the hopes of keeping alive my bid for the USNATO Political Counselor/Advisor position (see page 72, last paragraph of Complaint File Exhibit Section).*

6. State the basis for your allegation that the Agency discriminated against you on the basis of your race and sex when you were subjected to a sustained pattern of discrimination to deny you multifunctional assignments, including (in accordance with the definitions above) identification of each multifunctional assignment upon which you bid, the person(s) who did not properly regard you for the assignment, and all reasons why you believe you were better qualified than the person selected for the assignment.

*Please refer to my September 30, 2002 Declaration in which I responded to essentially the same*

*set of interrogatories (see responses to #1 and #2 which appear on page 164 of the Complaint File Exhibit Section).*

7. State the basis for your allegation that you were retaliated against because of your prior EEO activity when you were made the subject of an OIG investigation involving issues over separate maintenance allowance (SMA).

*Please refer to the ROI Complaint File, pages 78 (start with Initial Background) - 82, page 84 (2nd paragraph) of the Exhibit Section. Also the prejudicial method of handling the allegations were inconsistent with similar cases handled by Department of State. Those precedents can be gained from the Department or AFSA.*

8. State the basis for your allegation that you were retaliated against because of your prior EEO activity when you were prevented from proceeding to your assignment to Pretoria because your medical clearance was intentionally delayed.

*Please refer to the ROI Complaint File, pages 82- 84 of the Exhibit Section.*

9. State the basis for your allegation that you were retaliated against because of your prior EEO activity when the Office of Medical Services discussed you and your family's case before a worldwide conference in Boston, including in particular the basis upon which you believe that Dr. Feinstein discussed your situation with anyone other than Dr. Wadley.

*The basis for my allegation is an admission by Dr. Feinstein in his discussions with my spouse and me. Please refer to the Complaint File, pages 82 - 83 (section on "Post Departure Continuing Retaliatory Action"), particularly the first paragraph on page 83, and page 167, 3rd paragraph of the Exhibit Section. Note that the last digit of the date October 29, 2002, in the last sentence of that paragraph is a typographical error and should actually be October 29, 2001.*

10. State the basis for your allegation that you were retaliated against because of your prior EEO activity when management breached a signed agreement concerning the condition of your medical clearance.

*Dr. Feinstein was the individual involved in reviewing my spouse's medical clearance status in 1999 and from my perspective, was reluctant to consider favorable reports from three eminent psychiatrists in Hawaii (including the one he contracted on behalf the State Department to evaluate my husband). It was only after involvement of an AFSA union representative that State Med proceeded to give my husband a Class 2 medical clearance in September 1999., presumably overruling Dr. Feinstein. It is my contention that this earlier interaction set the tone for subsequent treatment where Dr. Feinstein apparently interposed obstacles to our medical clearance. Mention of my EEO activity appeared in a report commissioned by Dr. Feinstein and prepared by a State Department commissioned psychiatrist who conducted a series of tests on me. That report was delivered to Dr. Feinstein and should be part of my medical record held by the State Department.*

11.  For the persons who allegedly retaliated against you with respect to the issues identified in Interrogatories Nos. 7-10, above, state the basis for your allegations that

- 4 of 27 -

these persons were aware of your prior EEO activity.

*Dr. Steven Feinstein - An August 15, 2001 psychiatric evaluation report done by a contract State Department psychiatrist after administering several tests on me states that I had an EEOC complaint in process, a fact that both I and my spouse also covered directly in our discussions with Dr. Feinstein.*

*Marie Huhtala - Given the degree of tension between Ms Huhtala and myself over the issue of my husband not being allowed to return to Bangkok, the fact that I had involved AFSA in pushing for a Class 2 medical clearance for my husband in September 1999, and the fact that the post engineered a threat to remove my security clearance should my husband remain in Bangkok for a visit in February 1999, it would be logical for Ms Huhtala to expect that I might file an EEO complaint. As DCM Ms Huhtala was aware of all members of post who met with Deidre Davis, then Deputy Assistant Secretary for EEO & CR, during the latter's visit to Bangkok in October 1999. I later informed her I felt I had been forced to file a complaint because of discriminatory actions.*

*Richard Hecklinger - Like DCM Huhtala, Ambassador Hecklinger was aware of my views over the inappropriateness over his decision to bar my husband from returning to Thailand (despite the fact that as an American citizen he had the right to travel). I made repeated attempts to have Ambassador Hecklinger reconsider his position, providing supporting reports from doctors, but he was firm that if my husband came to Thailand, then I would be relieved of my duties. It was only when I found myself scheduled for two conferences abroad that he relented and authorized my husband to visit, have access to my residence and to the children on Embassy property. Within two days of my husband being at the residence, a poster with my husband's photo was circulated to Embassy security guards which barred him from Embassy property. My husband left my official residence as a result.*

*Ambassador Hecklinger was aware of my having been in touch with AFSA. I sent him several requests in writing asking for him to detail his objections to my husband's presence in writing. He chose not to put anything in writing and at one point, asked why are I was sending him memos, saying that I wasn't helping by requesting things in writing. This indicates that he was anticipating, given my past record of using AFSA, that there was likely to be an EEO complaint filed, hence he wanted to have as little in writing as possible. I informed him that I felt I had been forced to file a complaint. Ultimately, as Chief of Mission, it was Ambassador Hecklinger who put forward the OIG complaint against me regarding separate maintenance allowance, not the RSO as he has implied in page 208, bottom of paragraph 3 of Complaint File Exhibit Section. Neither he nor DCM Huhtala made any attempt to discuss this issue with me, despite the fact that I had informed them of my spouse's presence in separate quarters, due to what I believed was an "involuntary" separation as distinguished in the regulation.*

12. For the persons who allegedly discriminated against you with respect to the issues identified in Interrogatories Nos. 1-4 and 6, state the basis for your belief that each of those persons was aware of your race.

*Thomas Tiernan - see Complaint File, page 169 middle paragraph, of Exhibit Section.*

*Steven Feinstein - Dr. Feinstein was aware that I was of Asian background certainly on the*

basis of an August 2001 psychiatric evaluation report mandated by the State Department and his meetings with me. However, my race was discussed in earlier medical reports which Dr. Feinstein reviewed during deliberations concerning the reevaluation of my spouse's medical clearance, which was ultimately granted in September 1999.

Marie Huhtala - Ms. Huhtala was aware of my race on the basis of a few meetings prior to our joint assignment in Bangkok in 1998. At one point I met with her concerning bids for non-public diplomacy cone positions in Thailand (specifically Consul General Chiangmai) when she was the Office Director for EAP/BCLTV.

Richard Hecklinger - Ambassador Hecklinger was aware of my race from the time we met in February 1999.

Harlan D. Wadley - It is my understanding that Dr. Wadley was briefed by Dr. Feinstein as to my case and would have been aware of my race as well as my gender. Certainly upon arrival at post he would have seen that I was an Asian-American.

13. Identify any departmental policies or practices, written or unwritten, that you believe discriminated against you, or caused discrimination against you, on the basis of your race, sex, or in reprisal for prior EEO activity.

See my response to Interrogatory #5 above. I will also cite the practice of deferring paneling of senior positions with hard language, such as Chinese, until a year after what would normally be the start of a two year language training. This effectively forecloses the possibility of an officer, without some prior knowledge of the hard language, ever getting that position (see Complaint File, bottom of page 68 through first paragraph page 68 of Exhibit Section) and promotes a closed "club" atmosphere which is counter to a transparent and fair assignments process.

When the United States Information Agency was merged into the Department of State, protocols and policy announcements concerning the integration of the force promised equal opportunities for promotion and assignment. This has not been the case at large and certainly not for women and/or Asian Americans amongst the now unified foreign service personnel system, regardless of the source of their commission.

The assignment and bidding process is not only different to Foreign Service Information Officers (FSIOs), but more to the point, it appears hostile and discriminatory to Asian-American women in particular. During the bidding cycles of 1999-2000, 2000-2001, and presently in 2003-2004 I have placed about 65 bids for multi/interfunctional positions, not counting the cross-cone and in-cone bids, and I was only accepted for one fellowship, and the in-cone assignment I presently occupy. The available opportunities are stymied by discriminatory pretense. One is told that one is unlikely to be selected for a DCM position without political or econ experience yet when one applies for those positions, the pretense of being out-of-cone or lacking area expertise is raised. This occurs despite Congressional intent to have generalists in the Foreign Service and the Department's wish to have bid lists reflect geographic diversity.

It should be noted that the Department not only encourages geographic diversity, it requires its officers to apply in different geographic bureaus. It is therefore disingenuous for the Department to assert that an officer otherwise equipped with training, managerial, leadership, and budgetary

- 6 of 27 -

experience also have extensive area experience. That is a discriminatory pretense to circumvent the intent of the bidding and assignment process. Yes, there are tokens, but the Department's own statistics do not reflect an even playing field, and the responses of Mssrs. Tiernan, Hecklinger, Vershbow, McGuire, Dance, et al, to indicate a lack of area or subject matter experience is an irrational pretense for their discrimination. If a "smoking gun" is required one only need to review the workforce profile.

In the workforce profile provided by the Department of State, the data snapshot shows that of the 5193 total Foreign Service Generalists as of September 30, 2000, 67.6% were male and 32.4% were female; 3.4% were Asian American. However, in the Senior Foreign Service the disparity amongst the 390 total FE-OCs increases to indicate that 71.8%, or almost three-quarters, were male and 28.2% were female; 2.8% were Asian Americans and Asian American females were 1%. Asian Americans constituted 2.9% of the FS-01 level with Asian American females being 1.1%. Of the 304 FE-MC's, female numbers shrunk to only 20.4% and of those numbers only one Asian-American woman, or a mere .3% was represented. At the highest career level to which one can aspire, the rank or grade of FE-CM, of the 34 Career Ministers only nine were women and the percentages of Asian-Americans, men or women, dropped to zero! Ingrained discriminatory patterns are denying women and Asian-Americans the assignments necessary to prepare them for advancement.

My own entry junior officer class was composed of 33% women, 33% minorities (16.6% of the class was Asian-American). While 50% of the class were selected for promotion to FE-OC, all save one were Caucasian males, and there was only one female, who was also the only minority. None of the class members thus far chosen for promotion to FE-MC, or for multifunctional leadership positions, i.e., ambassadors, deputy chiefs of mission, or office, or directorships, have been females or minorities and certainly no Asian-Americans.

14. Identify all written and oral communications that you believe are pertinent to your allegations in this case.

*The written communication pertinent to my allegations forms the basis for the Complaint File. The same File also includes my rendering of some germane oral communication.*

15. Identify every person to whom you voiced any concern regarding any allegation accepted for investigation in this case, including the date and subject of your concern, and their response.

*As the Complaint File will show, I voiced my concerns to:*

*James Whitlock - I exchanged many emails with Mr. Whitlock to register bids, ask questions and seek clarifications, get guidance, and express concerns (see pp. 613-624 of Complaint File, Exhibit Section).*

*Tom Tiernan - Responded on May 19, 2000, to his e-mail of May 12, 2000 Emil [in which he asked me to "1) accept that you aren't going to be selected for the NATO jobs, 2) tell EUR/PD and Athens that you accept the Athens job." (See pp. 311 to page 314 of ROI Exhibit Section). Janice Bay - Called her May 19, 2000 to express my concerns (see page 81 of Complaint File Exhibit Section) and sent a follow-up email (see page 311 of Complaint File Exhibit Section).*

Kevin McGuire - He called me around May 22, 2000 to discuss my chances for succeeding in the shoot-out and explained the shoot-out process (see page 147, paragraph 3 of the Complaint File Exhibit Section.

Deidre Davis - Spoke with her during her visit to Bangkok. Faxed my formal complaint to her September 6, 2000, which was also sent by registered mail.

Brenda Ross - Called her on June 2, 2000 and on June 5, 2000 I faxed her a copy of Email exchanges which formed part of the basis of my EEO complaint. She did an inquiry, sent me a "Notice of Final Interview and Right to File" dated August 8, 2000, and filed a report dated September 13, 2000

Robert Hall's name was submitted to investigators, but he was not contacted, or given the opportunity to provide a response.

*Additionally, a privileged relationship exists between my legal counsel, legal counsel consulted in the selection process, Sharon Papp, AFSA Legal Counsel, and my spouse, George P. Farris.*

16. Identify the relief you seek in this case. State the basis for and quantify all compensatory damages, including pecuniary losses (including but not limited to out-of-pocket expenses, other past losses, and future losses) and non-pecuniary losses (including but not limited to pain and suffering and mental anguish) that you claim you suffered or will suffer as a result of the alleged discrimination against you.

*My initial suggestions for corrective action were given September 9, 2000 and appear on page 9 of the Exhibit Section of my Complaint File. Additionally, I would intend to seek all legal remedies otherwise available under the law, or by mutual agreement of the Parties. These would include all legal fees and services associated with this complaint presently at $7,773.87, but are rising; for travel and per diem expenses of my spouse's related to working with my attorneys on my complaint; for medical expenses related to counseling for my husband and myself and for my children, for which receipts in the amount of $1,100 are presently available, but additional receipts have been requested from Hawaii and will be supplied after we receive them; for damaged reputation which resulted in low ranking and being denied FE salary level increase for the period April 16, 2001 to the time of resolution or settlement; and such an amount for mental anguish due to the ongoing distress caused by the actions of the Department of State and its employees deemed allowable by the court; and any additional relief allowable by law. Additional documentation will be provided for subsequent expenses claimed, but is not presently available.*

17. If any of your relief is based on any alleged medical condition(s), identify each condition, and describe the treatment you have sought for such condition(s).

*My medical practitioner has not reached conclusive diagnoses since I am still undergoing therapy.*

18. If your answer to Interrogatory 12 is in the affirmative, identify all physicians or other medical personnel you have consulted concerning such conditions and their medical diagnoses.

*This interrogatory, which requests information on medical personnel I've consulted concerning alleged medical conditions, seems to be unconnected to the subject covered in Interrogatory #12. Since the interrogatory is unclear I would need additional clarification before responding.*

19. Identify all witnesses you intend to call on your behalf at a hearing in this case, both to the merits of your case and to relief sought, and provide a summary of the testimony that each will offer.

*Professional witnesses in the areas of human resources, economic compensation, medical conditions (which may include Drs. Robinson, Tsushima, and Fourie) will be selected subsequent to the discovery process. I intend to call Robert Hall who will testify to the predisposition to select an under graded white male Caucasian for the USNATO position and how that individual was manipulated into a stretch assignment. Additionally, William Harris will be called to verify his opinion as to the fitness of my credentials to fill the NATO Political Advisor position. However, should the discovery process uncover additional witnesses I would not waive the right to have my counsel call them to testify.*

20. Identify all persons with knowledge relating to your complaint or the relief you seek in this case.

*Please refer to my responses above and to the information I provided in the ROI to include Drs. Annon, Robinson, Tsushima, Fourie, my legal counsel (to include AFSA legal counsel), and my spouse. However, I reserve the right to add names based on the discovery process results.*

21. Identify all protected EEO activity you have engaged while employed by USIA and the Department of State.

*All activity concerning my EEO complaint and assignment process after discussing the situation with DAS for EEO & CR Deidre Davis October 29, 1999.*

22. Provide all information not otherwise included in the Report of Investigation that you believe supports your complaint.

*See answers above and responses to requests below.*

## Requests for Production of Documents

1. Provide a copy of all documents in support of your complaint.

*See ROI Complaint File. Additional documentation will be requested from the Department of State in the discovery process.*

2. Provide a copy of all documents that you anticipate introducing into evidence at the hearing.

*See ROI Complaint File. Additional documentation will be requested from the Department of State in the discovery process. Also note copy of the following embedded e-mail.*

In a message dated 3/15/00 9:23:17, hallr@natosabxl.brussels.army.mil writes:
-Had a conversation with Bill Harris during boring PJC meeting. Bill says
the job is an MC position which means it is a double stretch for Goodman.
If you are an MC (as I told Bill I thought you were), the State Personnel
people should insist that you have priority. (Assuming no other bidders --
MC or OC's would get priority over Andrew) **To get Andrew into the job Sandy**
**would have to persuade EUR to stall the completion of paneling of the**
**position and hope all the other bidders go away.**

Bill's suggestions are that you get hold of EUR and make sure they know you
are bidding on the job. And that you call Vershbow directly and ask him "to
give you a look, that you can do the job."

Bill says it has not been paneled yet -- but in normal course of events it
should be soon. I don't know much about the state system but i gather that
means EUR and Personnel and maybe others gather and go through a series of
jobs and applicants for them. **To get a stretch into the job, there would**
**have to be some overriding reason based on qualifications, high level**
**interference or no qualified bidders at the right grade. One way you get no**
**qualified bidders at the right grade is to stall the paneling until they all**
**get other jobs. In Bill's mind the argument that you don't have NATO**
**experience is specious. You have Andrew and others under you who do. Half**
**of your job is to manage all this talent. The rest you can learn here.**

I don't think Sandy is completely in love with giving Goodman the job, he is
still hoping for a qualified person at the right grade. However, he is
inclined to take Goodman if he feels he is "being stuck with some loser".
The purpose of a call from you and anyone in EUR that you can get to weigh
in would be to convince him that you are not a loser. I tried to tell him
that but he wasn't paying much attention -- in part because i had to admit
I last worked with you during my IOT training. ( or maybe he thinks i am a
loser or my opinion doesn't count??) But his major thing seemed to be that
he wanted someone with NATO experience. I don't think he has given much
thought to the personnel management aspect of the job -- which is equally
important. That is not one of Sandy's strengths. He is a great guy and
brilliant, but pretty much a lone wolf who just expects people to do their
jobs like he would. Doesn't have much idea about how to put together a team
and make it all work well in harness. There may also be some old prejudice
vs. USIA people in policy jobs -- but that shouldn't cut it with personnel
so he couldn't make that argument up front. Would be pretty ironic though --
if you get the job, his senior staff will be dominated by USIA people. He
doesn't think of me in that sense, because I was gone so long and he never
knew me as a USIA person. Only knows of me as a DoD person.
That's all the info i have. over to you.

FYI. Harris was/is an OC in the position.

3. Provide a copy of all documents you believe support your answers to the foregoing interrogatories.

*See ROI Complaint File. Receipts presently available are appended. Additional documentation will be requested from the Department of State in the discovery process.*

4. Provide a copy of all documents that you believe refute the statements of any individual who provided an affidavit/declaration in the Report of Investigation.

*See email cited in response to Request No. 2 above for Production of Documents. In addition see my Declaration of September 30, 2002 (pages 164-175 of the Complaint File Exhibit Section) in which I refute or contest statements made in the various affidavits.*

5. Provide all written policies that you believe discriminated against you, or caused discrimination against you, in any way.

*Additional documentation to be requested from the Department in the discovery process.*

6. ~~Provide copies of all documents~~ that relate to positions and/or assignments that you have placed at issue in this case.

*See ROI Complaint File. Additional documentation will be requested from the Department of State in the discovery process.*

7. Provide copies of all documents, including correspondence, that relate to your and your husband's medical clearances from 1999 through the present.

*The Department of State, rather than the individual, maintains a complete medical record on personnel and authorized family members, thus requests for copies of those records should be directed internally to the Department of State Medical Division.*

8. ~~Provide copies of all documents that relate to your marital counseling in Pretoria.~~

*~~Reports were provided to Dr. Swift, (RMO/P Pretoria) who has ostensibly included those in my State Department Medical File.~~*

9. Provide copies of all documents that relate to your claim for separate maintenance allowance in Bangkok.

*I am not able to presently locate copies of documents relating to my claim for Separate Maintenance Allowance beyond the general regulations for obtaining SMA. Originals would be in the possession of the Department.*

10. Provide copies of all medical releases signed by you and/or your husband in connection with this complaint.

*Copies of the Authorization for Release of Medical Information for myself and my husband appear in the Complaint File, pages 180 - 181 of the Exhibit Section.*

- 11 of 27 -

11. Provide a copy of your USIA and Department of State medical records.

*The Department of State, rather than the individual, maintains a complete medical record on personnel and authorized family members, thus requests for copies of those records should be directed internally to the Department of State Medical Division.*

12. Provide copies of all medical documentation that support your claim for relief for pain, suffering, or any other related condition, if any.

*Therapy is still in progress and I am not aware of the findings, nor do I possess any medical documentation, although I feel such documentation may be authored at a later date.*

13. Provide a copy of all documents that support your claim for relief and/or damages, including but not limited to your claim for compensatory damages.

*Principal documentation has been submitted in the ROI, other available copies attached. Additional documentation has been requested.*

14. Provide all your medical and other records in the possession of (or considered, relied upon, or prepared by) the individual's identified in response to Interrogatory No. 18.

*Please note response above to Interrogatory No. 18 requesting clarification. In its current form I an unable to meaningfully respond.*

## COMPLAINANT'S RESPONSES TO THE
## DEPARTMENT OF STATE'S REQUESTS FOR ADMISSIONS

1. Admit that you filed a false claim for separate maintenance allowance pertaining to your assignment in Bangkok.

*~~The underlying issue and interpretation is a matter of dispute as yet unresolved, so both the request and any admission requested would be inappropriate and premature.~~*

2. Admit that the issue of your false claim for separate maintenance allowance was investigated by the Office of the Inspector General.

*I admit that the issue of my claim for separate maintenance allowance was investigated by the Office of the Inspector General, but not that the underlying claim is necessarily false.*

3. Admit that the issue of your false claim for separate maintenance allowance was referred to the Office of the Inspector General to the Department of Justice for appropriate action.

*It is my understanding that the issue of my claim for separate maintenance allowance was submitted to the Deputy United States Attorney of additional evaluation and negotiation. As the underlying issue and interpretation is a matter of dispute as yet unresolved, any admission as to the character of the claim would be inappropriate and premature.*

- 12 of 27 -

4. Admit that it was not inappropriate for Dr. Feinstein to discuss your or your husband's medical condition or mental health counseling with Dr. Wadley.

*In my opinion any discussion concerning my assignment after the memorandum of agreement was signed, or any attempt to circumvent the intent was inappropriate, but it is my expectation that experts on medical ethics and confidentiality will be called to introduce evidence on this.*

I, Virginia Loo Farris, have read the above statement and attachments consisting of 27 pages. I declare under the penalty of perjury that my statement is true, correct, and complete to the best of my knowledge, information and belief. Executed this day, January 20, 2004.

_____
Signature of Complainant

Subscribed and sworn before me at the United States Embassy, Pretoria, Gauteng Province, Republic of South Africa, on this 20th day of January 2004.

CONSUL OF THE UNITED STATES
OF AMERICA  PRETORIA  SOUTH AFRICA

- 13 of 27 -