**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                             )
VIRGINIA LOO FARRIS            )
                                             )
                    Plaintiff,        )
                                             )
          v.                               )          Civil Action No. 05-1975 (RMU)
                                             )
CONDOLEEZZA RICE            )
Secretary of State                 )
Department of State               )
                                             )
                    Defendant.    )
_____)

**REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Introduction**

The defendant filed a motion for summary judgment on the grounds that the undisputed

material facts demonstrate that  defendant is entitled to judgment as a matter of law.  Rather than

demonstrate that there is a material fact in dispute or address the legal issues presented, plaintiff

seeks to defer consideration of the motion for summary judgment to engage in unnecessary

discovery.  Plaintiff also raises a battery of "disputed questions" that are at best tangential to her

claims and are based only on her unsupported speculation, opinions and conclusions.  And

finally, plaintiff seeks to inject new claims of discrimination and retaliation into the case that

were not raised below before the EEOC or in the District Court Complaint.

**I.          Response to Plaintiff's Statement of Material Facts in Dispute**

Plaintiff proffers a number of "questions" that purport to be material facts in dispute.

They are not statements of fact referencing parts of the record which support the statement as

required by Local Rule 7(h).[1]  The "questions" are sweeping iterations of plaintiff's unsupported speculation, opinions, and conclusions or are otherwise immaterial to any of the allegations or claims plead in the Complaint.  A response to each numbered paragraph in plaintiff's opposition is as follows (where the questions are actually linked to an argument made by plaintiff, they also are addressed in that context later in the reply):

1.  There is absolutely no evidence in the record that "stereotyping" occurred in this case. This statement is merely unsupported speculation on the part of the plaintiff.  Morover, the alleged "stereotyping" in 1998 (by unnamed individuals) has no connection to plaintiff's claims relating to the selection of "junior white males" for two positions in 1999, because no one involved in the selection process had any involvement with plaintiff in 1998.[2]

2.  This question does not reflect the legal standard applicable to Title VII claims.  The Court may not second-guess how employers rate candidates' qualifications or prioritize among the selection criteria absent evidence of discriminatory motive.  The plaintiff fails to present any evidence from which a jury could conclude that she was significantly better qualified for the positions in question than the selectees. See Holcomb v. Powell, 433 F.3d 889, 893-895 (D.C. Cir. 2006); Carter v. George Washington University, 387 F.3d 872, 881-882 (D.C. Cir. 2004); Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C. Cir. 2003).

---

[1]  Moreover, the plaintiff fails to controvert by reference to the record facts identified by the defendant in its Statement of Material Facts Not in Dispute.  In such circumstances, the Court may assume the facts identified by the moving party are admitted. LcvR 7(h).

[2]   In her declaration, plaintiff claims that unidentified co-workers and State Department employees recommended that she divorce her husband.  Evidence that friends and colleagues recommended that a victim of serious spousal abuse, as evidenced here, divorce her husband fails to support an inference of "Asian" stereotyping or other forms of discrimination.

3. The question is not a statement of a fact. The undisputed evidence, as shown by defendant's Standard Operating Policies and deposition testimony, is that the cede granted for the USNATO position was "possible" and that cedes are granted in every bid cycle where there is an unassigned senior officer who is not qualified or suited for the position (Exhibits 2 and 3, ROI, Ex. F17; Tiernan Dep. at 36, 169).

4. The question does not raise a material issue of fact. One e-mail from one foreign service officer to plaintiff expressing his personal opinion concerning Mr. Goodman's managerial skills does not create a material fact in dispute or in any way demonstrate pretext on the part of the Ambassador (ROI, Ex. F7, Ex. F5, Ex. F10).

5. There is no evidence to support the speculation contained in this question. The undisputed evidence demonstrates that the incumbent was urged to extend his tour (ROI, Ex. F5 at 4). The undisputed evidence reveals that the incumbent made a final decision not to extend his tour in late Spring of 2000. It was only then that Ambassador Vershbow considered Mr. Goodman as a possible fall-back candidate (Id.; see also Exhibit 2).

6. See Response to Paragraph 4. There is no evidence to dispute the relevant subject-matter and regional experience of Mr. Goodman and that those qualifications were deemed the most important by the Ambassador (ROI, Ex. F7; Ex. F5 at 3-4, Ex. F10; Ex. F6b).

7. There is no evidence to support plaintiff's speculation and erroneous conclusions. The only evidence (as opposed to speculation) is that plaintiff bid on the Hague position after the "short list" for the position was submitted (see ROI, Ex. F8a at 2-5; Ex. F18F; F8h).

8. This question is sweeping, vague and ultimately immaterial. Plaintiff's implied assertion that the European Bureau had a "preference" for white males does not create an issue of

fact or demonstrate pretext.  Plaintiff may not assert a pattern-and-practice case in an individual

Title VII case (see infra, pp. 20-21; ROI, Ex. F7; Ex. F10 and Fb6; ROI, Ex. F8a at 23; F2a).

9.  This question is not a statement of fact and is irrelevant.  Mr. Segal was not selected

over plaintiff for the Hague position because the short-list had already been forwarded to NATO

before plaintiff even submitted her bid (ROI, Ex. F8a and F2a).

10.  This question does not raise an issue of material fact.  It is argumentative and is

merely an unsupported assertion by plaintiff.  Plaintiff even fails to identify the "multifunctional"

or "interfunctional" positions about which she complains.

11.  Again, this question fails to raise a triable issue of material fact.  The evidence clearly

establishes that Ambassador Huhtala, as then Deputy Chief of Mission, initiated the investigation

because her job required her to look into possible fraud or waste of U.S. taxpayer resources

which occurs at post [3] (ROI, Ex. F3a; Huhtala Dep. at 55 (Exhibit 5); see also Def. Ex. 8).  There

was ample evidence that plaintiff engaged in conduct which might run afoul of the SMA

regulations. Id.

12.  The undisputed record establishes that Ambassador Huhtala had no discussions with

anyone between 1999 and 2002 regarding plaintiff's job bids (See ROI, Exh. F3, at 8-12).

Although plaintiff's counsel deposed her in March 2004, during her deposition counsel did not

ask Ambassador Huhtala about any post-2002 communications.  He, of course, was free to do so.

Plaintiff's retaliation claim on the part of Ambassador Huhtala is premised on the SMA

investigation and the continuing effects of that investigation on plaintiff's career prospects.

---

[3] At the time, Ambassador Huhtala was serving as Deputy Chief of Mission ("DCM") in
Bangkok; she is now the United States Ambassador to Malaysia.

Plaintiff raised no other claim of retaliation on the part of Ambassador Huhtala at the administrative level, except for the SMA claim (ROI, Ex. B1).

13. This question poses nothing but rank speculation. There is nothing in the record to suggest that a "stereo-typical view of Asian American women" or that "publicity" influenced the outcome of any of plaintiff's 1999 bids. See also Defendant's Response to No. 1.

14. The fact that Ambassador Huhtala did not initiate any other waste, fraud, and abuse investigations is immaterial and does nothing to undermine the fact that there were legitimate non-discriminatory reasons for the investigation of plaintiff, nor does it suggest pretext. Plaintiff has failed to proffer any evidence that Ambassador Huhtala was presented with remotely similar circumstances and failed to refer the matter for investigation.

15. This question presents vague and irrelevant issues. There is no allegation in the Complaint that discussion of plaintiff's "personal issues" constituted retaliation for her prior EEO complaint. While plaintiff initially raised this claim at the administrative level as a separate claim of retaliation, she failed to raise this claim in this Court within 90 days of the final agency decision in her District Court Complaint. 29 C.F.R. § 1614.

16. The only allegation of retaliation raised at the administrative level presently before the Court is the I.G. investigation for SMA payments (ROI, Ex. B1; compare Complaint). Plaintiff added several other allegations of non-selection in her District Court Complaint which she failed to raise at the administrative level. One is her allegation that she was pulled from two DCM "short lists" on which she failed to properly exhaust her administrative remedies as to these positions (See Defendant's Memorandum of Points and Authorities, pp. 30-34 and discussion). 29 C.F.R. § 1614.105(A)(1). To the extent plaintiff raises these DCM positions and

other allegations of non-selection as a basis for her pattern and practice claim, it must fail (see infra, pp. 20-22).

17.  Plaintiff was under an I.G. investigation.  She fails to present any evidence of disparate treatment.  Plaintiff fails to present any evidence that an FSO officer who is under investigation in similar circumstances was treated differently.  Indeed, as a result of that investigation, the U.S. Attorney's Office filed a False Claims Act suit against plaintiff.

18.  This paragraph is merely an allegation and a conclusion, not a statement of a material fact in dispute.

## ARGUMENT

### I.     Summary Judgment May Be Granted Before Discovery

Plaintiff's central argument is that she is entitled to discovery on both her discrimination and retaliation claims.  Plaintiff asserts that she is entitled under Federal Rule of Civil Procedure 56(f) to a range of additional discovery before summary judgment can be considered (See e.g., Opp. at 10-11).  However, Rule 56(f) does not provide a free pass to avoid summary judgment when the requested discovery is cumulative, redundant, or irrelevant to the adjudication of the claims.  See 10b Federal Practice & Procedure § 2741 at 438-41 1998.  Such is the case here.  Plaintiff seeks to delay the inevitable by repeating discovery that already occurred before the EEOC or could have been conducted before the EEOC, and initiating new discovery with no bearing on the merits of her claims.

The party seeking discovery under Rule 56(f) has the burden of identifying what additional, as-of-yet undiscovered evidence would create a disputed, triable issue.  Doe v. U.S. Dep't of Labor, 2006 WL 2615101 at *4-5 (D.D.C. Sep. 6, 2006).  That party must also provide a

6

reasonable basis for believing that the requested discovery will, in fact, produce the desired evidence. Id.; Messina v. Krakower, 439 F.3d 755, 762-63 & n.6 (D.C. Cir. 2005). Finally, the party seeking additional discovery must establish that there had not yet been an opportunity to obtain the desired evidence. Doe, 2006 WL 2615101 at *4-5; Strang v. U.S. Arms Control and Disarmament Agency, 864 F.2d 859, 861 (D.C. Cir. 1989). When a motion for summary judgment is supported by affidavits, for example, there is no justification for probing or challenging the affiants' existing testimony through new depositions unless there is a basis for questioning the affiants' veracity. Strang, 864 F.2d at 861; Radack v. United States Dep't of Justice, 402 F. Supp. 2d 99, 107 & n.9. Here, the plaintiff has failed to meet her burden under Rule 56(f).

One example of plaintiff's claim of the need for additional discovery stands out. Throughout the Opposition, plaintiff asserts the need to take Ambassador Huhtala's deposition (See Opp. at 3, 4, 11-13). Plaintiff has already taken Ambassador Huhtala's deposition during the EEOC proceeding and Ambassador Huhtala also provided a lengthy statement in response to the EEO investigator's inquiries (See ROI, Exh. F3 and Exhibit 3). Contrary to plaintiff's assertions that she has "had no discovery regarding whom Ms. Huhtala may have spoken to when Ms. Loo Farris was applying for positions in 1999," Ambassador Huhtala has unequivocally testified that she spoke to no one about plaintiff's 1999 bids or any bids from 2000-2002 for that matter (Huhtala Dep. at 31-32; ROI, Exh. F3, at 8-11). She also testified that she told no one except Ambassador Hecklinger in Bangkok and the OIG investigator that plaintiff had raised EEO concerns with her (Huhtala Dep. at 34-40). Ambassador Huhtala has also testified at length

about why she asked the Regional Security Officer to look into the SMA issue (Huhtala Dep. at 53-55; ROI, Exh. F3 at 13-15).

Plaintiff seeks to justify additional discovery from Ambassador Huhtala concerning her alleged efforts to damage plaintiff's bid prospects post 2002. The only basis for seeking this additional testimony, which could have easily been asked when her deposition was taken in 2004, is the purported statement to plaintiff by one retired foreign service officer, Peter Kovacs (See Opp. at 3 & Exh. 2 at ¶ 13)(Ms. Farris "understood" from a retired Foreign Service Officer that Ambassador Huhtala thought plaintiff should not obtain a favorable assignment to Indonesia). Plaintiff bases her need for additional discovery on her "understanding" of this second-hand hearsay. Finally, neither plaintiff's administrative EEO complaint nor her District Court complaint alleges that Ambassador Huhtala retaliated against her in the bidding process. There are no post-2002 bids even identified in the Complaint. Plaintiff's retaliation claim focuses solely on the SMA investigation and its repercussions. Plaintiff may not use Rule 56(f) to expand her claims of discrimination and retaliation beyond those asserted in either her EEO complaint or District Court complaint.

A.    The USNATO Position

Plaintiff raises two questions with regard to her bid on the USNATO position that she asserts precludes a grant of summary judgment at this time and demonstrates that she is entitled to discovery. Although plaintiff does not like the answer, both of these questions have been answered. There is no need for any additional discovery.

First, plaintiff questions whether the cede for the USNATO position was "appropriate", and argues that, if it was not, the "abuse" of the ceding process would be evidence of pretext

(Opp. at 11, 18).[4]  Because only a draft of the 1999-2000 bidding guidelines were produced in the EEOC proceeding, plaintiff seeks an additional opportunity to discover the "final" bidding procedures and, possibly, to depose the former Deputy Director of the Office of Career Development and Assignment, Mr. Dance (Opp. at 11).

This argument is misguided, and confuses the distinction between the "bidding guidelines" and the Department's Stretch Assignment Policy.  The Stretch Assignment Policy, which is what applied to Mr. Goodman's placement in the USNATO position, has been produced and it permits cedes in the circumstance presented here (Def. Ex. 2 & Pl. Ex. 21, at 2).  The bidding procedures that plaintiff seeks to discover are not a source of Department policy or procedures for granting cedes, and thus would not shed any light on the matter.[5]  There is absolutely no reasonable basis for believing that the "final" as opposed to the "draft" bidding procedures would affect the Department's long-standing Stretch Assignment Policy (Tiernan Dep. at 38, 169).

With regard to the Department's policy on cedes, plaintiff seeks to raise a factual dispute where none exists.  The defendant does not deny that senior cedes are not "common".  The Department's Standard Operating Policies acknowledges that "such cedes are rare when unassigned senior officers remain" (Def's  Ex. 2 & Opp. Ex. 21, at 2).  The Department does

---

[4]   Again, plaintiff misconstrues her legal burden.  It is insufficient for plaintiff to just prove that the decision was not correct, appropriate, or fair.  She must show that the reason given was a phoney reason and that discrimination was the real reason.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993); Fishbach, 86 F.3d at 1183.

[5]   Plaintiff already sought production of the final bid procedures for 1999-2000.  The plaintiff knows that they are no longer available.  The Department produced the draft procedures only because four years later it was unable to locate a copy of the final version despite a good faith search.  See Opp. Exh. 11.  The plaintiff  had every opportunity to depose Mr. Dance.

have a preference for assigning Foreign Service Officers at grade. Senior cedes are also uncommon because it is unusual to have a senior officer such as plaintiff persevering with a bid on a position so far afield from his or her previous assignments and background and for which the requisite experience is clearly lacking. However, cedes do occur when senior officers remain who do not have the necessary experience or qualifications for the position (Tiernam Dep. at 38, 169).

Thus, it is not surprising that plaintiff's career development officer wrote much earlier in the assignment cycle and months before the "shoot out" for the USNATO position that, at that point, cedes were being granted on a case-by-case basis or in situations where there were no senior bidders (Pl. Ex. 5). Nor is it surprising that Mr. Dance gave, as an example of when a cede might occur, a situation where "a senior level assignment cannot be filled by a senior level officer" that it is not identical to plaintiff's situation (Pl. Ex. 7, at 5). There is nothing in the record which negates the official applicability of Department policy permitting senior cedes or suggests that such cedes never happen.[6]

Plaintiff also "questions" whether Mr. Goodman was truly more qualified for the USNATO position and therefore seeks additional discovery of Mr. Goodman's personnel records (Opp. at 12, 19-20). However, there is already ample evidence of both Mr. Goodman's qualifications for the position and of the factors that were considered important by the Ambassador for the USNATO position. There is nothing in the record to suggest that Mr.

---

[6] To the contrary, Thomas Tiernan testified that "[t]here are circumstances every cycle where they might have some unassigned senior officers left, but they acknowledge that these people are not qualified, there's not a good fit between the officers remaining and the job that a bureau wants to put a lower graded officer in, so they'll cede the job" (Tiernan Dep. at 38-39).

Goodman's official personnel file would shed further light on his qualifications for the position which is already in the record.

Plaintiff contends that she had a better managerial background than Mr. Goodman, and notes one e-mail she received from a Foreign Service Officer denigrating Mr. Goodman's management skills (Opp. at 19-20). Regardless of plaintiff's managerial skills, the undisputed record indicates that she lacked both the regional and the substantive experience for the position. Ambassador Vershbow explained at length that negotiation was "perhaps, the most critical and difficult" aspect of the job. He explained the significance of having the right policy background, and he noted that the person filling the position would need to hit the ground running (Def.'s Exh. 4).[7] The undisputed record demonstrates Mr. Goodman had these skills and the experience. The bottom line, which is undisputed, is that plaintiff was a **public affairs** officer with primarily Asian experience applying for a **political** position in Europe and not just any political slot, but "one of the most critical and demanding oversees FS positions." Id.[8] (emphasis supplied)

---

[7] Plaintiff raises the credibility of Ambassador Vershbow as a final issue by questioning whether Mr. Goodman was really selected "at the very last minute." Opp. at 21 (commenting on Ambassador Vershbow's statement found at ROI, Exh. F5 at 4). Plaintiff notes that the "shoot out" occurred on June 6, 2000 and that Mr. Tiernan suggested that she accept an alternative assignment "as early as May 12, 2000." Apparently plaintiff believes that a period of one month can never fairly be characterized as "the very last minute." But the assignment cycle runs for a year and ends in the spring or early summer. By the last few months of that cycle, most foreign service officers have found a match and accepted a new position. That was clearly the context for Ambassador Vershbow's statement. There is absolutely no basis to challenge the veracity of his statement that he sought to persuade the incumbent to extend his tour for another year, "up until the month prior to the end of his tour of duty." When the persuasion failed, it was "the very last minute" for finding other high-quality candidates. (the deposition of Thomas Tiernan further corroborates Ambassador Vershbow's account (See Tiernan Dep. at 105.)

[8] See also Tiernan Dep. at 47-48, 89-91.

In order to defeat summary judgment, it is not enough to demonstrate that plaintiff was qualified for the USNATO position, or that she believed that she was the better qualified candidate. Title VII is not a basis for the Court to second-guess an employer's evaluation of qualified candidates. Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Therefore, an employer's selection of one qualified candidate over another does not raise an inference of pretext unless there is evidence that the plaintiff was significantly better qualified than the selectee. Id.; Carter v. George Washington University, 387 F.3d 872, 881-82 (D.C. Cir. 2004); see also Holcomb v. Powell, 433 F.3d 889 (D.C. Cir. 2006). Given Mr. Goodman's undisputed background in European policy matters and the significance of that background for the position, there is no way plaintiff can demonstrate that she is significantly more qualified than Mr. Goodman.

**B.      The Hague POLAD Position**

Plaintiff argues that summary judgment is not warranted at this time because she is entitled to discovery into the qualifications of the candidate who ultimately received the assignment to the Hague Polad position, and because supposed inconsistencies in the information she received about whether the position was still open for bids raise the specter of pretext (Opp. at 22-27). Neither of these arguments has merit.

The qualifications of Jack Segal, who received the Hague POLAD assignment, are irrelevant because plaintiff was not in competition with him for the assignment. The undisputed record demonstrates that no one selected Mr. Segal over the plaintiff. By the time plaintiff expressed an interest in the Hague POLAD position, the Department's short list of candidates had already been submitted to NATO (See ROI, Exh. F8a, at 5). Plaintiff could not have bid on

12

the position at that point.  The Department was no longer soliciting bids for the position.  See e.g.

Oliver-Simon v. Nicholson, 384 F. Supp. 298, 306 (D.C. 2005).

Plaintiff complains that she received incorrect information about the status of the

position.  Plaintiff's claim of a  "blizzard of inconsistencies" is greatly exaggerated and beside

the point.  The fleeting miscommunication between plaintiff and her career development officer

and the administrative errors in the computer input on the "hard to fill" list after the bid list had

already been submitted to NATO, does not create a triable issue of fact or create an inference of

discrimination.

Plaintiff first notes that on November 18, 1999 Mr. Whitlock, her career development

officer, wrote in an e-mail that the Hague position "[t]o my knowledge," was still open, even

though she had already been informed by the Deputy Director of Political Military Affairs for

Europe that the short list had already been forwarded to NATO officials (Opp. at 23 & Exh. 17).

The Deputy Director was "responsible for managing the process to fill . . . international positions,

such as Polad jobs, at NATO" (Pl. Exh. 14).  Mr. Whitlock, by contrast, did not have any

involvement with that placement whatsoever and does not purport to have looked into the matter

before e-mailing plaintiff on November 18, 1999.  Indeed, he called the very next day to correct

his error, and confirmed that the short list had in fact already been submitted, just as plaintiff had

been advised by the Deputy Director of Political Military in Europe (See ROI, Ex. F2a, at 4).

Next, plaintiff notes that the Hague POLAD position appeared on a computer list of "hard

to fill" positions in December (Opp. at 23 & Exh. 20).  Once again, Mr. Whitlock apologized and

explained that the person who compiled the "hard to fill" list had simply been misinformed (ROI,

Ex. F2a, at 5).  There is no evidence to suggest that the Deputy Director for Political Military

Affairs responsible for managing the filing of international position was incorrect.  The overwhelming evidence is that Mr. Whitlock was initially misinformed as was the individual responsible for maintaining the computerized "hard to fill" list.

Finally, plaintiff asserts that the explanation of who is involved in vetting and selecting from the short list of candidates once it is submitted was convoluted and unclear (Opp. at 24-25). Plaintiff fails to explain why this matters.  Plaintiff was not on the short list.  Plaintiff's failure to understand the selection process by NATO from the short list is immaterial.

### C.    Multifunctional Positions

Plaintiff still does not identify any specific bids for "multifunctional" positions, let alone point to any evidence of discrimination in the handling of those bids.[9]  As noted previously, plaintiff does not allege discrimination with respect to each and every position.  Rather, she seeks to allege a "sustained pattern of discrimination."  The Supreme Court recognizes such claims only in two contexts not present here: where the government brings a suit on behalf of others or in a private class action suit.  Cooper v. Fed'l Reserve Bank f Richmond, 467 U.S. 867, 876 (1984); Franks v. Bowman Transp. Co., 424 U.S. 747, 772 (1977).[10]

---

[9]  In her deposition, she thought "it was counterproductive to go bid by bid" (Farris Dep. at 40.)

[10]  The entire focus of plaintiff's claims is the alleged discrimination against her.  Plaintiff cannot circumvent the time requirement of Title VII by alleging a pattern and practice case after the rejection by the Supreme Court of the continuing violation theory in National Passenger R.R. Corp. v. Morgan, 536 U.S. 101 (2002).  It was incumbent on the plaintiff to raise each unsuccessful bid as a separate claim of discrimination or retaliation within 45-days of the event. 29 C.F.R. § 1614 et seq.

14

II.     **Retaliation Claim**

Plaintiff's retaliation claim is premised entirely on the Office of the Inspector General's investigation into her receipt of thousands of dollars (approximately $8,500) in "separate maintenance allowance" ("SMA") benefits while her husband and son lived in Bangkok, the same city where she was posted.  See Complaint at ¶¶ 29-37.

Defendant's motion noted the lengthy period of time between plaintiff's EEO activity and the initiation of the SMA investigation by Ambassador Marie Huhtala, who was the Deputy Chief of Mission ("DCM") in Bangkok precludes an inference of retaliation.  Plaintiff does not dispute that courts regularly find that such gaps undermine any possible inference of a causal link between protected EEO activity and alleged retaliation.  See, e.g., Forkkio v. Powell, 306 F.3d 11, 27, 136-38 (D.C. Cir. 2002); Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001).  Plaintiff's only response is that Ambassador Huhtala lacked any opportunity to retaliate until the SMA issue arose (Opp. at 29).  Plaintiff's contention strains credulity as Ambassador Huhtala was the number two figure at Embassy Bangkok, as well as plaintiff's immediate supervisor and the person who "rated" plaintiff's performance (See Huhtala Dep. at 15-16).

Plaintiff attempts to offer a defense of her receipt of SMA benefits on the merits.  She asserts that her family's separation was "involuntary" and therefore her receipt of SMA was not subject to the requirement that family members live in a different country and more than 300 miles away (Opp. at 28).[11]  Plaintiff's analysis misses the mark.  First, the family separation is

---

[11]  SMA is "an allowance to assist an employee who is compelled by reason of dangerous, notably unhealthful, or excessively adverse living conditions at the post of assignment in a foreign area, or for the convenience the Government, to meet the additional expense of maintaining family members elsewhere than at such post."  DSSR 261.1.  The Agency can authorize SMA in the event of an "involuntary" separation "when adverse, dangerous, or notably unhealthful conditions warrant

15

properly characterized as "voluntary" because it was made based on "health, educational or family considerations for the spouse, children or other family member" (Exhibit 10 (attached);DSSR 262.1).  Plaintiff's husband was not ordered to leave Bangkok; he consented to a medical evacuation (See ROI, Ex. F3 at 4).  Moreover, if plaintiff believed that the separation was "involuntary" because the Ambassador concluded that the presence of plaintiff's husband on embassy grounds would be disruptive, it was her responsibility to annotate the SMA application form, which she did not do.[12]

Regardless of whether the separation is voluntary or not, SMA generally is not available when family members are living off embassy grounds but in the same city as the foreign service officer.  The definition of involuntary SMA refers not to the exclusion of family members from the embassy, but to situations in which family members cannot reside in the same "area" as the FSO (Ex. 10 at DSSR 262.1).

In any event, this Court does not need to interpret the finer points of the SMA regulations. The issue is not whether plaintiff could ultimately have defended her receipt of SMA in the suit filed against her by the United States Attorney's Office under the False Claims Act, but whether

---

the exclusion of members of family from the area or when the agency determines a need to exclude members of family from accompanying an employee to the area."  DSSR 262.1.  The Agency also can authorize SMA in the context of a "voluntary" separation "when an employee requests SMA for special needs or hardship prior to or after arrival at post for reasons including but not limited to career, health, educational or family considerations for the spouse, children or other family members." DSSR 262.2.  "Voluntary SMA" is not permitted if family members reside anywhere within the same country or within 300 miles of the employee (DSSR 263.7 (Exhibit 10 attached).

[12]  "An SMA application based on 'for the convenience of the Government' reasons should be annotated in box 15 of the SF-1190 to reflect the following circumstances where appropriate: . . . (2) Where, in the interest of the Government, the agency has; . . . b.  recommended that the family member leave the post of assignment"  (Ex. 10 at DSSR 264.1).

there was a legitimate basis for investigating the matter.  The following undisputed facts

demonstrate that an investigation into plaintiff's SMA benefits was justified.  Plaintiff's husband

and son were living in Bangkok (ROI, Ex. F3); the Regional Security Officer and the Diplomatic

Security Bureau took the matter seriously enough to refer it to the Inspector General's Office

(OIG)(ROI, Ex. F3).  The OIG took the matter seriously enough to refer the matter to the U.S.

Attorney's Office who in turn filed a False Claims Act suit against the plaintiff and recovered

$10,000 in settlement of the matter.

### III.    New Allegations

In the Opposition, plaintiff raises a number of allegations that are not raised in the

Complaint (Opp. at 30-31).  These allegations relate to her medical clearance and the purported

discussion of her spousal abuse situation among Department medical staff and with personnel at

the embassy in South Africa. While plaintiff raised these issues as separate acts of retaliation at

the administrative level, she clearly abandoned them in her  District Court complaint.  Her failure

to assert these allegation of separate acts of retaliation within 90 days of the final agency decision

precludes her from reasserting them at this late date. 29 C.F.R. § 1614.109.

### IV.    Statistical Evidence

Finally, plaintiff offers a range of statistics that she asserts support her allegations of

disparate treatment and are probative as to pretext (Opp. at 31-33).  Admittedly statistics in some

rare cases can be relevant in an individual disparate treatment case, "such evidence generally is

not conclusive and will instead serve to 'add color to the inquiry into the employer's decision-

making process.'" Simpson v. Leavitt, 437 F. Supp. 2d 95, 104-05 (D.D.C. 2006).  Without other

evidence of pretext, however, the <u>Simpson</u> court noted that "there is nothing to which this more generalized [statistical] evidence may 'add color.'" <u>Id</u>.

The raw numbers offered by plaintiff are not probative and are no substitute for plaintiff's lack of evidence of discrimination.  Plaintiff fails to provide any such statistical analysis (<u>See</u>, e.g., <u>Frazier v. Conrail</u>, 851 F.2d 1447, 1452 (D.C. Cir. 1988)) (even for a disparate impact claim, "statistical calculations performed on data . . . are not probative of anything without support from an underlying statistical theory."); <u>Brown v. Small</u>, 437 F. Supp. 2d 125, 136 (D.D.C. 2006) (Simply "offering an array of numbers which, though accurate, have no meaning by themselves," is of no probative value, because "[i]n order to use statistics as evidence of pretext . . . the plaintiff must establish that her statistical comparisons are meaningful."); <u>Roberson v. Snow</u>, 404 F. Supp. 2d 79, 91 (D.D.C. 2005) ("Rather than merely stating that the majority of highly-ranked employees at SOI are white, the plaintiff must demonstrate to the court's satisfaction that [his] statistical comparisons are meaningful") (quotation omitted).

Plaintiff alleges discrimination in assignments and retaliation in the initiation of a waste, fraud, and abuse investigation, but she offers no statistics addressing whether Asian-American women with her qualifications and similar behavior  are disfavored in the assignment process or over-represented in disciplinary investigations.  Instead, plaintiff simply provides a hodge-podge of statistics showing selective racial and gender breakdowns of defendant's workforce at different grades and different times.  She completely fails to control for experience, skill codes, cones, regional experience, language proficiency, all of which are critical to assignments in the Foreign Service.   She also purports to offer her own statistical analysis of how far her own foreign-service class progressed in their respective careers.  Accordingly, her own statistical

analysis fails to factor in the type of experience or the other variables necessarily at play in the assignment and promotion process in the Foreign Service.  However, plaintiff's statistics have no probative value.[13] See Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395 (D.C. Cir. 1988), on rehearing, 852 F.2d 619 (1988)(describing the vigorous standards that must be followed in using statistics in Title VII cases).

### Conclusion

For the foregoing reasons and the reasons set forth in defendant's motion for summary judgment, the Court should grant defendant's motion.

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/
DIANE M. SULLIVAN, D.C. Bar #12765
Assistant United States Attorney
555 4TH St., N.W.,
Room E4919
Washington, D.C.  20530
(202) 514-7205

OF COUNSEL:

DAVID HUITEMAN
Department of State

---

[13]    It is unclear what plaintiff means by "her own foreign service class."  She may be referring to the group that started with her at the former USIA.  There were clearly more than twelve new Foreign Service Officers in the State Department the year that plaintiff joined USIA.  To the extent she is offering statistics based on what USIA did over the course of 20 years, it is very doubtful that these statistics would have any probative value after the merger of USIA and State.