**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| VIRGINIA LOO FARRIS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1975(RMU) |
| | ) | |
| CONDOLEEZZA RICE | ) | |
| Secretary of State | ) | |
| Department of State | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, the defendant renews its motion for summary judgment on the grounds that the undisputed facts demonstrate that the defendant is entitled to judgment as a matter of law.

In support of this motion, the Court is referred to the accompanying memorandum of points and authorities in support of defendant's renewed motion for summary judgment, the statement of material facts as to which there is no genuine issue, and a two volume Report of Investigation, the two volume deposition of the plaintiff, the depositions of Marie T. Huhtala and Thomas Tiernan (with exhibits), and exhibits previously filed with the Court on September 13, 2006, and additional exhibits filed herewith.

Respectfully Submitted,

___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
UNITED STATES ATTORNEY


___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


___/s/_____
DIANE M. SULLIVAN, D.C. BAR #427872
Assistant United States Attorney
Judiciary Center Bldg.
555 Fourth Street, NW, E4919
Washington, D.C. 20530
(202) 514-7205


Of Counsel:
DAVID HUITEMAN
CHARLES P. TRUMBELL
Department of State

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                         )
VIRGINIA LOO FARRIS      )
                         )
          Plaintiff,     )
                         )
     v.                  )      Civil Action No. 05-1975(RMU)
                         )
CONDOLEEZZA RICE         )
Secretary of State       )
Department of State      )
                         )
          Defendant.     )
                         )
```

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff, a public affairs Foreign Service Officer asserts that her failure to receive a range of job assignments through the State Department's "bidding" process was discrimination, and that the investigation of a separate maintenance allowance ("SMA") she received while living in the same city as her husband constituted retaliation. Because she was not promoted within the allotted "time in class," plaintiff was mandatorily retired on September 29, 2006 pursuant to the standard operation of the foreign service personnel system. See 22 U.S.C. § 4007, 3 FAM 6213.3-3. The defendant filed a motion for summary judgment which was denied without prejudice to refile following discovery. Discovery has been completed. The defendant has responded to four sets of interrogatories and requests for documents, producing thousands of pages of documents. Despite extensive

discovery, plaintiff still cannot sustain her burden of proof.

## FACTUAL BACKGROUND

Plaintiff began her government career as a Foreign Service Officer with the United States Information Agency ("USIA") in October 1972 (ROI, Ex. F2a, at 1).[1] While at USIA, she had approximately 13 assignments. Except for her years of training at the National War College (1997-1998) and her congressional fellowship (1983-1984), plaintiff's assignments were essentially as a Public and Cultural Affairs Officer. (Def. Ex. 1, Plaintiff's Curriculum Vitae).

USIA was integrated into the State Department in October 1999 pursuant to an Act of Congress. The State Department Foreign Service consists of five specialties (called "cones") to which Foreign Service Officers are assigned early in their careers. Prior to the integration of USIA with the State Department there were four "cones": political, economic, consular, and administrative. Upon integration, a fifth cone was added to incorporate the USIA Foreign Service Officers: public diplomacy (See generally, ROI, Ex. F2a, at 1). Upon integration, Ms. Farris continued to be assigned to the public diplomacy cone (Id.). The cone with the greatest number of officers is the

---

[1] "ROI" refers to the Report of Investigation of plaintiff's claims of discrimination and retaliation. The defendant is relying on exhibits previously filed on September 13, 2006 under seal, copies of which were delivered to the Court in chambers, in opposition to plaintiff's motion for preliminary injunction.

political cone (ROI, Ex. F7, at 5).  The cones that are understaffed are public diplomacy and administrative (Id.).

Plaintiff began a three-year assignment as Public Affairs Officer ("PAO") to Bangkok that commenced in August 1998 (ROI, Ex. F2a, at 2).  In late 1998, the Family Advocacy Committee in Bangkok learned that the plaintiff had been the victim of spousal abuse (ROI, Ex. F3a, at 3).  She had been hospitalized for broken bones, facial bruising, and a collapsed lung in November 1998 (Id.).  The plaintiff admitted to investigators that her injuries had been caused by her husband (Id.).  The plaintiff's husband departed Bangkok in December 1998 for psychiatric evaluation and to ensure the safety of the plaintiff (Id.).  For these and other reasons, he was not allowed to return to Bangkok for the duration of plaintiff's tour (Id., at 5-6).

In September 1999, for compassionate reasons and in order to enable plaintiff to reunite with her family should she so choose, USIA and plaintiff entered into an agreement (in which the State Department acquiesced) whereby plaintiff could bid early on positions for transfer in the summer of 2000 (a year short of her three-year tour of duty in Bangkok)(ROI, Ex. F2a, at 2-3; see also ROI, Ex. F2b at 10).  The agreement provided that if plaintiff did not receive an assignment to her satisfaction, she could complete her tour of duty in Bangkok and re-bid in the following assignment cycle (ROI, Ex. F10, at 2).  Accordingly,

3

plaintiff bid on potential assignments beginning in the fall of 1999 through spring of 2000.  She did not receive the assignments she desired and decided to remain in Bangkok until the summer of 2001.  During the next bidding cycle she bid on and was assigned to Pretoria, South Africa as Public Affairs Officer.

Plaintiff claims that she was the victim of discrimination, based on her race (Asian) and sex, when she was not selected for the USNATO Political Counselor position; when she was not selected for the Hague POLAD position; when she was not selected for the Public Affairs Officer (PAO) in Athens; and finally, she asserts a claim of a pattern of discrimination to deny her multifunctional assignments.  Plaintiff also alleged that she was retaliated against because of her prior EEO activity when she was made the subject of an OIG investigation. (ROI, Ex. B1).[2]

In her District Court complaint, plaintiff added several other allegations of non-selection which she failed to raise at the administrative level.  They are her non-selection for the PAO in Beijing (Complaint ¶ 34), withdrawal from the bidding process of a position in Jakarta (Complaint ¶ 34), and a posting in Riyadh (Complaint ¶¶ 1, 19).  She also alleges that she was pulled from two Deputy Chief of Mission "short lists" but fails

_____

[2] A review of plaintiff's District Court complaint reveals that she apparently abandoned her claim of discrimination with respect to the Public Affairs Officer (PAO) in Athens and several allegations of retaliation, except the OIG investigation.

to identify them further.  Similarly, she refers in passing to denial of training without further specificity (Complaint ¶¶ 1, 24).  <u>Compare</u> ROI, Ex. B1.[3]

## A.  <u>Positions at Issue</u>

### 1.  <u>USNATO Political Counselor.</u>

The USNATO Political Counselor (sometimes referred to as "Political Advisor" or "POLAD") is one of the principal advisers to the U.S. Permanent Representative to the U.S. Mission to NATO, who was then Ambassador Alexander Vershbow.  (Ambassador Vershbow is currently the U.S. Ambassador to Moscow.)  The USNATO Political Counselor serves as principal U.S. Representative in NATO's Senior Political Committee and in several other high-level NATO bodies, where Alliance position on issues of vital importance to U.S. interests are negotiated (Exhibit 1).  This includes the negotiation of communiqués for NATO Summits and semi-annual Foreign Ministers' meetings, and Alliance decision papers on NATO enlargement, the European security and defense identity, Kosovo, weapons of mass destruction, NATO-Russia relations, and National Missile Defense to name but a few (Exhibit 1).  This is a political cone position.

---

[3] Plaintiff's allegations concerning these selections and denial of training are untimely since they were not raised below. They are discrete acts which are subject to the prerequisite exhaustion requirements of Title VII. <u>See</u> <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002); <u>Ledbetter v. Goodyear Tire & Rubber Co.</u>, 127 S. Ct. 2162 (2007).

In early April, 2000, plaintiff learned that the European Bureau had a candidate one level of seniority below the plaintiff in the Foreign Service personnel system that it was strongly backing for the POLAD position and for whom it would request a "cede" (ROI, Ex. F2a, at 6). "Cedes" are expressly provided for in Department standard operating procedures (Exhibit 2). A "cede" in this context refers to the permission granted by the central Bureau of Human Resources to permit an assignment of an officer who is not in the Senior Foreign Service into a Senior Foreign Service position, commonly referred to as a stretch assignment (Exhibit 2, at Bates 440; Exhibit 10, Def. Response to Interrogatory No. 3).

Although she had been offered the PAO Athens position (see discussion, infra), and despite recommendations to the contrary the plaintiff insisted on what is called a "shoot-out" with the EUR Bureau's candidate for the USNATO position before the Department's assignments committee (Id.). On or about June 6, 2000, the assignments panel selected Andrew Goodman for the USNATO Political Counselor position (Id., at 18; ROI, Ex. F2a, at 8). Plaintiff's Career Development Officer advised her that the reason the panel did not select her for the position was that she had neither regional nor functional experience for the job (ROI, Ex. 18s). Plaintiff had no NATO experience (Farris Dep., March 3, at 13 (Exhibit 3)). Plaintiff's resume shows no experience in

6

the European region or in the political issues relevant to the
position (Def. Exhibit 1).

On May 30, 2000, Ambassador Vershbow sent a memorandum to
the European Bureau setting forth his views for the purposes of
the "shoot-out" as to why Mr. Goodman (FSO-1) was a superior
candidate to the plaintiff (Exhibit 4). Mr. Goodman was at the
time occupying the number two "political" position at USNATO,
i.e., he was the deputy to the incumbent Political Counselor
(ROI, Ex. F7, at 8). As to Mr. Goodman Ambassador Vershbow
states:

> I am confident that Andrew Goodman, while still an
> FS-1, can do the job effectively from day one. He has
> served with distinction for the past two years as
> Deputy Political Advisor (a position with formidable
> negotiating and managerial responsibilities in its own
> right), and he has considerable background in East-West
> and European issues. As head of the policy unit within
> the Political Section, Andrew has had under his wing
> the main substantive issues that are addressed in the
> SPC (e.g., ESDI, the Membership Action Plan). He has
> played a key role on these issues for the current
> POLAD, the DCM and myself, including taking the US
> chair on several occasions as Acting POLAD. His deep
> background on Russia is a particular bonus on issues
> such as NATO enlargement and National Missile Defense;
> his expertise on Germany has paid a similar dividend.
> As a manager, Mr. Goodman drafted our first Mission
> Program Plan in the new format and reconfigured the
> Political Section's portfolios with outstanding
> results. On a day-to-day basis, my impression is that
> the section runs like clockwork under his stewardship.
> In sum, based on his record and first-hand experience,
> I believe Andrew is equipped to take on the full range
> of tasks in the POLAD's portfolio. Moving Andrew
> Goodman up to the POLAD position will also ensure
> maximum continuity as a new DCM, Victoria Nuland, takes
> over this summer.

As to Ms. Farris, he commented:

> I have met personally with the other candidate,
> Virginia Farris, and reviewed her record carefully.
> While she is an excellent officer and has had some
> exposure to Politico-Military issues, she has virtually
> no EUR or NATO experience, little familiarity with the
> national security bureaucracy in Washington and no
> track record as a negotiator (the aspect of the job
> that is, perhaps, the most critical and difficult to
> pick up). While I trust that she has the potential to
> master the many different skills that the POLAD
> position requires, I do not think the Mission can
> afford a lengthy period of on-the-job training,
> especially at a time when the DCM position is turning
> over.

Ambassador Vershbow reiterated his assessments of Mr. Goodman and

Ms. Farris in his Declaration (ROI, Ex. F5, at 3-4).  Moreover,

he emphatically denied that Mr. Goodman was "pre-selected" for

the job as he explains:

> Mr. Goodman was not pre-selected for the position —
> indeed, we sought to persuade the at-grade incumbent,
> William Harris, to extend for one more year, up until
> the month prior to the end of his tour of duty, and
> only made the decision in favor of Mr. Goodman at the
> very last minute, based on the relative qualifications
> of all available candidates.

(Id., at 4).

Plaintiff's lack of comparable regional and political

experience was confirmed by the Deputy Director of the Office of

Career Development and Assignment in the Bureau of Human

Resources at the time of the shoot-out (ROI, Ex. F7, at 9), by

the Director of Senior Assignment in the Career Development

Office at the time of the shoot-out (ROI, Ex. F10, at 3; see also

Ex. F10, at 5), and by the European Bureau (ROI, Ex. F6b (Bates

8

248)).

## 2.  **The Hague POLAD Position**

This position is the Political Adviser to the NATO military commander located at Brunsum, Netherlands (ROI, Ex. F8a, at 2).[4] Thus, it was a NATO position and not a Department of State position (Id.).  As such, the timetable for the selection (and thus the submission of U.S. Government (USG) candidates for the position) was set by NATO and did not correspond to the Department of State bidding and assignment process (Id.).  Other NATO member countries would also have had the opportunity to submit candidates (Id.).  The final selection for this position was made by NATO authorities, not by U.S. government (USG) officials (Id., at 2-3).  The Department's "short list" of potential candidates for NATO consideration was made prior to the receipt of plaintiff's bid on the position (Id., at 5).  The European Bureau explained this to the plaintiff (Id.).

Plaintiff noticed, however, in November 1999 that the job was still listed on the Open Assignments list.  She immediately contacted her Career Development Officer and entered a bid on the position (ROI, Ex. F2a, at 4).  Plaintiff was advised the very

---

[4] At her deposition, the plaintiff claimed that her allegations concerned the assignments system, not her non-selection for the job, see Farris Dep., March 2, at 62.

next day that the short list had already been sent forward to NATO (Id.). When plaintiff noticed in December of 1999 that the position continued to be on a list of jobs that were "hard to fill," she again contacted her Career Development Officer to ask about the apparent contradiction (Id.). Plaintiff's Career Development Officer advised her that "the individual responsible for 'listing the Hague position in the 'Hard to Fill' cable had been misinformed" (Id., at 5).

The person selected for the NATO position was a Department of State Senior Foreign Service Officer (male, Caucasian) at the same rank as Ms. Farris. He had significant experience with the development and implementation of U.S. foreign policy toward Russia and managing U.S. policies in Europe, including at the National Security Counsel (NSC) (ROI, Ex. F8a, at 5; Exhibit 12, Bates Nos. 0335-0344). Plaintiff had no similar regional experience or experience in developing and implementing foreign policy towards Russia or Europe (Pl. Exhibit 4).

### 3. Athens Public Affairs Officer Position

Plaintiff appears to have abandoned her claim with respect to this position.[5] Plaintiff was offered the position of Public

---

[5] Even though plaintiff appears to have abandoned the claim of discrimination with respect to this position in her District Court complaint, the factual circumstances demonstrate her inability to succeed on the merits of any of her claims and her lack of understanding of the Department's unique personnel system. USIA did not merge with the Department of State until October, 1999. This was plaintiff's first experience with the

Affairs Officer in Athens ("PAO") (ROI, Ex. F18m) and voluntarily
chose to turn it down (ROI, Ex. F2a, at 7; ROI Ex. F18n, at Bates
630). Plaintiff listed the Athens PAO job as one of her six core
bids throughout the bidding cycle (Farris Dep., March 3, at 64).
She was both the Bureau's and Embassy's top candidate for the
position (ROI, Ex. F17, at Bates 598).

At plaintiff's request, the paneling of the position was
postponed several times. (ROI, Ex. F18m; ROI, Ex. F18o; and ROI,
Ex. F18r, Bates 635). Ultimately, the Department could wait no
longer as it needed to panel an officer into the job in order to
get that officer into the Greek language training course in the
summer of 2000 (ROI, Ex. 18r, at Bates 635; ROI, Ex. F2a, at 7;
see also ROI, Ex. F17 at Bates 601-602 and F2, Bates 121.
Plaintiff rejected the PAO Athens job choosing instead to
participate in a "shoot-out" for the USNATO Political Counselor
job in Brussels and because she could not arrange to take her
language requirement in Greece rather than at the Foreign Service
Institute (see supra).

### 4. "Multifunctional" Positions and Positions that Might Qualify Her for Multifunctional Positions.

The term "multifunctional" is a term of art within the
Foreign Service personnel system that does not correspond to the
repeated use of the word by the plaintiff. Specifically,

_____

Department's assignment system.

internal Department regulations permit Foreign Service Officers to bid on and be assigned to certain positions designated "multifunctional" outside their cones. 3 FAH 2620 et seq. Officers who apply for and are approved for multifunctionality are given a "multifunctional secondary skill code" (Id.).

Plaintiff did not apply for, nor was she granted, a multifunctional secondary skill code.  Plaintiff uses the term "multifunctional" to mean any job outside her public diplomacy cone (Farris Dep., March 3, at 20).  Positions that she believes would enhance her multifunctionality would appear to include what she considers to be all other career enhancing positions, including political officer, economic officer, and administrative officer positions (Id., at 21, 28, 29).

**B.  Retaliation Claim**

The gist of plaintiff's retaliation claim is that she was referred to the Office of the Inspector General regarding her claim for a Separate Maintenance Allowance ("SMA")[6] because she had not cooperated with the wishes of the Ambassador regarding the return of her family to Bangkok and because she had participated in Title VII protected activities (ROI, Ex. F2b, at 13). ████████████████████████████████████

---

[6] Separate Maintenance Allowance is granted to Foreign Service employees whose spouses are not living close to them at post.  It is intended to offset some of the additional expenses of maintaining two residences (ROI, Ex. F3a, at 13).

12

███████████████████████████

███████████████████████████

██████████ Plaintiff applied for and was granted SMA in September 1999 because her husband and son were then living in the United States (ROI, Ex. F3a, at 13). SMA regulations provide that the SMS allowance cannot be granted if the family members for whom it is obtained spend more than 30 days at a time at the employee's post of assignment or within 300 miles thereof (Id. See also Department Standardized Regulation 260).

In 2001 the Deputy Chief of Mission in Bangkok, Marie Huhtala, learned from the plaintiff that plaintiff's husband had visited Thailand on more than five occasions since he left ███ ███████████████████████████ (ROI, Ex. F3a, at 13-14). She asked the Regional Security Officer ("RSO") to investigate whether Mr. Farris had indeed returned to Bangkok in violation of the Ambassador's request (Id. at 14; Exhibit 13, Bates Nos. 0223-0285). The RSO's investigation revealed that George Farris and son Geoffrey Farris had returned to Bangkok in mid-2000 and were living in an apartment in the city. Plaintiff's son, Geoffrey, had been enrolled in a local school since the fall of 2000 (Id.). DCM Huhtala asked for the IG investigation because of her responsibility to ensure that allowances paid to employees at post were not being fraudulently obtained (Id., at 15). In fact, one of Ms. Huhtala's work

13

requirements as DCM in Bangkok was to investigate any case of
waste, fraud, or abuse (Huhtala Dep., at 55 (Exhibit 5)(Ms.
Huhtala was the U.S. Ambassador to Malaysia until her recent
retirement.)).

Subsequently, the U.S. Attorney's Office for the District of
Columbia filed suit against plaintiff under the False Claim Act,
31 U.S.C. § 3729 et seq. to recover damages and civil penalties
due to plaintiff's fraudulently receiving SMA payments totaling
$8,822.16 that she was not eligible to receive. See United States
v. Farris, Civil Action No. 05-1718.  On August 30, 2005, Ms.
Farris and the U.S. Attorney's Office entered into a settlement
agreement in which Ms. Farris agreed to pay $10,800 to the
government without an admission of liability (Def. Ex. 8).

### Argument

### A.  Summary Judgment Standard

Summary judgment is appropriate when the record shows that
no genuine issue exists as to any material fact and the moving
party is entitled to judgment as a matter of law.  See Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp.
v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co.
v. Zenith Radio, 475 U.S. 574, 587 (1986); Tao v. Freeh, 27 F.3d
635, 638 (D.C. Cir. 1994).  In determining whether a genuine
issue of material fact exists, the trier of fact must view all
facts, and reasonable inferences drawn therefrom, in the light

14

most favorable to the non-moving party.  Matsushita, 475 U.S. at

587.  The mere existence of a factual dispute, however, will not

defeat summary judgment.  The non-moving party must show that the

dispute is genuine and material to the case.  That is, the

factual dispute must be capable of affecting the substantive

outcome of the case and supported by sufficiently admissible

evidence that a reasonable trier of fact could find for the

non-moving party.  Anderson, 477 U.S. at 247-48; Laningham v. U.S.

Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the evidence

favoring the non-moving party is merely colorable, or is not

significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50 (citations omitted).  "[A] complete

failure of proof concerning an essential element of the

non-moving party's case necessarily renders all other facts

immaterial[,] [and] [t]he moving party is 'entitled to judgment

as a matter of law.'"  Celotex Corp., 477 U.S. at 323 (citations

omitted).

Moreover, Rule 56 does not require the moving party to

negate the non-movant's claim or to show the absence of a genuine

issue of material fact.  Celotex, 477 U.S. at 323.  Rather, when

the movant files a properly supported summary judgment motion,

the burden shifts to the nonmoving party to show "specific facts

showing that there is a genuine issue for trial."  Fed. R. Civ. P.

56(e).  Further, the non-movant cannot manufacture genuine issues

15

of material fact with "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions," "or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). See also Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).

## II. **Applicable Title VII Law**

In any Title VII case, the plaintiff bears the burden of demonstrating by a preponderance of the evidence that intentional discrimination was a motivating factor in his or her discriminatory treatment. This burden remains at all times with the plaintiff, Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Generally, the triparte framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) is the method "to bring the court expeditiously and fairly to this ultimate question." Burdine, 450 U.S. at 253.

In Fogg v. Gonzales, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, *inter alia*, that the 1991 amendments to Title VII codified two alternative ways of establishing liability for intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was

16

a "substantial factor" in the employment decision.  Id. at 451.
Under either theory, plaintiff must demonstrate discrimination by
a preponderance of the evidence[7] and may rely on direct or
circumstantial evidence to meet that burden.  Desert Palace, Inc.
v. Costa, 539 U.S. 90, 92-102 (2003).

    In the absence of direct evidence, Plaintiff may attempt to
establish that was the victim of intentional discrimination on
the basis of his race by relying on circumstantial evidence
analyzed using the scheme first set forth in McDonnell-Douglas
Corp. v. Green, 411 U.S. 792 (1973).[8]  Under that scheme, the
plaintiff must first, by a preponderance of the evidence,
establish a prima facie case of discrimination.  See St. Mary's
Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  If the employee
succeeds, the employer then must introduce evidence of a
legitimate, nondiscriminatory reason for its action.  See
McDonnell Douglas, 411 U.S. at 802.  Once it is established that
both parties have met their respective burdens of production

_____

    [7] "Preponderance of the evidence" means such evidence as,
when weighed against that opposing it, has the more convincing
force that something is so.  Hopkins v. Price Waterhouse, 737 F.
Supp. 1202 (D.D.C. 1990), aff'd 920 F.2d 967 (D.C. Cir. 1990);
Metropolitan Stevedore Company v. Rambo, 521 U.S. 121, 137 n.9
(1997).  "[W]hen the evidence is evenly balanced, the [party with
the burden of persuasion] must lose."  Id.

    [8] Reliance on the McDonnell Douglas scheme for testing the
viability of plaintiff's circumstantial evidence is not limited
to the "single-motive" theory of liability.  See Fogg v.
Gonzales, 492 F.3d 447, 451 n.*

(i.e., plaintiff by presenting a prima facie case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant. Hicks, 509 U.S. at 510. Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (citing 42 U.S.C. § 2000e-2(m)).

Plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action. St. Mary's Honor Center, 509 U.S. at 515-518. This a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor. In the single motive case, in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000), Justice O'Connor recognized occasions where summary judgment would be appropriate:

> Certainly there will be instances where, although the
> plaintiff has established a prima facie case and set
> forth sufficient evidence to reject the defendant's
> explanation, no rational factfinder could conclude that
> the action was discriminatory. For instance, an
> employer would be entitled to judgment as a matter of
> law if the record conclusively revealed some other,
> nondiscriminatory reason for the employer's decision,
> or if the plaintiff created only a weak issue of fact
> as to whether the employer's reason was untrue and
> there was abundant and uncontroverted independent
> evidence that no discrimination had occurred.

18

Which ever standard is employed, plaintiff fails to meet his burden of coming forward with evidence to create a triable issue. As demonstrated below, the undisputed facts illustrate that plaintiff can not demonstrate that discrimination was a motivating factor, much less that it was the sole motivating factor in the challenged decision.

In racial discrimination and retaliation suits under Title VII such as the instant case, "the plaintiff may prove his claim with either direct evidence or by indirectly proving a prima facie case under the burden-shifting framework established in McDonnell Douglas [Corp. v. Green, 411 U.S. 792, 802 (1973) ]." Kalekiristos v. CTF Hotel Mgmt. Corp., 958 F. Supp. 641, 665 (D.D.C. 1997). Under this framework, a plaintiff-employee carries the initial burden of production and must establish a prima facie case of discrimination. Id. If a plaintiff-employee does so, the burden shifts to the defendant-employer, who "must then articulate a legitimate, nondiscriminatory reason for its actions." Stella v. Mineta, 284 F.3d 135, 144 (D.C. Cir.2002), citing McDonnell Douglas, 411 U.S. at 802. If the defendant-employer successfully provides a valid reason, the burden shifts back to the plaintiff-employee, who "must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory." Id., citing McDonnell Douglas, 411 U.S. at 804.

19

However, under the D.C. Circuit Court's recent decision in Brady v. Office of Sergeant at Arms, 520 F.3d 490 (D.C. Cir. Mar. 28, 2008), in a disparate treatment case, once the defendant has articulated a legitimate non-discriminatory reason for its actions, the Court "need not- and should not" decide whether a plaintiff who suffered an adverse employment action established a prima facie case. Id. at 494 (emphasis in original). Instead, the Court must focus on one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ." See Short v. Chertoff, ___ F. Supp. 2d ___ 2008 WL 2174856 *6(D.D.C.).

Furthermore, as the D.C. Circuit noted in Brady, although "a plaintiff need not demonstrate that he or she was treated differently from a similarly situated employee or that the position was filled by a person outside the plaintiff's group[,] . . . such evidence (or the lack of such evidence) may be relevant to the determination at summary judgment or trial whether intentional discrimination occurred." Brady, 520 F.3d at 490, n.2. Indeed, "[w]hile a Title VII plaintiff can resort to multiple methods of showing that the employer's stated reason for the employment action was a pretext, the most common method . . . is evidence suggesting that the employer treated other employees

20

of a different race, gender, or national origin more favorably in the same factual circumstances. To prove that she is similarly situated to another employee, a plaintiff must demonstrate that all of the relevant aspects of her employment situation were nearly identical to those of the allegedly comparable employee.'" Laurent, 2008 WL 1710912, at *3 (internal citations and quotations omitted).

"[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Center, 509 U.S. at 515 (emphasis in original). "It is not enough, in other words, to disbelieve the employer, the fact finder must believe the plaintiff's explanation of intentional discrimination." Id. at 519. Plaintiff bears the ultimate burden of persuasion on the issue of whether she was intentionally discriminated against. Burdine, 450 U.S. at 253.

Even if the Court suspects that a job applicant "was victimized by [] poor selection procedures", it "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach v. District of Columbia Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir 1977)) ("It is axiomatic that under the statutory scheme of Title VII … an employer may make an employment decision for a good

21

reason, a bad reason, or no reason at all so long as racial or other discriminatory distinctions do not influence the decision."), aff'd, 595 F.2d 888 (D.C. Cir. 1979). "Once the employer has articulated a nondiscriminatory reason for its actions … the issue is not the correctness or desirability of [the] reasons offered … [but] whether the employer honestly believes in the reason it offers." Fischbach, 86 F.3d at 1183 (internal quotation marks and citations omitted). "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. She must show that the explanation given is a phony reason." Pignato v. American Trans Air, 14 F.3d 342, 349 (7th Cir. 1994), quoted in Fischbach, 86 F.3d at 1183.

Because an employer's selection of one qualified candidate over another qualified candidate raises no inference of discrimination, plaintiff can only meet his burden of showing pretext by presenting evidence from which a jury could conclude that she was significantly better qualified than the selectees. (emphasis supplied) Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 83 (D.C. Cir. 1996); Carter v. George Washington University, 387 F.3d 872, 881-82 (D.C. Cir. 2004). A plaintiff must prove that his or her qualifications were "plainly superior" to the selectee's or summary judgment should be granted. Lathram v. Snow, 336 F.3d 1085, 1091-92 (D.C. Cir.

22

2003); Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C. Cir. 2003)

(comparing rejected plaintiff's credentials with those of

successful applicant, and finding plaintiff "simply not

discernibly better" than applicant); Aka v. Washington Hosp.

Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1988); Poarch v. Caldera,

EEOC Doc. No. 01964230, 1998 WL 685237 (E.E.O.C. Sept. 18, 1998);

see also Holcomb v. Powell, 433 F.3d 889 (D.C. Cir. 2006).

    The "plaintiff's subjective belief of [her] qualifications

is not evidence that can be used to establish that [she] was

qualified for the job." Rasekh v. Veneman, 357 F. Supp. 2d 70, 74

(D.D.C. 2004) (citing Harris v. Univ. of the Dist. Of Columbia,

No. CIV.A.87-2631-LFO, 1990 WL 99316, at *5 (D.D.C. July 6, 1990)

(citing Morser v. AT&T Information Sys., 703 F. Supp. 1072, 1083

(S.D.N.Y. 1989)).

### IV.  Positions at Issue

### 1.  USNATO Political Counselor.[9]

    Apart from the fact that the selectee was a Caucasian male

and the plaintiff was a Chinese-American woman, there is not a

scintilla of evidence in the record that Ambassador Vershbow or

the State Department Assignments Panel intentionally

---

[9] While the plaintiff was eligible to bid on this position,
this is a far cry from establishing that she was qualified (or
competitive) for the position, a necessary element of a prima
facie showing.  Regardless, the defendant has clearly articulated
non-discriminatory reasons for its action and the record is
devoid of any evidence of pretext.

discriminated against plaintiff. ·Indeed, the record is replete with evidence that Andrew Goodman was chosen for the USNATO position because the Assignments Panel (and Ambassador Vershbow) considered him to be the most qualified of the two candidates, without regard to gender or race.

Ambassador Vershbow set forth in considerable detail the requirements of the position and his need for immediate continuity (Exhibit 2). Plaintiff's background and experience simply did not meet the needs of the position. Plaintiff has no NATO or European experience or experience in political-military positions (Farris Dep., March 3, at 13; Plaintiff's Exhibit 4). Her tour of duty as Public Affairs Adviser to the U.S. Pacific Command was in the public diplomacy arena, not in political arena. Her one-year of training at the National War College does not substitute for hands-on experience in a political-military job. Finally, her 1983 Congressional Fellowship bears no discernible relationship to her qualifications for a USNATO political adviser position. The remainder of plaintiff's assignments were exclusively in the public diplomacy field. (Pl. Ex. 4).

The selectee, by contrast, had served with distinction for the past two years as Deputy Political Advisor (a position with formidable negotiating and managerial responsibilities in its own right), and had considerable background in East-West and European

24

issues. (Exhibit 2)

Despite the stark disparity in her qualifications, plaintiff alleges that the reasons for selecting Mr. Goodman are pretextual because Mr. Goodman was "preselected." The record is clear that Ambassador Vershbow's first choice was the incumbent, not Mr. Goodman. Ambassador Vershbow had been attempting to persuade the incumbent in the position to extend his tour of duty, but in the end was unsuccessful (ROI, Ex. F5, at 4). It was only in the spring of 2000, therefore, that the Department was faced with making an immediate decision about a replacement after consideration of all candidates (Id.; see also Exhibit 2). There is no credible evidence of preselection.[10] Moreover, even if preselection were demonstrated by plaintiff, it would not establish sufficient evidence of pretext that would permit a reasonable fact-finder to conclude she was the victim of impermissible discrimination. Preselection does not violate Title VII when such pre-selection is based on the qualifications of the preselected party and not on some basis prohibited by Title VII. See, e.g., Mc Allister v. Runyon, 1994 WL 734528 (EEOC

---

[10] Plaintiff's claim of preselection also fails to take into account that the bidding cycle runs from the preceding fall through the following spring. It was only at the end of the bidding cycle that the incumbent informed all concerned he would not extend (ROI, Ex. F5). Similarly, plaintiff's claim that she was pressured to withdraw her bid for this position reflects nothing more than an honest assessment of her lack of experience and background for this position.

25

July 28, 1994); see also Goostree v. State of Tennessee, 796 F.2d
854, 862 (6th Cir. 1986) cert denied 107 S. Ct. 1374 (1987;
Kennedy v. Laudon, 598 F.2d 337, 341 (4th Cir. 1979). Here, the
superior qualifications of Mr. Goodman for this position are well
documented.

Plaintiff unsuccessfully attempts to challenge Mr. Goodman's
qualifications for the position by noting one e-mail she received
from a FSO denigrating Mr. Goodman's managerial background.
However, this isolated hearsay e-mail from a friend of plaintiff,
who had served with her many years previously, fails to lessen
the documented record of Mr. Goodman's superior qualification for
this position.[11] (See Exhibit 11, Bates Nos. 0010-0016; 0175-
0199). He has extensive education and experience in European
political affairs, particularly Russia. Plaintiff, by contrast,
lacked both regional and substantive experience for such a
sensitive position regardless of her FSO grade. Plaintiff was a
public affairs officer with primarily Asian experience applying

---

[11] The e-mail only notes that Mr. Goodman is not "that
popular with the troops here . . . and probably a pretty poor
manager." Plaintiff (and the e-mail) fails to note the sender's
background and dealings with Mr. Goodman. In other words, the e-
mail fails to establish any foundation for Mr. Hall's gratuitous
opinion. Significantly, the same e-mail demonstrates very little
current knowledge of plaintiff's background, having served with
her a "long-time ago" and is clearly skeptical that she would be
competitive for the job (ROI, Ex. 181; Pl. Ex. 8). The
Ambassador clearly did not share Mr. Hall's opinion. In order to
show pretext, plaintiff must establish more than the Ambassador
misjudged the qualifications. See Holcomb, 433 F.3d 889.

for a political (cone) position in Europe which was considered "one of the most critical and demanding overseas positions" (Def. Ex. 4, Tiernan Dep. at 47-48, 89-91).

Plaintiff asserts that she had a right to the position because Mr. Goodman was an FSO-1 and one level below her Senior Foreign Service status. However, there is no such right. The Department's standard operating procedures specifically provide for the highest-ranking mid-level officers, such as Mr. Goodman to "stretch" into a Senior Foreign Service Assignment. This requires what is known as a "cede" that is subject to approval by the central Bureau of Human Resources (Exhibit 3; ROI, Ex. F17, Bates 598; Plaintiff's Exhibit 9) ("There is no dictum that a senior officer automatically has priority for a senior job". . . the qualifications and background of the senior officer for the job in question are key factors". . . . "Bureaus . . . will not normally put a senior officer into a job they do not have the background at earlier stages of their career."). Although there is a general presumption in favor of at-grade for all jobs at all grades, the qualifications and background of the senior officer for the job in question are key factors (Id.). There are circumstances every cycle where there is an unassigned senior officer who is not qualified for a position or is not a good fit for the position (Tiernan Dep. at 38, 169). Contrary to plaintiff's contention, cedes are granted even when there are

27

senior officers prepared to take the job.  This was such a case.

Simply put, plaintiff's seniority does not trump the prerequisite experience for the position.  Although senior cedes are uncommon, it is also unusual to have a senior officer such as plaintiff persevering with a bid on a position so far afield from his or her previous assignments and background and for which requisite experience is clearly lacking (Tiernan Dep. at 38-39). Plaintiff cannot sustain her burden to show that her qualifications for the position were significantly superior to the selectee or that the articulated reasons were pretext for discrimination. Aka, 156 F.3d at 1294; Holcomb, 435 F.3d 894. The plaintiff cannot show pretext based merely on personal speculation of discriminatory motive or intent.  Green v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).

### 2.  **The Hague POLAD Position.**

The selection for the Hague POLAD position was made by NATO. The defendant's short list was prepared and sent to NATO before plaintiff even bid on the position (ROI, Ex. F8a).  By the time plaintiff bid on this position, it was closed for bidding, i.e. the employer was no longer selecting applicants for the position.

Plaintiff rests her claim of discrimination on her subjective belief that there was something wrong with a system that kept generating the position on open assignments and hard to fill lists.  She persists with this claim of discrimination

28

notwithstanding the undisputed fact that this assignment was a
NATO position, not connected with the Foreign Service bidding
cycle and repeated explanations that the short list had been
forwarded to NATO before she had bid on the position. (Farris
Dep., p. 64).

In November 1999, immediately after plaintiff inquired about
the Hague POLAD position, her Career Development Officer told her
that the "short list" had already been sent to NATO (ROI, Ex.
F18f). However, it continued to be listed as an available
position on the December 1999 jobs "hard to fill" list (ROI, Ex.
F18h). A mistake on the computer generated list of assignments
or a mistake by the person who listed the job in a "Hard to Fill"
document does not evidence intentional discrimination. (Id. at
5). The office simply failed to adjust the list in December 199
to reflect that the short list of candidates had been sent to
NATO. The plaintiff finds this suspicious and asks us to infer
discrimination and/or pretext. But plaintiff's subjective belief
or her unsupported conspiratorial speculation simply cannot
sustain her burden of proof.

Moreover, even if plaintiff's relative qualifications had
been an issue (which they were not), the Department had
legitimate non-discriminatory reasons for putting the selectee on
the short list rather than the plaintiff (the Department did not

29

make the ultimate selection, however).[12]  The selectee was a
Department of State Senior Foreign Service Officer (male,
Caucasian) at the same rank as Ms. Farris, who had significant
experience with the development and implementation of U.S.
foreign policy toward Russia and managing U.S. policies in Europe
(ROI, Ex. F8, at 5; see Exhibit 12; Bates Nos. 0335-0339 (1999
performance appraisal confirms Jack Segal was Senior Foreign
Service Officer).  Plaintiff had no such experience.  Thus,
plaintiff fails to establish sufficient evidence that would
permit a reasonable fact-finder to find in her favor.

### 3.    Pattern of Discrimination in Multifunctional Assignments.

Again, plaintiff cannot sustain her burden of proof with
respect to any of these assignments.  The complaint accepted for
investigation is that the Department engaged in a "sustained
pattern of discrimination" to deny her what she likes to term
"multifunctional" assignments and assignments that "might"
qualify her for "multifunctional" assignments (ROI, Ex. C, at
Bates 058).  Plaintiff's allegations are amorphous and subjective
at best, and are wholly unsupported by any evidence.

The plaintiff does not allege discrimination with respect to
each and every position.  ("I think it is counterproductive to go

---

[12] Plaintiff makes absolutely no attempt to argue let alone
prove that she was better qualified than the selectee for this
position.

bid by bid." Farris Dep., March 3, at 40.)  Nor does plaintiff even know who was selected for whatever positions she believes are in question (See, e.g., Farris Dep., March 3, at 47).  In her deposition, she conceded:  "I don't honestly know whether there was a conspiracy" (Id. at 35).

The plaintiff has failed to produce a scintilla of evidence to sustain a pattern and practice claim of discrimination nor has she demonstrated that she was better qualified for any of these positions than the selectee.  The Department had legitimate non-discriminatory reasons for not assigning her to the positions on her bid lists.  Unlike her experience at USIA, plaintiff was competing with high level Foreign Service Officers who had devoted their careers to specific regions of the world and cones and professional expertise and niches other than public diplomacy.  Finally, plaintiff refused to consider career-enhancing jobs in Washington, D.C. and was by her own admission limited in terms of where she could bid based on her husband's medical clearance (Id., at 39-40).  Plaintiff ignored every effort of those counseling her to enhance her career by playing her strong card:  her excellent service as a public diplomacy officer in the public diplomacy cone.

To take but a few examples: Plaintiff cites the "SHAPE POLAD" position as evidence of a sustained pattern of discrimination (Farris Dep., March 3, at 43)("SHAPE" is the

31

acronym for "Supreme Headquarters Allied Powers Europe."). She
alleges, without further specificity that her non-selection for
this position and others "caused me to wonder" if it was on the
basis of race or gender. Id. This position is the "crown jewel"
of POLAD jobs (ROI, Ex. F18k). Her competition that year
consisted of three ambassadors, all with extensive regional and
political/military experience (ROI, Ex. F17, at Bates 598).

She also cites a Deputy position at AIT-Taipei (Farris Dep.,
Mar. 3, at 45-46). The Department deferred filling this position
for a year (Id.). In other words, the Department was no longer
seeking applicants for this position during that bidding cycle.
There is no evidence whatsoever that it made this decision just
to deny the plaintiff the position. The issue of the deferral
was raised with her on one of her very first inquiries concerning
this position. This was also the case for the Deputy position in
Hong Kong (ROI, Ex. F2b, at 20). For this position she alleges a
"possible" element of discrimination, but again proffers no
evidence. (Farris Dep., March 3, at 46). Other positions
included Deputy Chief of Mission at the U.S. Mission to the
European Union, which "raised questions in [her] mind" (Id., at
47). She does not know who got the position and makes no attempt
to demonstrate that she had superior qualifications (let alone
just the qualifications). (Id.). She also sought a Deputy
position in Hong Kong (Id., at 48-49). This, too was deferred,

and there is no evidence whatsoever in the record linking that deferral to the plaintiff (Id.). Plaintiff sought a public diplomacy position at USNATO, but the incumbent (a woman) extended in the position (Id., at 51-52). These are but a few examples of the positions on which plaintiff "speculates" that she was not selected for discriminatory reasons. Plaintiff's unsupported speculation about motives and personal beliefs about her qualifications cannot sustain her burden of proof.

The record is replete with evidence that plaintiff was less competitive for jobs in the European regions where she had never served and for jobs outside her cone. Nevertheless, of the 24 bids she claims were "denied her" in 1999-2000, 10 were Deputy Chief of Mission (DCM) (or other "deputy") jobs at critical U.S. Embassies and consulates, including USNATO, Brussels, Bern, Geneva, Canberra, Santo Domingo, Amman, Colombo, Hong Kong (discussed above), and Taipei (discussed above). Two were for positions as head of the entire Consulate in Ciudad Juarez and Shanghai. Six were for high-level political jobs outside her cone and region: USNATO (discussed above), NATO-IS, the U.S. Mission to the European Union, London, Paris, and the OECD. Plaintiff fails to demonstrate in any way that she was objectively qualified for these positions and completely fails to demonstrate that she was significantly better qualified than the selectees. Three were POLAD jobs in The Hague (discussed above),

33

SHAPE (discussed above), and Stuttgart (ROI, Ex. F2c, at 13-14).
The incumbent in the Stuttgart job extended (ROI, Ex. F18f).
There is not a scintilla of evidence in the record that suggests
a "pattern of discrimination" against plaintiff.   Rather, it
evidences that plaintiff's list of bids was, at best, wholly
unrealistic.   Plaintiff's unsupported beliefs and erroneous
conclusions are insufficient to sustain her burden of proof.
Stewart v. Ashcroft, 352 F.3d at 429-430.

     Finally, plaintiff's pattern and practice argument lacks
merit because the Supreme Court recognizes such claims in only
two contexts: where the government brings suit on behalf of
others or in a private class action suit.   See Cooper v. Fed'l
Reserve Bank of Richmond, 467 U.S. 867, 876 (1984); Franks v.
Bowman Transp. Co., 424 U.S. 747, 772 (1977); see also, Celestine
v. Petroloeos DeVenezuella SA, 266 F.3d 343, 355 (5th Cir. 2001);
Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 759 (4th Cir.
1998), vacated on other grounds, 527 U.S. 1031 (1999); and Gilty
v. Village of Oak Park, 919 F.2d 1247, 1252 (7th Cir. 1990).
Neither applies in this case.

C.   **Plaintiff's Retaliation Claim**

     The DCM, Ms. Huhtalà, was aware of plaintiff's prior EEO
activity which was filed in September 2000.   The actions taken by
Ms. Huhtala to investigate possible improper receipt of SMA
payments almost a year later fails to demonstrate the causal

34

connection necessary for a prima facie case of retaliation.
Forkkio v. Powell, 306 F.3d 1127, 1136-1138 (D.C. Cir. 2002);
Clark County School District v. Breeden, 532 U.S. 268, 273 (2001)
(finding that a 20-month lag suggests no causality at all)
(quoting with approval cases finding 4-month and 3-month lags
insufficient to establish causality); see also Devera v. Adams,
874 F. Supp. 17, 21 (D.D.C. 1995) (eight months does not strongly
suggest causal link). Ware v. Burlington, 344 F. Supp. 2d 63
(D.D.C. 2004) (initiation of an investigation by itself is not an
adverse action).

In any event, the undisputed evidence reveals that
plaintiff's husband and son returned to Bangkok in mid 2000
contrary to the Ambassador's request (ROI, Ex. F3a at 13-14).  As
a result, plaintiff was not entitled to SMA.  The impetus for the
investigation was not her prior EEO activity, but the return of
her family to Bangkok and the continued acceptance of SMA.  The
Deputy Chief of Mission was obligated to investigate any case of
waste, fraud or abuse with respect to erroneous or illegal
payments to embassy staff (Huhtala Dep. at 55).  The U.S.
Attorney's Office instituted a False Claim Act suit to recover
the SMA payments.  The suit was resolved by a stipulation of
settlement which required repayment to the government (see Def.

Ex. 9).[13]

Plaintiff's claim of retaliation is meritless. She was not entitled to the SMA payments. Indeed, her husband and son were not supposed to even be in the country. It is axiomatic that because plaintiff has a pending EEO complaint, it does not entitle her to more favorable treatment than she would otherwise be entitled. Moreover, plaintiff's disagreement (or even frustration) with the Department's decision ███████████ ██████████████████ and the Ambassador's understandable request that her husband not return to post, does not give her either the right to collect SMA or to have her family at post. It certainly does not permit her to do both. Plaintiff cannot sustain her claim of retaliation.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment, should be granted.

---

[13] Although the plaintiff denied liability in the False Claims Act settlement, the fact that the settlement amount exceeded the single damages amount suggests that she realized that she faced a potent judgment under the FCA.

36

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/
DIANE M. SULLIVAN, D.C. Bar #12765
Assistant United States Attorney
555 4TH St., N.W.,
Room E4919
Washington, D.C.   20530
(202) 514-7205


Of Counsel:
DAVID HUITEMAN
CHARLES P. TRUMBELL
Department of State

37

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VIRGINIA LOO FARRIS )
)
)
Plaintiff, )
)
v. )    Civil Action No. 05-1975(RMU)
)
CONDOLEEZZA RICE )
Secretary of State )
Department of State )
)
Defendant. )
)

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

The defendant, in accordance with Local Rule 7.1(h), submits the following statement of material facts as to which there is no genuine issue:

1.    Plaintiff began her career as a Foreign Service Officer with the United States Information Agency (USIA) in October 1972. (ROI, Ex. F2a; see also Def. Ex. 1)

2.    USIA was integrated into the State Department by Act of Congress in October 1999.

3.    The State Department's Foreign Service consists of five specialties or "cones" to which Foreign Service Officers are assigned early in their career. (ROI, Ex F2a).

4.    Prior to the integration of USIA with the State Department there were four "cones": political, economic, consular, and administrative. Upon integration, a fifth cone was added to incorporate the USIA Foreign Service Officers: public diplomacy (See generally, ROI, Ex. F2a, at 1).

5.    Upon integration, Ms. Farris continued to be assigned to the public diplomacy cone (Id.).

6.    Foreign Service Officers are assigned for two to three year tours of duty by a bidding process.  Most assignment decisions for personnel at the FS-01 (the rank directly below that of Senior Foreign Service) level through the ranks of the Senior Foreign Service are handled by the general assignments committee and fall under the auspices of the Senior-Level Assignments Division in the Bureau of Human Resources (ROI, Ex. F7, at 4, 6)

7.    Decisions on Deputy Chief of Mission ("DCM") positions are made by a separate  "DCM Committee." Id.

8.    Plaintiff began a three-year assignment as Public Affairs Officer ("PAO") to Bangkok that commenced in August 1998 (ROI, Ex. F2a, at 2).

9.    In late 1998, ███████████████████████████ ██████████████████████████████████████████ (ROI, Ex. F3a, at 3). ████████████████████████ ██████████████████████████████████████████ (Id.).

10.  ██████████████████████████████████████ ██████████████████████████████████████████ ████████████ (Id.).  For these and other reasons, he was not allowed to return to Bangkok for the duration of plaintiff's tour (Id., at 5-6).

11.   In September 1999, for compassionate reasons and in order to enable plaintiff to reunite her family should she so choose, USIA and plaintiff entered into an agreement (in which the State Department acquiesced) whereby plaintiff could bid early on positions for transfer in the summer of 2000 (a year short of her three-year tour of duty in Bangkok)(ROI, Ex. F2a, at 2-3; see also ROI, Ex. F2b at 10).

12.   The agreement provided that if plaintiff did not receive an assignment to her satisfaction, she could complete her tour of duty in Bangkok and re-bid in the following assignment cycle (ROI, Ex. F10, at 2).

13.   Accordingly, plaintiff bid on potential assignments beginning in the fall of 1999 through spring of 2000.  She did not receive the assignments she desired and decided to remain in Bangkok until the summer of 2001.

14.   Plaintiff bid on the Athens Public Affairs (PAO) position. She was both the Bureau's and Embassy's top candidate for the position (ROI, Ex. 17 at 598).

15.   At plaintiff's request, the paneling of the position was postponed several times. (ROI, Ex. F18m; ROI, Ex F18o; and Ex. 18r at 633).

16.   Finally, the Department could wait no longer to fill the position because the officer had to be placed into the Greek language training course in the summer of 2000.  (ROI, Ex. 18v at 635; ROI Ex. Fza at 7).

3

17.   Plaintiff rejected the PAO job in Athens and instead chose to participate in a "shoot out" for the USNATO Political Counselor job in Brussels before the assignment's committee **with EUR Bureau's candidate for the position.**  (Id.).

18.   In early April, 2000, plaintiff learned that the European (EUR) Bureau had a candidate ranked one level below the plaintiff in the Foreign Service personnel system that it was strongly backing for the position and for whom it would request a "cede" (ROI, Ex. F2a, at 6).

19.   "Cedes" are expressly provided for in Department standard operating procedures (Exhibit 2).  A "cede" in this context refers to the permission granted by the central Bureau of Human Resources to permit an assignment of an officer who is not in the Senior Foreign Service into a Senior Foreign Service position (Exhibit 2, at Bates 440).

20.   Plaintiff's Career Development Officer advised her that the reason the panel did not select her for the position was that she had neither regional nor functional experience for the job (ROI, Ex. 18s).

21.   Plaintiff had no NATO experience (Farris Dep., March 3, at 13 (Exhibit 3)).  Plaintiff's resume shows no experience in the European region (Def. Exhibit 1).

22.   On May 30, 2000, Ambassador Vershbow sent a memorandum to the European Bureau setting forth his views for the purposes of the "shoot-out" as to why Mr. Goodman was a superior candidate

4

to the plaintiff (Exhibit 4). Mr. Goodman was at the time occupying the number two "political" position at USNATO, i.e., he was the deputy to the incumbent Political Counselor (ROI, Ex. F7, at 8). He had considerable background in East-West and European issues; a deep background on Russia and Germany; and he ran the day to day operations in the Political Section of the Embassy. Finally, he was an excellent negotiator which is a critical part of the job. Id.

23. Ambassador Vershbow met personally with Ms. Farris and reviewed her record carefully. While he thought she was an excellent officer and has had some exposure to Politico-Military issues, she had virtually no EUR or NATO experience, little familiarity with the national security bureaucracy in Washington and no track record as a negotiator (the aspect of the job that is, perhaps, the most critical and difficult to pick up). Ambassador Vershbow did not think the Mission could afford a lengthy period of on-the-job training for Ms. Farris, especially at a time when the Deputy Chief of Mission (DCM) position is turning over. Id.

24. Plaintiff's lack of comparable regional and political experience was confirmed by the Deputy Director of the Office of Career Development and Assignment in the Bureau of Human Resources at the time of the shoot-out (ROI, Ex. F7, at 9), by the Director of Senior Assignment in the Career Development Office at the time of the shoot-out (ROI, Ex. F10, at 3; see also

5

Ex. F10, at 5), and by the European Bureau (ROI, Ex. F6b (Bates 248)).

25.  Plaintiff attempted to bid for the position of Political Advisor to the NATO military commander located in Brunsum, Netherlands.  This is a NATO position.  (ROI, Ex. F8a at 2).

26.  The Department's "short list" of potential candidates for NATO consideration was made prior to receipt of plaintiff's bid.  Id.

27.  The person selected for the position was a Department of State Senior FSO (male, caucasian) with the same rank as plaintiff (ROI, Ex. F8a).  He had significant experience with the development and implementation of U.S. foreign policy towards Russia and National Security Counsel experience.  (ROI, Ex. F8 at 5).

28.  Plaintiff had no similar regional experience or political experience in developing foreign policy towards Russia or Europe.  (Def. Ex. 1).

29.  Internal Department regulations permit foreign service officers to bid on and be assigned to certain positions designated "multifunctional secondary skill code".  (2 FAH 2620 et seq.)

30.  Plaintiff did not apply for, nor was she granted, a multifunctional secondary skill code.  (Farris Dep. March 3, p. 20).

6

31. Plaintiff's family returned to Bangkok in mid-2000 during which time plaintiff received a separate maintenance allowance. (ROI, Ex. F3a).

32. The U.S. Attorney's Office filed suit against plaintiff under the False Claim Act, 31 U.S.C. § 3729 et seq., to recover damages and civil penalties. Ms. Farris settled that claim in August 2005 agreeing to pay $10,800 to the government. (Def. Ex. 8).

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/
DIANE M. SULLIVAN, D.C. Bar #12765
Assistant United States Attorney
555 4TH St., N.W.,
Room E4919
Washington, D.C. 20530
(202) 514-7205

Of Counsel:
DAVID HUITEMAN
CHARLES P. TRUMBELL
Department of State