**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**VIRGINIA LOO FARRIS,**                             )
                                                    )
     **Plaintiff**              )
                                                    )
**v.**                                              )       **Case No. 05-1975 (RMU)**
                                                    )
**CONDOLEEZA RICE,**                                )
                                                    )
     **Defendant**              )
_____)

**PLAINTIFF VIRGINIA LOO FARRIS' OPPOSITION TO DEFENDANT'S**
**RENEWED MOTION FOR SUMMARY JUDGMENT**

      The Plaintiff Virginia Loo Farris ("Plaintiff" or "Loo Farris"), through counsel,

hereby files this Opposition to Defendant's Renewed Motion for Summary Judgment.

Ms. Loo Farris will cite either to deposition transcripts already on file, to the Report of

Investigation ("ROI") previously submitted, to Exhibits 1-27 previously submitted by her

on September 20, 2006 in opposition to a prior motion for summary judgment

("Opposition"), or exhibits to this motion, which will begin with Exhibit 28 to be

consistent with the prior set of exhibits.

**SUMMARY OF ARGUMENT**

      Ms. Loo Farris has made out a claim of unlawful discrimination sufficient to

survive summary judgment.    Based on recent D.C. Circuit precedent, even if the jury

finds that her claim does not meet the standards for a single motive case, they may still

find a violation under a mixed motive theory.    Under a mixed motive claim, a plaintiff

can, but is not necessarily required to, satisfy the strict burden shifting standards under

McDonnell-Douglas.    The overarching test under even the single motive case is

1

whether an employee has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason, which is in fact that the employer discriminated against the employee.

The D.C. Circuit has recognized in 2008 in <u>Brady v. Office of the Sergeant at Arms</u> that inconsistent explanations and violations of policies may be used to evidence pretext for purposes of showing unlawful discrimination.  Most recently, in <u>Desmond v. Mukasey</u>, 2008 U.S. App. Lexis 13803 (D.C. Cir. July 1, 2008), the Court held that vigorously disputing defense rationales and facts is sufficient to withstand summary judgment.

As to the US NATO position at issue, the State Department, by admissions of its own officers and the opinion of an outside expert, did not follow its own procedures in passing over Ms. Loo Farris.   As to The Hague position, the State Department gave Ms. Loo Farris a barrage of inconsistent explanations during the bidding process, for which a jury could well find unlawful discrimination.    As to both these positions, therefore, summary judgment should be denied under <u>Brady</u>.

Also, Ms. Loo Farris has provided circumstantial evidence of a variety of retaliatory acts that satisfy the standards in <u>Burlington Northern and Santa Fe Railway Company</u>, in which the Supreme Court in 2006 broadened retaliation to include any act that might deter an EEO complaint.   Ms. Loo Farris had complained to her then supervisor, Marie Huhtala, of discrimination in 1999, and Ms. Huhtala initiated a retaliatory investigation, and continued to sabotage Ms. Loo Farris' career prospects as late as 2005, based on the discovery.

## STATEMENT OF FACTS

Plaintiff has sorted through voluminous records provided by Defendant, many of which generally address issues as to Plaintiff's background and history of service, and are not directly probative of discrimination or Plaintiff's discrimination complaints.   But the fundamental issue as to discrimination remains Ms. Loo Farris being passed over in favor of a junior white male officer for one post, and another white male in another post.   The retaliation claims are likewise inappropriate for summary judgment under the prevailing legal standards.

Plaintiff Virginia Loo Farris, an Asian-American woman, dedicated over thirty-four (34) years of service to the U.S. Foreign Service.  See Curriculum Vitae at Ex.1 to 9/20/06 Opposition.  She is a recipient of the Secretary of Defense Civilian Meritorious Honor Award, the United States Information Agency Director's Award for Superior Achievement, three United States Information Agency Meritorious Honor Awards, two Department of State Meritorious Honor Awards, and the Department of State Franklin Award.  Id.

Ms. Loo Farris bid in 1999 for ongoing positions, but the State Department passed her over for assignment in favor of a junior, white male officer in connection with a US NATO position, and possibly a second officer as to a position at The Hague.  The State Department passed her over for other positions as well.  Declaration of Virginia Loo Farris ("Farris Dec."), previously submitted at Ex. 2 to Opposition, at ¶¶ 7-10.

As to the US NATO position, there is no dispute that Ms. Loo Farris was passed over for a junior, white male officer.   Defendants' Memorandum in Support of Renewed Motion for Summary Judgment, ("Def.'s Mem.") at 27.   The Department's own witness

confirmed that passing over a senior officer who does not remove her name from consideration in such situation is against Department Policy. See Dance Statement, Ex. 7 to Opposition, at bates 265 also at ROI, Ex. F7, defining a "cede" as a situation where a "senior level position cannot be filled by a senor level officer."   James Whitlock, a State Department career development officer, also noted that cedes were not granted where a senior bidder at grade is bidding for a job.   2/8/2000 e-mail at Ex.5 to Opposition.

Ms. Loo Farris has retained an expert in State Department personnel matters, Minister/Counselor Barbara Harvey, who has opined that as to the US NATO position "Ms Farris was passed over in contradiction to the well-established internal policies of the State Department with regard to placing senior bidders."   Declaration of Minister/Counselor Barbara Harvey ("Harvey Dec."), Ex. 28 hereto, at ¶5.

The junior, white male officer, Andrew Goodman, was an F-01.  Ex. 11 to Def.'s Mem., at FAR-DC-187.   The "F" grades are the regular foreign service, and "01" is the highest level therein.  Ms. Loo Farris was one rank higher, at the lowest rank of the senior foreign service, as an "OC", or Officer Counselor.  See, e.g., ROI, Ex. 13a (reference to FE-OC as Ms. Loo Farris' rank).  The US NATO position was advertised as a Minister Counselor (MC) position, at the highest level of the senior foreign service.  ROI, Ex. F2a, at 6; ROI, F2 at bates 85.[1]

---

[1] In the Foreign Service, ranks descend from FS-01 to FS-09, the lowest rank.  Many Foreign Service career candidates begin at the FS-05 and FS-06 level.   Some officers serve and complete their careers without advancing to the Senior Foreign Service (SFS).  On the record it I clear that Andrew Goodman was an FS-01.  Ex. 11 to Def.'s Mem., at FAR-DC-187.  It remains unclear whether Goodman had even "opened his window," a term indicating an approximate seven year zone of consideration such applicants have remaining before selection to the senior foreign service or retirement.  Regardless, Ms. Loo Farris was already an Officer-Counselor (OC) within the Senior Foreign Service. See, e.g., ROI, Ex. 13a (reference to FE-OC as Ms. Loo Farris' rank).   As a member of the Senior Foreign Service all of  Ms. Loo Farris' bids for positions were considered at grade and not considered stretch assignments. Ex. 21 to Opposition.

Thus, Andrew Goodman as an F-01 represented a two-grade "stretch" into a senior position at US NATO.  As the Standard Operating Procedures make clear as to cedes, "[S]tretches across the senior level have special requirements.  There must be a cede from the Senior Officer Division.  Such cedes are rare when unassigned senior officers remain.  Double stretches across the senior threshold require the approval of the DG [Director General] in addition to a senior cede.  When a cede is called for, it must appear in the remarks section of the agenda item….and must be renewed weekly." Standard Operating Procedures, Ex. 21 to Opposition, at bates 440.

This is important because as an F-01, Goodman was a double stretch for an MC position, yet there is no record of any DG approval.    Also, to pave the way for a cede, Ms. Loo Farris was pressured to withdraw her bid, which she refused to do, and under those circumstances a cede was inappropriate, according to Mr. Dance, Mr. Whitlock, and Plaintiff's expert Ms. Harvey, as well as an e-mail from Mr. Hall, discussed below.

At the same time, the standard operating procedures specify that "seniors of any grade assigned to any senior grade position" are not stretch assignments.  Ex. 21 to Opposition, at bates 441.   Thus, Ms. Loo Farris as a senior officer was not a stretch into the next higher senior rank.

As to The Hague position, Ms. Loo Farris had difficulty even bidding for the job, because she received inconsistent explanations as to the bidding process and her bid's status at different times in late 1999.  After initially inquiring about The Hague POLAD position with Mr. Moon in October 1999, less than two weeks after it was advertised, Ms. Loo Farris was told a short list had already been put forward and thus it was too late.  See ROI, Moon Dec., Ex. F8a at bates no. 286; ROI, Farris statement, at bates no. 69.

Persistent, Ms. Loo Farris again inquired about The Hague POLAD position through her career development officer, Mr. Whitlock, on November 17, 1999. Ex. 29 hereto.  Mr. Whitlock informed Ms Loo Farris on November 18 that to his knowledge the position was still open. Ex. 30 hereto.  Ms. Loo Farris thus bid on the job no later than November 19, 1999.  Ex. 31 hereto.  Despite her prior bid, on November 21, 1999 Ms. Loo Farris was informed that the short list had gone forward, to a commanding general or generals, apparently without her name.   Ex. 32 hereto.

By December 22, 1999 Ms. Loo Farris noted that a list sent by Mr. Whitlock showed that The Hague POLAD job was on a hard-to-fill cable, which was inconsistent with her being told that bids and short lists had already been submitted. Ex. 33 hereto. The hard-to-fill list is apparently used, and possibly misused, to allow an otherwise ineligible bidder to bid early or out-of cycle.  <u>See</u> excerpt from State Department draft policies, Ex. (to be supplemented) (noting draft "hard-to fill" rules at bates nos. FAR-751-52).   The presence of The Hague position on a "hard-to-fill" list on December 22 shows that Ms. Loo Farris had been misled earlier about lists already being forwarded. The Defendant asserts that this was merely a mistake.  Def.'s Mem. at 29.

The State Department never proffered a straight story as to The Hague position. Mr. Moon provided a first affidavit dated December 3, 2001, where he disclaimed any knowledge of The Hague POLAD position. ROI, Ex. F8b, at bates 291, q.4.   But Mr. Moon contradicts himself in a later declaration of September 4, 2002, where he recalled that The Hague POLAD position was actually based in the nearby town of Brunsum, and went to a Mr. Jack Segal, a white male foreign service officer.  ROI, Ex. F8a, at bates 288, q. 18.  Unlike Mr. Whitlock, who had told Ms. Loo Farris that the list had gone to a

6

commanding general, Mr. Moon stated that a short list went to NATO authorities. ROI, Ex. F8a, bates 288, q.17. Mr. Tiernan stated that the Department of Defense made such a decision. Tiernan Dep., Ex. 54, 59-60. Three different State Department employees thus stated or testified that three different people made the decision as to The Hague POLAD decision.

As to retaliation, after Ms. Loo Farris' initial report of discrimination to her supervisor in 1999 followed up by a formal complaint, a proverbial cloud hung over Ms. Farris' career. Ms. Loo Farris' supervisor in Bangkok, Marie Huhtala, who was the focus of Ms. Farris' complaints, expressed surprise at Ms. Farris' EEO claims. Farris Dec., Ex. 2 to Opposition, at ¶ 7. Huhtala Deposition, at 33-35. An initial complaint of discriminatory treatment was made to Ms. Huhtala sometime in 1999. Huhtala Dep. at 33. Ms. Loo Farris made her formal complaint in 2000. ROI, Ex. A. Ms. Huhtala remained in a post senior to Ms. Loo Farris and influenced Ms. Loo Farris' assignments negatively. In May 2005, Ms. Huhtala recommended that human resources not assign Ms. Loo Farris to a position in Indonesia, noting that "EAP does not concur in the assignment" of Ms Loo Farris. May 23, 2005 Memorandum attached hereto as Ex. 34.

Contradictorily, Ms. Huhtala says the bureau had been "unable to recruit an appropriate candidate," at Ex. 34, bates 999, and having rejected Ms. Farris, then says that the bureau wanted to consider "bids from star performers from all Bureaus including, of course, Ms. Farris." Ex. 34. By deferring placement for the assignment, rather than assign Ms. Loo Farris, the Bureau ran the risk of finding no one, or attempting to recruit a qualified senior officer; in other words, Ms. Huhtala preferred that the position remain

unfilled rather than have Ms. Loo Farris assigned.  Ms. Huhtala recommended that the position remain unassigned, and that it be advertised in the fall of 2005.

After she learned of Ms. Loo Farris' EEO complaint, Ms. Huhtala initiated an investigation as to whether Ms. Loo Farris would be allowed to collect a separate maintenance allowance ("SMA") when her spouse, who was prohibited from returning to Bangkok and from whom she was involuntarily separated, had been living in the area. Huhtala Dep. at 53-54. Ms. Huhtala testified that in all her years in Bangkok, and in her years since Bangkok in Kuala Lumpur, Malaysia, she had never initiated, or heard of, an investigation for "waste, fraud and abuse" except in the case of Ms Loo Farris, which is the investigation at issue here as retaliation.   Huhtala Dep. at 55.

Also as part of such retaliation Ms. Loo Farris' medical clearance to a subsequent posting was delayed or withdrawn, her security clearance was threatened, and subsequent postings were delayed or withdrawn.   Ms. Loo Farris was passed over for promotion given this record, and after she was not promoted within a certain period, under the State Department's "up or out" policy, she was involuntarily retired in 2006.   See Def.'s Mem. at 1.

This roadblock in her career arose after her husband departed Thailand in December 1998 following spousal abuse on his part.  See Def.'s Mem. at 3.  Ms. Loo Farris had advised Ms. Huhtala, the Deputy Chief of Mission ("DCM") at the Embassy, in advance that her husband was returning and Ms. Loo Farris understood that the Department would "follow her lead" in determining her level of interaction with Mr. Farris.  See November 14, 2001 Form, at Ex. 3 to Opposition, at 2.   But within days of Mr. Farris' arrival in 1999 Ms. Loo Farris received word that if Mr. Farris did not leave

Thailand immediately she would lose her security clearance and would be relieved of her position as Public Affairs Officer ("PAO"). <u>See</u> Ex. 13 to Def.'s Mem., at FAR-DC-232 (among attachments to memo of Ms. Huhtala).

The Department had wanted to expel Ms. Loo Farris' husband from the embassy in Thailand, but was unable to do so by regulation, as was made clear to Ms. Huhtala. <u>See</u> Ex. 13 to Def.'s Mem., at FAR-DC-246-47. So the Embassy did so indirectly by pressuring Ms. Loo Farris; Ms. Huhtala wrote Ms. Loo Farris a memo explaining she would lose her security clearance if Mr. Farris returned to post. <u>See</u> Ex. 13 to Def.'s Mem., at FAR-DC-257. Non-medical State Department personnel went so far as to diagnose informally Ms. Loo Farris with "battered wife syndrome." Ex. 13 to Def.'s Mem., at bates FAR-DC-250. This document appears following a memo from Ms. Huhtala referencing "photocopies of all the files in my possession" and was thus presumably aware of this diagnosis. Ex. 13 to Def.'s Mem., at bates FAR-DC-223. Ms. Loo Farris herself has never been so diagnosed.

Ms. Loo Farris strongly believed that she should keep her family together and work on her marriage. Farris Dec., Ex. 2 to Opposition, at ¶ 5. Ms. Huhtala advised Ms. Loo Farris to divorce her husband, <u>Id.</u> at ¶1, and Ms. Loo Farris' refusal to take such advice led to the unraveling of her career. After that point, in late 1998, Ms. Loo Farris believed that Ms. Huhtala in particular viewed her as a subservient Asian-American woman unable to stand up to her husband. <u>Id.</u> at ¶¶ 5, 6. Her subsequent bids and assignments, as reflected in her bidding in the fall of 1999, resulted in rejection of her bids for favored, career-enhancing positions, violation of State Department personnel policies and procedures, and inconsistent explanations.

Ms. Loo Farris understood from Senior Foreign Service Officer, Peter Kovach (former Director of Public Diplomacy, Bureau of East Asian and Pacific Affairs (EAP) at the State Department), that Ms. Huhtala, while Deputy Assistant Secretary of the EAP, thought Ms. Loo Farris should not obtain a favorable forward assignment, and made clear to Mr. Kovach that she would oppose Ms. Loo Farris obtaining a position in Indonesia, an assignment that Mr. Kovach, the EAP Public Diplomacy Director, favored.  Farris Dec., Ex. 2 to Opposition, at ¶ 13.   Ms. Huhtala's memo at Ex. 34 confirms that she sabotaged Mr. Loo Farris' assignment to Indonesia.   Although Ms. Huhtala did not retaliate immediately after learning of the EEO complaint, Ms. Huhtala initiated an investigation, and evidence shows that she negatively influenced Ms. Loo Farris' future assignments and other career prospects when she had the opportunity.  After Ms. Huhtala served as Deputy Chief of Mission in Thailand, she served as Assistant Secretary, from where she could influence any job assignments for East Asia and talk to people across all areas of the State Department.

## **MATERIAL FACTS IN DISPUTE**

Ms. Loo Farris maintains that in the context of Title VII claims, the Defendant's material facts not in dispute are not sufficient to grant Defendant summary judgment. Defendant proffers no facts, for example, on retaliation.  Even so, Ms. Loo Farris proffers a short list of genuine issues of material fact that preclude summary judgment in this matter.    Ms. Loo Farris elaborates on these facts in the arguments set out in this memorandum:

1.     Ms. Loo Farris disputes that the State Department followed its procedures as to granting cedes by allowing the US NATO candidate Andrew Goodman, two ranks below the position, by granting a cede for the position.  That cede was inappropriate.

2.     Ms. Loo Farris disputes that a cede was properly granted in that any two-grade stretch for Mr. Goodman would have had to have been approved by the State Department Director General, such approval to be renewed weekly; nothing on record indicates that this was done.

3.     Ms. Loo Farris disputes that she has no experience in the European region.

4.     Ms. Loo Farris disputes that a "cede," that is, her being passed over for a junior officer for a position, is appropriate where she refused to remove her name form contention for a US NATO position.

5.     Ms. Loo Farris disputes that she was not the best qualified candidate for the US NATO and Hague POLAD positions.

6.     Ms. Loo Farris disputes that the State Department followed proper procedures in bidding/filling the The Hague position.

7.     Ms. Loo Farris disputes, to the extent it is in dispute, that no retaliation against her was initiated by Ms. Huhtala.

## ARGUMENT

**A.    THE SUMMARY JUDGMENT STANDARD REQUIRES DENIAL OF THE MOTION IN AN EMPLOYMENT DISCRIMINATION CASE SUCH AS THIS ONE BECAUSE PLAINTIFF'S EVIDENCE, SEEN IN THE LIGHT MOST FAVORABLE TO HER, WOULD PERMIT A JURY TO FIND UNLAWFUL DISCRIMINATION AND RETALIATION**

The D.C. Circuit has warned that the Court should view summary judgment motions in employment cases with special caution given the difficulties of proving

discrimination.   Farris v. Rice, 453 F. Supp. 2d 76 (D.D.C.  2007), citing Aka v. Washington Hospital Center, 116 F. 3d 876, 879 (D.C. Cir. 1997).   A court cannot grant summary judgment unless there are no genuine issues of material fact.   Hairston v. Washington Metro. Area Transit Auth., 1995 U.S. Dist. LEXIS 20851, at 5 (D.D.C.), quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court must also make all reasonable inferences in Plaintiff's favor at the summary judgment stage.  Id. at 6.

A court does not weigh evidence, draw inferences from facts, or make credibility determinations but determines only if there are issues for trial.  George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005); Hutson v. Department of Defense, EEOC Appeal No. 01A23350 (Dec. 4, 2003), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Where credibility is at issue, summary judgment is improper as credibility determinations are functions for a jury.  Alexis v. District of Columbia, 44 F.Supp. 2d 331, 337 (D.D.C. 1999), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**B.     MS. FARRIS HAS PRESENTED EVIDENCE OF PRETEXT THAT WOULD ALLOW A JURY TO FIND UNLAWFUL DISCRIMINATION**

In McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court set out a burden-shifting approach to employment discrimination claims in cases where the plaintiff lacks direct evidence of discrimination.  To proceed under McDonnell-Douglas, the plaintiff  "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." Id. at 802.   Plaintiff has asserted that for both the USNATO and Hague POLAD positions, white male foreign service officers, one who was junior to Ms. Loo Farris, were selected.  As the court has previously recognized, Plaintiff easily meets this burden.  Farris, 453 F. Supp. 2d at 76.

Evidence that the defendant's rationale is false, or other inconsistencies and inaccuracies that raise the questions of credibility as to the defendant's assertions, show evidence of pretext that is sufficient for Ms. Loo Farris' claim to survive summary judgment. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-47 (2000); Brady v. Office of the Sergeant at Arms, 520 F.3d 490 (D.C. Cir. 2008). "Vigorously disputing" the validity of reasons and rationales proffered by a defendant for an employment decision can create genuine issues of material from which a reasonable jury can find discrimination. Desmond v. Mukasey, 2008 U.S. App. Lexis 13803 (July 1, 2008).

The Supreme Court has explained that the elements of a discrimination case are flexible, and the standards were "never intended to be rigid, mechanized, or ritualistic." Tex. Dep't of County Affairs v. Burdine, 450 U.S. 248, 253 (1981). Plaintiff need not produce direct evidence of discrimination. Aka v. Washington Hospital Center, 156 F.3d 1284, 1292 (D.C. Cir. 1998). Plaintiff must "be afforded a full and fair opportunity to demonstrate through presentation of evidence and cross-examination of defendant's witnesses that defendant's explanation for an employment decision was pretextual. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993); Aka, supra, at 1287; Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006).

As in the recent Desmond case, here Ms. Farris "vigorously disputes" the State Department's rationale for her employment decisions. Cross-examination of witnesses will await trial. As the Court in Aka noted, pretext "can be slippery; sometimes it means that an employer's explanation is incorrect, and sometimes it means that both the explanation was incorrect and that the employer's real reason was discriminatory." Aka,

13

156 F.3d at 1289, n.3.   <u>Aka</u> also notes that a prima facie case alone combined with effective cross-examination may be enough by itself to survive summary judgment. <u>Aka</u>, 156 F.3d at 1289 n. 4, <u>quoting</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981).

As to the USNATO position, as set forth below, the State Department's failure to follow its normal procedures as to cedes is evidence of pretext tending to show that Ms. Loo Farris was unlawfully discriminated against.   As to The Hague position, multiple inconsistencies, and the contrast between what Ms. Loo Farris was told at different times, show that the Department's shifting rationales for denying Ms. Loo Farris assignments - or even consideration - were false and raise substantial questions about the credibility of Department witnesses.

**C.    THE D.C. CIRCUIT ITSELF HAS SUGGESTED THAT THE MORE STRICT EVIDENTIARY STANDARDS OF A "SINGLE MOTIVE" CASE DO NOT APPLY UNDER D.C. CIRCUIT PRECEDENT IN A "MIXED MOTIVE" CASE**

Defendant itself notes that unlawful discrimination can fall under two categories, as to a degree of causation, either a "single motive" case or a "mixed motive" case. Def.'s Mem. at 16.  Ms. Loo Farris does not necessarily have to prevail on the argument that discrimination was the but-for cause of her dismissal; to avoid summary judgment it will be sufficient for her to show that discrimination was a motivating part in the decision, which can be inferred from facts by a jury.   As Ms. Loo Farris stated in her Complaint, she alleges that discrimination "in part or whole" adversely affected her employment opportunities.  Complaint, ¶25.  As the Defendant suggests, under <u>Fogg v. Gonzalez</u>, 492 F. 3rd 447 (D.C. Cir. 2007), these two theories can be pursued under Title

14

VII, namely that unlawful discrimination was the but-for cause, or a motivating cause.   A reading of <u>Fogg</u> shows that under a mixed motive case the Plaintiff is not limited to the <u>McDonnell-Douglas</u> analysis, which is required under a single motive theory of unlawful discrimination.   <u>Fogg</u>, 492 F.3d at 451. <u>See</u> Def. Mem. at 17.   Plaintiff can also prevail under Title VII using a mixed motive theory of unlawful discrimination, in which unlawful discrimination plays a "motivating part" or is a "substantial factor" in a decision.   <u>Id</u>.  Evidence of the stricter standard under <u>McDonnell-Douglas</u> for a single motive case also satisfies the requirements of a mixed motive case, <u>Fogg</u>, 492 F Supp. 3d at 451, but is not necessarily required in a mixed motive case.   <u>See id</u>.   Plus, circumstantial evidence may satisfy the evidentiary standards under either a single motive or mixed motive case.   <u>Id</u>.      Thus, the jury can be given instructions for a single-motive case, with a mixed motive set of instructions in the alternative.

The D.C. Circuit this year seemed to dispense with at least aspects of the <u>McDonnell –Douglas</u> test even in a single-motive case.   In <u>Brady v. Office of Sergeant at Arms</u>, 530 F. 3d 490 (D.C. Cir. 2008), the D. C. Circuit noted that the question of a <u>prima facie</u> case, though a prerequisite under <u>McDonnell-Douglas</u>, may drop out of the equation entirely after an employer proffers non-discriminatory motives, and the Court need only determine whether an "employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employee intentionally discriminated against employee." <u>Id</u>. at 494.

## D.   STATISTICAL ANALYSES PROVIDE SUPPORT FOR MS LOO FARRIS

An employer's track record is relevant to the overall analysis of pretext and whether there is evidence of discrimination.   <u>Aka</u>, 156 F.3d 1284, 1289 (D.C. Cir. 1998).

Statistical analyses provided by the Defendant in discovery support Ms. Loo Farris's allegations of discrimination, and therefore support an inference of discrimination. Statistical evidence is relevant to claims of disparate treatment and should be given proper effect by the courts. Bauer v. Bailar, 647 F.2d 1037, 1045 (10th Cir. 1981). Other courts have recognized that statistics demonstrating a general pattern of discrimination are probative on the question of whether reasons proffered of a particular action are pretextual. Id. See also Casillas v. Department of the Navy, 735 F.2d 338 (9th Cir. 1984). Although plaintiffs do not often have, or use, statistics in individual discrimination cases, statistics are relevant, and can be important in cases such as this one, where Asian-American women are underrepresented at the highest levels of the State Department.

A gender breakdown of Foreign Service generalists overall shows that 67.6% are male and 32.4% are female in 2000. Ex. 27 to Opposition at FAR-724. In the senior foreign service the percentage of males rises to approximately 72%. Id. See also Ms. Loo Farris' response to discovery, Ex. 29 to Opposition, at 7.

At the highest level of the Foreign Service, the rank of Career-Minister, there are no Asian-Americans at all – 0% of a group of 34. Ex. 27 to Opposition, at 7. Only 9 of 34 Career Ministers were women. Id.

At the Minister-Counselor level, the next rank down, only 1 of 304 are Asian-American women, about 0.3%. Id. At Ms. Loo Farris's level, Officer Counselor, only 4 of 390 officers are Asian-American women. Id. All these numbers were as of 2000 and are consistent with actions taken against Ms. Loo Farris.

Older statistics that the State Department provided in discovery that go back to the early 1980's show the generalist breakdown as 85% male and 15% female, a

percentage that now stands at 67.6% male.  Ex. 27 to Opposition, bates no. FAR-724.  A similar gender breakdown of foreign service specialists, in contrast, shows that 61.4% are male and 38.6% female.  Ex. 27 to Opposition bates no. FAR-725.   But the Defendant's civil service employee base has been and remains predominantly <u>female</u>.  Ex. 27 to Opposition, bates no. FAR-723.  The further up the management ladder, the more the State Department becomes overwhelmingly male.    State Department discovery production includes sheets that are cut off and thus incomplete, but the printout by ethnic breakdown of generalists and specialists by grade shows that at the highest levels, Asian-American females are only 0.9% of the foreign service.  Ex. 27 to Opposition, bates no. FAR-634.   This last percentage was not broken down by generalists and specialists – presumably because showing the percentage of foreign service generalists that are Asian-American women at senior levels, if any, would be damaging to the State Department's arguments.

In her own foreign service class of twelve, 5 of 6 white males were promoted at least to Ms. Loo Farris' rank, while 5 of 6 non-white males were not so promoted and have, one way or the other, left the State Department.   <u>See</u> Ex. 27 to Opposition, at 7.  Of these remaining class members, only white males have been promoted over Ms. Loo Farris, the sole remaining non-white and woman of the class.

**E.    THERE IS EVIDENCE OF RETALIATION BY MS. HUHTALA <u>SUFFICIENT TO WITHSTAND SUMMARY JUDGMENT</u>**

**1.    A 2005 Memo Evidences Ms. Huhtala's Successful Efforts to Sabotage Ms. <u>Loo Farris' Job Prospects</u>**

As to retaliation, Ms. Huhtala continued to haunt Ms. Loo Farris' career after their disagreements in Bangkok in 1999 and Ms Loo Farris' claims of discrimination. On May 23, 2005, Ms. Huhtala made clear that Ms. Loo Farris should not be assigned to an important posting in Indonesia, despite the slot being open. Ex. 34 hereto. Ms. Huhtala signed her memo from "EAP" -- the East Asia and Pacific Bureau. Ms. Huhtala was careful to clarify that she was simply seeking a delay to ensure a "wider pool" of "star performers" like Ms. Farris. Id. In fact, it is clear that Ms. Huhtala wanted to preclude Ms. Loo Farris' assignment. Before then, in November 2004, Ms. Farris had a "handshake agreement" to be assigned to Beijing. Ex. 35 hereto. But that assignment, which would have required review from the East Asia and Pacific Bureau as well, was withdrawn, possibly due to the dispute over separate maintenance payments initiated by Ms. Huhtala as part of her retaliatory efforts for Ms. Loo Farris' filing of an EEO complaint. See Ex. 36 hereto.

As to timing, Ms. Huhtala did not retaliate against Ms. Loo Farris immediately in 1999, but she took the opportunity to retaliate against Ms Loo Farris as the opportunity arose while in Bangkok, and again during Ms. Huhtala's assignment as Assistant Secretary in 2004 and 2005. Ms. Huhtala simply was not in any position to retaliate outside of those times save possibly through informal communications with other persons. Although retaliation is often temporally related, the State Department bureaucracy did not provide an opportunity for additional retaliation by Ms. Huhtala for some time after the EEO complaint was filed.

Despite her recommending against Ms. Loo Farris getting the Indonesia position in May 2005, Ms. Huhtala testified in 2004 that "I think it would be great  for her and

great for the Service if she were to continue to do that kind of work [as a public diplomacy officer]."  Huhtala Dep. at 105.   In fact, Huhtala testified that Ms. Loo Farris "was and is qualified to be DCM." (Deputy Chief of Mission).  Id.   Yet in 2005 Huhtala stood in the way of a public diplomacy assignment for Ms. Loo Farris.

Ms. Huhtala admitted that she herself used "salty language," Huhtala Dep. at 106, would "display…forcefulness on the job," and would not be surprised if she was characterized as having a "feisty temper."   Huhtala Dep. at 107.   Given this background, her supervisory role over Ms. Loo Farris, and given her reaching out in 2005 to recommend against Ms. Loo Farris in a public affairs post, a jury could easily infer that Ms. Huhtala was retaliating against Ms. Loo Farris for Ms. Loo Farris' EEO complaints against her.   At the least, such retaliation could easily be found to be a motivating factor.

**2.      Ms. Huhtala's Investigation of "Waste, Fraud and Abuse" as To Ms. Loo Farris Was Apparently the Only Such Investigation in Ms. Huhtala's Entire Career**

Ms. Huhtala also testified that in all her years in Bangkok, and in her years since Bangkok in Kuala Lumpur, Malaysia, she has never initiated, or heard of, an investigation for "waste, fraud and abuse" except in the case of Ms. Loo Farris.  Huhtala Dep. at 55, Ex. 4 to Opposition.  Ms. Huhtala initiated an investigation as to whether Ms. Loo Farris would be allowed to collect a separate maintenance allowance ("SMA") when her spouse, who was prohibited from returning to Bangkok and involuntarily separated, had been living in the area.  Huhtala Dep. at 53-54, Ex. 4 to Opposition.

SMA permits officers to collect supplemental payments when they are separated from spouses and children, and thus have to maintain separate residences.  The SMA rules cited by the State Department that limit the application of the SMA benefit apply to

voluntary separations where the spouse resides within 300 miles. State Standardized Regulation 263.7, at Ex. 24 to Opposition. That regulation terminates SMA payments only in the case of voluntary separations, whereas the separation of the Farrises was involuntary. The Farris' separation was involuntary because Mr. Farris was prohibited from returning to the country by Post Management led by Ms. Huhtala, even after completion and submission of a recommended evaluation by a Department mental health contractor; thus, the rules cited by and relied upon by the State Department limiting SMA do not even apply. Ms. Huhtala knew that such separation was involuntary because she was the DCM and Mr. Farris had to obtain permission to visit the embassy in 2001. Huhtala Dep. at 93-96, Ex. 24 to Opposition.

Also, the Farrises did live separately throughout the time in dispute, from 2000 to 2001. Ms. Loo Farris' son was enrolled in a local school. Huhtala Dep, at 99, Ex. 4. He was covered by SMA at the time, although Ms. Loo Farris paid school fees directly as opposed to charging them back to the Embassy. Ms. Huhtala admitted in her deposition that Ms. Loo Farris, even if she sacrificed her SMA, would have been eligible for a school allowance for her son. Huhtala Dep. at 100, Ex. 4 to Opposition. That school allowance would have exceeded what Ms. Loo Farris allegedly received as a separate maintenance allowance. Ms. Loo Farris settled a civil complaint, without admitting any liability, for $10,800, simply because it was far cheaper to pay a settlement than to fight such matter in federal court. See Def.'s Mem., Ex. 8 to Opposition. Whether Ms. Loo Farris was liable or not for approximately $8000 of SMA, plus interest, or not, is irrelevant; the initiation of the complaint by Ms. Huhtala was retaliatory in any case.

It makes no sense for Ms. Huhtala to investigate an issue that she should have known was at best a wash, with no gain to the Treasury, except unlawfully to retaliate against Ms. Loo Farris.  Ms. Huhtala was aware of Ms. Loo Farris' prior protected activity, that is, her EEO complaint, Huhtala Dep. at 33, Ex. 4 to Opposition, and Ms. Huhtala admitted that she was surprised by such complaints from Ms. Loo Farris. Huhtala Dep. at 35, Ex. 4 to Opposition.  Ms. Loo Farris' formal EEO complaint was filed on September 6, 2000.  ROI, Ex. A, bates no. 1.  Ms. Loo Farris had complained to Ms. Huhtala directly alleging wrongful discrimination in 1999.  Huhtala Dep., Ex. 4 to Opposition, at 33-35.

**3.**     **Ms. Loo Farris' Claims Meet the Standards for Retaliation**

The Supreme Court clarified and broadened the standard for retaliation in Burlington Northern and Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006).  See also Howard v. Gutierrez, 2006 WL 1888953, 3 (D.D.C.) and Pegues v. Mineta, 2006 WL 2434936, 6 (D.D.C. 2006).  (any retaliatory action that might deter a person from making an EEO complaint is now prohibited under Title VII, whereas the various circuits had enunciated mixed standards prior to that time)  For example, in this case, the administrative judge in this matter ruled that actionable retaliation must affect a material term or condition of Ms. Loo Farris' employment, a narrow definition of retaliation that arguably precluded Ms. Loo Farris' claims.  The State Department had similarly argued that retaliation had to affect a material term or condition of Ms. Loo Farris' employment.

In this case, as noted previously, Ms. Loo Farris' denial of further assignments including career developing and interfunctional assignments and training[2] made it impossible for her to obtain a promotion, which resulted in her involuntary retirement.

**F.    A REVIEW OF MS. LOO FARRIS' JOB SELECTIONS IN 1999 SHOWS EVIDENCE OF DISCRIMINATION UNDER *MCDONNELL-DOUGLAS***

**A.    As to the USNATO Position, the State Department Did Not Follow Its Own Procedures, As Suggested by Statements of Its Employees Mr. Dance and Mr. Whitlock and as Confirmed by Plaintiff's Expert's Opinion**

The D. C. Circuit has confirmed this year that an employer's "failure to follow established procedures or criteria" is one method by which employees cast doubt on a non-discriminatory rationale and show pretext.   Brady, 520, F. 3d 490 (D.C. Cir. 2008). Plaintiff's expert has confirmed exactly that.   Harvey Dec, Ex. 28, ¶ 5.   "Cedes" are personnel actions where the Personnel bureau waives the rank or seniority requirement on an advertised, or open assignment either because no officer of the required rank and eligibility to fill a given position has bid on the assignment, or under extraordinary circumstances, because a senior foreign service officer declares their lack of interest in said position and allows the Department, in contravention of standard operating policy, to accept a bid by an officer junior in rank.  Standard Operating Procedures, Ex. 21 to Opposition, at 440.   A "cede" is necessary before a junior officer is even eligible to bid. Id.

**1.    Cedes Are Not Granted Where Senior Officers Are Actively Bidding**

---

[2] Such as PO USNATO, DCM UNESCO, DCM Athens (in both instances her name, after vetting and selection by an international or geographic bureau, was removed after being placed on the "short list"), PAO Beijing (along with Chinese Language and Area Studies training), PAO Jakarta (along with Bahasa Indonesia language training), and PAO Riyadh, Saudi Arabia (with Arabic language training), along with many other  positions for which she applied since the discrimination and retaliation was initiated by Ms. Huhtala and sustained by the culture within the Department.

James Whitlock, Ms. Loo Farris' career development officer, states in a February 8, 2000 e-mail that cedes are not granted where a senior bidder at grade is bidding for a job. Ex. 5 to Opposition. The State Department has argued in contrast that cedes were granted, potentially even in circumstances where a senior officer bid. If the Department could not grant a cede, its explanation as to why it chose Mr. Goodman would be false and pretextual. Whitlock earlier confirmed that such cedes were appropriate only where there were no senior bidders. Whitlock Jan. 31, 2000 e-mail, Ex. 6 to Opposition. Robert Dance describes a cede as a position "when, for example, a senior level assignment cannot be filled by a senior level officer." Dance Statement, Ex. 7 to Opposition, at 5. In this case, though, there was a senior officer, Ms. Loo Farris, applying. For that reason the third ranking senior foreign service officer at USNATO e-mailed to Ms. Loo Farris his view that the State Department might be compelled to give her the USNATO position. Hall e-mail at Ex. 5 to Opposition.

Further evidence shows that a cede is not granted where a senior officer is actively bidding. Mr. Goodman was apparently not even eligible to be considered for the US NATO position if Ms. Loo Farris bid. See Hall e-mail of 3/15/00 at Ex. 8 to Opposition; Whitlock e-mail at Ex. 5 to Opposition. Mr. Tiernan thus pressured Ms. Loo Farris to withdraw her bid for the US NATO position entirely. Tiernan e-mail of May 12, 2000, Ex. 9 to Opposition, bates no. 87-88. Mr. Tiernan strongly advised Ms. Loo Farris to take the PAO Athens position, id., (which strongly suggests that the State Department could not simply grant a "cede") and clear the way for Mr. Goodman to be selected for the US NATO position.

Ms. Loo Farris was a senior foreign service officer, and since she did not withdraw her bid, no "cede" should have been granted. Defendant argues that "cedes" are expressly provided for in the Defendant's operating procedures, but such cedes are only referenced, and it is not discussed how they occur, other than that they are "rare." Standard Operating Procedures, Ex. 21 to Opposition, at 440. Ms. Loo Farris understood that cedes should not be granted where a senior officer bids; the procedures mention cedes but do not rebut Ms. Loo Farris' view that cedes should not be granted where a senior officer is bidding. Farris Dec., at ¶9.

The State Department somehow took the extraordinary step of "ceding" the US NATO position that Ms. Loo Farris had bid for, though she was a senior officer, and apparently the only senior officer, bidding. Ex. 10 to Opposition. To the extent the State Department misrepresented the "cede" policies and procedures, which would evidence pretext and suggest that the extent the Department's explanation was false. <u>Reeves v. Sanderson Plumbing Products, Inc</u>., 530 U.S. 133, 146, 147 (2000). The standard practices on cedes were, in Ms. Loo Farris' view, and the view of her expert, Barbara Harvey, violated, as a cede was given even though she refused to withdraw her bid.

Defendant avers that cedes are granted even "when there are senior officers prepared to take the job." Def.'s Mem. at 28. But that is not supported in the regulations. Otherwise, the Department would have had no need to pressure Ms. Loo Farris to withdraw her bid.

 **2. Mr. Goodman Could Not Even Bid without a 'Cede' (and/or Ms. Loo Farris' Her Withdrawal), As Evidenced by Pressure on Ms. Farris to <u>Withdraw</u>**

Without a "cede" from Ms. Farris, Mr. Goodman was apparently not even eligible to be considered for the USNATO position.  See Hall e-mail of 3/15/00 at Ex. 3 to Opposition; Whitlock e-mail at Ex. 2 to Opposition.     Mr. Tiernan thus pressured Ms. Farris to withdraw her bid for the USNATO position entirely.   Tiernan e-mail of May 12, 2000, ROI, Ex. 5a, bates no. 87-88.     Mr. Tiernan strongly insisted Ms. Farris take the PAO Athens position, id., (which confirms that the Department could not simply grant a "cede"), which would clear the way for Mr. Goodman to be selected for the USNATO position.

Mr. Tiernan of the European Bureau was telling Ms. Loo Farris to withdraw because Mr. Goodman was allegedly going to get this position in any case, as of May 12. Tiernan Dep., Ex. 13 to Opposition, at 114; E-mail of Thomas Tiernan at Ex. 9 to Opposition.  Mr. Tiernan requested that Ms. Loo Farris withdraw to clear the way for Mr. Goodman to obtain the position. Ex. 9 to Opposition.

Plaintiff's expert, Barbara Harvey, confirms that a cede in Ms. Loo Farris' case was contrary to standard procedures.   See Harvey Dec., Ex. 1, at ¶ 4.   In this case, there was a senior officer, Ms. Loo Farris, applying for the USNATO position.   For that reason another senior foreign service officer e-mailed to Ms. Farris his view that the State Department should be compelled to give her the USNATO position.  ROI, Exhibit 18l, at bates no. 627.

The Defendant took an extraordinary step and "ceded" the USNATO position that Ms. Farris had bid for, though she refused to withdraw her bid and was the only senior officer bidding.  ROI, Ex. F18p.   (The State Department also "ceded" another political

advisor position, at USEU in Europe, on which Ms. Loo Farris had bid at around the same time. ROI, Ex. F18.)

Ms. Loo Farris was bidding for positions at her rank. The standard operating procedures cited by the Department address "stretch assignments" where officers, such as Mr. Goodman, may bid for higher graded jobs. Ex. 21 to Opposition, at 440. Those regulations indicate that "cedes" are needed before a junior officer is even eligible to bid for a senior job, and such cedes are rare where there are unassigned senior officers. Id. at bates 440.

### 3. Mr. Goodman Was Not Unblemished, and Ms. Loo Farris Was Highly Qualified

Furthermore, it appears as if Mr. Goodman's credentials may have been exaggerated to support the Department's appointment of him over Ms. Loo Farris. Discrediting an "employer's asserted reason is often quite probative of discrimination." Brady, supra, at 496. The e-mail of Mr. Hall notes that Goodman "isn't that popular with the troops here – and probably is a pretty poor manager, too." Ex. 12 to Opposition. That e-mail suggests that Ms. Loo Farris would be hard-pressed not to get that USNATO position due to her seniority. Id. The March 15, 2000 e-mail from Mr. Hall also notes, inexplicably, that Ms. Loo Farris's name is not on the bid list, as "no senior bidder has bid." Id. Yet Ms. Loo Farris in fact did bid for that position earlier, by November 19, 1999, and reiterated her interest on November 22, 1999. Ex. 12 to Opposition.

Ms. Loo Farris was admittedly "an excellent officer." Def.'s Statement of Undisputed Material Facts, ¶23 (Ambassador Vershbow's comments). Other of the Department's affiants confirm that Ms. Loo Farris was "an excellent officer." Dance Statement, at Ex. 7 to Opposition, at 262. Ms. Loo Farris's employee evaluations are

replete with multiple, similar references that Ms. Loo Farris should be promoted, was an excellent officer, and that she earned a position as DCM or as principal officer elsewhere. See sample EER at Ex. 23 to Opposition.

Ms. Loo Farris had many years of managerial experience and of directing her own departments within embassies and at headquarters, including the supervision of dozens of employees. Ex. 1 to Opposition. She also worked on a joint unified command staff and graduated from the National War College, and had been formally recognized by the Secretary of Defense. Id. Mr. Goodman had NATO experience as a mid-level officer. See Robert Hall e-mail attached as Ex. 8 to Opposition.

### 4. Preselection, Though Not Discriminatory by Itself, Is a Relevant Factor

Mr. Tiernan, as set out above, was pressuring Ms. Loo Farris to withdraw as of May 12, 1999, weeks before Ambassador Vershbow supposedly sent a memo recommending Mr. Goodman on May 30. Def.'s Statement of undisputed Material Facts, ¶22. Although preselection may not itself be discriminatory, it can provide evidence of wrongful discrimination. Where a woman filed a discrimination complaint based on gender, the court found the plaintiff had in fact been treated disparately when a male was pre-selected for a position for which the female plaintiff was more qualified; further, the employer retracted a previous advertisement for the position that specified the need for experience the plaintiff had that the pre-selected male did not (under the guise the employers made a mistake by asking for those specific qualifications). Hartman v. Wick, 600 F. Supp. 361 (D.D.C. 1984). Also, in Ingram v. Missouri Pacific R.R., 897 F.2d 1450, 1455 (8th Cir. 1990), the Court held that, where promotions were granted according to a "good old boy" network, a black employee was given the run-around when trying to

obtain a promotion, and white employees were being promoted over the black employee with no good indication why, the employer had unlawfully discriminated against his employee.   In this case, the issue of preselection and the "old boy network," while not themselves discriminatory, can corroborate discriminatory intent.

### 5.  **"Fair Share" Policies Should Have Favored Ms. Farris Based on Not Having Been Assigned to Europe Previously; She Should Not Have Been Penalized for Lack of NATO Experience**

Ms. Farris had earlier served in Europe on a U.N. fellowship but had not previously been stationed in Europe with the State Department.   State Department bidding procedures require officers to bid in multiple geographic areas to ensure that officers cannot limit themselves to one geographic area and thus overly identify with such area; the rules also prevent an informal "revolving door" that would deprive others of the opportunity to serve in more developed, favored posts.   See State Department discovery, at FAR-743 (no more than three core bids on one geographic area); FAR-746 (fair share rules require rotation out of geographic areas into differential posts), Ex. (to be supplemented) hereto.

Additionally, officers such as Ms. Farris and their eligible family members need to have some chance to serve in more developed posts such as Europe, as they may be precluded by medical limitations from serving in many third-world postings.

As to both the NATO and Hague position, this should have helped Ms. Farris, but instead her lack of previous NATO experience was used against her.   Ms. Farris had substantial military-related experience.   She had served as the public diplomacy advisor for the Commander in Chief of the U.S. Pacific Command.   Ex. 1 to Opposition.   She received a Masters in National Security Studies from the National War College in 1998,

where she cultivated contacts with European and NATO colleagues.  See ROI, Ex. 5, bates no. 66.   She received the Secretary of Defense Civilian Meritorious Honor Medal in 1992.  See ROI, Ex. 13, bates no. 553-55.

Ms. Farris' relevant experience should have merited extra consideration by decision-makers filling positions, especially given the Agency's policy to rotate personnel through different geographic areas.

The fair share rules have an obvious purpose, namely to prevent precisely the type of "old boy" networks from flourishing that lock primarily women and minorities out of favored positions or bureaus, especially in western European assignments.   In the instant case, the "old boy " network prevailed and white male "favorite-son" candidates were paneled into positions, seemingly aided by their identity as white males.

The only two requirements for the USNATO position were to have a minimum grade of FE-OC and a 3/3 French score, both of which Ms. Loo Farris possessed. Additionally in Ms. Loo Farris' prior "head of section" assignments she had supervised far more people than Goodman, conducted negotiations, and had administered multi-million dollar budgets.   See Curriculum vitae at Ex  1 to Opposition.   Mr. Goodman had no such training, and lacked Senior Level defense training (Ms. Loo Farris had trained at the National War College, had an MA in Strategic Studies, and served a tour on the principal staff of a unified command advising the CINC.  See Ex. 1 to Opposition).

All the puffing of Goodman's supposed qualifications was pretextual, and in conflict with the Department's "fair share" concept, which was primarily created to prevent European generalists from spending their entire careers in a revolving door between Europe and Foggy Bottom, allowing officers such as Ms. Loo Farris who were

assigned to hardship, or differential, posts in Africa, Asia, and the Caribbean, to develop the local geographic familiarity to enhance their performance.

The necessary management and leadership skills, like the cone, among generalists were envisaged to be fungible. With a history in different geographic areas, in Asia, the Caribbean, and Africa, Ms. Loo Farris should have been an asset for the State Department to meet their "fair share" goals. Nor was such an assignment in any way a "stretch" for her under the rules.  As the State Department's Standard Operating Procedure B-2 states, "Because the generalist selection process screens for the same basic knowledges [sic], skills, and abilities for *all cones* (emphasis added), an out-of-cone assignment is not considered to be a stretch assignment for a generalist."  Ex. 37 hereto.

## B.    Ms. Farris Faced a Blizzard of Inconsistent Explanations as to The Hague POLAD position

The D.C. Circuit in <u>Brady</u> also noted that "pointing to changes and inconsistencies in the stated reasons for the adverse action" is also a standard way to challenge an employer's stated reason.  <u>Brady</u>, <u>supra</u>, 520 F.3rd at 496.    The State Department's explanation of the Hague position is littered with inconsistencies set out in the Statement of Facts above.  After initially inquiring about The Hague POLAD position with Mr. Moon in October 1999, Ms. Loo Farris was told a short list had already been put forward.  <u>See</u> ROI, Moon Dec., Ex. 14 to Opposition at bates no. 286; ROI, Farris statement, Ex. 15 to Opposition, at bates no. 69.  Ms. Loo Farris again inquired about The Hague POLAD position through her CDO on November 17, 1999. Ex. 16 to Opposition. Her CDO, Mr. Whitlock, informed her on November 18 that to his knowledge the position was still open. Ex. 17 to Opposition.  Ms. Loo Farris thus bid on the job no later than November 19, 1999, according to the records.  Ex. 18.   Despite her prior bid, on

November 21 Ms. Loo Farris was informed that the short list had gone forward to a commanding general or generals, apparently without her name.   Ex. 19.

By December 22 Ms. Loo Farris noted that a list sent by Mr. Whitlock showed that The Hague POLAD job was on a hard-to-fill cable, which was inconsistent with her being told that bids and short lists had already been submitted. Ex. 20 to Opposition.  The hard-to-fill list is apparently used, and possibly misused, to allow an otherwise ineligible bidder to bid early or out-of-cycle.  See excerpt from State Department draft policies, Ex. 11 to Opposition, (noting draft "hard-to fill" rules at 15).   The presence of The Hague position on a "hard-to-fill" list on December 22 suggested that Ms. Loo Farris had been misled earlier, despite the Department's assertions that this was a mistake.  Def.'s Mem. at 29.

Mr. Moon's changing memory and inconsistent statements, first disclaiming even any knowledge of The Hague POLAD position, and then later recalling details about the The Hague POLAD position and the selectee having been chosen by NATO, are discussed above in the Statement of Facts.   Department personnel testified that at least three different people or entities made the decision as to the selectee.   See, supra, at 6.

Regardless of who made such decision, the State Department submitted a short list, which apparently had to have gone through Mr. Tiernan, Dep., Ex. 13, at 58, and given its disappearance may well have contained only one name.  That State Department short list may have been generated by the NATO desk at the State Department, as Mr. Tiernan testified, id., but the list went through Mr. Tiernan to Human Resources at State. Id. at 59.   Then according to Mr. Tiernan, Human Resources at State made the final

decision, but that was little more than a "rubber stamp" of a DoD decision based on an unwritten agreement between State and DoD.  Id. at 59-60.

Thus, the Department's own witnesses state variously that short lists were passed to a commanding general, to NATO authorities, or to DoD, which person or persons then made the decision on the job – or maybe not, since the State Department's Human Resources people had a final say which was possibly no more than a rubber stamp.  The State Department may have prepared a short list of candidates, which might well have been limited to one person, and did not include Ms. Loo Farris.  The Department's inconsistent and contradictory statements to Ms. Loo Farris show that she was lied to and present evidence of pretext.

Ms. Loo Farris was misled by the Department repeatedly about The Hague-POLAD position.  She kept trying to apply, but a white male foreign service officer was selected.  Mr. Moon of the State Department admits that the job was put on an open assignments list in 1999 to "advertise" for the position.  ROI, Ex. F8, at 4.   Neither does Mr. Moon dispute that he may have submitted names before bidding was closed, nor does he dispute that the position was later on a hard-to-fill list.

For undisclosed reasons, the position apparently was not filled in late 1999 despite Ms. Farris' bidding on the job and reiterating her interest on multiple occasions.  Then Ms. Loo Farris was told it was too late to bid even though the job was still on an open list.

## CONCLUSION

For the foregoing reasons the Defendant's Renewed Motion for Summary Judgment should be denied.

Respectfully submitted,


VIRGINIA LOO FARRIS
By Counsel


/s/     George Doumar
George R.A. Doumar (D.C. Bar #415446)
George R. A. Doumar, PLLC
2000 N. 14th Street
Suite 210
Arlington, VA  22209
Phone: (703) 243-3737
Fax: (703) 524-7610

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of August, 2008, a copy of the foregoing was served via ECF, on the following:

**Diane M. Sullivan**
UNITED STATES ATTORNEY'S OFFICE
555 4th Street, NW
Civil Division
Washington, DC 20530

/s/  George Doumar