# EXHIBIT 35

Case 1:05-cv-01975-RMU   Document 43-4   Filed 08/22/2008   Page 1 of 19

**From:** Kramer, Richard E
**Sent:** Friday, November 19, 2004 11:01 AM
**To:** Farris, Virginia L
**Cc:** Pinkley, Adele
**Subject:** Handshake on PAO Beijing -- Planning and Timing

Ginny,

Congratulations on your handshake for PAO Beijing. Sounds like a BIG job!

As we discussed, I have entered an item on the agenda for Tuesday's panel to assign you to a holding position in order to get orders as quickly as possible since your departure date is so soon and post needs fiscal data to pack you out and purchase your airline tickets. I'm hoping your assignment to Beijing via language training can be paneled in the following week or two.

Here is my understanding of what you'd like to do for travel/timing. Please confirm or correct.

| | |
|---|---|
| 12/8/04 | Depart Pretoria |
| 12/9/04-1/21/05 | Annual Leave |
| 1/24-2/18 | Home Leave |
| 2/21-2/25 | Consultations/Medical |
| 2/28-8/?/2005 | CM Language Training at FSI |
| Following Year | CM Language Training in Taipei |
| Summer 2006 | Arrive Beijing |

Regards,

rick

Richard E. Kramer

Career Development Officer - Senior Level

HR/CDA/SL - Room 2332A HST

Ex 35

# EXHIBIT 36

☐ PLEASE CHECK ONLY IF THIS MUST GO UP TONIGHT

CPA-PL
OC
mail memo to
Ms. Farris
1. GP
2. Rick Kramer

# OFFICE OF THE DIRECTOR GENERAL
## BUREAU OF HUMAN RESOURCES

---

SUBJECT: <u>ASSIGNMENT APPEAL – VIRGINIA LOO FARRIS</u>

DATE/TIME IN _____ 3/16 _____    DISK ATTACHED? __Yes__

DRAFTER'S NAME: **R. KRAMER**   OFFICE: HR/CDA/SL   TEL: 7-3915

NOTE: PLEASE PROOFREAD AND SPELL-CHECK YOUR DOCUMENT.

---

ROUTING INFORMATION

____ . DAS JOHN M. O'KEEFE   INITIAL ATTACHED CLR PAGE

____ . DAS LINDA S. TAGLIALATELA   INITIAL ATTACHED CLR PAGE

__X__ . PDAS RUTH A. WHITESIDE   INITIAL ATTACHED CLR PAGE   *RW*

__X__ . DIRECTOR GENERAL W. ROBERT PEARSON

____ . RETURN TO STAFF ASSISTANTS

CONTROL # __26551__

---

*Special Instructions*

____ RETURN TO DRAFTER

COMMENTS: I can give you details, but I support CDA and DS. Ruth

---

U:\SA\PUBLIC FILES\generic dox\BuckSlip.doc

Ex 36

FAR-DC-1001



**United States Department of State**

*Director General of the Foreign Service
and Director of Human Resources*

*Washington, D.C. 20520*

## PERSONNEL SENSITIVE MEMORANDUM

TO: M/DGHR – W. Robert Pearson

FROM: HR/CDA – Gary Pergl

SUBJECT: Assignment Appeal for Virginia Loo Farris

Virginia Loo Farris is an FE-OC PD cone officer who just completed her tour as Public Affairs Officer in Pretoria. Last November, Ms. Farris received a handshake from EAP for an assignment as PAO in Beijing.

Before an assignment can be made to a critical human intelligence threat post like Beijing, 12 FAM 263.3-2 requires DS/ICI/CI to evaluate factors that could adversely affect suitability for the assignment, and then prepare a recommendation to the Director General.

In the course of its investigation, DS/ICI/CI learned that OIG had brought to the Department's attention an improper claim filed by Ms. Farris for separate maintenance allowance (SMA). The Department investigated the matter and decided to suspend Ms. Farris for 5 days. In addition, the Assistant U.S. Attorney's Office (AUSA) is considering filing a civil suit against her.

Citing the nature of the offense and the decision to impose such a strict penalty, DS/ICI/CI recommended against assigning Ms. Farris to Beijing.

After consulting with AFSA, Ms. Farris submitted a request that you not accept DS/ICI/CI's recommendation. In her request Ms. Farris refers to an EEO complaint she filed four years ago, and she alleges that the Department is retaliating against her as a result of that complaint. While maintaining that she did not act improperly, she suggests that a suspension of only 5 days indicates that the matter of the SMA claim should not be considered

FAR-DC-1002

-2-

serious enough to prevent her assignment to Beijing. She also states that the Department is attempting to punish her three times for the same offense: the suspension; the proposed action by AUSA; and the denial of her assignment to Beijing.

Having carefully considered the points made by Ms. Farris in her request, CDA feels that she has not provided sufficiently compelling justification for you to decide against the recommendation of DS/ICI/CI.

**Recommendation:** That you accept the recommendation of DS/ICI/CI to deny the assignment of Virginia Loo Farris to Beijing.

Accept DS Recommendation _BP_ 3/21    Reject DS Recommendation ____

IF ACCEPT DS RECOMMENDATION PLEASE ALSO SIGN THE

LETTER TO MS. FARRIS AT TAB D    _____

Attachments:  Tab A: Farris Appeal
              Tab B: DS Recommendation
              Tab C: 12 FAM 263.3-2
              Tab D: DG Response to Farris

PERSONNEL SENSITIVE                              FAR-DC- 1003

Drafted by: HR/CDA/SL:REKramer /reh/
03/14/05      X 7-3915

Cleared:    M/DGHR:RAWhiteside /rw/
            HR/CDA:HKlemm - /hk/
            HR/CDA/SL:WLNesbitt /wln/



INITIAL HERE

PERSONNEL SENSITIVE                    FAR-DC- 1004

```
Ms. Farris resent via email on 3/2 to correct addressee; DG Pearson ---
-----Original Message-----
From: VLooFarris [mailto:VLooFarris]
Sent: Friday, February 25, 2005 4:29 PM
To: Pearson, William R(Beijing)
Cc: gdoumar@doumarlawgroup.com; Papp, Sharon(AFSA); GFarris848
Subject: Appeal by Virginia Farris on PAO Beijing
```

The Honorable W. Robert Pearson
Director General of the Foreign Service
Department of State
Washington, District of Columbia
Dear Ambassador Pearson:

I am writing to appeal a recommendation by DS against my assignment as PAO Beijing. On or about February 15th, I received word from my CDO passing on a message from HR/CDA Deputy Director Gary Pergl saying, "I have been informed by DS that they will not be clearing Virginia Farris for Beijing." I have tried to confirm this information but have been unable to talk to DS about it since I returned to Washington this week.

Although I have only received notification via email, rather than a formal document, I wanted to lodge an appeal quickly to request that you reject DS's recommendation against my assignment as PAO Beijing. Let me provide a little background.

In late November, with the endorsement of DCM Sedney and the support of Ambassador Randt, I was offered a provisional handshake agreement and selected for the PAO Beijing position. Pending my actual assignment, transit orders were cut to allow me to depart post December 8th, and have a medical examination over the period of February 23d and 25th, prior to beginning language training on February 28th.

Having served on the China desk in the past and in Hong Kong, I was pleased as this position would allow me to utilize both my Masters' in Chinese Studies and in National Security Strategy, while improving my Chinese language proficiency. However, on Christmas Eve, while on leave I received word from my Career Development Officer (CDO) that it was unlikely that my assignment to Beijing would take place.

As suggested by my CDO, I contacted Barry Moore in DS on January 7th, just after his return from leave. He said he had no objection to my assignment, but indicated that an objection had been raised elsewhere and while he was not familiar with my case, he would see if it was an item slated for discussion with Gary Pergl that day. I then contacted him again January 9th, leaving a voice mail.

On January 13th, Mr. Moore sent me a brief e-mail stating that he "spoke with HR's Gary Pergl about your case. He [Gary Pergyl] agreed that he would research the issues surrounding your assignment and get back to you." When I inquired further with Gary as to whether the objections came from HR or DS, he indicated that issues related to a pending case I have with the Assistant U.S. Attorney's (AUSA) office was the major stumbling block to DS approving my assignment.

AFSA contacted Barry Moore on my behalf to try and clarify the situation. Mr. Moore indicated that the basis for his recommendation to HR that clearance for my assignment to Beijing be denied was item c (9) under 12 FAM 263.3-2 Critical Human Intelligence Threat Posts. The quote from the FAM is "DS/ICI/CI prepares a recommendation to the Director General of the Foreign Service with respect to an employee's suitability for assignment to a HUMINT threat posts after considering...(9) Whether a past investigation concerning the employee documents a serious allegation concerning misconduct, suitability, or professional ethics that can be exploited by a FIS."

For more than four years I have had an EEO complaint pending. That complaint includes an allegation that the Department has retaliated against me as a result of the EEO complaint. It is a matter of record that I was investigated by the IG over whether I improperly received SMA payments when my husband and I were involuntarily separated. In 2001, the IG requested the Department of Justice (DOJ) to proceed as a result of the investigation. The Assistant United States Attorney (AUSA) declined this for prosecution, but did consider a civil case on behalf of the Department.

Although the AUSA has had the file for almost four years, none of the settlement/repayment offers made by my attorney were accepted, nor has the AUSA initiated any action, and I assumed the matter had been dropped almost two years ago. I had offered to repay the money. As recently as February 23, 2005 when my attorney checked with the AUSA office he was unable to identify anyone who was familiar with the case, or to find it listed in their database. Finally an AUSA called my attorney and indicated that their office had dropped the ball as attorneys had departed the office over the years, but that there was a file, and she would check with the State Department about how to resolve it. I would infer from this that my case has not been a priority for AUSA and am uncertain when or whether they will take action.

Both the EEO case in chief and the allegations of retaliation stemming from that case are still pending. However, the Department has chosen to proceed with an internal action recommending a sanction of a five day suspension. In a recent discussion with Ambassador O'Keefe, who is adjudicating this issue in regards to the SMA payments, he seemed to acknowledge that this indeed was an involuntary separation, at least with regard to my husband, and understood that I was maintaining two separate households as well as paying for my son's education. While the two households were within a 300 mile proximity radius, the Department's written SMA publications clearly indicate the 300 mile SMA radius is applicable to "voluntary" separations, not "involuntary" separations. To date, no one -- not the IG, the AUSA, or the Office of allowances -- has ever addressed this issue or advised me that they disagreed with my position that this was an involuntary separation to which the "300 mile rule" did not apply. As I have said all along, including from my initial interview with the IG, if the Department determined that the separation was voluntary and that I owed the money, I would pay it back. In fact, even without such decision I have been and am willing to resolve this immediately and pay the money back through an agreement with the AUSA, or through the Department, as long as the issue is really resolved.

FAR-DC-1006

With regard to DS's recommendation against my assignment based on 12 FAM 263.3-2(c)(9), the facts of this investigation and dispute are known widely within the relevant parties in the Department. While maintaining my conduct was proper, I would alternatively suggest that the
recommended "5-day suspension" sanction indicates that the Department does not regard this as one of the more serious violations it reviews. This case cannot be used to exploit me in any manner envisaged in 12 FAM 263.3-2. In any event, if a foreign national employee ever approached me about this matter, I would promptly report the approach to the Regional Security Officer.

When I spoke with Ambassador O'Keefe concerning my SMA case, he was surprised that it had been linked to my assignment as PAO Beijing. If in fact this unresolved SMA matter is the crux of the matter, then I believe punishment is being sought in three ways for the same matter: one, the Department has proposed a five day suspension; two, the proposed action by AUSA; and three, by denial of my assignment.

While maintaining the correctness of my actions I have always agreed that I would pay back the SMA provided it did not constitute an admission of wrongdoing. The IG representative showed no interest in reclaiming the SMA payments. As witnessed by AFSA General Counsel, who was present at the interview, and the numerous exchanges my attorney had with the AUSA during settlement negotiations, it is a matter ripe for settlement. This case has been dragging on since 2001. Of course, I would like to resolve it.

Nonetheless, it is hardly hidden, and it is widely known to the relevant members of the Department, AFSA, and myself. It is neither logical, nor likely, that any FIS could exploit this case as foreseen in 12 FAM 263.3-2 cited above. To accept the recommendation will give credence to allegations that the denial is pretextual and offers the appearance of retaliatory responses from the Department to my EEO claims.

I think it is important to note that the disagreement has not affected my professional performance or conduct as I have led the largest public diplomacy operation in Africa during the time the EEO and SMA cases have been pending and have garnered praise and awards for my staff and myself. Additionally, I had the support and confidence of Ambassador Randt, DCM Sedley, and the Director of EAP/PD, Peter Kovach. While I wish to have my right to privacy and confidentiality observed I have nothing to hide from the Department, and I am more than qualified to serve as PAO Beijing. (I am sending a copy of my cv separately.)

Certainly, I would be happy to answer any questions you may have. The possibility of serving in the PRC has always been a dream of mine. I really want this assignment and will work hard to justify the Department's faith in me. I have a distinguished record of more than 30 years of loyal service. I would greatly appreciate your consideration of my appeal to decline the DS recommendation, and ask that you allow my training and assignmment to proceed. I am more than willing to enroll in language training pending resolution of this issue, in order to preserve my opportunity to serve in Beijing.

FAR-DC-1007

Since I have just arrived in Washington, I am in the process of locating appropriate quarters when my family arrives on February 27 and trying to determine how best to serve the Department while this appeal goes forward. Should you need to reach me, I will be at the Georgetown Suites 202-298-1600 through February 28.. Otherwise, it may be best to send an email to "GFarris848@aol.com" or to call my cell 202-368-6666 after Feb 27.

Very respectfully,

Virginia Loo Farris

FAR-DC-1008



**United States Department of State**

*Washington, D.C. 20520*

March 14, 2005

To:       Gary Pergl – CDA

From:    Joe Morton – Assistant Secretary - DS (Acting)

Subject:   Farris, Virginia Loo

    DS/ICI/CI was asked to review Virginia Loo Farris's for any counterintelligence concerns regarding her proposed assignment as Public Affairs Officer to Beijing. DS/ICI/CI's review found that Ms. Farris past conduct and handling of Separate Maintenance Allowance claims is a matter before both the Director General of the Foreign Service and the United States Attorney's Office.

    The United States Mission is Beijing is under extreme scrutiny by the Chinese security services including their intelligence arm, the Ministry of State Security (MSS). DS/ICI/CI believes that Ms. Farris's pending administrative and legal issues are exploitable by hostile intelligence services like the MSS and not in the best interest of either the employee or the Department. DS/ICI/CI therefore objects to the proposed assignment of Ms. Farris to Beijing.

FAR-DC-1009

## 12 FAM 263.3-2  Critical Human Intelligence Threat Posts

*(TL:DS-72; 01-26-2001)*
*(Effective Date: 02-08-1999)*

a.  In addition to the security awareness requirements cited in 12 FAM 264.3-1, the following additional instructions apply to posts that face a critical human intelligence (HUMINT) threat.

b.  All executive branch agencies will review the proposed permanent assignment of all of their employees, contractors, and temporary duty personnel assigned in excess of 60 days accumulated in one year (not necessarily consecutive) to determine their suitability.

c.  In the Department of State, the Investigations and Counterintelligence Division (DS/ICI/CI) reviews background investigations and personnel files on all Department employees proposed for permanent assignment to HUMINT threat posts.  DS/ICI/CI evaluates security and suitability factors that could adversely affect suitability for assignment, in light of the heightened HUMINT threat, and any personal vulnerabilities potentially subject to HUMINT exploitation.  DS/ICI/CI prepares a recommendation to the Director General of the Foreign Service with respect to an employee's suitability for assignment to a HUMINT threat post after considering the following circumstances:

(1)  Whether the employee or an immediate family member has an immediate family member still residing in the proposed critical HUMINT threat country;

(2)  Whether the employee or an immediate family member has other family ties in any critical HUMINT threat post where a foreign intelligence service (FIS) could exploit familial bonds of affection;

(3)  Whether the employee has family member(s) currently or recently employed by the critical HUMINT threat country's military armed forces, intelligence or security service, police service, or ministry of foreign affairs;

(4)  Whether the employee has a history of poor security practices (violations of 12 FAM 262 and 12 FAM 550) that are recent and of a serious nature;

(5)  Whether the employee is or has been a known target of interest to a FIS;

(6)  Whether the employee has a history of aberrant behavior such as drug or alcohol abuse or deviant sexual activities;

(7)  Whether the employee has demonstrated emotional instability (as determined by MED);

(8)  Whether the employee has exhibited financial or fiscal management irresponsibility;

FAR-DC-1010

(9) Whether a past investigation concerning the employee documents a serious allegation concerning misconduct, suitability, or professional ethics that could be exploited by a FIS;

(10) Whether the employee has had more than one previous assignment to the same critical HUMINT threat post;

(11) Whether the employee has made an unauthorized disclosure of sensitive or classified information;

(12) Whether the employee or close family member has demonstrated loyalty to the proposed critical HUMINT threat country of assignment (i.e., previously employed with the FIS or ministry of foreign affairs); and

(13) Whether the employee has had romantic involvement with citizen(s) of the proposed critical HUMINT threat country of assignment.

d. The Director General of the Foreign Service may accept or reject the recommendation made by DS for the proposed assignment to a critical HUMINT threat post. Upon request, DS will provide any pertinent information regarding the recommendation to the Director General.



**United States Department of State**

*Director General of the Foreign Service
and Director of Human Resources*

*Washington, D.C. 20520*

March 21, 2005

Virginia Loo Farris
EB/IFD/ODF/TRT
Department of State
Washington, DC 20521

Ms. Farris:

    Thank you for your e-mail of March 2 regarding your proposed assignment as Public Affairs Officer in Beijing.

    After carefully considering the pertinent information in this matter, including the points made in your e-mail, I have decided to accept the recommendation made by Diplomatic Security and disapprove the proposed assignment.

Sincerely yours,

W. Robert Pearson

FAR-DC-1012

# EXHIBIT 37

**STANDARD OPERATING PROCEDURE**

B-2
Revised: 5/2000
Approved: 7/2000

STRETCH ASSIGNMENT POLICY

The assignment of Foreign Service Employees to at-grade, in-cone positions is the most effective use of State Department human resources. Stretch assignments, both above and below the bidder's grade, should be made only after a full review of the stretch candidate's qualifications and in accordance with guidelines laid down in this SOP. Because of the nature of their career paths, the stretch policy for specialists must be distinct for each category of specialist and different from the stretch policy applied to generalists.

Stretch assignment categories are:

Service Need (includes Hard to Fill)
Directed
Career Enhancing
Extension in Stretch
Downstretch

When upward stretch assignments are made, the proposed candidate's qualifications must be thoroughly reviewed as well as the availability of eligible at-grade bidders. The stretch category must be included in the remarks section of the agenda item when brought to panel. For downstretches a downstretch letter (a sample letter is in the CDA Handbook) must be on file and so noted in the remarks section of the agenda item.

Generalists

Any assignment of a generalist to a position classified higher or lower than the officer's personal grade is a stretch assignment, except as noted below. Because the generalist selection process screens for the same basic knowledges, skills and abilities for all cones, an out-of-cone assignment is not considered to be a stretch assignment for a generalist.

Ex 37

FAR - DC - 2082

Stretch assignments are permitted at different points in the assignment cycle. Off-cycle stretches have similar restrictions within the off-cycle assignments timeframe. As a result, late-season off-cycle career enhancing stretches may be made during the summer assignments season before such stretches are allowed for summer cycle positions. In the period before regular assignments begin (early season) stretches can be made in assignments to key positions, Special Embassy Program posts, as directed assignments or as timely extensions in stretch assignments.

The annual Open Assignments package (negotiated with AFSA prior to the start of the assignments cycle) establishes start dates during regular season for considering stretch assignments to high (15% or higher) differential posts, Hard-to-Fill positions and Most-Difficult-to-Staff posts. Down stretches and non-timely extensions in stretch assignments may be considered during the regular season. Downstretches are not encouraged. However, there are circumstances where downstretching an employee is a reasonable option; such proposals will be reviewed on a case by case basis.

Career-enhancing stretches are part of the late season, generally starting in March or April for summer cycle assignments. The exact timetable is established in the annual Open Assignments package. Such stretch assignments must be well justified.

There are risks associated with "holding out for a stretch." For the officers: at-grade possibilities will go to other officers while they wait. For Bureaus: at-grade bidders might insist on being brought to panel before the stretch candidate is eligible for consideration. Furthermore, qualified, at-grade bidders may be assigned elsewhere leaving the Bureau no acceptable candidates if the stretch proposal is not successful.

Stretches across the senior threshold have special requirements. There must be a cede from the Senior Officer Division. Such cedes are rare when unassigned senior officers remain. Double stretches across the senior threshold require the approval of the DG in addition to a senior cede. When a cede is called for, it must appear in the remarks section of the agenda item; it is valid only for one agenda and must be renewed weekly if the assignment is held or deferred.

In accordance with the Steigman Rule, an officer already stretched into a senior-level position may extend in that position without a senior cede so long as the request is timely and consistent with other tour of duty provisions. If the extension is not timely, a senior cede must be obtained before the extension can be brought to panel.

A tenured O-4 generalist going to his/her third assignment is considered at-grade for an O-3 position.

Downstretches of mid-level (ML) bidders into entry-level (EL) positions are generally not in order. Any such downstretches require the explicit concurrence of the EL division. Such assignments will take the standard EL tour of duty (TOD) rather than the TOD of the post. Exceptions to this policy include certain domestic assignments, such as positions in S/S-O and staff assistant positions. Other exceptions may be considered on the basis of compassion, tandem concerns or other extraordinary circumstances.

FAR - DC - 2083

The following cases are not considered to be stretch assignments:

1. Seniors of any grade assigned to any senior grade position.
2. Untenured junior officers assigned to O-4 and below positions; e.g. an FP-04 assigned to an O-5 position.
3. Details - - always considered to be at grade for the incumbent.
4. Y Tours - - always considered to be at grade for the incumbent.
5. If an assignee is at grade when paneled, s/he is not considered to be in a downstretch if s/he is subsequently promoted.

Specialists

Stretch considerations do not apply to Printers, Construction Engineers, English Language, Information Resource, Diplomatic Security (DS) and Medical (MED) specialists, as long as the assignment is within the bidder's skill code. DS Specialists must get a senior cede for assignments across the senior threshold. Facilities Maintenance Specialists (FMS) follow the generalist stretch rules except that tenured 04s are not considered at grade for 03 positions. Tenured specialists selected for positions advertised under the Specialist Excursion Program will be considered at grade for that excursion tour position.

For Admin. Specialists (GSO, PER and FMO):

Tenured FP-05 and –04 GSO, PER and FMO Specialists who have attained their skill code through the Career Mobility Program are considered at-grade for FP-03 positions within their skill codes.

FP-04 Personnel Specialists are considered at grade for PER positions at the FP-03 level.

For Office Management Specialists (OMS):

A job at the OM level includes grades FP-03 and FP-04 for bidding and assignments purposes. OMS in grades FP-07 and FP-08 are considered at grade for jobs at the FP-07 and FP-08 levels.

For Information Management Specialists (IM):

Information Management Technical Specialist (IMTS) FP-05 and FP-04 positions are considered interchangeable and should not be considered as stretch assignments within these two grades.

Information Management Specialist (IMS) FP-05 and FP-06 positions are entry-level positions and are considered interchangeable within these two grades.

Assignment of all other IM specialists at the grade of FP-04 and above to any position other than at the employee's personal grade is considered a stretch assignment, including tenured FP-04 IRM specialists proposed for FP-03 positions.

Panels

Proposals for stretch assignments within the mid-level will be brought to the ML Assignments Panel. All other stretch assignment proposals, including downstretches into EL positions, will be brought to the ID (Inter-Divisional) Assignments Panel.

FAR - DC - 2084