# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

VIRGINIA LOO FARRIS,    :
            :
     Plaintiff,    :  Civil Action No.:  05-1975 (RMU)
            :
     v.       :  Document No.:  39
            :
HILLARY RODHAM CLINTON,   :
Secretary of State, Department of State,  :
            :
     Defendant.   :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter is before the court on the defendant's[1] renewed motion for summary judgment. The plaintiff is an Asian-American woman formerly employed by the U.S. Foreign Service, a branch of the U.S. Department of State ("the Department"). She alleges that the defendant unlawfully discriminated against her based on her race and gender and then retaliated against her for complaining about the discrimination. The defendant previously filed a motion for summary judgment, which the court denied in June 2007 after determining that the plaintiff was entitled to discovery to develop the factual record. Following the close of discovery, the defendant filed the instant motion for summary judgment, which the plaintiff has opposed. Because the plaintiff has produced enough evidence to withstand summary judgment on her

---

[1] The original defendant to this action, Condoleezza Rice, was the Secretary of State when this action was instituted. Pursuant to Federal Rule of Civil Procedure 25(d), the court has substituted the current Secretary of State, Hillary Rodham Clinton, for Rice as the defendant in this action. *See* FED. R. CIV. P. 25(d) (stating an "officer's successor is automatically substituted as a party" and that "[l]ater proceedings should be in the substituted party's name").

discrimination claims but not on her retaliation claims, the court grants in part and denies in part the defendant's renewed motion for summary judgment.

## II.  BACKGROUND

### A.  Factual Background

The plaintiff, a thirty-four year veteran of the U.S. Foreign Service, served as a Public Affairs Counselor at the American Embassy in Bangkok, Thailand beginning in 1998.  Compl. ¶ 5; Pl.'s Opp'n to Def.'s Renewed Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 1.  In late 1998, following reports that the plaintiff's husband, also a Foreign Service employee, was physically abusing the plaintiff, the U.S. Ambassador to Thailand revoked the husband's diplomatic status, forcing him to leave Thailand.  Compl. ¶ 6; Pl.'s Opp'n at 8.  In an effort to "keep her family together and work on her marriage," the plaintiff sought alternative positions in the Foreign Service in locations in which both she and her husband could live.  Compl. ¶ 10; Pl.'s Opp'n at 9.  The defendant did not hire the plaintiff for any of these positions.  Compl. ¶ 11; Pl.'s Opp'n at 9.  The plaintiff alleges that the decisions not to hire her were impermissibly based on her race and gender because the defendant "viewed her as a subservient Asian-American woman unable to stand up to her husband."  Compl. ¶ 14; Pl.'s Opp'n at 9.[2]  The plaintiff expressed her

---

[2]     More specifically, the plaintiff alleges that the decisions not to hire her were based in whole or in part on her race and gender.  Thus, she advances both a single-motive theory and a mixed-motive theory of unlawful discrimination.  *See Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008) (distinguishing a single-motive case, "in which [the plaintiff] argues race (or another prohibited criterion) was the sole reason for an adverse employment action," from a mixed-motive case, "in which [the plaintiff] does not contest the *bona fides* of the employer's [nondiscriminatory] justifications but rather argues race [or another prohibited criterion] was also a factor motivating the adverse action").

2

concerns to the Deputy Chief of Mission and the Department's Chief Equal Employment Opportunity Officer "early in 1999," Compl. ¶ 17, and on September 6, 2000 she filed a formal EEO complaint, *id*. The plaintiff claims that because she filed the EEO complaint, the defendant retaliated against her by investigating an allegation that the plaintiff was fraudulently receiving a stipend to which she was not entitled. *Id*. ¶ 18. An Administrative Law Judge rejected the merits of the plaintiff's EEO complaint. *Id.* ¶ 21.

### B. Procedural Background

The plaintiff filed the instant action on October 5, 2005. *Id.* She filed a motion for a preliminary injunction on September 5, 2006, seeking to prevent the defendant from discharging her from her job. Mot. for Prelim. Inj. The court denied that motion on September 25, 2006. Mem. Op. (Sept. 25, 2006). Immediately thereafter, the defendant filed its motion for summary judgment, which the court denied on June 12, 2007 after determining that the plaintiff was entitled to discovery to develop the factual record. Mem. Op. (June 12, 2007). Following the close of discovery, the defendant filed a renewed motion for summary judgment, asserting that there is no triable issue of material fact with respect to the plaintiff's claims of discrimination and retaliation. *See* Def.'s Renewed Mot. for Summ. J. ("Def.'s Mot"). The plaintiff opposes the motion. *See* Pl.'s Opp'n. The court turns now to the parties' arguments.

### III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if she "support[s] [her] allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central

purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

### B.  The Plaintiff's Race and Gender Discrimination Claims

#### 1.  Legal Standard for Race and Gender Discrimination

Generally, to prevail on a claim of discrimination under Title VII or the ADEA, a plaintiff must follow a three-part burden-shifting analysis known as the *McDonnell Douglas* framework. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  The Supreme Court explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection" . . . .  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . .  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted) (quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of gender or race discrimination under Title VII, the plaintiff must show that "(1) [she] is a member of a protected class; (2) [she] suffered an adverse

employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *Stewart v. Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003); *Carroll v. England*, 321 F. Supp. 2d 58, 68 (D.D.C. 2004). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253.

If the plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated against the employee. *Id.* at 254. To rebut this presumption, the employer must articulate a legitimate, non-discriminatory reason for its action. *Id.* The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the McDonnell Douglas framework – with its presumptions and burdens – disappears, and the sole remaining issue is discrimination *vel non*." *Lathram*, 336 F.3d at 1088 (internal citations omitted); *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting that "the prima facie case is a largely unnecessary sideshow"). The district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494. The court must consider whether the jury could infer discrimination from (1) the plaintiff's prima

facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff. *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka*, 156 F.3d at 1289). The plaintiff need not present evidence in each of these categories in order to avoid summary judgment. *Aka*, 156 F.3d at 1289. Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case. *Id.* at 1291.

### 2. The Court Denies the Defendant's Renewed Motion for Summary Judgment With Respect to the Plaintiff's Race and Gender Discrimination Claims

The plaintiff claims the defendant discriminated against her on the basis of her race and gender by denying her bids for two positions: one as a USNATO Political Counselor, a principal adviser to Ambassador Vershbow, the U.S. Permanent Representative to the U.S. Mission to NATO ("the USNATO position"), and another as the Political Advisor to the NATO military commander in the Hague ("the Hague POLAD position"). Compl. ¶ 11; Def.'s Mot. at 5.[3] For the reasons discussed below, the court denies the defendant's motion for summary judgment with respect to the plaintiff's claims of unlawful discrimination.

### a. The USNATO Position

The defendant passed the plaintiff over for the USNATO position, a post based in Europe, in favor of Andrew Goodman, a white, male officer who was junior to her in rank. Pl.'s Opp'n at 4. The plaintiff alleges that the decision to hire Goodman rather than her was based on

---

[3]     In the complaint, the plaintiff focuses on the Hague POLAD position and the USNATO position, but also mentions the defendant's decision not to hire her for more than thirty other positions. Compl. ¶ 10. The defendant notes that the plaintiff appears to have abandoned these claims. Def.'s Mot. at 10-12, 30-34. By only discussing two of the other positions tangentially and in the context of her retaliation claim, *see* Pl.'s Opp'n at 19-21, the plaintiff concedes the defendant's point, *see Twelve John Does v. District of Columbia*, 117 F.3d 571, 577 (D.C. Cir. 1997) (noting that arguments not addressed are treated as conceded).

her race and gender.  *Id.* at 3.  Meanwhile, the defendant asserts that it chose Goodman, notwithstanding the fact that he was not a senior officer, because he was more qualified for the job.  Def.'s Mot. at 7-8; 24-28.  Specifically, as the "number two" political appointee at USNATO, Goodman had experience taking on "formidable negotiating and managerial responsibilities" and had "considerable background in East-West and European issues," including specialties in policy matters related to Russia and Germany.  *Id.* at 7.  Further, Goodman was an outstanding manager whose "section [ran] like clockwork under his stewardship."  *Id.*  The defendant notes, in contrast, that although the plaintiff was a senior foreign service officer, she had "virtually no [European] or NATO experience, little familiarity with the national security bureaucracy in Washington and no track record as a negotiator (the aspect of the job that is, perhaps, the most critical and difficult to pick up)."  *Id.* at 8.

Because it would be permissible for the defendant to have chosen Goodman for the position based on his superior qualifications rather than on the plaintiff's race and gender, the defendant has successfully asserted a legitimate, nondiscriminatory reason for choosing Goodman over the plaintiff.  Accordingly, "the question whether the [plaintiff] actually made out a prima facie case is 'no longer relevant.'"  *Brady*, 520 F.3d at 493 (quoting *St. Mary's Honor Ctr.*, 509 U.S at 510).  Instead, the court's central task is to determine whether the plaintiff has produced evidence from which a reasonable jury could determine that the defendant's asserted non-discriminatory reason for not hiring her was pretextual and that the defendant intentionally discriminated against the plaintiff based on her race and/or gender.  *Brady*, 520 F.3d at 494.  The plaintiff offers four rationales in support of her contention that the defendant's asserted nondiscriminatory reason was a pretext for unlawful discrimination.  *See generally* Pl.'s Opp'n.

The court now addresses each of these rationales in turn to determine whether a reasonable jury could infer from these rationales individually or as a whole that the defendant acted with discriminatory intent.

### i.  Statistical Evidence

The plaintiff offers, as evidence of the defendant's poor "track record" concerning discrimination in employment practices, statistical evidence concerning the dearth of Asian-American women at the highest levels of the defendant's management structure.  Pl.'s Opp'n at 15-17.  The defendant counters that statistical evidence alone is insufficient to create a triable issue of material fact with respect to pretext, and further argues that the statistics the plaintiff has offered here are irrelevant because they fail to compare the pool of qualified Asian-American female candidates for high-level positions to the pool of Asian-American female candidates actually selected for those positions.  Def.'s Reply at 16-19.

In determining whether an employer has unlawfully discriminated against an employee on the basis of her race and gender, statistical evidence may be helpful, although it is ordinarily not dispositive.  *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984) (pointing out that statistical evidence is less significant in the individual disparate treatment context than in disparate impact and classwide disparate treatment cases).  The usefulness of statistics "depends on all of the surrounding facts and circumstances."  *Id.* (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)); *see also Horvath v. Thompson*, 329 F. Supp. 2d 1, 10 (D.D.C. 2004) (noting that "statistical evidence is only one small part of a substantial web of evidence indicating pretext") (quoting *Bell v. Envtl. Protection Agency*, 232 F.3d 546, 553 (7th Cir. 2000)).

9

The statistics that the plaintiff offers, viewed in the light most favorable to her, show that as of 2000, while women were heavily represented among the civil service employee base of the Department, *see* Pl.'s Opp'n at 17, men comprised 72% of the senior ranks of the Foreign Service, *see id.* at 16. The plaintiff also proffers statistics concerning the representation of Asian-American women in particular among the senior ranks of the Foreign Service: at the plaintiff's seniority level, only 4 officers out of 390 were Asian-American women. *Id.* What the plaintiff's statistics fail to address, however, is the only comparison relevant to this action, namely, the proportion of qualified Asian-American candidates to those chosen for senior-level Foreign Service positions. *See Whitacre v. Davey*, 890 F.2d 1168, 1172 (D.C. Cir. 1989) (citing *Hazelwood School Dist. v. United States*, 433 U.S. 299, 311-13 (1977) and *Int'l Bhd. of Teamsters*, 431 U.S. at 339-40 n.20) (observing that absent evidence of the pool of available and qualified applicants, the court could not know whether the number of selectees over age 40 "was disproportionately small to the pool [of applicants], disproportionately large, or approximately statistically perfect"). Because the statistics that the plaintiff offers are not relevant to the question whether the defendant's choice not to hire her was a pretext for unlawful discrimination, no reasonable jury could infer that the defendant's motivation was discriminatory. *See Horvath*, 329 F. Supp. 2d at 12 (holding that because the plaintiff failed to offer statistics concerning the relevant comparison, the "plaintiff's reliance on statistics do not, as a matter of law or of fact, permit a jury to find that defendant's proffered nondiscriminatory reason was pretextual").[4]

---

[4]     The plaintiff appears to offer the statistics to bolster her claim that she was discriminated against with respect to both the USNATO position and the Hague POLAD position. Because the court's analysis applies equally to both positions, the court declines to address these statistics separately in its analysis of the Hague POLAD position.

### ii.  Candidates' Respective Qualifications for the USNATO Position

Next, the plaintiff asserts that the defendant exaggerated Goodman's credentials and understated her own to make it appear that he was more qualified for the position.  Pl.'s Opp'n at 26-27, 29-30.  The plaintiff proffers evidence that she met the minimum qualifications for the position and, citing her curriculum vitae, notes that she had supervised more people than Goodman, conducted negotiations and administered budgets.  *Id.*  In addition, she had acquired senior-level training at the National War College, holds an MA in Strategic Studies and had served on a tour advising the Commander-in-Chief.  *Id.* at 29.  The defendant stands by its determination that because Goodman occupied the number two post at USNATO and possessed regional experience in Europe, a superior political acumen and a more extensive background in negotiation, he was more qualified for the position than the plaintiff.  Def.'s Reply at 12-13.  The defendant dismisses the plaintiff's subjective belief that she was more qualified for the position, contending that her belief lacks evidentiary value.  *Id.*

A plaintiff who alleges that he or she was unlawfully rejected for a job may not demonstrate pretext based on the applicants' respective qualifications unless a reasonable jury could conclude that the plaintiff was significantly more qualified than the successful applicant. *Aka*, 156 F.3d at 1294.  If a reasonable jury could conclude that the plaintiff was more qualified than the successful applicant – but not significantly so – the plaintiff cannot create a triable issue of fact with respect to pretext on this basis alone, because employers are reasonably perceived as being "more capable of assessing the significance of small differences in the qualifications of the candidates," or as having "simply made a judgment call."  *Id.*

11

Based on the evidence that the parties have proffered, no reasonable jury could determine that the plaintiff was significantly more qualified than Goodman.  The plaintiff relies heavily on the fact that she was a senior officer, but rather than addressing Goodman's comparative strengths, she dismisses as "puffing" the fact that he had firsthand experience with the USNATO position as a result of having served in the "number two" post previously, as well as having acquired crucial political skills and extensive negotiating experience that the plaintiff lacked.  *See* Pl.'s Opp'n at 29.  If the plaintiff was, indeed, more qualified than Goodman, a reasonable jury could only determine that she was marginally so.  *Compare Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C. Cir. 2006) (concluding that given the successful candidate's numerous publications, several university affiliations and success in running a significantly larger division, the district court properly determined that the plaintiff failed to discredit the employer's claim that it believed the successful applicant was better suited for the promotion), *with Aka*, 156 F.3d at 1296-97 (determining that a reasonable jury could conclude that in applying for a position in a pharmacy that involved "billing, accounting, tracking drugs and patients and planning pharmacy operations," the plaintiff was significantly more qualified than the successful applicant because the plaintiff had a master's degree in business and professional administration with a concentration in health services management, whereas the successful applicant lacked even a college degree).  Accordingly, the plaintiff has failed to create a triable issue of material fact on the basis of the candidates' respective qualifications alone.

### iii.  Preselection

The plaintiff next claims that the defendant preselected Goodman for the USNATO position because he was a member of a "good old boy" network, and that consistent with

Goodman's preselection, Thomas Tiernan, a human resources representative, pressured the plaintiff to withdraw her bid for the position. Pl.'s Opp'n at 27-28. The defendant maintains that it did not preselect Goodman for the position. Def.'s Mot. at 25. To the contrary, the defendant's first choice for the position was the incumbent USNATO officer, and the defendant only selected Goodman for the position when the incumbent suddenly decided not to extend his tour of duty. *Id.* In the alternative, the defendant asserts that even if it had preselected Goodman, the preselection would have been based on his qualifications for the position and therefore would have been permissible. *Id.*

An employer's preselection of a job candidate, in violation of its own procedures requiring fair consideration of qualified applicants, is "undeniably relevant to the question of discriminatory intent" and may allow a jury to reasonably reject the employer's asserted nondiscriminatory justification. *Krodel*, 748 F.2d 701, 709 (D.C. Cir. 1984). Here, it is undisputed that as early as April 2000, the defendant's European Bureau strongly endorsed Goodman for the USNATO position. Def.'s Stmt. of Material Facts ("Def.'s Stmt.") ¶ 18; *see also* Def.'s Mot., Ex. 6 ("Tiernan Dep.") at 104-105 (noting that by the time the incumbent decided not to extend his tour many senior officers had already accepted other posts, and surmising that Ambassador Vershbow decided, "boy, the best I could do at this point is stick with [Goodman,] this actual deputy who's first in the issues and knows the post"). On May 12, 2000, Tiernan e-mailed the plaintiff urging her to reconsider her candidacy for the position, Pl.'s Opp'n, Ex. 9; when she declined his advice, the defendant selected Goodman for the post in June 2000, Tiernan Dep. at 105. Based on this evidence, a jury could reasonably conclude that the plaintiff "never was in the running" for the USNATO position because the defendant had

preselected Goodman for the post, and therefore that the defendant's asserted nondiscriminatory reasons constituted "after-the-fact rationalizations unworthy of belief." *See Kolstad v. Am. Dental Ass'n*, 108 F.3d 1431, 1436 (D.C. Cir. 1997), *rev'd on other grounds*, 527 U.S. 526 (1999). And that determination could, in turn, permit a reasonable jury to conclude that the defendant engaged in unlawful discrimination. *Id.* (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511; *Barbour v. Merrill*, 48 F.3d 1270, 1277 (D.C. Cir. 1995)).

### iv. Failure to Follow Established Procedures

The plaintiff also alleges that the defendant failed to follow its standard operating procedures in choosing Goodman over her. Pl.'s Mot. at 2-5, 22-26, 28-30. This allegation is two-fold. First, the plaintiff asserts that the defendant violated the "stretch policy," the policy that dictates the situations in which non-senior officers can "stretch" into a senior-level position such as the USNATO post.[5] *Id.* at 2-5, 22-26. Under her interpretation of the stretch policy, Goodman, as a non-senior officer, should not have been granted a cede for the USNATO position because the plaintiff, a senior officer, was willing to take the job. *Id.*

In support of her position, the plaintiff offers the defendant's Standard Operating Procedure, specifically the procedure outlining the defendant's "stretch assignment policy." *Id.*, Ex. 21. The policy states that "[w]hen upward stretch assignments are made, the proposed candidate's qualifications must be thoroughly reviewed as well as the availability of eligible at-grade bidders." *Id.* Further, an officer stretching into a senior-level position (referred to as a stretch "across the senior threshold") must be granted a cede. *Id.* "Such cedes are rare when

---

[5] When an officer is allowed to assume a higher-level post – for example, a non-senior officer stretching into a senior level position – it is termed a "cede." Pl.'s Opp'n at 4.

unassigned senior officers remain." *Id.* An additional requirement exists when, as in this case, a non-senior officer seeks to bid for a senior-level position not one, but two seniority levels above his or her grade (termed a "double stretch across the senior threshold"):

> Double stretches across the senior threshold require the approval of the [Director General] in addition to a senior cede. When a cede is called for, it must appear in the remarks section of the agenda item; it is valid for only one agenda and must be renewed weekly if the assignment is held or deferred.

*Id.*

The plaintiff also cites a statement of Robert Dance, a former Deputy Director in the defendant's Human Resources division, in which he defines a "cede" as follows: "[a] cede occurs when, for example, a senior-level assignment cannot be filled by a senior-level officer. Then the assignment may be 'ceded' to the Mid-level Branch." *Id.*, Ex. 7. In addition, the plaintiff offers a February 8, 2000 e-mail from James Whitlock, the plaintiff's career development officer at the Department, stating that the defendant grants cedes "reluctantly and on a case-by-case basis where it appears that no senior officer will be prepared to take the job." *Id.*, Ex. 5.

Finally, the plaintiff propounds the declaration of Minister/Counselor Barbara Harvey, former Deputy Assistant Secretary of State for Personnel, whom the plaintiff offers as an expert in State Department personnel matters. *Id.*, Ex. 28 ¶ 5. Harvey opines that the plaintiff "was passed over in contradiction to the well-established internal policies of the State Department with regard to placing senior bidders." *Id.* In Harvey's experience,

> it has been extremely rare that a cede is granted for a junior officer to be assigned to a position for which a senior at-grade officer is bidding, and has not declared her lack of interest. With [the plaintiff's] bid for the USNATO position, she was at grade and did not consent to a cede, and therefore under standard Department policy a cede would not have been granted.

15

*Id.*

The defendant takes a starkly different view of the stretch policy. Def.'s Mot. at 27-28; Def.'s Reply at 3-10. "Contrary to plaintiff's contention," the defendant maintains, "cedes are granted even when there are senior officers prepared to take the job. Simply put, plaintiff's seniority does not trump the prerequisite experience for the position." Def.'s Mot. at 27-28. The defendant responds to the plaintiff's evidence by (1) offering an interpretation of the stretch policy under which the defendant would be permitted to hire Goodman despite the fact that the plaintiff had bid for the position, Def.'s Reply at 6; (2) asserting that Harvey fails to qualify as an expert, *id.* at 5; (3) citing an e-mail and deposition testimony from Tiernan explaining that senior officers do not automatically have priority for senior-level posts, Def.'s Mot. at 27; and (4) noting an e-mail that one of the plaintiff's colleagues, Robert Hall, wrote to the plaintiff telling her that for a non-senior officer to stretch into a senior-level post, "there would have to be some overriding reason based on qualifications, high level interference or no qualified bidders at the right grade," Def.'s Reply at 8. The defendant also disputes the plaintiff's interpretation of the Dance and Whitlock e-mails, arguing that they stand only for the proposition that the defendant grants a cede to a non-senior level officer when there is no willing, qualified senior-level officer available. *Id.* at 8-9. In the defendant's view, because the plaintiff was willing but not qualified to take the USNATO position, the defendant properly granted a cede to Goodman. *Id.* at 9.

A defendant's failure to follow established criteria or procedures can cast doubt on its asserted legitimate, nondiscriminatory reason for not hiring the plaintiff. *Brady*, 520 F.3d at 495 n.3; *see also Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504, 509 (D.C. Cir. 2005) (citing *Lathram v. Snow*, 336 F.3d 1085, 1093-94 (D.C. Cir. 2003) (holding that the jury could draw an

inference of discrimination because the defendant departed from its normal procedures without justification); *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) (noting that although "a finding of a failure on the part of the prospective employer to follow its own regulations and procedures, alone, may not be sufficient to support a finding of . . . discrimination," such a failure "is a factor that the trier of fact may deem probative . . . in determining the true motivation behind the hiring decision of the prospective employer").

To determine whether there is a genuine dispute as to whether the defendant violated the stretch policy by hiring Goodman, the court looks to the evidence proffered by both parties, viewing it in the light most favorable to the plaintiff. *Anderson*, 477 U.S. at 255. Viewing the evidence in this light, the court concludes that there is a factual dispute with respect to whether the defendant's decision to hire Goodman notwithstanding the plaintiff's bid was consistent with standard practice within the Department. *See Lathram*, 336 F.3d at 1093-94. The court is in no position to resolve this dispute by crediting either party's version of the facts, and contrary to the defendant's assertions, it is far from clear from the evidence submitted that the decision to hire Goodman did not deviate from standard practice. *Id.* Thus, a reasonable jury could determine that the defendant failed to follow established procedures, which could in turn give rise to a determination that the defendant's asserted nondiscriminatory justification for the hiring decision was pretextual. *Brady*, 520 F.3d at 495 n.3.

The plaintiff also claims the defendant violated the "fair share policy" as it is articulated in Department regulations. Pl.'s Opp'n at 28-30. According to the plaintiff, the policy aims to prevent officers from "limit[ing] themselves to one geographic area and thus overly identify[ing] with such area; the rules also prevent an informal 'revolving door' that would deprive others of

the opportunity to serve in more developed, favored posts." *Id.* at 28.  The plaintiff asserts that to

view her lack of experience in Europe as a disadvantage and Goodman's extensive experience in

Europe as an advantage flew in the face of the fair share policy.  *Id.* at 28-30.  Instead, the

defendant should have looked more favorably upon her candidacy for a post in Europe precisely

*because* she lacked extensive experience there.  *Id.*  The defendant, on the other hand, maintains

that the fair share policy does not apply in this context.  Def.'s Reply at 11-12.  According to the

defendant, the policy is intended to ensure that it can staff its "hardship posts," not to enable as

many officers as possible to serve in favored posts, including those in Europe.  *Id.*  Indeed, the

defendant emphasizes that regional experience was an important qualification of the USNATO

position.  *Id.*  As with the stretch policy, the court cannot resolve the parties' dispute over the

meaning of the fair share policy without weighing contradictory evidence.  *Rogers Corp. v. EPA*,

275 F.3d 1096, 1103 (D.C. Cir. 2002) (opining that "summary judgment is inappropriate when

contradictory inferences may be drawn from the evidence").  Therefore, the defendant is not

entitled to summary judgment on the plaintiff's discrimination claim.

### b.  The Hague POLAD Position

The defendant also seeks summary judgment on the plaintiff's claim that the defendant

discriminated against her based on her race and gender by not hiring her for the Hague POLAD

position.  Def.'s Mot. at 9-10, 29-30.  The defendant asserts a legitimate, nondiscriminatory

justification for the decision not to hire her: bidding on the position had already closed by the

time she attempted to submit her bid.  *Id.*  Accordingly, the court must determine whether the

plaintiff has produced evidence from which a reasonable jury could determine that the

defendant's asserted justification was a pretext for unlawful discrimination. *Brady*, 520 F.3d at 494.

In support of her contention that the defendant's asserted nondiscriminatory reason was pretextual, the plaintiff notes that she received a "barrage of inconsistent explanations" regarding whether bids for the post were still being accepted. Pl.'s Opp'n at 2, 5-7, 14, 30-32. She initially inquired into the position in October 1999, less than two weeks after it was advertised, but was told that a short list had already been submitted and therefore it was too late to bid. *Id.* at 5. She then asked her career development officer, Whitlock, about the position and was told that to his knowledge it was still open. *Id.* at 6. The following day the plaintiff resubmitted her bid, and was again told that she was ineligible for the position because the short list had already been compiled. *Id.* The following month, the plaintiff noticed that the position was listed as open on a list of hard-to-fill posts. *Id.* According to the plaintiff, the defendant's "inconsistent and contradictory statements . . . show that [the plaintiff] was lied to and present evidence of pretext." *Id.* at 32.

In response, the defendant notes that the Hague POLAD position was a post within NATO, not the Department, and therefore the Department's bidding process did not apply. Def.'s Reply at 13. Rather, the defendant and other NATO member countries each compiled a "short list" of their candidates, from which NATO authorities – not the defendant – made the final selection. *Id.* The defendant does not contest the plaintiff's account of the factual circumstances surrounding her requests to be considered for the Hague POLAD position. *Id.* at 13-15. Instead, the defendant explains that although it had already submitted its short list in November 1999, the position still appeared by mistake on the "open assignments" list. *Id.* at 13-

14. Because Whitlock "did not have any involvement with [the Hague POLAD] placement," he was unaware that bidding was closed on the position when he mistakenly told the plaintiff that the position was still open. *Id.* at 14. In December 1999, the position again erroneously appeared as an open assignment – this time on the "hard to fill" list – because the individual responsible for posting the "hard to fill" list was misinformed. *Id.* Finally, the defendant notes that the plaintiff would not have been offered the position even if she had been allowed to bid on it because she was less qualified than the successful candidate. Def.'s Mot. at 10, 29-30.

Changes and inconsistencies in an employer's stated reasons for an adverse employment action can cast doubt on its asserted nondiscriminatory justification for the action. *Brady*, 520 F.3d at 495 n.3; *Sw. Merch. Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C. Cir. 1995) (holding that the jury could infer pretext and unlawful discrimination from an employer's shifting and inconsistent explanations for its action). "The question is whether the plaintiffs have cast such doubt on [the] credibility [of the defendant's nondiscriminatory justification] that a reasonable juror could regard it as pretext and infer a discriminatory motive." *Anderson v. Zubieta*, 180 F.3d 329, 345 (D.C. Cir. 1999). Here, whether the defendant's nondiscriminatory justification is called into question depends on whether one believes its contention that the inconsistent information was the result of innocent human error or, conversely, that the defendant deliberately sought to mislead the plaintiff. *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 511 (noting that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination")). Giving the plaintiff the benefit of all favorable inferences, the court determines that a reasonable jury could

20

infer that the incorrect information was not the result of innocent human error; therefore, the

defendant is not entitled to summary judgment on this claim. *Rogers Corp.*, 275 F.3d at 1103.

### C.  The Plaintiff's Retaliation Claim

### 1.  Legal Standard for a Retaliation Claim

To prevail on a claim of retaliation, a plaintiff must follow the *McDonnell Douglas*

framework. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003)

(applying the *McDonnell Douglas* framework to a Title VII retaliation claim); *Duncan v. Wash.*

*Metro. Area Transit Auth.*, 214 F.R.D. 43, 49-50 & n.8 (D.D.C. 2003) (applying the *McDonnell*

*Douglas* framework to a Rehabilitation Act retaliation claim). To establish a prima facie case of

retaliation, a plaintiff must show that (1) she engaged in a statutorily protected activity, (2) a

reasonable employee would have found the challenged action materially adverse, and (3) there

existed a causal connection between the protected activity and the materially adverse action.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006); *see also Scott v.*

*Kempthorne*, 2006 WL 1980219, at *3 (10th Cir. July 17, 2006). The plaintiff's burden is not

great: she "merely needs to establish facts adequate to permit an inference of retaliatory motive."

*Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

As with discrimination claims, if the employer successfully presents a legitimate, non-

retaliatory reason for its actions, "the presumption raised by the prima facie is rebutted and drops

from the case." *St. Mary's Honor Ctr.*, 509 U.S. at 507 (internal citation omitted); *Brady*, 520

F.3d at 494 (noting that "the prima facie case is a largely unnecessary sideshow"). Upon such a

showing by the defendant, the district court need resolve only one question:  "Has the employee

produced sufficient evidence for a reasonable jury to find that the employer's asserted non-

[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494.  In other words, did the plaintiff "show *both* that the reason was false, *and* that . . . [retaliation] was the real reason." *Weber*, 494 F.3d at 186 (alterations in original and internal quotations omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).  The court must consider whether the jury could "infer [retaliation] from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were [retaliatory] or that the non-[retaliatory] justification was pretextual." *Smith v. District of Columbia*, 430 F.3d 450, 455 (2005) (quoting *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005)).  The court should assess the plaintiff's challenge to the employer's explanation in light of the totality of the circumstances of the case.  *Aka*, 156 F.3d at 1291.

The strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor in his attempt to rebut the defendant's legitimate non-retaliatory reason for the adverse action.  *See Aka*, 156 F.3d at 1289 n.4 (stating that "a prima facie case that strongly suggests intentional discrimination may be enough by itself to survive summary judgment"); *Laurent v. Bureau of Rehab., Inc.*, 544 F. Supp. 2d 17, 23 n.5 (D.D.C. 2008) (holding that the plaintiff cannot establish pretext because "she is unable to show any causal connection"); *Meadows v. Mukasey*, 2008 WL 2211434, at *5-6 (D.D.C. May 29, 2008) (holding that the plaintiff demonstrated pretext in part by establishing a causal connection).  The plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v.*

*Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)); *accord Clark County Sch. Dist. v. Breeden*, 532

U.S. 268, 273 (2001) (noting that the temporal connection must be "very close": a three- or four-

month period between an adverse action and protected activity is insufficient to show a causal

connection, and a twenty-month period suggests "no causality at all").

### 2.   The Court Grants the Defendant's Renewed Motion for Summary Judgment with Respect to the Plaintiff's Retaliation Claim

The plaintiff brings a retaliation claim arising out of incidents in which the plaintiff's

supervisor, Marie Huhtala, allegedly prompted an investigation into "waste, fraud and abuse" and

sabotaged the plaintiff's candidacy for a position in Indonesia in 2005.  Compl. ¶¶ 29-37; Pl.'s

Opp'n at 19-21.  The court will address each of these allegations in turn.  The investigation into

waste, fraud and abuse concerned a separate maintenance allowance ("SMA") that the defendant

grants to officers who "are separated from spouses and children, and thus have to maintain

separate residences."  Pl.'s Opp'n at 19.  The plaintiff applied for and was granted the SMA

beginning in September 1999 because her husband and son were living in the U.S.  *Id.*; Def.'s

Mot. at 13.  The defendant construes its rules concerning the SMA as prohibiting an officer from

collecting the SMA when his or her spouse lives within 300 miles of the officer.[6]  Def.'s Mot. at

---

[6]        The plaintiff, on the other hand, construes the defendant's rules as only prohibiting collection of
an SMA in the case of *voluntary separations* when the spouse lives within 300 miles of the
officers.  Pl.'s Opp'n at 19-20.  Because the plaintiff's separation from her husband was not
voluntary, she maintains that she was entitled to the SMA.  *Id.*  The defendant notes that the
Foreign Service Greivance Board rejected the plaintiff's distinction between voluntary and
involuntary separation with respect to eligibility for the SMA.  Def.'s Reply at 20-21.  In
addition, the parties note that the U.S. Attorney's Office filed a False Claims Act suit against the
plaintiff, and subsequently reached a settlement with the plaintiff whereby she agreed to pay
$10,800 to the government without admitting culpability.  Def.'s Mot. at 14; Pl.'s Opp'n at 20.
But whether the plaintiff fraudulently received the SMA or not is not the key question here; the
focus of the court's inquiry is whether Huhtala instigated the investigation in retaliation for the
plaintiff's complaint of discrimination.

13.  Huhtala asserts that the plaintiff remarked in March 2001 that her husband and son had visited Bangkok at least five times; Huhtala's suspicion having been aroused, she asked the Regional Security Officer to investigate the situation to determine whether the plaintiff's husband was living within 300 miles of Bangkok.  Pl.'s Opp'n, Ex. 4 ("Huhtala Dep.") at 54.  Upon investigation, the Regional Security Officer learned that the plaintiff's husband and son had been living in an apartment in Bangkok since mid-2000, and therefore the plaintiff was ineligible for the SMA.  *Id.*

The defendant asserts that Huhtala instigated the investigation because one of her job responsibilities was to "to investigate any case of waste, fraud or abuse" "to ensure that allowances paid to employees at post were not being fraudulently obtained."  *Id.* at 54-55.  Because this is a legitimate nondiscriminatory justification, the court turns to the plaintiff's allegation of pretext.  *St. Mary's Honor Ctr.*, 509 U.S. at 507.  The plaintiff asserts that Huhtala decided to prompt the investigation to punish the plaintiff for filing a complaint of discrimination in September 2000.  Pl.'s Opp'n at 19-21.  Aside from repeating her argument that she was entitled to the SMA because she was involuntarily separated from her husband, the only evidence that the plaintiff offers to support her pretext argument is the fact that the investigation into the plaintiff's receipt of the SMA was the only investigation into "waste, fraud and abuse" that Huhtala had initiated – indeed, the only such investigation Huhtala had even heard of – while posted in Bangkok.  Pl.'s Opp'n at 19 (citing Huhtala Dep. at 55).

As with the plaintiff's proffer of statistical evidence, discussed in Part III.B.2.a.i *supra*, the plaintiff misconstrues the relevance of the fact that Huhtala had never investigated another case of waste, fraud and abuse while stationed in Bangkok.  This evidence would only be

24

relevant to pretext if it were accompanied by evidence that other officers had, in fact, committed waste, fraud and abuse, and that Huhtala was aware of such conduct and had decided not to pursue investigations in those cases. *Cf. Whitacre*, 890 F.2d at 1172 (holding that evidence proffered in support of the plaintiff's discrimination claim was inadequate to withstand summary judgment because it failed to compare the number of available, qualified applicants in the protected class to the number of successful applicants in the protected class). In other words, without any evidence as to the relevant comparison, a reasonable jury could not infer that retaliatory motives prompted Huhtala's actions.

Thus, the only basis on which the plaintiff could defeat summary judgment would be the temporal proximity between the filing of the complaint and the instigation of the investigation. For temporal proximity between an employer's knowledge of protected activity and an adverse employment action alone to give rise to a reasonable inference of causality, the temporal proximity must be "very close," *i.e.*, closer than three or four months. *Clark County Sch. Dist.*, 532 U.S at 273 (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (deeming a three-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (holding a four-month period insufficient)). Thus, the court determines that the six-month interval between the plaintiff's complaint and Huhtala's allegedly retaliatory act alone cannot give rise to an inference that the plaintiff's complaint caused Huhtala's actions. *Clark County Sch. Dist.*, 532 U.S at 273. As a result, the plaintiff's allegation regarding the SMA investigation cannot support a retaliation claim.

The plaintiff also claims that after she applied for a position as a Public Affairs Officer in Jakarta, Indonesia in 2005, Huhtala sabotaged her candidacy for the position by "ma[king] clear to [the Department's human resources division]" that Huhtala was opposed to the plaintiff obtaining the position.[7]   Pl.'s Opp'n at 7, 9-10.   This allegation arises out of a memorandum that Huhtala wrote to the human resources division on May 23, 2005.  *Id.*, Ex. 34.   In the memorandum, Huhtala stated that as a result of the heightened attention paid to Indonesia following the 2004 tsunami, the Jakarta post promised to be a "key focus" of the Department's effort to improve public diplomacy.  *Id.*   Accordingly, Huhtala advised the division to seek out "the very best" Public Affairs Officer for the position.  *Id.*   Huhtala further noted that the division should "give careful consideration to bids from star performers from all Bureaus including, of course, [the plaintiff]," but given the importance of the position, Huhtala recommended that the division "make a selection from a large pool of qualified applicants, all of whom will have applied for this job in light of its new, post-tsunami demands."  *Id.*

Because the memorandum contains a legitimate, nondiscriminatory justification for Huhtala's recommendation – specifically, that to hire "the very best" Public Affairs Officer possible in light of the sudden prominence of the Jakarta post, the defendant should conduct a wide-ranging search for applicants – the court examines the plaintiff's allegation of pretext.  *St. Mary's Honor Ctr.*, 509 U.S. at 507.  The plaintiff offers nothing but conjecture to support her

---

[7]      The defendant argues that the plaintiff is barred from making this allegation because she failed to timely raise it during the administrative proceeding.  Def.'s Reply at 21-22.  But it is not necessary for the plaintiff to exhaust her administrative remedies when bringing a retaliation claim.  *Pierce v. Mansfield*, 530 F. Supp. 2d 146, 154 n.8 (D.D.C. 2008); *Jones v. Greenspan*, 402 F. Supp. 2d 294, 298 (D.D.C. 2005); *Turner v. District of Columbia*, 383 F. Supp. 2d 157, 178 (D.D.C. 2005) (stating that "[t]he proposition that exhaustion is unnecessary for retaliation claims stems . . . from the fear that filing a separate charge will result in more retaliation, and that a retaliation claim is necessarily related to the underlying charge").

assertion that her discrimination complaint caused Huhtala to recommend that she not be hired immediately for the Jakarta post.  *See* Pl.'s Opp'n at 7, 9-10; *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 844-45 (D.C. Cir. 2001) (noting that the employer was entitled to summary judgment because the plaintiff presented no evidence to rebut the employer's legitimate justification).  And because the complaint preceded the recommendation by nearly five years, a reasonable jury could not infer causation from temporal proximity alone.  *Clark County Sch. Dist.*, 532 U.S. at 273.  As a result, the defendant is entitled to summary judgment on the plaintiff's retaliation claim.


## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendant's renewed motion for summary judgment with respect to the plaintiff's retaliation claims but denies it with respect to the plaintiff's discrimination claims.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 12th day of March, 2009.


RICARDO M. URBINA
United States District Judge